ORIGINAL

CV 18-7252

Page 2

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

DONNELLY, J.

| United States District Court | District Eastern District of New York |
|---|---|

Name (under which you were convicted): Ynmaculada Gomez

Docket or Case No.: 538/09

Place of Confinement: Bedford Hills Correctional Facility

Prisoner No.: 1460730

Petitioner (include the name under which you were convicted) Ynmaculada Gomez

v.

Respondent (authorized person having custody of petitioner) Superintendent LaMmanna

The Attorney General of the State of New York

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 28 2018 ★

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging: BROOKLYN OFFICE
Queens County Supreme Court
125-01 Queens Blvd. Kew Gardens, NY   11415
   (b) Criminal docket or case number (if you know): _____

2. (a) Date of the judgment of conviction (if you know): 6/23/14
   (b) Date of sentencing: 7/14/14

3. Length of sentence: 26 1/2 - Life

4. In this case, were you convicted on more than one count or of more than one crime?   Yes ☑   No ☐

5. Identify all crimes of which you were convicted and sentenced in this case: Murder in the
Second Degree (PL § 125.25 (i)), Two Counts of Criminal
Possession of a Weapon in the Second Degree (PL § 265.03
(i)(b), (3), and Tampering with Physical Evidence (PL § 215.40 (2))

6. (a) What was your plea? (Check one)
   (1) Not guilty ☑          (3) Nolo contendere (no contest) ☐
   (2) Guilty ☐              (4) Insanity plea ☐
   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge,
   what did you plead guilty to and what did you plead not guilty to? N/A

RECEIVED
DEC 28 2018
PRO SE OFFICE

_____ N/A _____

(c) If you went to trial, what kind of trial did you have? (Check one)

   Jury ☑️      Judge only ☐

7. Did you testify at either a pretrial hearing, trial or a post-trial hearing?

   Yes ☐   No ☑️

8. Did you appeal from the judgment of conviction?

   Yes ☑️ No ☐

9. If you did appeal, answer the following:

   (a) Name of court: _Appellate Division Second Department_

   (b) Docket or case number (if you know): _A. D. No. 2014-07277_

   (c) Result: _Affirmed_

   (d) Date of result (if you know): _8/16/17_

   (e) Citation to the case (if you know): _153 A.D. 3d 724_

   (f) Grounds raised: _1) Court's remarks deprived Appellant of her right to a jury chosen according to the law, Due process, and Fair Trial. 2) Deprivation of Fair Trial by Admission of Prejudicial Testimony 3) Deprivation of Fair Trial due to Prosecutor's remarks/Summation. 4) Deprivation of Fair Trial/Counsel's Deficient Performance- IAC 5) Deprivation of Fair Trial/Brady Material violation, 6) Prosecutorial misconduct during summation_

   (g) Did you seek further review by a higher state court? Yes ☑️ No ☐

   If yes, answer the following:

   (1) Name of court: _Court of Appeals_

   (2) Docket or case number (if you know): _____

   (3) Result: _Denied_

   (4) Date of result (if you know): _12/28/17_

   (5) Citation to the case (if you know): _____

   (6) Grounds raised: _1) Court's Remarks during jury selection/deprivation of Due Process, Fair Trial, 2) Deprivation of fair trial/prejudicial testimony, 3) Deprivation of fair trial/prosecution's summation, 4) Court instructions inadequate for Tampering/physical evidence_

   (h) Did you file a petition for certiorari in the United States Supreme Court? Yes ☐ No ☑️

   If yes, answer the following:

   (1) Docket or case number (if you know): _____ N/A _____

(2) Result: _____ N/A

(3) Date of result (if you know): _____ N/A

(4) Citation to the case (if you know): _____ N/A

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

    Yes ☐   No ☑

11. If your answer to Question 10 was "Yes," give the following information:

  (a)  (1) Name of court: _____ N/A

    (2) Docket or case number (if you know): _____ N/A

    (3) Date of filing (if you know): _____ N/A

    (4) Nature of the proceeding: _____ N/A

    (5) Grounds raised: _____ N/A

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    Yes ☐   No ☐

    (7) Result: _____ N/A

    (8) Date of result (if you know): _____ N/A

  (b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court: _____ N/A

    (2) Docket or case number (if you know): _____ N/A

    (3) Date of filing (if you know): _____ N/A

    (4) Nature of the proceeding: _____ N/A

    (5) Grounds raised: _____ N/A

    _____

    _____

    _____

    _____

    _____

    _____

N/A

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

Yes ☐ No ☑

(7) Result: _____ N/A

(8) Date of result (if you know): _____ N/A

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: _____ N/A

(2) Docket or case number (if you know): _____ N/A

(3) Date of filing (if you know): _____ N/A

(4) Nature of the proceeding: _____ N/A

(5) Grounds raised: _____ N/A

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

Yes ☐ No ☑

(7) Result: _____ N/A

(8) Date of result (if you know): _____ N/A

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:    Yes ☐ No ☐    N/A

(2) Second petition:  Yes ☐ No ☐

(3) Third petition:   Yes ☐ No ☐

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not: _____

N/A

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: State Court's Determination that Petitioner Was Not Deprived a Fair Trial (Improper Remarks During Voir Dire) - unreasonable application of the Law.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): During voir Dire, the Court made several inappropriate remarks to potential jurors which precluded Petitioner from having a jury chosen according to the law, violated her right to Due Process, and a Fair Trial. The Second Department affirmed such argument citing people v. Mason, 132 A.D. 3d 777 (2015) which is wholly unsupportive of Petitioner's position. Therefore the State Court's determination was an unreasonable application of the Law.

(b) If you did not exhaust your state remedies on Ground One, explain why: ~~Petitioner's Contention~~ ~~no~~ so Remedies were exhausted to Highest State Court.

(c) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?
Yes ☑ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: N/A

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
Yes ☐ No ☑

(2) If your answer to Question (d)(1) is "Yes," state:
Type of motion or petition: N/A
Name and location of the court where the motion or petition was filed: N/A

Docket or case number (if you know): 
Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available): _____ N/A _____

_____

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____ N/A _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: Presentation of this issue would be futile being that the 440.10 statute enables a court to deny motion when Petitioner was in a position to adequately raise such ground but unjustifiably failed to do so.

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _____ N/A _____

_____

**GROUND TWO:** Petitioner Was Deprived of Her Constitutional Protected Right to Fair Trial / Highly Inflammatory Remarks by prosecutor during summation.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Petitioner's right to a fair trial was violated due to the admission of unnecessary and unduly prejudicial testimony that she previously solicited individuals to kill or frame decedent. The admission of such testimony was prejudicial and far outweighed any probative value, thereby denying Petitioner her right to a fair trial and Due Process.

Page 8

(b) If you did not exhaust your state remedies on Ground Two, explain why: _Submitting a CPL 440.10 would be futile for this issue being that the Highest State Court has already made a decision on such ground, therefore remedies have been exhausted._

(c) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes [✓] No [ ]

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _N/A_

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        Yes [ ] No [✓]

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _N/A_

    Name and location of the court where the motion or petition was filed: _N/A_

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    (3) Did you receive a hearing on your motion or petition?  _N/A_

        Yes [ ] No [ ]

    (4) Did you appeal from the denial of your motion or petition?  _N/A_

        Yes [ ] No [ ]

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  _N/A_

        Yes [ ] No [ ]

    (6) If your answer to Question (d)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _N/A_

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _Raising this issue in a 440.10 would be futile, being that the Highest State Court has already made a determination. Likewise, Petitioner had a reasonable confusion as to the timing of a 440 motion._

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _N/A_

**GROUND THREE:** _Petitioner Was Deprived of Effective Assistance of Counsel_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _During trial, Petitioner's defense counsel presented a flawed alibi defense which deprived Petitioner of her constitutionally protected right to effective assistance of counsel. Defense counsel failed to conduct appropriate investigations which violated Petitioner's right to a fair trial as well as Due Process._

(b) If you did not exhaust your state remedies on Ground Three, explain why: _This ground has been properly exhausted to the Highest State Court._

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?
   Yes ☑  No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _N/A_

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
   Yes ☐  No ☑

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _N/A_

Name and location of the court where the motion or petition was filed: _N/A_

Docket or case number (if you know): _____ *N/A* _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                    *N/A*

Yes [ ]  No [ ]

(4) Did you appeal from the denial of your motion or petition?        *N/A*

Yes [ ]  No [ ]

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   *N/A*

Yes [ ]  No [ ]

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____ *N/A* _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: *Being that Petitioner has fully exhausted this claim to the Highest State Court, further submitting this in a collateral proceeding would be a nullity*

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____ *N/A* _____

_____

_____

**GROUND FOUR:** *Factual Determination By the State Court Was Not Supported by the Record*

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): *The Second Department affirmed Petitioner's conviction by stating that the Supreme Court properly sustained defendant's objections to certain improper comments and corrected any possible prejudice", was not supported by the record. Due to the fact that the prosecution's improper*

