UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| YNMACULADA GOMEZ,<br><br>                Petitioner,<br><br>v.<br><br>AMY LAMANNA, as Superintendent of Bedford Hills Correctional Facility,<br><br>                Respondent. | **AMENDED AND RENEWED PETITION UNDER 28 U.S.C. § 2254 FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**<br><br>Docket No.  1:18-cv-07252-AMD-LB |

Petitioner Ynmaculada Gomez ("Petitioner" or "Gomez"), through her undersigned attorneys, respectfully submits this amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently incarcerated in the Bedford Hills Correctional Facility.

### Preliminary Statement

The Constitution unambiguously mandates that a defendant in a criminal trial has a right to be tried by an impartial jury.  Petitioner did not receive the benefit of that Constitutional guarantee when the trial court judge, during *voir dire*, intimidated members of the jury pool to keep quiet with any reservations they might have as to their inability to remain impartial or to fully understand the testimony they were to hear.  Although even the state appellate court stated that the trial court's actions in this regard were "improper," it nevertheless concluded, without explanation, that Petitioner should not receive a new trial.

The actions of the state courts do not simply constitute a series of errors over which reasonable jurists could disagree.  Rather, they amount to a quintessential unreasonable application of constitutional law in that actively attempting to undermine a defendant's right to an impartial jury does not involve a judgment call that could arguably go either way.  Indeed,

one federal appeals court has held that virtually the same exact acts of a federal district court judge constituted an abuse of discretion that warranted a new trial. While that decision is not binding, it is at least persuasive authority as to whether the state courts unreasonably applied clearly established Federal Law as announced by the United States Supreme Court that a trial court judge has an affirmative duty to ensure that the defendant in a criminal trial is being judged by an impartial jury.

## Summary of the Case and Relevant Procedural History

Petitioner was charged in an indictment with one count of second degree murder, two counts of criminal possession of a weapon and tampering with physical evidence in connection with the shooting death of Mario Rei, and was eventually convicted of all counts after a jury trial. On July 14, 2014, Petitioner was sentenced to twenty-five years to life imprisonment on the murder charge, fifteen years for each weapon possession count and one and one-third years to four years on the tampering count, all to be served concurrently.

### *The Trial Court Judge's Improper Statements During Jury Selection*

On the first day of jury selection, and after some preliminary remarks, the trial court judge (Hon. Kenneth Holder, J.S.C.) informed prospective jurors how long the trial was expected to last and asked whether anyone would be unable to serve as a result of "pressing business" or "personal reasons." (V 41, 100-01).[1] One of the first of the prospective jurors to raise their hand turned out to be a police officer and stated that his "professional bias" would prevent him from being fair to the defendant. (V50). The officer explained that in his experience, the evidence against the defendant was probably strong "if you're going this far with the charge." (*Id.*) The trial court judge rewarded the police officer's honesty by berating him as to whether the

---

[1] "V" refers to the *voir dire* transcript pages. Unprefixed umbers in parentheses refer to the pages of the trial transcript.

presumption of innocence meant anything to him. (V51). The officer responded that he understood what it meant, but "speaking in all honesty," he could not set his personal views aside, explaining that while he "would like to say he would give [Petitioner] the benefit of the doubt . . . at the end of the day I don't want to second guess myself and hurt someone else." (V51-52). While the trial court judge released the police officer from serving on the panel, he stated in view of the other jurors:

> [Y]ou really have no business in this courtroom. I'm not sure you have any business being a police officer. I'm going to tell you that straight up, okay. But you cannot walk into this courtroom and simply just prejudge this case because it's gotten to this level knowing that you know zero about this case, all right. That's pretty shameful as a police officer.
>
> And quite frankly, I'm disheartened to actually hear you say that and it makes me wonder about the job you do.
>
> Get out of my courtroom. You, frankly, have no [business] coming in a courtroom. [V52].

The trial court judge subsequently told the jury:

> This is one, in my estimation, one of the pitfalls of what you can have in a criminal justice system. You cannot have a system where without any evidence whatsoever or knowing anything about any case simply because someone is arrested or ends up in a trial situation, that you can judge that they are guilty of whatever it is they are charged with. For those words to come out of a police officer is, frankly, sickening. That's just my personal opinion, okay. [V53].