*comments violated Petitioner's right to a fair trial, the defense could not "unring the bell", thereby evincing prejudice*

(b) If you did not exhaust your state remedies on Ground Four, explain why: *The ground for improper comments by Prosecutor was fully exhausted in Highest State Court, however Petitioner is primarily presenting the fact that the State Court's determination was not supported by the record, in instant petition. The reason*

(c) **Direct Appeal of Ground Four:** *being that this is a federal Standard*

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes [✓] No [ ]

(2) If you did not raise this issue in your direct appeal, explain why: _____ *N/A* _____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes [ ] No [ ]

(2) If your answer to Question (d)(1) is "Yes," state: *N/A*

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion or petition? *N/A*

Yes [ ] No [ ]

(4) Did you appeal from the denial of your motion or petition? *N/A*

Yes [ ] No [ ]

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? *N/A*

Yes [ ] No [ ]

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____ *N/A* _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_N/A_

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _This ground was already presented to the Highest State Court, therefore presenting such claim to a lower court, would be a nullity._

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _N/A_

13. Please answer these additional questions about the petition you are filing:

    (a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    Yes [ ]    No [✓]

    If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _Ineffective assistance of counsel claim was presented to both the Second Department as well as the Court of Appeals, however these issues are based on off-the-record issues. Petitioner is actively pursuing a 440.10 on this, hence the need for a stay + abeyance_

    (b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: _N/A_

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?   Yes [ ]   No [✓]

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinions or orders, if available. _N/A_

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?   Yes ☐ No ☑

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____ *N/A* _____

_____

_____

_____

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

    (a) At preliminary hearing: *Sally Butler*

    (b) At arraignment and plea: *Sally Butler*

    (c) At trial: *Sally Butler*

    (d) At sentencing: *Sally Butler*

    (e) On appeal: *Sally Butler*

    (f) In any post-conviction proceeding: *Sally Butler*

    (g) On appeal from any ruling against you in a post-conviction proceeding: *Sally Butler*

_____

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?   Yes ☐ No ☑

    (a) If so, give name and location of court that imposed the other sentence you will serve in the future: *N/A*

_____

    (b) Give the date the other sentence was imposed: _____ *N/A*

    (c) Give the length of the other sentence: _____ *N/A*

    (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?   Yes ☑ No ☐

*I am currently working on a CPL 440.10 therefore any "mixed claims" in instant petition require a "Stay and abeyance" so that I may have the matter determined on the merits.*

18.  TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*



N/A

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Page 15

Therefore, petitioner asks that the Court grant the following relief: _A Stay and abeyance until 440.10 Motion is fully exhausted, immediate release, or, in the alternative, an evidentiary hearing._ _Petitioner also requests discovery of Brady Material under Rule (6)(a) of the Federal Rules of Civil Procedure_

or any other relief to which petitioner may be entitled.

---

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _December 26, 2018_ _____ (month, date, year).

Executed (signed) on _December 24, 2018_ (date).

_[signature]_

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition. _____
_____
_____

---

Appellant, a Florida businesswoman, was charged in an indictment with second-degree murder, criminal possession of a weapon and tampering with physical evidence, in the shooting death of her former business partner Mario Rei. Appellant's former employee Luis Rosado testified, pursuant to a cooperation agreement, that he shot Rei at appellant's behest in return for appellant's promise that he could live rent-free in a house she owned in Florida.

During jury selection, the court angrily told one prospective juror who said that, as a police officer he had a professional bias against appellant and could not be

3

fair, that he had "no business" being in a courtroom or being a police officer, and ordered him to "get out" of the courtroom. Additionally, the court falsely told several prospective jurors who said they had difficulty understanding English that they would have to take English classes for ten weeks. Other remarks the court made in questioning prospective jurors who expressed hardships or who were students, led one prospective juror to say he had been "afraid" to tell the court he was a student and had missed a class. The court denied defense counsel's motions for dismissal of the entire jury panel and, later, the sworn jurors, on the ground that the court had so intimidated the prospective jurors that they were afraid to respond truthfully to questions during voir dire.

Over defense counsel's objection that it was unduly prejudicial, the court allowed the prosecution to elicit, in order to prove intent, testimony that appellant had attempted to solicit two other people to kill Rei, and one to frame him for drug possession.

During summation the prosecutor accused appellant of tax fraud, told the jury that defense counsel was trying to "distract" them and "didn't let the facts get in the way of her arguments," and that evidence defense counsel referred to regarding a silver car being used by Rei and another witness to drive to Rei's workplace and kill him did "not exist."

The court sentenced appellant, a 46-year-old business woman with no prior criminal record to, cumulatively, twenty-six and a half years' to life imprisonment.

4

## The Court's Remarks During Jury Selection

After some preliminary remarks, the court informed prospective jurors how long the trial would last and asked whether anyone, as a result of "pressing business" or "personal reasons," would be unable to serve (V 41, 100-01).[1] The court individually questioned those who raised their hands. One of the first of these prospective jurors was a police officer, who stated that his "professional bias" would prevent him from being fair to the defendant, and that he knew "as a police officer if you're going this far with the charge, I would say that the evidence is pretty..." (V 49-50). Asked by the court whether as a police officer, the presumption of innocence meant anything to him, the officer responded that he understood what it meant, but that "speaking in all honesty" he would be biased against the defendant (V 91). The prospective juror further stated that while he "would like to say he would give [the defendant] the benefit of the doubt, "at the end of the day I don't want to second guess myself and hurt someone else" (V 52). Releasing him, the court stated:

> [Y]ou really have no business in this courtroom. I'm not sure you have any business being a police officer. I'm going to tell you that straight up, okay. But you cannot walk into this courtroom and simply just prejudge this case because it's gotten to this level knowing that you know zero about this case, all right. That's pretty shameful as a police officer.

---

[1]     Numbers in parentheses preceded by "V" refer to the voir dire minutes, by "S" to the sentencing minutes and by "PSR" to the Presentence Report.  Unprefixed numbers in parentheses refer to the trial minutes.

> And quite frankly, I'm disheartened to actually hear you say that and it makes me wonder about the job you do.
>
> Get out of my courtroom. You, frankly, have no [business] coming in a courtroom. (V 52).

The court subsequently explained to the jury:

> This is . . . in my estimation, one of the pitfalls of what you can have in a criminal justice system. You cannot have a system where without any evidence whatsoever or knowing anything about any case simply because someone is arrested or ends up in a trial situation, that you can judge that they are guilty of whatever it is they are charged with. For those words to come out of a police officer is, frankly, sickening. That's just my personal opinion, okay (V 53).

The first prospective juror in the group who stated she had trouble understanding English was excused after the court questioned her about the length of time lived in the United States, employment status, whether she had children in school and had to speak to their teachers, and whether she had understood what had thus far been said in the courtroom (V 47-49). Thereafter, the court questioned prospective jurors who said they had trouble understanding English before telling them it did not believe them and excusing them, stating they would be sent to English classes for ten weeks: "Okay, we're going to send you for English lessons today. I'm going to excuse you and send you to English lessons for 10 weeks" (V 73); "Hold on a second. Ten weeks of English classes. Hope you do well" (V 90); "I'll be honest with you. I don't really believe you. ... We are going to help you out. Twenty-four years here. ... Ten weeks of English lessons ... Good luck" (V 106); "English lessons.

I'll be honest with you. I don't believe you but I'll send you for English lessons anyway."(111). One prospective juror who said he had difficulty with English was questioned and not excused (V 111-13).

The court asked prospective jurors who asked to be excused for job-related reasons what their employers would do if they were "hit by a bus" (V 60, 122), "a train ran over your legs" (V 62), or "broke both your legs (V 103), and did not excuse them (V 60, 62, 103, 122). The court excused several students (V 43-44, 58-59, 66, 70-71, 78, 119), in some instances asking them why they failed to seek postponements and suggesting they should have read the jury service notification form more carefully (V 44, 59).

On the second day of jury selection, after prospective jurors were placed in the jury box for formal <u>voir dire</u>, one of them revealed that she was a student and had missed class that day (V 183). She stated that she had been "afraid" to come up and tell the court the previous day (V 183). After the court excused her with the consent of both counsel, defense counsel, moved for "dismissal of this panel and mistrial" on the ground that jurors had been "intimidated" by the court, stating:

> I think it's been apparent throughout the picking of this jury, many of the jurors have been intimidated that your Honor has . . . said that he didn't believe what they were saying or the police officer didn't belong in the courtroom when he was just expressing what he said to be the truth.
>
> I think this young lady demonstrates how scared the members of this jury are to come forward to even say they don't understand the language, especially since I have a client that

doesn't speak English. It puts us in a very difficult place (V 184).