The trial court judge then proceeded to question a number of prospective jurors who said they had trouble understanding English. Before excusing these jurors, the trial court said he would be sending them to English classes for ten weeks: "Okay, we're going to send you for English lessons today. I'm going to excuse you and send you to English lessons for 10 weeks." (V72-73). The trial court judge later repeated his threat of sending jurors to mandatory English classes and questioning whether those jurors were being truthful: "I'll be honest with you. I

don't really believe you.  I'm having a little problem with this.  I'm going to send you for English lessons . . . We are going to help you out.  Twenty-four years here . . . . Ten weeks of English lessons   . . . Good luck."  (V106).  The trial court judge refused to excuse one prospective juror who said he had difficulty with English.  (V111-13).

The trial court similarly scolded prospective jurors who asked to be excused for job-related reasons asking what their employers would do if they were "hit by a bus," a "train ran over your legs," or if you "broke both your legs."  (V60, 62, 103, 122).  The trial court refused to excuse these jurors.  (V122).  While the trial court judge did, on the other hand, excuse several students, it upbraided many of them, suggesting that they should have read the jury service notification more carefully.  (V43-44, 58-59, 66, 70-71, 119).  Indeed, on the second day of jury selection, one prospective juror stated that she was a student and had missed class that day, but had not said anything earlier because she was "afraid" to do so based on the trial court judge's behavior towards other prospective jurors.  (V183).  Both parties consented to excuse this juror.

At this point, defense counsel moved for a "dismissal of this panel and mistrial" on the grounds that the judge's repeated questioning of the honesty and integrity of prospective jurors had intimidated the members of the jury pool to come forward and speak honestly about their ability to judge the case impartially.  Specifically:

> I think it's been apparent throughout the picking of this jury, many of the jurors have been intimidated that your Honor has . . . said that he didn't believe what they were saying or the police officer didn't belong in the courtroom when he was just expressing what he said to be the truth.

> I think this young lady demonstrates how scared members of this jury are to come forward to even say they don't understand the language, especially since I have a client that doesn't speak English.  It puts us in a very difficult place.  [V184]

4

The trial court judge denied the motion, stating that he was right to observe that prospective jurors who had said they did have a sufficient grasp of English "were faking," and that it was right to call the police officer's admission that he could not be impartial "reprehensible." (V185-86). Indeed, the trial court judge suggested that he was doing Petitioner a favor by upbraiding him because it was "consistent with supporting your client and her ability to get a fair trial." (*Id.*) The trial court judge even denied that any of the jurors were affected by anything he said even when defense counsel pointed out to him that one prospective juror explicitly stated she was afraid to come forward. (V186). The trial court judge rationalized the contradiction by claiming that he observed some prospective jurors laughing at his jokes and that others were willing to engage him in a "back and forth" (V211-12).

During her *voir dire* defense counsel took the opportunity to ask prospective jurors if they felt they could not be fair or could not sit on the pane, even if they felt "too intimidated to say so." (V245-46). While none raised their hands immediately, some would later indicate that they had potential scheduling conflicts that they had not previously mentioned because the court had asked prospective jurors what their employers would do if they got "run over by a truck." (V257, 260). The trial court judge stated that he viewed this as tactic to "squeeze out of this jury that they're fearful of disclosing things . . . ." (V271). Defense counsel again objected to the jury panel on her previously stated grounds and moved for a mistrial. The trial court judge denied the motion. (714-17).

*Pretrial Motions*

The prosecution moved to admit evidence of prior uncharged bad acts pursuant to *People v. Molineux*, 168 N.Y. 264 (1901), a description of which is available in Petitioner's *pro se* filing. (ECF Dkt. # 1 at 21-23). In brief, the prosecution argued that this evidence would be

introduced to show Petitioner's acrimonious relationship with the victim and the fear that one Prosecution's witnesses, Gionconda Pazmino, allegedly had of Petitioner.   In allowing the introduction of the evidence, the trial court rejected Petitioner's argument that the evidence was more prejudicial than probative.