Denying the motion, the court stated that it was apparent that the prospective jurors who had said they did not understand English "were faking," that the police officer's statement had been "reprehensible," and that its explanation to the jury that the officer's position was unacceptable was "consistent with supporting your client and her ability to get a fair trial" (V 185-86). The court further stated that the juror who said she had been afraid to come up "was just nervous" and "not affected by anything I said" (V 186). Defense counsel responded that the juror had "actually said she was afraid," and that the objection was to "the comments that you're making to them that [have] intimidated this entire panel," however the court reiterated its denial of the motion (V 186). Later, to "complete the record," the court noted its belief that there was no indication that any of the prospective jurors was afraid to speak since some had been laughing at the court's jokes, volunteering information, and speaking freely "back and forth" with the court (V 211-12). From this the court concluded that there was no indication that anyone was fearful of speaking (Id.).

During her voir dire, defense counsel asked the prospective jurors if they had any reason they felt they could not be fair or could not sit, even if they felt "too intimidated to say so" (V 245-46). No jurors raised their hands (Id.). When counsel asked whether every juror could promise that their attention would be focused on the case, one prospective juror mentioned her child's graduation she wished to attend but

stated, "If I got run over by a truck I wouldn't be there, you know" (V257, 260). The court responded that it had not meant that comment to apply to her children, only to jobs (Id.). Another prospective juror then stated, "I know just like you said last time, if I was to get run over by a truck I wouldn't be able to make it, you know," then added, "My English is not that well and I'm scared I misunderstand for the case . . ." (V 261). After questioning her regarding her ability to understand English, the court did not discharge her (V 262).

Later, the court again "complet[ed] the record," asserting that although defense counsel "on her questioning essentially tried to squeeze out of this jury that they're fearful of disclosing things and questioned them whether or not they're reluctant to make such a disclosure because they're intimidated," "not one person raised their hand" (V 271). Before the selected jury was sworn, defense counsel reiterated her motion, which the court again denied (714-17).

## The Molineux Ruling

On the ground that the evidence proved motive, identity and intent, and provided necessary background regarding appellant's acrimonious relationship with Mario Rei and Gioconda Pazmino's fear of appellant, the prosecutor moved for the admission of testimony that appellant: 1) told Pazmino she had to have Rei killed because he had ruined her business and credit and taken her woman (referring to Rei's wife Flor Cepeda); 2) shown her gun to Pazmino and stated that it was for Rei and

9

whoever else stood between her and Flor; 3) on separate occasions in the summer of 2008, solicited her father and a customer to kill Rei; 4) paid someone to plant drugs in Rei's house and then call the police; 5) made what the prosecution contended as a false report that her gun had been stolen and that she suspected, Pazmino, a recent houseguest, of stealing it; and 6) threatened Pazmino during an argument, telling her that she could shoot her and no one would know (V 12-27).

Defense counsel argued, inter alia, that all of the proposed evidence should be excluded because of "sheer prejudice" (706). She had no objection to the admission of appellant's report that her gun was stolen (708).

Noting that it "must make the determination whether the evidence is more prejudicial than probative before allowing it to be admitted," the court granted the application and ruled that appellant's "multiple threats that she had to get rid of [Rei]" because he had ruined her business, her credit and taken her woman, and her statement that the gun was "for Mario … or anyone else who got between her and Flor" were "admissible as background information concerning the relationship between the defendant and the victim, and to establish [the] motive, intent, identity of the perpetrator" (711-12). It ruled that appellant's solicitations of her father and a customer to kill Rei were "admissible to establish intent" (Id.). Evidence of appellant's attempt to plant evidence "to frame [Rei] for a crime" was, the court ruled, admissible to "show[] the acrimonious relationship between [appellant and Rei]" (712-13). The court also ruled that evidence that appellant threatened that she could shoot

Pazmino and no one would know, was "admissible as background information and to explain the nature of the relationship between [appellant] and Pazmino at that time" (713).

The prosecutor had also sought under <u>Sandoval</u> to cross-examine appellant, if she testified, about the threat to shoot Pazmino and a credit card application, found in appellant's home during execution of a search warrant, in which she had named Flor Cepeda as the applicant and allegedly forged her signature (V 28-32). The court granted that application as well, reasoning that the incidents were probative of appellant's credibility and "indicative of her willingness to place her own self-interests" before those of society (713).

<u>The People's Direct Case</u>

On November 12, 2008, at about 5:00 p.m., <u>John Vasilantonakis</u>, the owner of a mechanic shop located at 50-30 98th Street in Queens, heard three gun shots fired shortly after his employee, decedent Mario Rei, had left the shop for the day (994-96). Vasilantonakis looked outside and saw a man in a heavy dark coat and a dark "ski hat" running away (996). The man got into the passenger side of a "silver Dodge Caravan" parked on the corner, which then made a right turn and drove out of sight (996-97). Rei was lying on the street bleeding (<u>Id</u>.). Paramedics arrived and administered CPR at the scene, then transported Rei to the hospital, where he was pronounced dead (EMT <u>John Scott Hayter</u> 753-62). The cause of death was three gunshot wounds to the torso (Dr. <u>Irini Scordi-Bello</u> 1551).

Flor Cepeda and Mario Rei came to the United States from Venezuela in 1999, and remained here illegally (865, 869). They married in 2000, had a son in 2002, and lived in Queens (865, 867). Cepeda met appellant in Queens in or about 2001 at a Jehovah's Witness Kingdom Hall that they both attended (866). They became close friends; appellant got Cepeda a job as a salesperson at a company called Northeast where appellant was also a salesperson, and they saw each other almost daily (868, 908-09). Appellant also helped Cepeda and Rei obtain auto insurance, a lease for their apartment, and credit cards for Cepeda (868, 907). Appellant put these things in her name because Cepeda and Rei were in the country illegally. They in turn paid appellant to cover the bills and Rei, a mechanic, would fix appellant's car for free (869, 908). Appellant, Cepeda and Rei also took vacations together to the Poconos and to Tampa, Florida, where appellant owned property (867-68, 877).

The relationship began to deteriorate after Cepeda and Rei learned that their illegal status did not require them to put things in appellant's name (869-70). Appellant and Rei fought and appellant threatened to report them to immigration (Id.). In 2005, Cepeda and Rei moved to Charlotte, North Carolina and, for a time, ceased communicating with appellant (871-72).

After Cepeda and Rei had been in North Carolina for about eight months, Cepeda received an email from appellant saying that her mother had passed away (872). Cepeda called appellant to offer her condolences, they thereafter began regularly communicating again, and Cepeda invited appellant to come to North

Carolina for a visit (871-73). She met appellant in a hotel in North Carolina for about half an hour, but denied, at trial, that she and appellant had a sexual relationship then or at any time (873-74). Cepeda had, several years earlier, questioned appellant about her feelings because appellant had no husband or boyfriend and would hug Cepeda and say "I love you" a lot, but appellant had told her she thought of her as a daughter and that they were "like family" (874-75, 898, 914). Cepeda denied communicating with appellant after the move to North Carolina before appellant's mother died, or meeting her in a hotel in New York on Valentine's Day in 2006 (910-12). Cepeda did borrow between $3,000 and $5,000 from appellant so that she could move back to New York (875-77). Rei did not want to move back to New York so, in late December 2006 or early 2007, Cepeda and Rei moved to Tampa, Florida (877).

When Cepeda and Rei had been in Tampa for about two months, they accepted appellant's dinner invitation to her Tampa home, reconciled, and talked about going into business together (878-82). Appellant also offered Cepeda and Rei, who were then living in an apartment, her second home in Tampa. She stated that she would transfer its title to them, while the mortgage would remain in her name and they would give her the monthly payments (880-83). Three weeks later, Cepeda and Rei moved into the house, located on North Hale Avenue (the "North Hale house"), and in or about September 2007, appellant transferred title to the house to Cepeda (882-83, 921).

Appellant, Cepeda and Rei also opened a "tire shop" called Tire Flea Market (885-87). Rei contributed $5,000 to the startup costs (886-87). Appellant, in their presence and the presence of an accountant, incorporated and registered the business in her name because of Cepeda and Rei's illegal immigration status (Id.).

The business made money and everything went well for about a year. At the beginning of 2008, however, appellant accused Rei of stealing money and Rei accused appellant of failing to pay him and Cepeda their agreed percentages of the business earnings (888). Rei decided to terminate the partnership and asked for his $5,000 back. Appellant told him she did not have the money (889). One day in May 2008, Cepeda came to the shop and found the police there telling Rei he had to leave the premises. Since the business was in appellant's name, Rei had to leave and Cepeda had to leave the car she had driven to the shop, which was also in appellant's name (890-91).

Cepeda and Rei continued to live in the North Hale house, but stopped paying the mortgage because appellant would not return the $5,000 (893). Rei opened his own mechanic shop called Los Chomos, after an accountant advised them they could legally own a business despite their immigration status (892). In September 2008, Rei closed the shop because the landlord did not renew his lease. He and Cepeda subsequently returned to New York, where Rei got a job as a mechanic at his former employer's Queens auto shop (897-98). Cepeda never received an email from

appellant telling her that their relationship was over; before leaving Florida she had blocked appellant's emails (975).