<u>*The Trial*</u>

The details of the Petitioner's trial are set forth in the brief that was submitted in support of Petitioner's state court appeal and which accompanied Petitioner's *pro se* filing.  (ECF Dkt. # 1 at pp. 23 to 43).  In brief, Petitioner was accused of hiring an individual named Luis Rosado to murder a former employee of hers named Mario Rei.  The alleged motive was that the two were former business partners who had falling out with one another, and that Petitioner was a jealous woman who had romantic intentions towards Rei's wife, Flor Cepeda.  Whatever the precise nature of the relationship, Cepeda, Rei and Petitioner, since meeting in about 2001 in Queens were generally on friendly terms with one another and the three would take vacations together in the Poconos and Tampa, Florida.  (867-68, 877).

According to the prosecution, the three also had a quasi-business relationship.  Because Cepeda and Rei were in the country illegally, they believed that they could not enter into certain business transactions in their own name.  (869, 907-08).  Accordingly, Petitioner obtained auto insurance, a lease for their apartment and credit cards for Cepeda in Petitioner's name, although the understanding was the Cepeda and Rei would be responsible for payment.   In return, Petitioner would receive free auto mechanic services from Rei.   (*Id.*)   The relationship deteriorated when Cepeda and Rei came to the conclusion that their immigration status did not require their business dealings to be done in Petitioner's name.  (869-70).  Cepeda claimed that

she and Rei fought with Petitioner, who in turn threatened to report them to immigration. (*Id.*) In 2005, Cepeda and Rei moved to Charlotte, North Carolina. (871-72).

The three apparently reconciled about eight months after Cepeda and Rei moved to North Carolina, when Petitioner emailed Cepeda saying that her mother had died. (871-73). The two began to talk regularly when Cepeda invited Petitioner to visit. Petitioner then loaned Cepeda between $3,000 and $5,000 from Petitioner so that she could move back to New York. (875-77). Cepeda apparently changed her mind, and instead she and Rei moved to Tampa, Florida. (877).

While in Tampa, Cepeda and Rei met at Petitioner's Tampa home. (878-82). Petitioner offered to transfer title of a second home in Tampa to Cepeda and Rei, where they would live, and they would give Petitioner monthly payments for the mortgage. (880-83). The prosecution attempted to elicit that Petitioner hoped to use this arrangement as some sort of tax evasion scheme. The three also opened up a "tire shop" called the Tire Flea Market. (885-87). Cepeda testified that Rei contributed $5,000 to the start up costs, although the business was incorporated and registered under Petitioner's name, supposedly because of Rei and Cepeda's immigration status. (886-87). The business did not last long, as Petitioner accused Rei of stealing money and Rei accused Petitioner of not paying him. (888). Rei announced he was quitting the business and wanted his $5,000 back, which Petitioner told him she didn't have. (889). Rei and Cepeda stopped paying their share of the mortgage on Petitioner's Tampa home. (893). They eventually returned to New York where Rei got a job as a mechanic at his former employer's Queens auto shop. (897-98).

After Rei and Cepeda quit the business, Petitioner contacted Gioconda Pazmino to essentially take Cepeda's place at the tire shop. Petitioner and Pazmino had been a couple for eight or nine years before they broke up in 2000 or 2001. (1010-12). Pazmino agreed to move

to Tampa and lived with Petitioner for the three months she ended up staying there.  Pazmino casually knew Rei and Cepeda.  (1017-18, 1022, 1056).

In July of 2008, Petitioner asked Pazmino to go and visit Cepeda and have her sign documents transferring ownership of the Tampa house back to Petitioner.   (894-86, 1019).  Pazmino testified that Petitioner told her to tell Cepeda that she would tell Rei that the two had been in a romantic relationship if she did not sign the document.  (1019-20).  Cepeda refused saying nobody would believe Petitioner anyway.  (1021).  Pazmino claimed that when she brought the news back to Petitioner, Petitioner got angry and said she was going to kill Rei.  (1022).  Pazmino claimed that she overheard Petitioner ask her father, Joel Gomez, to kill Rei for her.  (1108-09).  She testified she also overheard Petitioner offer a drug dealer who was at the tire shop $3,000 to kill Rei.  (1023-24).  Pazmino also claimed that Petitioner gave someone $300 to plant drugs in Rei's house.  (1024).  In September of 2008, Pazmino and Petitioner got into an argument, when Petitioner told Pazmino to leave.  Pazmino asked for her outstanding pay, but Petitioner said she did not have the money, but gave her train fare back to New York.  (1025-26).