Cepeda was not aware that in August 2006, appellant had transferred two Florida properties to her (915-18, 922; Defense Exhibit A). While she signed the quit claim deeds in 2007 (Defense Exhibits C, D) transferring the properties back to appellant, she was not aware of what she was signing because she did not read English (940-41, 982-84). Cepeda never read letters addressed to her from the Florida Department of Revenue regarding the quit claim deeds (Defense Exhibits for identification G, H)[2], because she gave any such mail she received to appellant (946, 986-87). Cepeda was not aware that in December 2006, appellant made her the beneficiary of an insurance policy (917-18). She never went into a paper business called IFGO with appellant and did not know what the letters stood for (911-12).

Gioconda Pazmino had known appellant for 17 years. They had initially worked together in New York; they subsequently became a couple and were in that relationship for eight or nine years before breaking up in 2000 or 2001 (1010-12, 1050). They did not talk for several years after that, until in May 2007, appellant called her and they reestablished a friendship (1013). In May 2008, appellant told Pazmino she needed help at her business because she had fired Rei and Cepeda, whom Pazmino knew casually as appellant's friends from the Kingdom Hall (1015-16,

---

[2]     The letters were never admitted into evidence (977, 1651, 1688).

1054). Pazmino moved to Tampa to work at Tire Flea Market (1016-18). She lived with appellant during her three-month stay, and worked for her seven days a week (1017-18, 1022, 1056).

In July 2008, appellant asked Pazmino to go to Rei's shop with a document she wanted Cepeda to sign transferring ownership of the North Hale house, where Cepeda and Rei had been living, back to her (Cepeda 894-96; Pazmino 1019). If Cepeda refused, Pazmino was to tell her that appellant would reveal to Rei that Cepeda and appellant had been in a romantic relationship (Pazmino 1019-20). Pazmino went to Los Chomos and met with Cepeda and Rei (Pazmino 1020; Cepeda 895-96). Cepeda refused to sign the document. When Pazmino delivered appellant's message to Cepeda, she "laughed" and told Pazmino to go ahead and tell Rei, because there was no such relationship between her and appellant and she "didn't like women, and much less Ynmaculada" (Pazmino 1021; Cepeda 896).

Pazmino claimed that when she reported what had happened, appellant became "angry" and said she was "going to kill [Rei] ... because he had ruined the business, he had ruined the credit, and besides that, he had stayed with Flor" (1022). Appellant supposedly repeated this statement "five or six times" during the three months Pazmino was in Florida (Id.).

Pursuant to the Molineux ruling, the prosecutor elicited that when appellant's father, Joel Gomez, visited that summer, Pazmino heard appellant ask him to kill Rei (1022, 1108-09, 1284). Gomez responded that he would do it, but that he would also

16

have to kill whoever else was home at the time (1022-23, 1109, 1112). Appellant said that she did not want "Flor and the boy" hurt and told her father to forget it (1023). Pazmino also contended that in August 2008, she heard appellant offer a customer at the tire shop, who was a drug dealer, $3,000 to kill Rei. He responded that it would take $10,000 to kill Rei, and that for $3,000 he could only put him in the hospital (1023-24, 1107, 1113, 1115). Pazmino was present at the tire shop another time that summer when appellant gave someone $300, told them to purchase drugs and plant them in Rei's house, and provided the keys (1024). That individual took the money and never came back (1025).

In September 2008, appellant and Pazmino had an argument "about a customer" and appellant told Pazmino to leave (1018, 1025, 1066). When Pazmino, who had not been paid all summer, demanded her pay, appellant said she could shoot Pazmino and no one would ever know (1025-26). Pazmino had seen a gun appellant kept in a dresser and carried to and from work when she was carrying large sums of money, and had heard appellant say she was going to use it "to harm somebody" (1018, 1062-64, 1066). She therefore left and stayed with a friend for a few days (1026). She subsequently went to appellant's house to get her things, and asked for her pay, but appellant said she did not have the money (1067). Pazmino asked for and was given train fare back to New York (Id.).

Luis Rosado testified under a cooperation agreement pursuant to which he pleaded guilty to manslaughter and would be sentenced to a maximum of 24 years'

17

imprisonment (1367-68).   In the summer of 2008, Rosado was living in Tampa with his pregnant girlfriend Odette and her three children (1292, 1354).   He had first met appellant in March or April 2008, when he bought tires from Tire Flea Market.   Rei had put the tires on his car at that time, but apart from that Rosado did not know him (1293-95).   In August 2008, appellant hired Rosado as a mechanic, working at the shop six days a week (1293).   He worked alongside Pazmino for about three weeks (Pazmino 1124; Rosado 1298-99).   When Pazmino "quit," she came to Rosado's house to tell him about the argument (Rosado 1299-1300).

As Rosado's friendship with appellant grew, she told him that her "ex- partner" Rei had stolen money from the business, and that she was losing her home in North Hale, because Rei was not paying the mortgage (1297-98).   Supposedly, appellant once said she wanted Rei dead, but Rosado did not take her seriously although he knew she owned a gun (1296-98).   In October 2008, appellant asked Rosado to help her drive to New York to see an attorney and to see Rei to "resolve" their problem (1300-01).   Rosado agreed to go because when he at first refused, appellant purportedly threatened him, saying she knew where his family lived (1301-02).

On October 26, 2008, Pazmino received a call from appellant, saying she had found out where Cepeda and Rei lived and was coming to New York.   She asked Pazmino to purchase her a cell phone (1026).   Pazmino bought appellant a cell phone, but put it in her own name (1027-28).   She gave appellant the cell phone when she

arrived in New York the next day with Rosado (Pazmino 1029-30, 1039; Rosado 1304).

Rosado and appellant stayed with Pazmino for two or three days, during which they drove to several repair shops in Corona, Queens looking for Rei, and located him in one such shop (Rosado 1304-05; Pazmino 1031).   Appellant had brought a gun in a black box which she kept on top of Pazmino's television set in her bedroom (Pazmino1032).   Rosado and appellant discussed killing Rei on Halloween (Pazmino 1031, 1282; Rosado 1306-08).   Rosado at first refused, but agreed in order to "get her off [his] back" after she threatened his family by commenting that she had an incarcerated brother with a "bad attitude" (Rosado 1306-08, 1311, 1395; Pazmino 1031).   Although he assented, he claimed that he never intended to follow through (Rosado 1311, 1352).

Appellant returned to Florida, leaving Rosado behind and her gun hidden in a closet in Pazmino's bedroom (Rosado 1308-09).   Rosado testified that he intended to have Pazmino drive him, in her husband's silver car, to where Rei worked, and then use appellant's gun to shoot Rei (1363-64, 1395-96).   On re-direct, Rosado claimed this was appellant's plan and that he never intended to carry it out or spoke to Pazmino about it.   He denied that Pazmino was involved in the planning or execution of Rei's death (1395-96).   Rosado and Pazmino hung out with Pazmino's friends in Yonkers for a few hours, but when they returned to Queens, Pazmino told him that he could not stay in her apartment because her husband did not want him there

(Rosado 1310), or because Pazmino "didn't want to get [involved] in" Rosado's plan to kill Rei (Pazmino 1035-36). She then took him to Penn Station and he spent the night in the station before returning to Florida (Pazmino 1036; Rosado 1310, 1396).

When Rosado returned to Florida and told appellant he had not killed Rei, she demanded that he go back and do it, but he refused despite her repeated threats (1312). A few days later, however, appellant proposed that if Rosado would kill Rei, she would allow him to stay in the North Hale house rent free and continue to work for her (1312-14, 1350). Rosado, facing eviction from his apartment, agreed (1312-14). On November 11, 2008, Rosado and appellant left Florida in a gold colored Dodge Caravan that Rosado had borrowed from a friend, and again headed for New York (1314-17; Maribel Ortiz 1456-57). Appellant did not bring her "regular" cell phone from Florida with her to New York (Rosado 1319). Using the cell phone Pazmino had bought for her, appellant called Pazmino and told her she was coming to New York on November 12, 2008, in order to commemorate the anniversary of her mother's death with family (1036). When Pazmino later called appellant to find out when she would be arriving, appellant said she was in New Jersey and that when she arrived in New York she would need to get something she had left at Pazmino's house (1037-38). In New Jersey, appellant and Rosado stayed with Kenia Soto an acquaintance of appellant's through Pazmino, to rest for a few hours before proceeding to New York (Rosado 1317-19; Soto 1466-69). Appellant thereafter called

20

Pazmino several times to find out when she would be home (Rosado 1319; Pazmino 1038).