Luis Rosado who confessed to killing Rei, agreed to testify against Petitioner in exchange for being permitted to plead guilty to manslaughter with a maximum sentence of 24 years imprisonment.  (1367-68).  He testified that he had visited the Tampa tire shop in March or April of 2008 and later Petitioner hired him to be a mechanic.  (1293).  He testified that he met Rei once in passing, but did not know him.  (1293-95).  On the other hand, he testified that he was better acquainted with Pazmino having worked along side her for three weeks, and that Pazmino came to Rosado's apartment when she quit and told him about her argument with Petitioner.  (1298-1300).  Rosado testified that Petitioner had told him he wanted Rei dead because he stole

money from the business and had stopped paying the mortgage  (1297-98).  Rosado traveled to New York with Petitioner to see an attorney to resolve the problem of the ownership of the Tampa property.  (1300-01).

Rosado testified that Petitioner and he stayed with Pazmino when they arrived in New York, at which time Pazmino gave a cell phone to Petitioner that she had bought on Petitioner's instructions. (1026-28).  Pazmino and Rosada testified that they drove around Queens with Petitioner and eventually found him at a repair shop in Corona. (1304-05).  Rosado said that he agreed with Petitioner that he would kill Rei on Halloween, but that he apparently did so just to "get her off my back." (1306-08).  Pazmino testified that Petitioner left a gun with Pazmino that she understood Rosado was to use. (1032). Nevertheless, Rosado testified that he intended to have Pazmino drive him in her husband's silver car to where Rei worked and shoot Rei. (1363064; 1395-96).  Rosado ultimately aborted his plan, had Pazmino drive him to Penn Station, and he returned to Florida the next morning.  (1310, 1396).

Rosado testified that when he returned to Florida, and informed Petitioner that he had not killed Rei, she demanded he go back and do it, although at first he refused.  (1312).  Rosado claimed he eventually accepted when Petitioner said he could live rent free in Petitioner's home and continue to work for her.  (1312-14).  Rosado testified that they went up from Florida to New York in gold Dodge Caravan that Rosado borrowed from a friend and Petitioner brought a different cell phone than he had previously seen her with.  (1314-17).  Pazmino testified that she received a call from Petitioner at around this time who said she was coming to New York commemorate the anniversary of her mother's death with family.  (1036).

Pazmino testified that she called Petitioner at around 2:00 p.m. on November 12, 2008 in response to several calls she had received from her, and was told to retrieve a gun that was in

Pazmino's bedroom (which Rosado had supposedly left in her apartment on his previous visit) and bring it to the corner of 60th Avenue and Calloway Street.  Pazmino testified that she went to the meeting spot, saw Rosado and gave him the gun. (1040-42).

Rosado that he returned to the Dodge Caravan and then he and Petitioner drove to the shop where Rei worked and parked about a half a block away.  (1324-25).  Rosado testified that he exited the vehicle at about 5:00 pm and hid behind a school bus parked across from the shop. About fifteen minutes later, according to Rosado, Rei came out of the shop and Rosado shot him three times in the chest.  (1326-30).  Rosado said he ran back to the Dodge and he and Petitioner drove away and headed to Florida, where, along the way in Maryland, Petitioner threw the cell phone she had been using out of the car window.  (1332).  Notably, Rosado testified that he held on to the gun and returned it to Petitioner a week later.  (1333-34).  One of the first witnesses that police interviewed at the scene described the fleeing car as a silver Dodge Caravan, the same color of Pazmino's car, according to Rosado.  At trial, he repeated that he the color of the vehicle he saw fleeing the scene was silver.  (996-97).

Cepeda was informed of her husband's shooting the same evening.  (899).  She was visited by detectives, and gave them Petitioner's name claiming they had been fighting.  (*Id.*) That same night, while at a friend's house, Pazmino heard a news report of the shooting and called a friend who was an NYPD detective.  (1046, 1073).  She testified that after several meetings with police, she told them where she gave Rosado the "package." (1258-60).

On December 2, 2008, Rosado and Petitioner were arrested in Florida.  (1148-50, 1588-89).  The next day, police searched Petitioner's home and found a Glock in an unconcealed duffel bag in Petitioner's apartment.  (1165-67, 1582-84).  Law enforcement personnel testified that a bullet recovered from Rei's body came from the gun recovered from Petitioner's home.