Pazmino got home on November 12, 2008, at about 2:00 p.m.; her friend "Belky" and Belky's partner Erica, had driven her from Yonkers to Queens and remained parked outside because Pazmino intended to return with them to Yonkers (Pazmino 1041-42, 1102-04; Belkis Sanchez 1560, 1570-72). When Pazmino called appellant to ask what she needed from her apartment, appellant told her a gun was in a drawer in the bedroom and told her to bring it to the corner of 60th Avenue and Calloway Street, about a block from Pazmino's apartment (1040-41, 1265-66). Pazmino found the gun wrapped in a sealed black bag, which she did not open (1040-41). She had actually known that the gun was in the apartment because appellant had called her a few days after Rosado left in October, asked her why she had "sent Luis back to Florida without doing what he was going to do," and told her she had left the gun (1275-77).

Pazmino went in Belky's car to the location, and when she did not see appellant's car, called to ask where she was (1041-42, 1102-04, 1278-79). Appellant responded, "you didn't come alone," "are you afraid of me?", and told her to come to the corner alone (1041-42, 1278-79). Pazmino walked to the corner, saw Rosado and gave him the gun, then returned to Belky's car and left (Pazmino 1042-43; Rosado 1322; Sanchez 1561).

Rosado returned to the Dodge and, he claimed, he and appellant drove to the shop where Rei worked and parked about half a block away (1324-35).  At about 5:00 p.m., Rosado got out of the vehicle and hid behind a school bus parked across from the shop.  Rei came out of the shop about ten or fifteen minutes later and, as he walked towards his Jeep, Rosado came from behind the bus and shot him three times in the chest (1326-30, 1349, 1373-74).  Rosado then ran back to the Dodge, jumped into the rear passenger seat, and appellant drove them away (1331, 1349).  They headed to Florida; in Maryland, appellant threw the cell phone she had been using out of the car window (1332).[3]  Once in Florida, Rosado kept the gun for about a week before returning it to appellant (1333-34; 1377-78).

Cepeda was informed of her husband's shooting on the evening of November 12, 2008 (899).  Asked by a detective if Rei had any enemies, she gave him appellant's name and said they had been "fighting" (Id.).  On the same night while at Sanchez's house in Yonkers, Pazmino heard a news report of Rei's shooting (Pazmino 1046; Sanchez 1562).  Sanchez called a friend who was an NYPD detective and the following night, Detectives Rivera and Pavese spoke to Pazmino at Sanchez's house (Pazmino 1073, 1117-18; Sanchez 1563-65).  Pazmino told police "what she knew," but did not recall telling them of her role in delivering the gun to Rosado (1046, 1088-

---

[3]     Phone records showed calls to and from the cell phone on November 12, 2008, used cell towers in Queens at 60-15 Calloway Street and 50-54 98th Street and in Passaic New Jersey (Joseph Sierra, 1467, 1487, 1490, 1495-98; People's Exhibits 50, 51).  The last call made on the phone was at 9:29 p.m. via a cell tower in Aberdeen, Maryland (1499).

89, 1258-60, 1285-86). She subsequently spoke to the police several more times and showed them where she gave Rosado the "package" (Pazmino 1258-60, 1285-86; Det. Ramon Munoz 1590-91, 1595).

On December 2, 2008, Special Agent James Noblitt of the Florida Department of Law Enforcement assisted New York detectives who had come to Florida in the arrests of Rosado and appellant (Noblitt 1148-50; Munoz 1588-89). Noblitt, the detectives and members of the sheriff's department arrested Rosado outside his apartment where he was in the process of moving (Noblitt 1150-53; Rosado 1338-39). Before he was taken away, Rosado told his girlfriend to call appellant (Rosado 1340; Noblitt 1154). Noblitt and others, including Detectives Munoz and Milan, then went to appellant's house (1154-55). When they knocked about 15 to 20 minutes later appellant, wearing pajamas, answered her door, allowed them to come in and, after being told she was under arrest, changed into appropriate attire in the presence of a female officer, before being taken to the precinct (1155-58). Police did a cursory search of the house to make sure no one else was there (1157).

The next day police searched appellant's residence pursuant to a warrant and found, among other things, a Glock, ammunition and magazines in an unconcealed duffel bag in appellant's closet (Noblitt 1165-67; Munoz 1582-84; People's Exhibit 36). Discharged shell casings recovered from the street near Rei's body, a bullet from the floor of the ambulance in which Rei was transported to the hospital, and a bullet recovered from Rei's body, all came from this gun (Hayter 762; Police Officer Brian

Leguernic 787; Det. Robert Saenz 821; Det. Francisco Castillo 1398-1400; Det. Gregory Dicostanzo 1446-48). On November 2, 2008, appellant had reported the gun stolen and stated that she thought Pazmino, who had been visiting that summer, might have taken it when she returned to New York (Deputy Sheriff Thomas Stein 1212-15, 1222). The police also seized various documents from appellant's house, including a credit application, dated December 2, 2008, allegedly forged in the name of Flor Cepeda (Noblitt 1170, 1182-83; Munoz 1594; Cepeda 978).

The Defense Case

Yoselin Amarante, appellant's former in-law, recalled that appellant visited her home in Tampa sometime around mid-November 2008 (1606-08). She did not know the precise date, but recalled that it was before Thanksgiving, and that appellant was sad because it was the anniversary of her mother's death (1608, 1612, 1617, 1623). Appellant's brother, Yacell Gomez, testified that their mother died on November 12, 2006 (1631-32, 1664). Amarante had informed appellant's attorney about appellant's visit two years earlier, and had informed family members in December 2008 (1614).

Gomez saw appellant, Rosado and Pazmino together in New York on October 29, 2008 (1651-52, 1665). Appellant's and Gomez's father was in Tampa, Florida in the summer of 2008 staying with a cousin, not with appellant (1634, 1665). When Gomez was a child, their father worked in law enforcement in Puerto Rico as a

24

"Special Deputy" who transported inmates (1635). Gomez, one of six siblings, had never been convicted of a crime (1632).

## The Rebuttal

Lieutenant Frank Torres and Detective Richard McCabe, of the Queens District Attorney's Office, interviewed Amarante in a surprise visit to her home on May 27, 2014 (1667-69, 1674). Amarante told them that the day appellant was with her was between mid-November and early December, 2008, and that she remembered this because at the time appellant visited, Amarante was expecting her sister to fly in from Portugal before Thanksgiving, and her brother to arrive on December 3, 2008 (1671-73).

## The Summations

Defense counsel argued, principally, that Vasilantonakis's testimony that the getaway car was silver proved that Rosado and Pazmino, using Pazmino's silver car, were the ones who planned and executed Rei's homicide (1690-93), and that their intention was not only to kill Rei, but to frame appellant (1713). Counsel argued that Rosado admitted on cross-examination that on Halloween, he and Pazmino drove Pazmino's silver car to Rei's shop intending to kill him, and that he changed that testimony on redirect examination because he had a cooperation agreement with the district attorney's office.

25

The prosecutor argued that defense counsel was "trying to distract the jury from all the evidence that shows her client is guilty" (1717) and that counsel "didn't let the facts get in the way of her arguments" (1718). He also contended there was no evidence that Pazmino had a silver car (1718), and that the silver car "does not exist" (1747).

The prosecutor also contended that Rosado was not the first person appellant asked to kill Rei; she had asked her father who "would do it but he didn't care if anyone else was present" and a customer who for $3,000 would only put Rei in the hospital and would need $10,000 to kill him (1732-33).

The prosecutor remarked that the properties appellant transferred to and from Cepeda did not prove they were in a relationship, but rather evinced "heavy tax evasion" by appellant (1757). Defense counsel's objection was overruled (Id.). The prosecutor then expounded on the argument, referring to an August 2006 transfer of property to Cepeda that the following year Cepeda quit claimed back to appellant (1757-58). Defense counsel's objection was again overruled (1758). The prosecutor continued, citing Cepeda's testimony that she gave letters addressed to her from the Department of Revenue to appellant, and stating "The Department of Revenue in Florida was looking for taxes on the property because the defendant transferred them to her for a year from '06 to '07 (1758). Defense counsel's objection was overruled (Id.). The prosecutor then concluded:

26

> Two properties she never lived in, two properties she never
> got a dime from, but the defendant quit claims them to her
> and then back to her specifically without knowing what's
> on the document. She wants to tell you that's a suggestion
> there's some relationship here. It's her getting out from
> under the dire taxes and putting it in the name of an illegal
> person (1759).

The prosecutor also argued that the tampering with physical evidence charge referred to "[appellant] secreting the gun in her home so that it wouldn't be found" (1765) [emphasis added].

At the close of summations defense counsel moved for a mistrial based upon the prosecutor's "statement that [appellant] had committed tax fraud" (1767). The court denied the motion on the ground that, "in light of the charge of murder, the fact of some tax evasion, if that's how you deem it, is quite minimal" and that by putting "those documents" in evidence, defense counsel had opened the door for the prosecutor to "form[] an argument that he believes supports the true underlying basis of that document" (1769). The court stated that if there was any error, it was harmless and that it might give the jury a curative instruction. Defense counsel asked the court to give such instruction (1770).