(762).  Petitioner had previously reported the gun stolen and stated to police officers that she thought Pazmino might have taken it to New York.  (1212-15, 1222).

The defense called Petitioner's former in-law, Yoselin Amarante, who testified that she was with Petitioner in Tampa around the time of the anniversary of Petitioner's mother's death in mid-November 2008.  (1606-08).  Petitioner's brother testified that their mother's died on November 12, 2006.  (1631-32).  In rebuttal, the prosecution elicited that Amarante told police officers, during a visit almost six years later, that Petitioner was with her between mid-November and early December 2008.  (1671-73).

For Petitioner's summation, her counsel argued that the only eye witness to the murder testified that he saw the gunman get into a silver car that drove away, which was the color of Pazmino's husband's car according to Rosado's testimony.  (1690-93).  Petitioner's counsel also pointed out that Flor Cepeda, who had used an alias, and Petitioner had a closer relationship than she had let on.  While making the point that the burden was on the prosecution to prove its case beyond a reasonable doubt, Petitioner's counsel argued that Rosado and Pazmino had worked together to frame Petitioner as the mastermind of Rei's murder to lessen their own culpability. He pointed out that it was odd that Petitioner would supposedly destroy the cell phone on her way back to Florida after the murder, but she would hold on to the murder weapon.  (1713).

In addition to recounting the evidence presented in its case in chief, the prosecution argued to the jury that there would be no motive for Rosado and Pazmino to agree to murder Rei in the first place as both had testified that they barely knew him or Cepeda.  The prosecution also argued that there was no evidence of any silver car, claiming it "does not exist."  (1747).

Petitioner's counsel moved for a mistrial at the close of the summation based on comments the prosecutor made that Petitioner was involved in a tax evasion scheme. While the trial court denied the motion, but gave a curative instruction during jury instructions.

The jury convicted Petitioner of all charges. The court sentenced her to concurrent terms of twenty-five years to life for the murder charge and fifteen years for each count of criminal possession of a weapon.

### *Petitioner's State Court Appeals*

Petitioner timely appealed to the Appellate Division, Second Department. The grounds raised by Petitioner's counsel were: (i) that Petitioner was deprived of her right to a fair trial by an impartial jury under the New York State law and the Sixth Amendment of the United States Constitution made applicable to the States by the Fourteenth Amendment by virtue of the trial court judge's comments to the jury pool during *voire dire*; (ii) that Petitioner was deprived a fair trail by the prosecution's summation remarks accusing her of tax fraud and other denigrating remarks and that trial counsel was ineffective for failure to object; (iii) that the trial court erred in admitting evidence of prior bad acts; and (iv) that the evidence was insufficient to support a conviction on the tampering with physical evidence count. Petitioner submitted a *pro se* brief to the Second Department that raised the additional argument that she was deprived of effective assistance of counsel by virtue of presenting a flawed alibi defense as a result of poor trial preparation.

By decision dated August 17, 2017, the Second Department rejected Petitioner's appeal in its entirety. *People v. Gomez*, 153 A.D.3d 724, 61 N.Y.S.3d 70 (2d Dep't 2017). The court conceded that the trial court judge's comments during *voir dire* were "inappropriate," but held, in conclusory terms, that the remarks did not warrant reversal. The court additionally held that the

trial court judge properly exercised his discretion to admit evidence of prior bad acts for the purpose of demonstrating motive. The Second Department also held that the prosecution's remarks during summation were not improper, and that, in any event, the trial court judge's instructions were sufficient to cure any prejudice. Lastly, the court did not consider the ineffective assistance of counsel claim raised on Petitioner's *pro se* supplemental briefing, holding that it was more properly the subject of a motion under N.Y. CPL § 440.10.

Petitioner timely sought leave to appeal to the New York Court of Appeals. That application was denied on December 28, 2017. *People v. Gomez*, 30 N.Y.3d 1060 (2017).

At trial, Petitioner was represented by Sally Butler and Carla Comisso, 4240 Bell Boulevard, Bayside, New York 11361. On her appeal to the Appellate Division and on her application for leave to the appeal to the New York Court of Appeals, Petitioner was represented by Yvonne Shivers, Appellate Advocates, 111 John Street, 9th Floor, New York, New York 10038.