## The Court's Charge and the Verdict

During its final charge the court instructed the jury as follows:

> Evidence concerning an allegation of tax evasion or tax
> fraud regarding the use of documents that contained Flor
> Cepeda's signature and other documents in that same batch
> that contained what is purported to be the signature of Flor

27

Cepeda, this evidence may be considered by you only as it bears on the significance or insignificance of the depth or lack of depth of the relationship that existed between the defendant and Flor Cepeda. Nothing else. This is not tax court and there's no such issues before you to resolve (1784).

The charges of murder in the second degree, criminal possession of a weapon in the second degree (two counts), and tampering with physical evidence were submitted to the jury (1791-97).

The court instructed the jury that it must not consider evidence of bad acts or uncharged crimes as proof of propensity to commit the charged crimes (1783).

With respect to the tampering count, the indictment charged the following:

The defendants, on or about <u>November 12, 2008, in the County of Queens</u>, acting in concert with each other, with the belief that a <u>pistol</u> was about to be produced or used in a prospective official proceeding, and with the intent to prevent such production or use, they suppressed <u>said pistol</u>, by an act of concealment, alteration or destruction [emphasis added] (<u>See</u> Indictment).

The court instructed the jury that it could convict appellant of tampering with physical evidence if it found:

One. That on or about <u>November 12, 2008, in the County of Queens</u>, the defendant, Ms. Gomez, acting in concert with another person, suppressed <u>physical evidence</u> by an act of concealment, or alterations, or destruction.

Two. That the defendant did so believing that such <u>physical evidence</u> was about to be produced or used in a prospective official proceeding.

Three. Defendant did so intending to prevent such production or use (1797) [emphasis added].

The court repeated this charge when, during deliberations, the jury asked that the court reread all of the elements of all of the crimes (1813, 1820).

The jury convicted appellant of all of the charges (1823-24).

<u>The Sentencing</u>

Appellant came to the United States from the Dominican Republic in 1991, and became a naturalized citizen in 2001; she lived in New York for nearly 16 years before moving to Florida in 2006 (PSR 5, 6). She graduated from law school in the Dominican Republic and was licensed to practice law there (PSR 5).

With both parents deceased and single with no children, appellant was close to her siblings and nieces and nephews (PSR 5). Appellant's sister, Yaraliz Amezquita, a high school teacher in Massachusetts, submitted a letter in support of appellant on behalf of all her siblings.[4] She was at a loss regarding appellant's crime, which contrasted with the "loving and caring person who took care of her siblings all of her life" and was a "role model" for the entire family. Amezquita recalled how appellant helped their mother care for her younger siblings and how she helped support the family when their parents were not working. Jhoeny Gomez, appellant's eldest niece, a former teacher seeking her nursing degree in vascular surgery, described appellant's

---

[4]     The letters were filed with the court on July 8, 2014, however they were not found in the court file. Copies of the letters obtained from trial counsel's file are therefore submitted as Exhibits with this brief. An additional letter, submitted by Reverend Delores Barret, could not be located as of the time this brief was filed, but will be submitted as an additional exhibit for the court's consideration should appellate counsel obtain it.

commission of the crime as "out of character." Appellant had helped raise Jhoeny and took her to Kingdom Hall and "preaching" in the community, and involved her and other cousins in recreational activities in the church. Appellant also took Jhoeny and her cousins on trips to Disney World. Appellant's brother Yacell Gomez, a salesman, told the probation department that appellant was "a great person" who was "religious, hard-working, and had no issues with substance use, or any other areas" (PSR 5).

At sentencing, defense counsel asked the court not to sentence appellant vindictively because she went to trial and to consider that Rosado, who actually killed Rei, would receive only 16 years' imprisonment (S 9). Appellant wrote on her own behalf and addressed the court, maintaining her innocence and asking for lenience (S 10-11). The prosecutor recommended that the court impose the maximum sentences, and that it impose the tampering sentence consecutively (S 8-9).

The court concluded, based on the letters submitted on appellant's behalf, that appellant became a provider and caregiver for illegal immigrants, but in return demanded "unquestioned" loyalty and punished "disloyalty," and that appellant had Rei killed for disloyalty in business and in failing to let appellant have his wife (S 14-15). Calling appellant "conniving, deceitful, deceptive and cunning," the court sentenced her to concurrent prison terms of twenty-five years to life for murder in the second degree and fifteen years for each count of criminal possession of a weapon in the second degree, and a term of five-years' post release supervision (S 16-17). It

sentenced her to a consecutive prison term of one and a third to four years for tampering with evidence (S 17).

## ARGUMENT

### POINT I

THE COURT'S REMARKS, INCLUDING BERATING ONE PROSPECTIVE JUROR WHO SAID HE COULD NOT BE FAIR AND FALSELY TELLING OTHERS THAT THEY WOULD BE REQUIRED TO TAKE A TEN-WEEK ENGLISH COURSE, HAD A CHILLING EFFECT ON JURY SELECTION THAT DEPRIVED APPELLANT OF HER RIGHTS TO A JURY CHOSEN ACCORDING TO THE LAW, DUE PROCESS AND A FAIR TRIAL. U.S. CONST., AMENDS. VI, XIV; N.Y. CONST., ART. 1 SEC. 2; C.P.L. § 270.15.

The court made blistering comments to one prospective juror, a police officer who said he could not be fair, telling him he did not belong in a courtroom and ordering him to get out of the courtroom. It then falsely told several prospective jurors who said they had language deficiencies that it did not believe them and that they would have to take a ten-week English course. These and other comments created a chilling atmosphere that discouraged prospective jurors from being candid regarding matters affecting their ability and qualifications to serve, as evidenced by several jurors mid-selection comments, including one juror who had been "afraid" to

31

<u>POINT I</u>

THE STATE COURT'S DETERMINATION THAT PETITIONER WAS NOT
DEPRIVED OF A FAIR TRIAL BY IMPROPER REMARKS MADE BY THE
SUPREME COURT TO PROSPECTIVE JURORS DURING VOIR DIRE IS
WITHOUT MERIT, IS BASED ON AN UNREASONABLE APPLICATION OF THE
LAW

1. After some preliminary remarks, the court informed prospective jurors how long
   the trial would last and whether anyone, as a result of "pressing business" or
   "personal reasons", would be unable to serve (voir dire 41, 100-01). The court
   individually questioned those who raised their hands. One of the first of these
   prospective jurors was a police officer, who stated that his "professional bias"
   would prevent him from being fair to the defendant, and that he knew "as a police
   officer if you're going this far with the charge, I would say that the evidence is
   pretty..." (voir dire 49-50). When being asked by the court whether as a police
   officer, the presumption of innocence meant anything to him, the officer
   responded that he understood what it meant, but that "speaking in all honesty" he
   would be biased against the defendant (voir dire 91). The prospective juror
   further stated that while he "would like to say he would give [the defendant] the
   benefit if the doubt, "at the end of the day I don't want to second guess myself
   and hurt someone else" (voir dire 52). This was all stated in front of the panel of
   prospective jurors, whereas some of these prospects became actual jurors in
   Petitioner's trial, thereby violating Petitioner's right to have a jury chosen
   according to the law, with that being said, her right to be tried by a fair and
   impartial jury.

2. Upon being released, the court then stated: "This is...in my estimation, one of the
   pitfalls of what you can have in a criminal justice system. You cannot have a
   system where without any evidence whatsoever or knowing anything about any
   case simply because someone is arrested or ends up in a trial situation, that you
   can judge that they are guilty of whatever it is they are charged with. For those
   words to come out of a police officer is, frankly, sickening. That's just my
   personal opinion, okay" (voir dire 53)

1

3. It is Petitioner' belief that these improper comments by way of a prospective juror strongly violated her right to a fair trial due to the other potential jurors having already heard the unfair comments by the police officer, indicating that Petitioner was, in all likelihood, guilty. This violated Petitioner's presumption of innocence which, as a result, violated Petitioner's right to a jury chosen according to the law, Due Process, and a Fair Trial.

4. Moreover, it is Petitioner's argument that the state court relied on an unreasonable application of the law with respect to affirming her conviction. The Second Department cites People v. Mason, 132 A.D.3d 77 in support of their determination however the court in Mason, (supra) specifically deals with the "improper questions and remarks made by the prosecutor during cross-examination and summation", contrary to the situation in Petitioner's case. In Mason, (supra), the court states " the court's alleged misconduct did not constitute a mode of proceedings error exempting him form the rules in preservation", whereas in Petitioner's case, the Court's statements constituted a "mode of proceedings" error, thereby denying Petitioner her right to a fait and impartial jury.

5. The Court questioned prospective jurors who said they had trouble understanding English before telling them it did not believe them and excusing them, stating that they would be sent to English classes for ten weeks. The court then asked prospective jurors who asked to be excused for job-related reasons what their employees would do if they were "hit by a bus" (V 60, 122), "a train ran over your legs" (V 62), or broke both your legs (V 103), and did not excuse them (V 60,62, 103, 122).