*Petitioner's Pro Se Filing and Related Matters*

Petitioner filed the instant petition on a *pro se* basis on December 28, 2018. The *pro se* filing raised six issues: (i) that the trial court's remarks during *voir dire* deprived her of her Sixth Amendment right to an impartial jury; (ii) that Petitioner was deprived of a fair trial by virtue of the trial court permitting the prosecution to introduce evidence of prior bad acts; (iii) that Petitioner was deprived of a fair trial by virtue of the prosecutor's inflammatory remarks during summation; (iv) that Petitioner was deprived of her right to effective assistance of counsel by virtue of presenting a flawed alibi defense at trial; (v) that the prosecution failed to turn over phone records it had subpoenaed from Rosado's cell phone carrier in violation of *Brady v. Maryland*; and (vi) that Petitioner's conviction was not supported by the record.

On January 24, 2019, Petitioner filed a letter with the Court requesting a "stay and abeyance" of her petition so that she could pursue unexhausted state court claims, specifically her argument that her trial court counsel was ineffective for presenting a flawed alibi defense at trial, which the Second Department did not consider and suggested Petitioner could pursue as part of a motion under N.Y. C.P.L. § 440.10.  (ECF Dkt. #7).  Petitioner explained that she filed the petition when she did because she felt it was necessary to preserve the claims she did exhaust in the State court proceedings.  The Court granted Petitioner's request for a "stay and abeyance" January 30, 2019.

By orders dated September 16, 2019, December 11, 2019 and February 21, 2020, the Court ordered Petitioner to inform the Court of the status of any state court proceedings.  On March 20, 2020, the undersigned counsel informed the Court that he believed the instant petition could proceed irrespective of whether Petitioner had brought a N.Y. CPL § 440.10 motion and took no position of its potential merits.  (CDF Dkt. #10).  The Court thereafter permitted Petitioner to file a renewed petition with the assistance of her newly retained attorneys.

At this time, no other petition or appeal on Petitioner's behalf is pending in any court as to the judgment that is be challenged in this case.  The Petitioner is serving no other sentences and has no other sentences to serve

### This Petition Was Timely Filed

This Petition is timely because it was filed within one year after the expiration of the amount of time to seek writ of certiorari from the United States Supreme Court.  *Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005).  In addition, the tolling provision of 28 U.S.C. § 2244(d)(2), which provides: "The time during which a properly filed application for State post-conviction or other collateral view with respect to the pertinent judgment or claim is pending

shall not be counted toward any period of limitation under this subsection." *See also Holland v. Florida*, 130 S. Ct. 2549, 2555 (2010) (noting that subsequent application for post-conviction relief in state court following United States Supreme Court's denial of certiorari stayed AEDPA one year limitations period).

Here, as noted above, the New York Court of Appeals denied Petitioner's application for leave to appeal on December 28, 2017, which gave Petitioner until March 28, 2018 to seek a writ of certiorari from the United States Supreme Court. Accordingly, this Petition is timely filed as it has been filed before March 28, 2019.

## **Grounds For Petition**

*Violation of Petitioner's Right To An Impartial Jury Based On The Comments*
*Of The Trial Court Judge During Voir Dire*

Petitioner contends that her right to trial by an impartial jury under the Sixth Amendment of the Constitution made applicable to State court prosecutions under the under the Fourteenth Amendment to the United States Constitution was violated by virtue of the trial court judge's repeated improper comments to the jury pool during *voir dire*. As explained in further detail below, the trial court judge's actions had the presumptive effect of intimidating jurors from revealing any potential biases they had that would be unable to allow them to judge the case impartially.

Petitioner's state court conviction is reviewed under the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, a habeas petitioner must demonstrate that the decision of state appellate court was either "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

15

Clearly established federal law for AEDPA purposes is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). As the Second Department did not identify an incorrect legal standard when assessing Petitioner's argument of lack of impartiality, the inquiry here is whether it "unreasonably appli[ed] it to the facts of the particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 405, 407 (2000). The state court, however, need not be presented with an "'identical factual pattern before a legal rule must be applied.'" *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)). The state court's application must be "objectively unreasonable, [and] not merely wrong." *Woodall*, 134 S. Ct. at 1702 (internal quotation and citation omitted). Nevertheless, "the increment of incorrectness beyond error need not be great; otherwise, *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Jackson v. Conway*, 763 F.3d 115, 135 n.19 (2d Cir. 2014) (quoting *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011)). In addition, "circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent." *Watts v. Wengler*, No. 1:12-cv-00215-CWD, 2014 WL 117567, at *3 (D. Idaho Jan. 10, 2014) (citing *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999)).