6. A defendant has a constitutional right to a trial by a particular jury chosen in accordance with the law, in whose selection the defendant has had a voice, People v. Buford, 69 N.Y.2d 290 (1987). The process by which juries are seated, examined, excused for cause and by peremptory challenge, and sworn as trial jurors is prescribed by CPL 270.15". Section 270.15 requires that the court put to prospective jurors "questions affecting their qualifications to serve as jurors in the action" and that counsel for "[e]ach party...be afforded a fair opportunity to

2

question the prospective jurors in the action" and that counsel for each party be afforded a fair opportunity to question the prospective jurors as to any unexplored matter affecting their qualifications", CPL §270.15 (1)(b)(c).  All of the foregoing statutes are governed by the U.S. Constitution, thereby evincing a violation of Petitioner's 6th Amendment right as well as Due Process.  While a trial court has broad discretionary power to regulate the conduct of jury selection, "its discretion must be exercised consistent with the essential demands of fairness." United States v. Barnes, 604 F.2d 121 (1979).  Its actions must therefore be in accord with "the purpose of the voir dire", Barnes (supra).  It is Petitioner's argument that the purpose of voir dire is for the defendant to choose a fair and impartial jury according to the law, indicating that the trial court abused its discretion which subsequently violated Petitioner's right to a fair trial and Due Process.

## POINT II

PETITIONER WAS DEPRIVED OF HER CONSTITUTIONALLY PROTECTED RIGHT TO A FAIR TRIAL DUE TO HIGHLY INFLAMMATORY REMARKS BY THE PROSECUTOR DURING SUMMATION. LIKEWISE THE STATE COURT'S DETERMINATION OF FACTS IN LIGHT OF THE EVIDENCE PRESENTED WAS UNREASONABLE.

7.  During summation, the prosecution suggested that the main defense argument— that Vasilantonakis saw the shooter flee in a silver car and only Pazmino had a silver car---was pure fantasy.  In fact, however, Pazmino did have access to the silver car belonging to her husband and Rosado had testified he planned to use it in carrying out Rei's murder when he was in New York the first time.  Rosado backtracked on that testimony on redirect, claiming he never planned to carry the murder out, but the prosecutor's suggestion—that the silver car and Rosado's plan to have Pazmino drive it was fabricated from non-existent testimony—was untrue.  The prosecutor's mischaracterization of the evidence in an attempt to gut the defense was improper.

8.  It is Petitioner's assertion that the improper comments by the prosecution violated her right to a fair trial.  The Second Department, in their opinion, stated that "most

of the challenged remarks constituted a fair response to arguments made by defense counsel during summation, or constituted fair comment on the evidence, and did not denigrate the defense" (See People v. Galloway, 54 N.Y.2d 396; People v. Ashwal, 39 N.Y.2d 105). However, it is Petitioner's argument that the State Court's determination of facts in light of the evidence Presented was unreasonable as the holding in Williams v. Taylor, 529 U.S. 362 (2000) states that "the federal court should ask whether the state court's application of clearly established federal law was objectively unreasonable".

9. With respect to the unreasonable application of clearly established federal law, Petitioner asks this Honorable Court to consider the fact that the Second Department cited People v. Mason, 132 A.D.3d 777 in order to support their opinion which stated "The defendant's contention that she was deprived of a fair trial by improper remarks made by the Supreme Court to prospective jurors during voir dire is without merit". However, it is Petitioner's assertion that the holding in Mason, (supra) is unavailing due to its holding pertaining to improper comments by a prosecutor during cross-examination, therefore Petitioner argues that there has been an unreasonable application of facts in light of the evidence presented.

## POINT III

PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL

10. During trial, defense counsel pursued a flawed alibi which deprived Petitioner of her constitutionally protected right to effective assistance of counsel that is guaranteed by the U.S. Constitution (6th Amendment). The entire defense that Petitioner relied upon was the testimony of Yoselin Amarante who was specifically called to express that Petitioner was with her in Florida during the time of the murder, thereby negating any theory of the prosecution. However, due to lack of preparation, when being questioned as to Petitioner's whereabouts on the day of the incident, Ms. Amarante's response was as follows:

Q-Now, I'm going to ask you about a specific time in November 2008. In November of 2008, do you remember Ynma Gomez coming to your house?

4

A-Yes.

Q-Describe what you remember about that particular day.

A-I had made her some-because she was not feeling well from her period, and it was the Anniversary of her Mother's death.

Q-And on that day, the anniversary of her Mother's death, did she come to your house or-did she come to your house, if you remember, or did you go to her house?

A-She came to my house.

Q-Was there anyone else at your house at the time?

A-Yes, my sister was in my house.

Q-Do you recall---if you recall, at around the time Ms. Gomez arrived at your house on that date, the Anniversary of her mother's death, do you recall, if you recall, at approximately what time Ms. Gomez arrived on that date, on the Anniversary of her Mother's death?

A-No, I really don't remember

Q-Do you remember if it was daylight or evening

A-It was the afternoon.  I think it was the afternoon.

Yoselin Amarante, Cross Examination (T. 1615)

Q-Do you as you sit here now, know what day in November 2008 she was with you?

A-Not exactly, I don't remember.

11. Ms. Amarante's failure to attest with certainty that Ms. Gomez was present with her on the day of the incident, presented a flawed alibi which denied Petitioner her right to a fair trial as well as effective assistance.  Ms. Amarante's uncertainty precluded Petitioner from having a notice of alibi which is recognized of a defense witness which implicates the defendant's Sixth Amendment fundamental right to present witnesses in his or her defense (See Taylor v. Illinois, 484 U.S. 400 (1988)). Defense Counsel's failure to adequately prepare Ms. Amarante for testimony during trial, violated Petitioner' 6th Amendment right to providing an appropriate defense which entailed proffering evidence which was exculpatory in nature, thereby violating Petitioner's Due Process rights.

5

12. As set forth under <u>Strickland v. Washington,</u> 466 U.S. 668 (1984) Petitioner argues that counsel's performance was deficient and that counsel's deficiency has prejudiced Petitioner. Counsel's errors were so serious that it undermined Petitioner's 6th amendment right to a fair trial. It is Petitioner's argument that there is a reasonable possibility that had it not been for counsel's unprofessional errors, the results of the proceedings would have been different. The Court in <u>Henry,</u> 409 F.3d at 65 states "An alibi defense is fraught with danger, for an attempt to create a false alibi is generally accepted as evidence of consciousness of guilt".

13. Defense counsel elicited an alibi for an improper date, which could not have been a strategy since defense counsel undoubtedly, knew when the crime occurred. Therefore, her representation fell below an accepted level of professional competence.

14. Likewise, trial counsel failed to conduct appropriate investigations by failing to contact three witnesses whose testimony could have been exculpatory in nature. The good character or reputation of the accused is not a defense as a matter of law, but is a fact for the jury's consideration in connection with other facts. A defendant is allowed to introduce evidence of his or her good character and reputation, where such evidence has reference to a trait in the offense with which he or she is charged, <u>Hoffman v. State,</u> 95 So.2d 643 (2007). A defendant in a murder prosecution is denied effective assistance of counsel where the defendant's claim that he or she has given defense counsel the name and address of a crucial witness, who counsel fails to contact, is supported by the corroborating affidavit of the witness in question. (See <u>People v. Castaneda,</u> 189 A.D.2d 890 (1993)).

15. Petitioner avers that defense counsel's failure to conduct appropriate investigations for witnesses who could have potentially proffered exculpatory information for the defense, was absent strategic explanation or other legitimate explanation for her shortcomings. Likewise, Petitioner has been prejudiced by the failure to contact such witnesses where had they been called; there is a reasonable possibility that the results of the proceedings would have been different. The

6

primary witness whom Petitioner advised defense counsel to contact, to no avail, was Ramon Diaz who was mentioned in the trial record (T. 1051). Mr. Diaz had the capability of testifying about Petitioner's good character. Although the good character or reputation of the accused is not a defense as a matter of law, it is a fact for the jury's consideration with other facts, Hallengren v. State, 14 Md.App. 43, 286 (1972).

16. Moreover Diaz had the capability of testifying to the truthfulness concerning the relationships of all parties with Petitioner. Being that Diaz employed all parties in the case, he had awareness of their circumstances on a personal level. Likewise, Mr. Diaz had the potential to impeach the credibility of Flor Cepada's denial of an acrimonious relationship with Petitioner. Inasmuch as potentially exculpatory witnesses are concerned that defense counsel failed to call includes Victoria Alvarez who was mentioned during Petitioner's trial. Ms. Alvarez was the attorney who prepeared all of the legal documents such as (Last Will, Power of Attorney, Health Care Proxy, etc.) for Petitioner and Ms. Flor Cepeda. This attorney had the capability of testifying concerning the veracity and authenticity of such documentation that would not have been admitted into evidence, whereby the ruling of the court would have been different with respect to admitting such documentation into evidence, thereby establishing the prejudice prong set forth under Strickland (supra).