The Sixth Amendment to the United States Constitution, as made applicable to the states pursuant to the Fourteenth Amendment, provides that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." The Supreme Court has explained that "[a]mong those basic fair trial rights that can never be treated as harmless is a defendant's right to an impartial adjudicator, be it judge or jury." *Gomez v. United States*, 490 U.S. 858, 876 (1989). Based on this principle, the Court has clearly established that "while

16

impaneling a jury the trial court has a serious duty to determine the question of actual bias" although it retains broad discretion in deciding challenges from the prosecution or defense. *Dennis v. United States*, 339 U.S.162, 168 (1950). The Court has reiterated the principle that the trial court judge has a meaningful duty to ensure that the jury panel is impartial and free from "outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966); *see also Irvin v. Dowd*, 366 U.S. 717, 722 (1961). While, as noted above, trial courts have broad discretion to make a judgment call as to whether a particular juror in the *venire* will be impartial, it still necessarily follows from the clearly established principles espoused by the Supreme Court that the trial court itself cannot affirmatively create conditions where there is a real threat that jurors will not reveal biases they may have either against the defendant or in favor the prosecution. Or, as the Supreme Court has long observed: "It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Starr v. United States*, 153 U.S. 614, 626 (1894) (citation omitted).

It is true that there may not be an overwhelming body of case law that holds that a trial court judge cannot, consistent with the plain mandate of the Sixth Amendment, actively intimidate the jury panel from revealing their inability to remain impartial. This only demonstrates that it goes without saying that it is "an unreasonable application" of Supreme Court precedent (and common sense) for a trial court judge to do so. In one of the reported instances where a trial court judge acted in such a manner, the appellate court swiftly overturned a guilty verdict.

In *United States v. Rowe*, a jury convicted three defendants of forming a conspiracy to distribute cocaine and marijuana. 106 F.3d 1226, 1227 (5th Cir. 1997). During *voir dire* a

potential juror approached the district court judge and said she did not think she could be fair and impartial to the defendants because her brother was an undercover narcotics officer and her father was a police officer. *Id.* at 1228. After the district court judge asked the prospective juror if she could not "follow the order of this court and put aside your personal opinions," the prospective juror responded "I don't feel that my verdict would be fair." *Id.*   While the district court judge dismissed the juror, in front of the entire *venire* panel, she her to "see if you can figure out how to put aside your personal opinions and do your duty to your country as a citizen, because this kind of answer which is clearly made up for the occasion is not really great.  You are excused." *Id.*  In response to the district court judge's inquiry if anyone else on the panel had relatives in law enforcement, another prospective juror stood up and said: "I knew I was going to get myself in trouble when I said that, but, and I don't know really what I should say here, but I feel that . . . if the law enforcement agency has done [enough work] on somebody to get them here in court, they know what they're talking about."  Again, in front of the panel, the district court judge stated:

> It is appalling, actually, that you would come into a court, and presume that people were guilty because they were standing here charged with a crime.  That's not our system. And apparently you will not, or you cannot follow the instructions of the court, so you're excused.  Put her back on the jury panel for February, March and April, and perhaps you can take [sic] some remedial constitutional inquiries in the meantime.  Does anyone else feel that these people are guilty, without hearing anything further.  Now I don't want to scare you into not responding.  You will not be taken into custody.  It's just hard, it's actually hard for me to believe somebody who stands up and says that they believe that because someone's sitting here that they're guilty. [*Id.* at 1228-29].

None of the prospective jurors responded when the district court judge twice asked if anyone would be unable to follow its instructions. *Id.* at 1219.  At the end of *voir dire*, defense counsel

moved to strike the jury panel based on the court's treatment of the two members of the *venire* who stated their views, which made it unlikely that other jurors would be forthright about any reservations they had about their ability to remain impartial.  The district court judge denied the motion after asking the jury panel if anyone was "frightened" by the statements during *voir dire*.  A few weeks after the defendants were convicted, defense counsel moved for a new trial based on his claim that one of the juror's approached him in a restaurant and stated she "felt like she had no recourse but to sit there and keep her mouth shut, and that was the best thing she could do." *Id.* 1229.  The district court judge denied the motion.