17. The final witness that defense counsel failed to call is Donna Garcia who also worked for Ramon Diaz but was further acquainted with all parties outside of work. Ms. Garcia was further acquainted with Petitioner, Pazmino and Cepeda for years. Being that Garcia was cognizant of the actual relationship between Petitioner, Cepeda, and Pazmino, defense counsel's falure to call this witness constituted prejudicial error, which rendered Petitioner's trial fundamentally unfair.

18. Petitioner asserts that "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense...the right to defend is given directly to the accused, for it is he who suffers the consequences if the defense fails", Faretta v. California, 422

7

U.S. 806 (1975). As such, "Certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate", Florida v. Nixon, 543 U.S. 175 (2004); McCoy v. Louisiana, 138 S.Ct. 1508 (2018). Petitioner further contends that "the right to defend is personal and a defendant's choice in exercising that right 'must be honored out of that respect for the individual which is the lifeblood of the law"., McCoy (supra) (quoting Faretta (supra)).

19. Counsel must respect those fundamental decisions, even if he disagrees with them. A lawyer cannot usurp his client's constitutional right to chart the course of her defense- a choice reflecting, "what the client's objectives in fact are", because ultimately, the defendant's life and liberty are at stake, not her lawyer's life.

## POINT IV

### THE FACTUAL DETERMINATION BY THE STATE COURT WAS NOT SUPPORTED BY THE RECORD

20. Petitioner argues that the presumption of correctness is not irrefutable. "If a state court determination is fairly supported by the record, and thus presumed correct, the Petitioner in an evidentiary hearing may nonetheless prevail by shouldering the burden by establishing 'by convincing evidence that the factual determination by the State Court was erroneous", Lafferty v. Cook, 949 F.2d 1546 (1991). Being that "The presumption of correctness obtains unless one of the circumstances listed in section 2254(d)(1) to (7) exists, unless the [state court] determination is not fairly supported by the state court record, or unless the petitioner shows by convincing evidence that the factual determination by the state court is erroneous", see Tinsley v. Borg, 895 F.2d 520 (1990).

21. Petitioner contends that the factual determination given by the state court that "Further, the Supreme Court properly sustained the defendant's objections to certain improper comments and corrected any possible prejudice by issuing curative instructions", People v. Gomez, 153 A.D.3d 724 (2017) is not supported by the record with respect to curative instructions being given for each prejudicial comment made during summation. The Second Department's uncertainty to this

8

aspect is depicted in their statement "To the extent that some of the prosecutor's other comments were improper, any error was not so egregious as to have deprived the defendant of a fair trial".

22. Despite Second Department's statement "the court providently exercised its discretion in determining that the probative value of the evidence outweighed any prejudice to the defendant", People v. Gomez, (supra), this is not supported by the record being that the record demonstrates that without these prior allegations of an acrimonious relationship between Petitioner and Ms. Cepeda as well as threats aimed at Mario Rei, it would be quite difficult to determine that Petitioner had any motive at all to allegedly participate in this crime. Evidence of these prior bad acts provided ample background, motive, and intent evidence, which was highly prejudicial to Petitioner. The evidence of these prior bad acts, did, in fact, denigrate the defense, contrary to the Second Departments' decision, therefore, Petitioner argues that this opinion is not supported by the record. In rebutting such presumption of correctness, Petitioner need only establish by a preponderance of the evidence that her right to a fair trial has been violated (See Tamayo-Reyes v. Keeney, 926 F.2d 1492 (1991)), a burden which Petitioner has clearly met.

## POINT V
### THE PROSECUTION VIOLATED BRADY, THEREBY VIOLATING PETITIONER'S FUNDAMENTAL RIGHT TO A FAIR TRIAL

23. The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution impose an absolute obligation on a prosecutor to disclose to the defense favorable evidence "material either to guilt or punishment", (Brady v. Maryland, 373 U.S. 83, 87 (1963). Failure to do so will violate Due Process. Under the Federal standard, evidence is material if there is a "reasonable probability" that, had the prosecution timely disclosed the evidence, the results of the proceedings would have been different.

24. Defense Counsel made a specific request to turn over the documents they received for the subpoena of co-defendant Luis Rosado's telephone records, the T-mobile 2008 cell sites (T. 698), as well as the information recovered in a search warrant

9

executed on Petitioner's AOL account (T. 694). The prosecutor's response to such request was "Judge, with respect to Mr. Rosado's telephone records I subpoenaed, defendant's telephone records I subpoenaed. I'm not introducing either one of those records. I'm not even sure I have them. I know they were subpoenaed. I don't believe we have them. We may have them, I don't plan on using them" (T. 695). Despite Mr. Clark not intending on using the foregoing records during trial, the prosecution still had an ongoing obligation to disclose such material under the CPL §240.22 (h) statute.

25.   As such, the defense could have impeached the credibility of witnesses such as Luis Rosado and Gioconda Pazmino being that it would have undoubtedly established a close relationship between one another, a relationship they denied during their testimony. Rosado's phone records would have established that he had continued communicating with Pazmino, after Pazmino left Tampa, Florida in September of 2008. This was a fact that the prosecutor denied, trying to establish that Rosado and Pazmino just had "a work relationship" that lasted only three weeks, as he argued during summation, attacking the defense theory that Petitioner was framed by Rosado and Pazmino.Being that Rosado's phone records could have shown his activities the days before the date of the crime.

26. Petitioner's phone records had the potential to reveal information favorable to her that could have potentially impeached Ms. Cepeda's and Pazmino's testimony. With respect to Petitioner's phone records, defense counsel argued, "So if he has the records and they are arguable Brady material, he can say she didn't bring her phone. But if he has the records, I demand they be turned over. If there's cellular records that shows my client's phone was answering in Florida, it's Brady material (T. 697). Nondisclosure of Rosado's and Petitioner's phone records prevented the defense from conducting a proper cross-examination of Rosado and Pazmino, thereby violating her right to a fair trial. For these reasons, Petitioner is requesting permission under rule 6 (a) of the Federal Rules of Civil Procedure for discovery of the portions of Brady material that was not turned over to the defense. Specifically, Petitioner is requesting the complete T-Mobile phone

record, the T-mobile 2008 cell cites as well as the information recovered in a search warrant executed on Petitioner's AOL account.

27. Petitioner argues that the unavailability of such records violated her right to a fair trial being that such information was material and had the prosecution turned such material over to the defense; there is a reasonable possibility that the outcome of the proceedings would have been different. Petitioner asserts that the phone records and AOL documents were exculpatory in nature and could have established Petitioner's constant communication with Flor Cepeda prior to the passing of Petitioner's mother. This information was crucial to the defense in that Ms. Cepeda denied being in a relationship with Petitioner (contrary to what material would have displayed) and had not communicated with Petitioner before Petitioner's mother passed on November 12, 2006.

28. The absence of the state to turn this over to the defense was of such prejudicial nature that it violated the due process rights under Brady as well as Petitioner's right to a fair trial.

<u>POINT VI</u>

PETITIONER WAS DEPRIVED OF A FAIR TRIAL BY THE ADMISSION OF UNNECESSARY AND UNDULY PREJUDICIAL TESTIMONY THAT SHE PREVIOUSLY SOLICITED INDIVIDUALS TO KILL OR FRAME THE DECEDENT

29. There was an extensive amount of testimony regarding Petitioner's business relationship with, and threats aimed at, Mario Rei, as well as her romantic interest in his wife Flor Cepeda, that provided ample background, motive and intent evidence. In allowing the sensational testimony that Petitioner tried unsuccessfully to recruit her father and, later, a drug-dealing customer, to kill Rei, and another individual to purchase and plant drugs in Rei's house, the court failed to properly balance the extraordinary prejudicial effect of this evidence against its limited additional probative value.

30. This unnecessary evidence was the height of propensity evidence, made worse by the admission of the unnecessary chilling responses of the potential hitmen, and cast such a long shadow on the trial as to deprive Petitioner a fair trial. The Court in <u>McKinney v. Rees,</u> 993 F.2d 1378 held that a state prisoner's use of other acts"

11

as character evidence was fundamentally unfair in violation of due process principles and warranted federal habeas corpus relief under the *Brecht* test for harmless error; "The analysis that leads us to conclude that the erroneous admission of propensity evidence rendered McKinney's trial fundamentally unfair in violation of the Due Process Clause is similar to the analysis we must undertake to determine whether his conviction must be set aside on collateral review", McKinney, (supra).This kind of error is 'trial error' that necessitates habeas relief when it results in grievous wrong to a defendant at the hands of the state. Petitioner requests this Honorable Court to assess the prejudicial impact of constitutional error in a state-court criminal under the 'substantial and injurious effect' standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).

**Wherefore**, Petitioner prays this Honorable Court to grant immediate release, or, in the alternative, discovery as well as an evidentiary hearing in order to demonstrate the egregious violations of federal law for which she is currently imprisoned for.

Respectfully Submitted,

Ynmaculada Gomez
14G0730
Bedford Hills Correctional Facility
247 Harris Rd.
Bedford Hills, NY 10507

12