The Fifth Circuit vacated the convictions.  Initially, the court rejected the notion that the district court's actions were akin to the typical admonishments that trial court judges give to prospective jurors who appear to be attempting to avoid service, which do not constitute reversible error. *Id.* at 1229 (citing *United States v. Shannon*, 21 F.3d 77, 82 (5th Cir.), *cert. denied*, 513 U.S. 901 (1994).  The court reasoned instead that the typical assumption that jurors answer questions honestly does not hold when they "are given reason to fear reprisal for truthful responses," and that courts should "presume that members of the panel are not fools." *Id.* at 1229-30.  The district court's action, the panel held, "cut off the vital flow of information from *venire* to the court." *Id.* at 1230.  While the responses from the two panel members "may offend the ideal that defendants are presumed innocent . . . such responses are far from dishonest or even atypical." *Id.*  Thus, the court concluded the district court abused its discretion in not dismissing the panel because "it became impossible for counsel to get the information from potential jurors necessary for jury selection." *Id.*  The court also held that it was not necessary to inquire whether the district court judge's conduct resulted in actual prejudice, observing that

"[i]ronically, the only two members of the *venire* who spoke up disclosed views that absent explanation or retreat disqualified them from services." *Id.*

As noted above, *Rowe* is at least persuasive authority as to whether the New York state courts unreasonably applied the clearly established Supreme Court rule that a trial court judge must take some effort to ensure that there is an impartial jury. In Petitioner's case, as in *Rowe*, the trial court judge did not simply use inartful language when admonishing a juror he believed was not being honest, nor did he make even an objectively incorrect judgment call as to whether to strike a potential juror from the jury pool. Rather the trial court judge here affirmatively made a point to berate one juror who, under his own circumstances, gave an answer about his ability to remain impartial was "far from dishonest or even atypical." *Rowe*, 106 F.3d at 1230. Indeed, the trial court judge took this a step further by threatening repeatedly (whether in jest or not) to send prospective jurors who had limited English proficiency from to mandatory English classes. One juror made it clear that she was intimidated into not saying that she was a student during the first day of *voir dire* for fear of repercussion from the judge. This behavior by the trial court judge was not simply "improper," as the Appellate Division characterized, but rather, objectively unreasonable in light of the gravity of the charges against Petitioner.

In sum, Petitioner is not asking the Court to construct its own rule of general applicability that she predicts the Supreme Court would fashion based on its earlier precedents. Rather the plain text of the Sixth Amendment and clearly established and axiomatic holdings of the Supreme Court make clear that the trial court judge has a duty to ensure that the jury panel is impartial. While the trial court judge is afforded a great amount of latitude in carrying out that goal, it cannot be anything other than an unreasonable application of clearly established Federal

law to affirmatively and gratuitously undermine that very principle.   Accordingly, the petition should be granted on this basis.

*Grounds Raised in Pro Se Petition Incorporated By Reference*

As indicated above, Petitioner *pro se* filing asserted that her conviction (i) that Petitioner was deprived of a fair trial by virtue of the trial court permitting the prosecution to introduce evidence of prior bad acts; (ii) that Petitioner was deprived of a fair trial by virtue of the prosecutor's inflammatory remarks during summation; (iii) that Petitioner was deprived of her right to effective assistance of counsel by virtue of presenting a flawed alibi defense at trial; (iv) that the prosecution failed to turn over phone records it had subpoenaed from Rosado's cell phone carrier in violation of *Brady v. Maryland*; and (v) that Petitioner's conviction was not supported by the record.   That filing made arguments in support of those claims that incorporated herein by reference.

## Conclusion

For all of the foregoing reasons, petitioner Jeffrey Joseph respectfully requests that the Court grant a writ of habeas corpus.

Dated: May 29, 2020

FRANZBLAU DRATCH, P.C.

/s/   Stephen N. Dratch
Stephen N. Dratch
233 Broadway, Suite 1800
New York, New York 10279
Tel: (212) 571-1808
sdratch@njcounsel.com
*Attorneys for Petitioner*