## United States District Court
## Eastern District of New York

18-CV-07252
(Donnelly, D.J.)

YNMACULADA GOMEZ,

*Petitioner*,

against

Superintendent LaMann,

*Respondent.*

## AFFIDAVIT AND MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR A WRIT OF HABEAS CORPUS

MELINDA KATZ
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York  11415
(718) 286-6696

JOHNNETTE TRAILL
SHARON Y. BRODT
NANCY FITZPATRICK TALCOTT
    Assistant District Attorneys
        *Of Counsel*

JULY 15, 2020

## TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

AFFIDAVIT IN OPPOSITION TO PETITION FOR A WRIT
    OF *HABEAS CORPUS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    FACTUAL AND LEGAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            Petitioner's Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    THE CURRENT APPLICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR
    A WRIT OF *HABEAS CORPUS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    POINT ONE

            THE COURT'S COMMENTS DURING JURY DID NOT DEPRIVE
            PETITIONER OF A RIGHT TO A FAIR TRIAL.. . . . . . . . . . . . . . . . . . . . . . . 13

    POINT TWO

            PETITIONER'S CLAIM REGARDING THE TRIAL COURT'S
            EVIDENTIARY RULING DOES NOT PRESENT A FEDERAL
            CONSTITUTIONAL ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    POINT THREE

            PETITIONER'S CLAIM THAT SHE WAS DENIED THE
            EFFECTIVE ASSISTANCE OF COUNSEL IS UNEXHAUSTED. . . . . . . . . . 32

    POINT FOUR

            PETITIONER'S CLAIM REGARDING THE PROSECUTOR'S
            SUMMATION COMMENTS DOES NOT PRESENT A FEDERAL
            CONSTITUTIONAL CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

<u>Page No.</u>

## Cases

*Allan v. Conway*, No. 08-CV-4984, 2012 WL 70839, at *22 (E.D.N.Y. 2012). . . . . . . . . . . . . 31

*Aponte v. Scully*, 740 F. Supp. 153 (E.D.N.Y. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Beriguete v. Ercole*, 2015 WL 1840678 (E.D.N.Y. 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

*Boyd v. LeFevre*, 519 F.Supp. 629 (E.D.N.Y. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bradley v. Meachum*, 918 F.2d 338 (2d Cir. 1990), *cert. denied*, 501 U.S. 1221 (1991). . . . 34, 39

*Brecht v. Abramhamson*, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Collins v. Scully*, 755 F.2d 16 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,  28, 31

*Crane v. Kentucky*, 476 U.S. 683 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cupp v. Naughten*, 414 U.S. 141 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Darden v. Wainwright*, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Daye v. Attorney General*, 696 F.2d 186 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*DiGuglielmo v. Smith*, 366 F.3d 130 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Dowling v. United States*, 493 U.S. 342 (1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Estelle v. McGuire*, 502 U.S. 62 (1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 27, 28

*Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Gomez-Kadawid v. Kirkpatrick*, 2011 WL 2581838 (S.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . 15

*Gonzalez v. Sullivan*, 934 F.2d 419 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

*Harmon v. McVicar*, 95 F.3d 620 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jackson v. Tellado*, 295 F.Supp.3d 164 (E.D.N.Y. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Johnson v. Rosemeyer*, 117 F.3d 104 (3d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Klein v. Harris*, 667 F.2d 274 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Lawn v. United States*, 355 U.S. 339 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Mack v. New York*, 2004 U.S. Dist. LEXIS 3739 *21-22 (E.D.N.Y. March 11, 2004). . . . . . . . 36

*Malley v. Manson*, 547 F.2d 25 (2d Cir. 1976), *cert. denied*, 430 U.S. 918 (1977). . . . . . . 36, 37

*Mattox v. United States*, 156 U.S. 237 (1894). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Mu'Min v. Virginia*, 500 U.S. 415 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ohio v. Roberts*, 448 U.S. 56 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Padilla v. Brady*, 2015 WL 394090, at *6 (S.D.N.Y. Jan. 29, 2015). . . . . . . . . . . . . . . . . . . . . 32

*People v. Ahmed*, 66 N.Y.2d 307 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Baker*, 14 N.Y.3d 266 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*People v. Casanova*, 62 A.D.3d 88 (1st Dept. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*People v. Chapman*, 101 A.D.3d 406 (1st Dept. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*People v. Dorm*, 12 N.Y.3d 16 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Dudley*, 151 A.D.3d 878 (2d Dept. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21n.5

*People v. Gomez*, 153 A.D.3d 724 (2d Dept. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16, 27, 33

*People v. Gomez*, 30 N.Y.3d 1060 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*People v. Johnson*, 137 A.D.3d 811 (2d Dept. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Mason*, 132 A.D.3d 777, *lv. granted*, 26 N.Y.3d 1147 (2016). . . . . . . . . . . . . . . 21n.5

*People v. O'Gara*, 239 A.D.2d 215 (1st Dept. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*People v. Pinkney*, 272 A.D.2d 52 (1st Dept. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Porter*, 153 A.D.3d 857 (2d Dept. 2017)................................. 21n.5

*People v. Rodriguez*, 103 A.D.2d 121 (1st Dept. 1984). ............................. 39

*People v. Wirth*, 224 A.D.2d 1002 (4th Dept. 1996)................................. 28

*People v. Wisdom*, 120 A.D.3d 724 (2d Dept. 2014).................................. 29

*Picard v. Connor*, 404 U.S. 270 (1971)........................................... 32

*Ponnapula v. Spitzer*, 297 F.3d 172 (2d Cir. 2002)................................ 14

*Pulley v. Harris*, 465 U.S. 37 (1984)............................................ 14

*Ristaino v. Ross*, 424 U.S. 589 (1976)........................................... 15

*Robert Molina v. Christopher Artuz*, No. 98-CV-6089 (NG) (E.D.N.Y.)................. 15

*Rose v. Lundy*, 455 U.S. 509 (1982). ........................................... 33n.9

*Sams v. Walker*, 18 F.3d 167 (2d Cir. 1994). .................................... 15

*Schleeper v. Groose*, 36 F.3d 735 (8th Cir. 1994)................................. 14

*Sedney Delano v. Superintendent Greiner*, 2003 WL21821432 (E.D.N.Y. July 23, 2003). .... 37

*Taylor v. Scully*, 708 F.2d 886 (2d Cir. 1983).................................... 30

*Udzinski v. Kelly*, 734 F.Supp. 76 (E.D.N.Y. 1990). .............................. 34, 36

*United States v. Cruz*, 797 F.2d 90 (2d Cir. 1986)................................. 28

*United States v. Elias*, 285 F.3d 183 (2d Cir. 2002). ............................. 36

*United States v. Melendez*, 57 F.3d 238 (2d Cir. 1995)............................. 36, 37

*United States v. Modica*, 663 F.2d 1173 (2d Cir. 1981). ........................... 36

*United States v. Nersesian*, 824 F.2d 1294 (2d Cir.), *cert.denied*, 484 U.S. 958 (1987)........ 34

*United States v. Robinson*, 485 U.S. 25 (1988).................................... 35

*United States v. Rowe*, 106 F.3d 1226 (5th Cir. 1997). ............................ 18

iv

*United States v. Rubin*, 37 F.3d 49 (2d Cir. 1994)...................................... 15

*United States v. Torres*, 128 F.3d 38 (2d Cir. 1997)................................... 15

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081 (1990). . . . 34

*United States v. Young*, 470 U.S. 1 (1985). ..................................... 35, 36

*Weinberg v. Warden*, 2012 WL 5834393 (E.D.N.Y. Nov. 16, 2012). ..................... 35

*Wilson v. Corcoran*, 562 U.S. 1 (2010).......................................... 14

*Wilson v. Heath*, 938 F.Supp.2d 278 (N.D.N.Y. 2013)................................. 15

**Statutes**

28 U.S.C. § 2254. ................................................... 14, 27, 33n.9

C.P.L. § 270.15. ......................................................... 16

C.P.L. § 270.20. ......................................................... 16

C.P.L. § 270.25. ......................................................... 16

C.P.L. § 440.10. .................................................... 9, 11, 33

New York Penal Law § 125.25. .......................................... 3, 4

New York Penal Law § 215.40. .......................................... 3, 4

New York Penal Law § 265.03. .......................................... 3, 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                        :

YNMACULADA GOMEZ,

                                        :

                    Petitioner,          AFFIDAVIT

                                 :          IN OPPOSITION

          -against-              TO PETITION FOR

                                 :          WRIT OF *HABEAS*

Superintendent LaManna,           *CORPUS*

                   Respondent.  :

                                          18-cv-07252

                                 :          (AMD) (LB)
-----------------------------------------------------x

STATE OF NEW YORK )
                     ) ss.
COUNTY OF QUEENS  )

        **NANCY FITZPATRICK TALCOTT**, an attorney admitted to practice in this

Court, being duly sowrn, deposes and states as follows:

        1.     I am an Assistant District Attorney, of counsel to Melinda Katz, the District

Attorney of Queens County.  I am submitting this affidavit in opposition to the *pro se* application

of Ynmaculada Gomez for a writ of *habeas corpus*, filed in the United States District Court for the

Eastern District of New York on or about December 28, 2018, as well as the amended application,

through counsel, filed on or about May 29, 2020.  I make the statements in this affidavit upon

information and belief, based on my review of the records and files of the Queens County District

Attorney's Office.

        2.     By agreement with the Attorney General of the State of new York, the District

Attorney of Queens County represents respondent in this matter.

        3.     In compliance with this Court's January 10, 2019, Order, the  state is

submitting the following documents via ECF, along with a courtesy hard copy of this return: (a) the

transcript of petitioner's state court trial and sentencing proceedings; (b) the briefs filed on direct appeal in the Appellate Division, Second Department, and that court's decision; and (c) petitioner's leave application in the New York Court of Appeals, the State's response, and that court's decision denying leave.

## FACTUAL AND LEGAL BACKGROUND

4.    In the summer of 2008, petitioner was angry at her former business partner, Mario Rei, because she believed Rei had ruined her credit and her business, and alienated petitioner from Rei's wife, Flor Cepeda, about whom petitioner harbored romantic fantasies.  The couple had met petitioner in 2001, and they saw each other daily for years.  They socialized and traveled together, and petitioner helped them with legal matters.  At some point, Rei and petitioner planned to start a business together, for which Rei gave petitioner $5,000 cash.  Petitioner also transferred title of one of her homes to Cepeda's name, and Cepeda and Rei agreed to pay her for doing so, and to pay the mortgage and taxes.

5.    As the relationship soured between petitioner and the couple soured, petitioner asked her long-time friend and former lover Gioconda Pazmino, to get the couple to sign papers to transfer the house back to petitioner's name.  Rei refused until petitioner returned his investment in the business.  At petitioner's direction, Pazmino also threatened Cepeda that petitioner would expose their relationship.  Cepeda denied the relationship and refused to sign the papers.  When Pazmino relayed their responses to petitioner, petitioner – who Pazmino knew kept a black pistol in her dresser drawer – became angry and said numerous times that she was going to kill Rei.

6.    As a result, petitioner solicited her father to kill Rei, and, thereafter, solicited another individual.  Unable to come to an agreement with either of them, petitioner tried to convince

2

a third person to buy and plant drugs in Rei's home.  Unsuccessful in her attempts, in the fall of 2008, petitioner promised her employee Luis Rosado free housing for him and his family and job security if Rosado murdered Rei.  After petitioner threatened his family, Rosado agreed.

7.　　On November 12, 2008, petitioner and Rosado arrived in New York from Florida.  Rosado used petitioner's gun to kill Rei.  The two returned to Florida and Rosado returned the weapon to petitioner, who hid it in a bag in her closet.  When petitioner was ultimately arrested, the police executed a search warrant and recovered the weapon.  Ballistics tests confirmed it was the murder weapon.

8.　　For these crimes, petitioner and Rosado were charged, by Queens County Indictment Number 538/2009, with Murder in the Second Degree (New York Penal Law § 125.25[1]), two counts of Criminal Possession of a Weapon in the Second Degree (New York Penal Law § 265.03[1][b], [3]), and Tampering with Physical Evidence (New York Penal Law § 215.40[2]).[1]

9.　　Petitioner proceeded to trial before the Honorable Kenneth Holder, Queens County, and a jury.  During jury selection, the Court chastised a prospective juror who stated that, as a police officer, he was biased against petitioner.  After dismissing the juror, the Court impressed upon the prospective jurors the importance of the presumption of innocence in our system. Additionally, the Court asked some students who asked to be excused why they had not sought to defer serving, but excused all, stressing the importance of not missing class.  The Court also ensured

---

[1]Pursuant to a plea agreement, Rosado pleaded guilty to Manslaughter in the First Degree and Criminal Possession of a Weapon in the Second Degree.  The court sentenced Rosado to an aggregate term of imprisonment of twenty-four years.  According to the records and files of the Appeals Bureau of the Queens County District Attorney's Office, Rosado did not file a notice of appeal.

that no prospective jurors tried to shirk the important civic duty of jury duty by assessing the veracity of some claims of language or work–related issues.

10.     The jury convicted petitioner of Murder in the Second Degree (New York Penal Law § 125.25[1]), two counts of Criminal Possession of a Weapon in the Second Degree (New York Penal Law § 265.03[1][b], [3]), and Tampering with Physical Evidence (New York Penal Law § 215.40[2]).

11.     On July 14, 2014, the Court sentenced petitioner to an indeterminate term of imprisonment of from twenty-five years to life for the murder, to run concurrently with concurrent determinate terms of imprisonment of fifteen years, to be followed by five years of post-release supervision, for each weapon-possession count.   The Court also sentenced petitioner to an indeterminate term of imprisonment of from one and one-third to four years for the evidence tampering count, to run consecutively to the concurrent  sentences.

**Petitioner's Direct Appeal**

12.     On or about July 1, 2016, petitioner, through counsel, perfected her direct appeal by filing a brief in the New York State Appellate Division, Second Department.  Appellate counsel raised five claims on petitioner's behalf.  First, counsel claimed that the Court's remarks during *voir dire* had a "chilling effect" on jury selection, thereby depriving petitioner of her right to choose a jury according to the law.  Second, counsel asserted that the Court improperly admitted evidence that petitioner had previously solicited individuals to kill or frame the victim.  Third, counsel alleged that petitioner was deprived of a fair trial because, during summation, the prosecutor

improperly accused her of tax fraud, denigrated the defense, and mischaracterized the evidence.[2]
Fourth, counsel raised several claims regarding the evidence tampering count. Counsel asserted that
the Court's charge on this count was insufficient because it failed to state that the subject of the
charge was the gun. Moreover, counsel claimed that the charge, as well as the prosecutor's
summation comment regarding this count, constructively amended the indictment. Counsel also
asserted that the evidence was legally insufficient to support the evidence-tampering charge. Finally,
counsel argued that petitioner's sentence was excessive.

  13.   On or about October 3, 2016, the State filed a brief in opposition to the brief
filed on petitioner's behalf. The state argued that the Court's comments ensured that the prospective
jurors would follow the law as given. The State added that the freedom with which the prospective
jurors spoke established that there was no chilling effect, but, rather, an open dialog between the
Court and venirepersons. The State argued that the lone juror who expressed some trepidation about
coming forward gave no indication that her hesitancy was the result of anything the Court had said
and not merely the common anxiety associated with the process of jury selection.

  14.   Next, the State replied that the Court properly exercised its discretion in ruling
that the prosecutor could elicit testimony regarding the fact that petitioner had solicited others to
commit the murder, as such evidence was relevant to establish motive and intent, as well as to refute
the defense that others had conspired to kill the victim without petitioner's knowledge. Additionally,
the State continued, the Court alleviated any potential prejudice with its limiting instruction

---

[2]As noted below, the State argued that petitioner's attacks on the prosecutor's summation were unpreserved for
appellate review. To the extent this claim was unpreserved, petitioner argued, in the alternative, that counsel was
ineffective for failing to object to all of the purported improper comments (Appellant's Brief at 49).

regarding the evidence.  The State concluded that error, if any, was harmless in light of the overwhelming evidence of petitioner's guilt.

15.     Addressing petitioner's claim of prosecutorial misconduct during summation, the State first noted that the claim was largely unpreserved for appellate review.  Morever, the State continued, the claim was completely without merit, as the prosecutor's comments represented fair comments on the evidence and reasonable inferences to be drawn therefrom, or invited response to petitioner's summation.  Furthermore, the State highlighted that the Court instructed the jurors that the comments of counsel did not constitute evidence.  Finally, the State argued that error, if any, in the prosecutor's comments was harmless in light of the overwhelming evidence of petitioner's guilt and did not deny petitioner a fair trial.

16.     The State argued that petitioner's claims regarding the sufficiency of evidence of the tampering count were unpreserved for appellate review and without merit.  The State noted that, given the time frame alleged in the indictment, the prosecutor's comment that the tampering occurred in Florida when petitioner secreted the weapon in her closet was accurate.  Moreover, the court's tracking of the statutory language was proper and did not deny petitioner a fair trial. Additionally, the evidence that petitioner demanded the gun back from Rosado and then hid it in her home was sufficient to establish the elements of the crime charged.

17.     Finally, the State argued that, given the manipulative nature with which petitioner carried out this heinous crime, the sentence imposed was entirely proper.

18.     In a decision and order dated September 23, 2016, the Appellate Division granted petitioner permission to file a *pro se* supplemental brief.

19.     On or about December 28, 2016, petitioner filed her *pro se* brief, raising three claims.   First, petitioner claimed that she was denied the effective assistance of counsel. Specifically, petitioner asserted that counsel was ineffective for failing to clarify a discrepancy in the testimony of the alibi witness, Yoselin Amarante, regarding the exact date she saw petitioner, resulting in a flawed alibi defense.   Petitioner also alleged that counsel was ineffective for failing to call three other witnesses.

20.     Second, petitioner argued that the prosecutor's summation comments shifted the burden, called for speculation, tried to inflame the jury, and vouched for the credibility of the States's witnesses.   Petitioner also argued that, in his summation, the prosecutor became an unsworn witness and accused petitioner of uncharged crimes.

21.     Third, petitioner asserted that the State had failed to disclose *Brady* materials, thereby denying her a fair trial.   Specifically, petitioner claimed that the prosecutor improperly withheld her phone records, Luis Rosado's phone records, and the T-mobile 2008 cell-site records.

22.     On or about February 23, 2017, the State filed a brief in response to petitioner's *pro se* supplemental brief.   Addressing petitioner's first claim, the State responded that Amarante' testimony did not negate petitioner's alibi defense.   Defense counsel's strategic decision to call Amarante to suggest petitioner may have been with her on the date of the murder did not fall below a standard of reasonableness.   The State added that, insofar as petitioner criticized counsel's preparation of this witness, it depended on matters not in the record, and, therefore, was not reviewable on direct appeal.   Moreover, the State concluded, the single alleged error was not so clear and dispositive as to render counsel's representation ineffective.

23.     Regarding petitioner's claim that counsel was ineffective for failing to call three other witnesses, the State also noted that claim was also *dehors* the record and was not properly raised on direct appeal.  Although petitioner claimed on appeal that counsel knew of these witnesses, there was no indication of that alleged knowledge on the record.  Moreover, there was nothing on the record regarding any conversations between petitioner and counsel regarding these witnesses or any decision whether to call them, or even whether counsel interviewed the witnesses and elected not to call them.  As such, the State argued, the claims were not properly raised on direct appeal.

24.  The State argued that petitioner's claim regarding the prosecutor's summation was largely unpreserved for appellate review and completely without merit.  The prosecutor's comments were fair comment on the evidence or invited response to defendant's summation.  In any event, the State noted, the Court alleviated any potential prejudice with its instructions.  Further, error, if any, was harmless in light of the overwhelming evidence of petitioner's guilt.

25.     Finally, the State argued that petitioner's *Brady* claim was abandoned.  Specifically, when petitioner raised whether the records existed at trial and argued that they constituted *Brady* material, the prosecutor made clear he had turned over all discoverable material and did not have the documents petitioner sought, although he would check again.  The prosecutor also stated that he did not intend to introduce any such records into evidence.  By not raising the issue again, petitioner abandoned the claim.  In any event, the State posited, petitioner's claim was devoid of merit, as the records did not constitute *Brady* material.  And, the State concluded that, error, if any, was harmless in light of the overwhelming evidence of petitioner's guilt.

26.     In a decision and order dated August 16, 2017, the Appellate Division affirmed the judgment of conviction.  *People v. Gomez*, 153 A.D.3d 724 (2d Dept. 2017).  The Court

held that, while some of the Court's comments during *voir dire* were inappropriate, they did not warrant reversal. *Id.* at 725. The Court determined that petitioner's challenge to the legal sufficiency of the evidence supporting her conviction of tampering with evidence was unpreserved. In any event, the Court continued, viewing the evidence in the light most favorable to the State, the evidence was indeed legally sufficient to establish petitioner's guilt. *Id.*

27.     The Court next found that the trial court properly admitted evidence of certain prior bad acts, as such evidence was "relevant to establish [] [petitioner's] motive and intent to murder the victim, and provided necessary background information on the nature of the relationship between [petitioner] and the victim." *Id.* The Court concluded that the trial court properly exercised its discretion in determining that the probative value of the evidence outweighed its prejudicial impact, and gave a "sufficient limiting instruction regarding the use the jury could make of the evidence." *Id.*

28.     The Appellate Division held that most of petitioner's challenged remarks to the prosecutor's summation were fair responses to the defense summation, or fair comment on the evidence and did not denigrate the defense. The Court added that the trial court properly sustained petitioner's objections to some comments and corrected any prejudice with curative instructions. Finally, the Court concluded that, to the extent any comments were improper, the error was not so egregious as to deprived petitioner of a fair trial. *Id.*

29.     Addressing the ineffective assistance of counsel claim raised in petitioner's main brief and *pro se* brief, the Court held that the claims involved matters on and off the record. As such, the "mixed claim" had to be raised in a motion to vacate the judgment pursuant to section 440.10 of the New York Criminal Procedure Law. *Id.*

30.   Finally, the Appellate Division held that petitioner's remaining contentions, including those raised in her *pro se* brief, were without merit.  *Id*.

31.   Petitioner, through counsel, sought leave to appeal to the New York Court of Appeals.  In a letter dated October 17, 2017, the state opposed that application.

32.   In a decision and order dated December 28, 2017, the New York Court of Appeals denied petitioner's application for leave to appeal.  *People v. Gomez*, 30 N.Y.3d 1060 (2017) (Feinman, J.).

## THE CURRENT APPLICATION

33.   In a petition dated December 24, 2018, petitioner moves in this Court for a writ of *habeas corpus*, contending that the Appellate Division decision unreasonably applied the law.  In this regard, petitioner reiterates some of the claims she raised on direct appeal.  Specifically, petitioner asserts that the court's comments during *voir dire* precluded her "from having a jury chosen according to the law," thereby denying her due process and a fair trial.  Petitioner also claims that the admission of evidence that she had solicited individuals to kill or frame the victim denied her due process and a fair trial, as the prejudicial effect of such evidence outweighed any probative value.  Petitioner also alleges that the state court's determination regarding the prosecutor's summation comments was not supported by the record, and that the comments denied her a fair trial.

34.   Petitioner also reiterates her claim that she was denied the effective assistance of counsel, alleging that counsel put forth a flawed alibi defense and failed to investigate the case properly.  Although petitioner initially asserts that this claim was properly exhausted (Petition at 9, Ground Three[b]), she later acknowledges that, although she raised the claim in the Appellate Division and in her leave application to the New York Court of Appeals, it involves off-the-records

10

matters.  Thus, she seeks a stay of the petition while she pursues a motion to vacate the judgment pursuant to Section 440.10 of the new York Criminal Procedure Law to exhaust any "mixed claims" (Petition at 12-13, 15, ¶¶ 13[a], 17[d]).

35.     Meanwhile, petitioner retained Stephen N. Dratch, Esq., to represent her.  On or about May 29, 2020, counsel filed an amended and renewed petition on petitioner's behalf. Counsel asserts that the trial court's comments during *voir dire* violated petitioner's right to an impartial jury.  Counsel also asks the Court to consider the other claims raised on petitioner's *pro se* filing.

36.     As explained more fully in the attached memorandum of law, the Court should deny the petition.  The Appellate Division properly concluded that the court's comments during *voir dire* did not deny petitioner a fair trial.  Petitioner's claim regarding the trial court's evidentiary ruling does not present a federal constitutional question.  Further, as petitioner concedes, her claim that she was denied the effective assistance of counsel is unexhausted.  Finally, the Appellate Division's rejection of petitioner's claim regarding the prosecutor's summation was not contrary to, or an unreasonable application of, Supreme Court precedent.  Because petitioner cannot show that the purported errors had a substantial or injurious effect or influence on the jury, or that the prosecutor's summation so infected the trial with unfairness that she was denied due process, *habeas* relief is not warranted.

11

**WHEREFORE**, and for the reasons set forth in the accompanying memorandum of law, the Court should summarily deny the petition.

_____

Nancy Fitzpatrick Talcott
Assistant District Attorney
(718) 286-6696

Sworn to before me this
15th day of July, 2020

_____

Notary Public

cc:    Ynmaculada Gomez
       1460730
       Bedford Hills Correctional Facility
       247 Harris Road
       Bedford Hills, New York 10507

       Stephen N. Dratch, Esq.
       FRANZBLAU DRATCH, P.C.
       233 Broadway, Suite 1800
       New York, New York 10279

12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

YNMACULADA GOMEZ,                         :

                          Petitioner,       :

                                            MEMORANDUM
          -against-                 :        OF LAW

Superintendent LaManna,            :

                          Respondent.  :        18-cv-07252
                                            (AMD) (LB)

                                    :
-------------------------------------------------------x

## INTRODUCTION

This Memorandum of Law is submitted, along with the accompanying Affidavit, in opposition to the petition for a writ of *habeas corpus*.

## POINT ONE

## THE COURT'S COMMENTS DURING JURY DID NOT DEPRIVE PETITIONER OF A RIGHT TO A FAIR TRIAL.

The trial court's comments during jury selection were designed to examine prospective jurors regarding their qualifications and certainly did not deny petitioner a fair trial. In fact, by its comments, the Court ensured that all prospective jurors were qualified to sit and would follow the law as given. Nevertheless, petitioner repeats her claim that the Court's "inappropriate remarks" to prospective jurors precluded her from "having a jury chosen according to the law, violated her right to due process, and a fair trial" (Petition at 6, Ground One; *see also* Amended Petition). This claim is without merit and, therefore, does not present a federal constitutional question.

13

Initially, petitioner's evidentiary claim does not present a federal constitutional issue, and is, therefore, barred from review.  Federal courts "shall entertain an application for a writ of *habeas corpus* in behalf of a person in custody pursuant to the judgment of a state court only on the ground that [she] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (in *habeas corpus* proceedings, federal courts are limited to deciding whether a state conviction violated the United States Constitution or laws).  Any claim that the state court erred as a matter of state law does not present a federal question reviewable in a *habeas corpus* proceeding.  *See*, *e.g.*, *Wilson v. Corcoran*, 562 U.S. 1 (2010) (state court error in applying state law regarding factors to consider in imposing death penalty does not present federal constitutional question); *Crane v. Kentucky*, 476 U.S. 683, 689 (1986) ("We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (federal court may not issue writ of *habeas corpus* on the basis of perceived error of state law).  And "[a] federal court may not re-examine a state court's interpretation and application of state law." *Schleeper v. Groose*, 36 F.3d 735, 737 (8th Cir. 1994); *see also Harmon v. McVicar*, 95 F.3d 620, 623 (7th Cir. 1996) ("Errors of state law do not, in and of themselves, violate the Constitution") (citation omitted); *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) ("not every error of state law can be transmogrified by artful argumentation into a constitutional violation"); *see also DiGuglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004) (alleged errors of state law "cannot be repackaged as federal errors simply by citing the Due Process Clause") (quoting *Johnson v. Rosemeyer*, 117 F.3d 104, 111 [3d Cir. 1997]).

14

Because *voir dire* is conducted under the supervision of the court, "great deal must, of necessity be left to the trial court's discretion." *Ristaino v. Ross*, 424 U.S. 589, 594 (1976); *United States v. Rubin*, 37 F.3d 49, 54 (2d Cir. 1994). The state's handling of jury selection will be accorded great deference. *Boyd v. LeFevre*, 519 F.Supp. 629, 634 (E.D.N.Y. 1981); *see generally Wilson v. Heath*, 938 F.Supp.2d 278, 289 (N.D.N.Y. 2013) (citing *Mu'Min v. Virginia*, 500 U.S. 415, 423-24 [1991]; *United States v. Torres*, 128 F.3d 38, 44 [2d Cir. 1997]); *Robert Molina v. Christopher Artuz*, No. 98-CV-6089 (NG) (E.D.N.Y.).

To be entitled to *habeas* relief because of comments a court made during *voir dire*, "a petitioner must show that the comments not only misstated the law, but also deprived [her] of a fair trial." *Gomez-Kadawid v. Kirkpatrick*, 2011 WL 2581838 (S.D.N.Y. 2011) (citing *Sams v. Walker*, 18 F.3d 167, 171 [2d Cir. 1994]). "A comment is grounds for relief only if it "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 [1973]). "A comment made by a trial judge may not be judged in 'artificial isolation' but must be evaluated in the context of the instructions as a whole and the trial record." *Id*. "The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id*. (quoting *Dowling v. United States*, 493 U.S. 342, 352 [1990]). This standard, which is generally used for jury instructions, has been applied to comments made during voir dire. *Gomez-Kadawid v. Kirkpatrick*, 2011 WL 2581838, *7.

Here, no such error occurred. In adjudicating petitioner's claim regarding the Court's comments, the Appellate Division held that, "[w]hile some of the court's remarks were

inappropriate, those remarks do not warrant reversal." *People v. Gomez*, 153 A.D.3d 724, 724 (2d Dept. 2017). This decision was proper.

Section 270.15 of the New York Criminal Procedure Law prescribes the manner in which a court must conduct jury selection, including the manner in which jurors should be seated for *voir dire*, the order in which the parties question the jurors and exercise challenges, and the fact that each party must have a full and fair opportunity to examine the potential jurors. The statute also explicitly gives a court discretion to ask the prospective jurors "questions as it deems proper regarding the qualifications of such prospective jurors." C.P.L. § 270.15(1)(c); *see generally People v. Ahmed*, 66 N.Y.2d 307, 310 (1985) ("integral component" of right to jury trial is the supervision of judge); *People v. Pinkney*, 272 A.D.2d 52, 53 (1st Dept. 2000) (Judge has responsibility to rule on challenges raised by counsel, and to "independently determine that every chosen juror is fit to serve [CPL 270.15, 270.20, 270.25]").

During jury selection, after discussing some preliminary matters, the Court noted the importance of the civic obligation of jury duty. Obviously recognizing that people might want to shirk that duty, the Court added that, merely because an individual might be excused from this particular case, did not mean he or she was free from the obligation of jury duty (39-43, 101).

Prospective juror Athanasios Ternas informed the court that he was a police officer and felt that his "professional bias" prevented him from being "impartial" (49-50). The Court confirmed that, other than what it had said, Ternas did not know anything about the case. Ternas answered that merely because the case was on trial, he was biased. After Ternas admitted that he understood the presumption of innocence, the Court asked whether that should not be afforded to defendant, reminding Ternas that he knew nothing about the case. Ternas replied, "That goes to

16

show you how deep that bias is" (50-52).  Ternas noted that, while he would like to give defendant

the benefit of the doubt, "at the end of the day" he did not want to "second guess" himself and "hurt

someone else."

> The court admonished the officer:

> Just so I'm clear, because I'm going to release you, you really have no business being
> in this courtroom.  I'm not sure you have any business being a police officer.  I'm
> going to tell you that straight up, okay.  But you cannot walk into this courtroom and
> simply just prejudge this case because it's gotten to this level, knowing that you
> know zero about this case, all right.  That's pretty shameful as a police officer.

> And, quite frankly, I'm disheartened to actually hear you say that and it makes me
> wonder about the job you do.

> Get out of my courtroom.  You, frankly, have no [business] coming in a courtroom.

(52).

> After dismissing Mr. Ternas, the Court addressed the panel, stating that there could

not be a system "where without any evidence whatsoever or knowing anything about any case simply

because someone is arrested or ends up in a trial situation, that you can judge that they are guilty of

whatever it is they are charged with."  The judge added that in his "personal opinion," for a police

officer to have indicated he would so judge someone was "sickening" (53).

> Contrary to petitioner's suggestion (Amended Petition at 20), it is difficult to see how

the Court conveying such a strong belief in the presumption of innocence and impressing upon the

panel of prospective jurors the importance of that principle would prejudice petitioner in any way.

Furthermore, given that police officers are charged with upholding the law – inside and outside of

a courtroom – the officer's statements, made in the presence of other jurors, were inappropriate.  As

such, the Court's comments were understandable and, as noted, designed to convey to the other

panelists the importance of the presumption of innocence.  And, there is absolutely no indication that the Court's comments to and about this panelist had a detrimental effect on any other jurors.

Petitioner's reliance on *United States v. Rowe*, 106 F.3d 1226 (5th Cir. 1997) (Amended Petition at 17-20), is misplaced.  In *Rowe*, the Court chastised two prospective jurors, resulting in giving the rest of the panel reason "to fear reprisals for truthful responses." *Rowe*, 106 F.3d at 1229.  The court accused the two panelists who indicated they could not be fair of "refusing the follow instructions and attempting to avoid jury service, and then sanctioned" them. *Id.* at 1230. Indeed, the *Rowe* Court concluded that the court's comments – including, "you will be coming back again, and again, and again . . . and see if you can figure out how to put aside your personal opinions and do your duty to your country as a citizen" – could "be interpreted only as punishment for responding to the affirmative to questions about bias." *Id*.

In this case, by contrast, while the Court scolded one panelist for seemingly refusing to abide by the law – which, as a police officer, he had a duty to do – it did not threaten or punish him in any way.  Nor did it convey that any panelist would be punished for conveying any bias. Significantly, the *Rowe* Court recognized that the court in that case had "an opportunity to remind the entire panel that an indictment is the procedural device for commencing a criminal trial," but "lost any opportunity to explore the members' views and educate them." *Id*.  As is evident, here, the Court took the opportunity to remind the panel members that merely because someone was accused of a crime or on trial, did not mean that they could be judged without jurors knowing anything about the case or before the presentation of any evidence.

Finally, in *Rowe*, a prospective juror told defense counsel that after the court's colloquy with one juror who reported bias, she "felt like she had no recourse but to sit there and keep

her mouth shut. . . ." *Id*. Here, by contrast, there was absolutely no evidence that the Court's scolding of a police officer for not adhering to the law had any such chilling affect in this case. On the contrary, as discussed below, jurors freely discussed any issues with the court, and the court made clear that the process had been open and congenial.

The Court also did not deny petitioner a fair trial in offering help by way of English classes to those who sought to be excused because of a language barrier.[3] Section 510 of the Judiciary Law requires a person must be able to "understand and communicate in the English language" in order to qualify as a juror. Therefore, questions and comments regarding a prospective juror's ability to speak English necessarily fall within a Court's discretion. In this regard, the court recognized that many prospective jurors do not want to serve on jury duty, and, to that end, will often exaggerate, or even fabricate, viable excuses to be relieved from service – one such excuse being an imperfect understanding of English.[4]

The Court asked the first juror who raised concerns about her ability to understand some background questions and confirmed with the parties the juror should be excused (47-49). After posing similar questions to the next juror who did not understand the proceedings, the Court stated, "[W]e're going to send you for English lessons, okay. I'm going to excuse you and send you for English lessons for ten weeks. . . . You're excused, but we'll try to assist you. . . ." (71-73).

---

[3]Petitioner does not set forth specific comments in her application, but attached the Appellate Division Brief raising this claim. As such, respondent will address the additional comments with which petitioner took issue on appeal.

[4]The court suggesting that an English course might be appropriate for a citizen called for jury service is in keeping with the report by the Chief Administrator of the Courts in 2011 expressing the concern that "the racial and ethnic makeup of the eligible juror pool in Bronx, Kings and Queens Counties is certainly affected by the fact that, according to the 2010 Census, in 17 to 18 percent of households in these counties, no one over the age of 14 speaks only English or speaks English very well." A. Pfau, *First Annual Report Pursuant to Section 528 of the Judiciary Law* at 11. http://courts.state.ny.us/publications/pdfs/528_ReportNov2011.pdf (accessed 7/8/20)

The purpose behind the Court's statement about helping the jurors who were hindered from service because of language issues was twofold.  First, the statement was clearly designed to fend off any sort of exaggerated or fabricated excuse regarding the ability to comprehend the proceedings.  Second, the statement was designed to actually help those immigrants who did not speak the language well so that they could someday fulfill their civic obligation.  This had no affect on other panelists, as evidenced by the others who came forward raising possible language issues.

The Court asked some background questions of the next juror who had a language issue.  Again, after excusing the juror, it noted that they would send her for ten weeks of English lessons.  The court added, "Hope you do well.  Thank you very much" (89-90).

After questioning another juror regarding a potential language issue, the Court questioned the sincerity of her claim, but politely noted that it would "help her out" and send her for English lessons.  The Court wished the juror "good luck" (104-06).  Although the Court also questioned the veracity of the next juror's language issue, it also excused the juror and provided for him to go to English lessons (110-11).

Thus, the Court did not question the sincerity of all jurors who claimed that they could not serve because of an inability to understand English well enough.  Rather, it did so only after questioning the juror and determining whether it thought there was truly a language barrier warranting that juror's dismissal.  Even when the Court was hesitant to believe there was a true issue with language, it excused those jurors.  Again, that could only have inured to petitioner's benefit.  Furthermore, given the number of jurors who asked to be excused because of a language barrier *after*

20

the court initially mentioned English classes to the first such venireperson, any speculation that the court's comments may have discouraged others from coming forward is belied by the record.[5]

There were also a number of students who asked to be relieved from service.  The first informed the Court that he was a full-time student and had finals the following week.  The Court asked why he had not postponed jury service.  Although the student replied that he did not know he could postpone it, he also stated that he was a student all year round, indicating that postponing it would have had no practical effect.  After the court advised him to "always look at the form," the court wished the student "[g]ood luck" (44).

This obviously did not discourage anyone from raising potential issues with school, others raised similar issues.  Six more students came forward.   The Court addressed all politely before excusing them (58-59, 66, 70-71, 75-76, 78, 82).  Thus, it is clear that nothing the Court said affected their willingness to come forward and express their concerns about their ability to serve. There was no support in the record for petitioner's speculative claim that the Court's discussions with the jurors gave any "impression that openness would be met by embarrassing questions or

_____

[5]Petitioner notes that the Appellate Division's citation to *People v. Mason*, 132 A.D.3d 777, *lv. granted*, 26 N.Y.3d 1147 (2016), appeal dismissed on ground abated by defendant's death, 29 N.Y.3d 972 (2017), (Petition at Ground One) was "wholly unsupportive" of her position.  However, the Appellate Division cited *Mason*, in which the trial court had  made a blanket statement to the jury pool that, if they raised a language issue, the Court might require them to take English classes, for the proposition that the claim had to be preserved for appellate review.  And, although the Appellate Division found the Court's comments inappropriate in *Mason*, it also held that they did not deny the defendant of a fair trial.  It should be noted that, since the Court of Appeals granted leave in *Mason* – and it is not clear upon what ground it did so – it is no longer the practice of the handful of judges in Queens County, who were informing prospective jurors that they had to take English classes, to do so.  As reported in the New York Daily News on March 23, 2017, the Office of Court Administration had indicated that "[j]udges are no longer suggesting jurors take English Language courses."  Moreover, as the article indicated, this practice was involved in ten cases.  The Second Department held in *Mason* and several other cases that the court's comments about English classes were "inappropriate," but did not deny the defendants a fair trial.  *See People v. Porter*, 153 A.D.3d 857 (2d Dept. 2017); *People v. Dudley*, 151 A.D.3d 878 (2d Dept. 2017).

worse" (Appellate Division Brief at 35-36).  To be sure, questions about whether someone read a form, where they went to school, and about class schedules are hardly embarrassing.

The following day the Court asked another full-time student whether he did not see on the form that he could postpone service.  The Court questioned why he would be there when he had school.  The Court asked him whether anyone in central jury had discussed excusing him because he was a full-time student (107-09).

When another prospective juror noted that she was a full-time student, the Court confirmed that she was in school at the time and had missed class.  Concerned, the Court replied "[W]e can't have that."  The juror stated she was afraid to "come here yesterday."  The Court assured her that when there was problem she had to "step up."  Recognizing the importance of her education, the Court then excused the juror on consent (183).

At this point, petitioner moved for a mistrial, arguing that many of the jurors were intimidated, and that the Court had indicated it did not believe some, and highlighting the court's comment that the police officer did not belong in the courtroom.  Petitioner argued that the juror demonstrated how scared jurors were to come forward even if there was a language barrier (184).

The Court replied that some of the jurors had jobs requiring them to speak English, and that "through their physical actions, their facial expressions and their actual answers acted as though they didn't even understand one wor[]d of English.  It became quite apparent that they were faking."  The Court added that it still dismissed those jurors (185).

The Court stated that for a police officer to convey that anyone who reached that point in a case must be guilty was a "reprehensible statement for a law enforcement officer to make in a courtroom."  The Court noted that it made it clear to the venirepersons that such a belief could not

22

be tolerated because a fundamental tenet in this country was that people are innocent until proven guilty. The Court added that such statements supported defendant and her ability to get a fair trial and were not designed to intimidate anyone. On the other hand, the Court could not have a courtroom that was "going to be run over by individuals who are just feigning and faking" (185-86).

The Court finished by stating that there was "one lady" who said she was "just nervous about coming up and saying anything," indicting she would not have come up even before the court had said anything (186). Given the number of students who came forward, the Court asking a small number why they had not postponed service obviously had no chilling effect.

Petitioner also took issue with questions the Court posed with some potential work-related issues (Appellate Division Brief at 36). The Court's questions were entirely proper. For example, when a juror raised a potential issue because she was the only provider of a certain service at her job, the Court posited, out of curiosity – and stating its hope that it never occur – what would happen to the clients if she got hit by a bus and could not work for a month. The juror replied that she believed the company would look for someone new, as she might be able to switch appointments for a few days, but to do so for weeks would be "very hard" (59-60).

The Court's hypothetical – which, by its extreme nature was obviously illustrative – was merely posited to assess how truly burdensome the potential work-related issues were. Indeed, the Court questioned the juror further and actually clarified that her issue with missing work would really result in a financial hardship (60-61). As a result, the Court excused her (66), as it did

23

whenever the court's questions revealed that service created a financial hardship (47, 54, 82-83, 84-85, 118, 123, 125, 126).[6]

Given that most, if not all, employed people could seek to avoid jury duty with some work-related excuse, the Court reasonably exercised its discretion in probing these potential conflicts. Such questions were not improper and did not prevent the venirepersons from being forthright with the court. Indeed, after the above exchange, others raised work-related concerns (62-63, 102-03, 122, 123-24).

And the Court later clarified the nature of its work-related hypothetical when a juror raised a potential conflict with the graduation of her children. Using the Court's example, the juror observed that if she got hit by a bus she would not be able to attend. The Court assured her the example did not apply with respect to her children, and there was a reason it said it with respect to a job (260). When the juror was chosen, the Court assured her that she would be able to attend the graduation (270).

Outside the presence of the prospective jurors, the Court made a further record in response to petitioner's mistrial motion. The Court noted that the panel was "jovial" and laughed at its jokes. It added that the prospective jurors were "quite open," "candid," and "volunteer[ed] information." The Court found that there was "no indication" that its comments to two or three people had had any effect on the panel "such to make them fearful of speaking" (211). The Court added that it had explained to the jurors that it thought it was reprehensible that an officer of the law took the position the officer had taken and would make such statements in a public courtroom (212).

---

[6]The Court also excused a prospective juror whose ability to apply for a promotion would possibly affected by serving (64), as well as two others who had training for new jobs (74, 78-79).

24

Thus, the Court ensured that the prospective jurors were available for service for the duration of the trial, while positing questions to enable them to be able to be available to fulfill their civic duty at a future time if they could not do so for petitioner's trial.  This only ensured that the prospective jurors were the best candidates from whom petitioner would choose.

Petitioner's reliance on the one juror who expressed some hesitance in coming forward was misplaced (Appellate Division Brief at 35-36), as there was absolutely no indication that her trepidation was the result of anything the court had said and not merely the normal nervousness associated with coming forward in such a situation.  Notably, this general anxiety was referenced several times during jury selection, including by the defense (46, 128, 245, 248, 267, 467, 468, 475, 529, 530).  *See* Respondent's Appellate Division Brief at 49-51.

Thus, the record established that petitioner's constitutional right to a jury was in no way impaired by the court's comments.  *See People v. Casanova*, 62 A.D.3d 88, 92 (1st Dept. 2009).  The Court's comments did not prevent jurors from raising various issues regarding potential problems with their ability to serve.  Additionally, even when it questioned the veracity of some issues raised, the Court ensured that petitioner received a fair trial by dismissing those jurors.  As such, petitioner has failed to show any chilling effect at all, much less that her federal constitutional right to a fair and impartial jury was implicated.  Thus, she has failed to raise a cognizable *habeas* claim.  The record did not support any contention that the jury selected did not represent a fair cross-section of the community or that petitioner was not tried by a fair and impartial jury.  Moreover, the jurors who ultimately served were selected with full input from petitioner.

25

In sum, the court conducted *voir dire* in a fair and impartial manner.  Its comments had no chilling effect on the panel.  As such, petitioner's claim is devoid of merit and does not present a federal constitutional issue warranting *habeas* relief.

## POINT TWO

### PETITIONER'S CLAIM REGARDING THE TRIAL COURT'S EVIDENTIARY RULING DOES NOT PRESENT A FEDERAL CONSTITUTIONAL ISSUE.

Petitioner's claim regarding the trial court's decision to admit evidence that she had solicited other people to commit the murder, as well as evidence that she attempted to frame the victim for drug possession, does not present a federal constitutional question.  Further, the court properly admitted such evidence, which was relevant to establish the background and nature of the relationships between the parties.  This set forth the increasingly acrimonious feelings of petitioner toward the victim.  More importantly, the evidence was also relevant to establish petitioner's identity as the mastermind behind the plan to murder the victim, and refute her claim that Rosado and Pazmino conspired together to commit the murder and sought to frame her for the crime.

Nevertheless, petitioner attempts to elevate her state evidentiary claim to the level of a constitutional violation by asserting that the court's ruling violated her right to Due Process and a fair trial (Petition at 7, Ground Two).  But the trial court's ruling admitting the evidence was simply an evidentiary ruling, which does not present an issue of federal constitutional dimension.  Indeed, the trial court's ruling was in accord with well-settled New York law.  Thus, petitioner cannot obtain *habeas* relief on this ground.  Further, petitioner cannot show that the Appellate Division's finding that the state court's evidentiary was proper, was "contrary to, or involved an

unreasonable application of, clearly established Federal law." As such, petitioner's claim should be denied.

Initially, petitioner's evidentiary claim does not present a federal constitutional issue, and is, therefore, barred from review (*see* Point One, *supra*). Specifically, with respect to the allegedly erroneous admission or exclusion of evidence, it is well settled that state evidentiary rulings generally do not implicate the federal constitution. *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980); *Mattox v. United States*, 156 U.S. 237, 243-244 (1894); *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985); *see also Estelle v. McGuire*, 502 U.S. at 72; *Aponte v. Scully*, 740 F. Supp. 153, 158 (E.D.N.Y. 1990) (petitioner seeking *habeas corpus* relief based on claim of erroneous admission of evidence "bears a heavy burden; mere evidentiary errors generally do not rise to constitutional magnitude").

Here, the propriety of the trial court's ruling admitting the evidence of petitioner's attempts to frame the victim or solicit others to murder him is a question of state law. Petitioner is, therefore, not entitled to *habeas* relief on the basis of the trial court's evidentiary ruling, as her claim relies on perceived errors of state law.

Further, the deferential standard of review contained in Section 2254(d) applies to this case because the state court adjudicated petitioner's claims on the merits. Here, the Appellate Division explicitly agreed with the trial court's determination, holding that the evidence "was relevant to establish [petitioner's] motive and intent to murder the victim, and provided necessary background information on the nature of the relationship between [petitioner] and the victim." *Gomez*, 153.D.3d at 725. This clearly amounts to an adjudication on the merits, and, accordingly,

27

petitioner can only succeed if she can show that the state court determination was contrary to, or an unreasonable application of, clearly established Supreme Court law.  This petitioner cannot do.

To the extent that petitioner attempts to elevate her state evidentiary claim regarding the trial court's preclusion of the evidence to the level of a constitutional violation by asserting that the court's evidentiary ruling violated her federal constitutional rights to present a defense, this claim should be rejected as meritless.

In order to prevail on a claim that an evidentiary error deprived a petitioner of due process, he or she must show that the error was so pervasive as to have denied him or her a fundamentally fair trial.  *Estelle v. McGuire*, 502 U.S. at 68-70; *Collins v. Scully*, 755 F.2d at 18. Indeed, because the admissibility of evidence rests within the sound discretion of the trial court, "[its] decision will not be overturned unless [it] has acted arbitrarily or irrationally." *United States v. Cruz*, 797 F.2d 90, 95 (2d Cir. 1986).

Under New York law, "evidence of prior crimes or bad acts is admissible if relevant to prove something other than propensity to commit the act or crime, such as motive, intent, or identity." *Beriguete v. Ercole*, 2015 WL 1840678 (E.D.N.Y. 2015) (citation omitted).

In this case, evidence that defendant had solicited other people to commit the murder, as well as evidence that she attempted to frame the victim for drug possession, was relevant to establish her motive and intent.  *See People v. Wirth*, 224 A.D.2d 1002, 1003 (4th Dept. 1996).[7]  The evidence was also relevant to establish the background and nature of the relationships between the parties.  This set forth the increasingly acrimonious feelings of defendant toward Rei.  *People v.*

_____

[7]Specifically, it was offered to show that, contrary to petitioner's claim, *she* solicited the murder, as she had tried to do a number of times earlier, and Rosado acted at her behest.

28

*O'Gara*, 239 A.D.2d 215 (1st Dept. 1997).  Finally, the evidence was also relevant to establish defendant's identity as the mastermind behind the plan to murder Rei, and refute defendant's claim that Rosado and Pazmino conspired together to commit the murder and sought to frame her for the crime.

Thus, the Court properly exercised its discretion in weighing the probative value of the evidence against the potential prejudice.  Applying the appropriate standard, the Court correctly determined that the evidence provided relevant background information regarding the relationship of the parties, and was also relevant to establish motive, intent, and identity (712).  *See People v. Dorm*, 12 N.Y.3d 16 (2009) (evidence of prior and subsequent conduct toward victim was probative of motive and intent to assault victim; provided necessary background on nature of relationship and placed charged conduct in context);  *People v. Johnson*, 137 A.D.3d 811 (2d Dept. 2016) (evidence of uncharged crimes properly admitted as relevant to and probative of defendant's motive, gave jury appropriate context in which to evaluate case, necessary background evidence and completed narrative); *People v. Wisdom*, 120 A.D.3d 724 (2d Dept. 2014) (evidence of uncharged crimes against complainant's daughter made clear defendant's rage began against daughter and arose from relationship with her, rather than anything complainant said to defendant).

Petitioner claimed below that there was ample evidence of her motive (Appellant Division Brief at 40).  But, while there was evidence regarding the deterioration of the relationship between Rei and petitioner, the evidence of the uncharged crimes established petitioner's intent to murder Rei.  Additionally, such evidence provided the background of the state of the relationship.  Having a business dispute or unrequited love may arguably be common ends to relationships; actively seeking to murder or frame someone for a crime provides a different backdrop entirely,

29

demonstrating here that petitioner was not prepared simply to let the relationship end and move on with her life. Finally, this evidence also provided evidence of petitioner's identity as the mastermind of the plot to murder Rei, thereby negating petitioner's claim that Pazmino and Rosado had concocted the plan and framed her.

Moreover, the court minimized any potential prejudice by giving a lengthy limiting instruction regarding the admission of evidence of uncharged crimes. The court first noted that the evidence of the uncharged bad acts and crimes "w[as] not offered and must not be considered for the purpose of proving that the [petitioner] had a propensity or predisposition to commit the crimes charged in this case" (1783).

Addressing the evidence that petitioner solicited others to commit the murder, the court instructed the jurors that the evidence was offered "for your consideration on the question of intent" (1783). The court later cautioned the jurors that evidence of petitioner's attempt to frame Rei for a crime was offered for "your consideration on the question of [petitioner]'s state of mind and the relationship between the [petitioner] and Mario Rei" (1783-84).

After discussing the evidence of prior bad acts and uncharged crimes, the court instructed the jurors that *if* they found the evidence of prior bad acts and crimes believable, they could "consider it for the limited purpose, those limited purposes I just told you and nothing else" (1784). Not only did the court limit the purpose of the evidence, it made clear to the jurors that they did not even have to credit the evidence.

And, error, if any, in the admission of prior bad acts evidence would warrant *habeas* only if it deprived petitioner of a fair trial. *See Taylor v. Scully*, 708 F.2d 886, 890-91 (2d Cir. 1983). The standard for reviewing this question is "whether the erroneously admitted evidence, viewed

30

objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985). Other "overwhelming evidence" of guilt "is a factor that weighs against finding that erroneously admitted evidence was sufficiently material to provide the basis for conviction." *Beriguete v. Ercole*, 2015 WL 1840678, at *6 (citing *Allan v. Conway*, No. 08-CV-4984, 2012 WL 70839, at *22 [E.D.N.Y. 2012]); *see also People v. Chapman*, 101 A.D.3d 406 (1st Dept. 2012) (admission of uncharged crime evidence was harmless in face of overwhelming evidence of defendant's guilt). Here, the evidence of petitioner's guilt, even absent the uncharged crimes evidence, was truly overwhelming.

Although motive was not even necessary to establish petitioner's guilt, the victim's wife, Flor Cepeda, Rosado, and Pazmino each provided evidence of the motive for the crime – namely, to avenge what petitioner perceived as a business deal gone bad, the loss of her home, and unrequited love. Rosado, who carried out petitioner's plan in the hopes of getting free housing and a secure job, also testified in detail as to petitioner's plan to have him murder Rei. Pazmino corroborated large portions of Rosado's testimony, particularly regarding the events leading up to and surrounding the shooting. And Soto corroborated Rosado's testimony regarding stopping in New Jersey en route to New York.

Cell phone records provided further corroboration regarding petitioner's location and activities before the morning of the shooting. Ballistics evidence established that the shots were fired from petitioner's gun, which Rosado confirmed petitioner had provided. The police recovered this gun from defendant's home. Finally, petitioner's flight was also indicative of her guilt.

31

In sum, the trial court properly exercised its discretion in admitting evidence of petitioner's attempts to solicit others to commit the murder and evidence of petitioner's attempt to frame the victim. Such evidence was highly probative of petitioner's motive and intent, provided relevant background evidence regarding the relationship of the parties, and refuted her defense that others committed the crime without her knowledge. The court alleviated any potential prejudice with its limiting instruction. Finally, error, if any, was harmless in light of the overwhelming evidence of petitioner's guilt.

## POINT THREE

### PETITIONER'S CLAIM THAT SHE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IS UNEXHAUSTED.

Petitioner concedes that her claim that she was denied the effective assistance of counsel is unexhausted. Before a federal court may consider the merits of a claim raised in a *habeas corpus* petition, the petitioner must have fairly presented the same claim in the state courts; otherwise, the claim is unexhausted. *See Picard v. Connor*, 404 U.S. 270, 275 (1971). Exhaustion of state remedies requires that a petitioner fairly present the claim to 'the highest state court from which a decision can be had" (*Daye v. Attorney General*, 696 F.2d 186, 190 n.3 [2d Cir. 1982]) by "utiliz[ing] all available mechanisms to secure review" of the federal claim in state court. *Padilla v. Brady*, 2015 WL 394090, at *6 (S.D.N.Y. Jan. 29, 2015) (quoting *Klein v. Harris*, 667 F.2d 274, 282 [2d Cir. 1981]).

Specifically, petitioner alleges that counsel was ineffective for presenting a flawed alibi defense, and failed to conduct an appropriate investigation. As the Appellate Division correctly concluded, the attacks against counsel "are based, in part, on matter appearing on the record and, in

part, on matter outside the record and, thus, constitutes a 'mixed claim' of ineffective assistance." *Gomez*, 153 A.D.3d at 725 (citations omitted).  The court, therefore, properly concluded that, because the ineffective-assistance-of-counsel claim could not "be resolved without reference to matter outside the record, a CPL 440.10 proceeding is the appropriate forum for reviewing the claim in its entirety." *Id*.  Because the claim must be raised in a motion to vacate the judgment pursuant to section 440.10 of New York Criminal Procedure Law, which petitioner has not done, the claim, therefore, is unexhausted.[8]

In short, because petitioner has failed to exhaust her claim that she was denied the effective assistance of counsel, the claim must be denied, or the petition dismissed as a mixed petition.[9]

## POINT FOUR

### PETITIONER'S CLAIM REGARDING THE PROSECUTOR'S SUMMATION COMMENTS DOES NOT PRESENT A FEDERAL CONSTITUTIONAL CLAIM.

Petitioner's claim that the prosecutor's summation deprived her of a fair trial does not present a federal constitutional issue.  Petitioner nonetheless asserts that the Appellate Division's conclusion that the court "properly sustained [petitioner's] objections to certain improper comments

---

[8]Petitioner asserts that the ineffective assistance of counsel claim was raised on direct appeal, as well as in her leave application to the New York Court of Appeals, thereby properly exhausting the claim (Petition at 9, Ground Three), but thereafter appears to correctly recognize that, because the issues involve off-the-record matters, it must be raised in a motion to vacate the judgment pursuant to section 440.10 of the New York Criminal Procedure Law.  As such, petitioner claims that she is "actively pursuing a 440.10," and so asks the Court to stay the petition and hold it in abeyance (Petition at 12, par. 13[a]).  As of the time of this submission, petitioner has not yet filed a 440.10 motion.

[9]In her *pro se* application, petitioner asks for a "stay and abeyance" to exhaust the claim (Petition at 12, par. 13[a]; *see also* letters dated 12/5/18 and 1/17/19), noting that she is "currently working on a CPL 440.10" (Petition at 13, par. 17[d]).  Although, as noted, the Court may dismiss such a mixed petition, or dismiss the unexhausted claim.  *See* 28 U.S.C. § 2254(b)(1)(A); *Rose v. Lundy*, 455 U.S. 509, 518-19 (1982).  In a letter dated March 20, 2020, counsel took no position on the issue, except to ask that the unexhausted claim not preclude the Court from considering the petition.

and corrected any possible prejudice," "was not supported by the record" (Petition at 10-11, Ground

Four).[10] But petitioner has not established that summation error, if any, was so pervasive and

egregious as to deny her a fair trial.   In any event, the trial court dissipated any potential prejudice

with its strong and thorough instructions.   And error, if any, was harmless in light of the

overwhelming evidence of petitioner's guilt.

Again, petitioner's claim does not present a federal constitutional issue (*see* Point

One, *supra*).  It is well settled that the propriety of comments made by a prosecutor at trial and on

summation generally does not present a federal constitutional question.  *See, e.g., Gonzalez v.*

*Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,  643

[1974]).  A prosecutor's remarks, even if improper and beyond the bounds of fair advocacy, would

not warrant the granting of a writ of *habeas corpus* unless the remarks caused the petitioner

substantial prejudice.  *See*, *e.g.*, *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990), *cert. denied*,

501 U.S. 1221 (1991); *see also United States v. Tutino*, 883 F.2d 1125, 1136 (2d Cir. 1989), *cert.*

*denied*, 493 U.S. 1081 (1990); *United States v. Nersesian*, 824 F.2d 1294, 1327 (2d Cir.),

*cert.denied*, 484 U.S. 958 (1987); *Udzinski v. Kelly*, 734 F.Supp. 76, 85 (E.D.N.Y. 1990).

In order for a petitioner to make out a claim of constitutional error on the ground of

prosecutorial misconduct, "it is not enough that the prosecutors' remarks were undesirable or even

universally condemned."   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).   "The relevant

question," the Supreme Court has held, "is whether the prosecutors' comments 'so infected the trial

with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (quoting *Donnelly*

---

[10]Petitioner does not reference any specific comments in her petition.  Respondent will address and respectfully
refer the Court to its brief in that appeal regarding specific comments petitioner attacked on direct appeal.

*v. DeChristoforo*, 416 U.S. at 643); *see also Weinberg v. Warden*, 2012 WL 5834393 (E.D.N.Y. Nov. 16, 2012).  Indeed, the Second Circuit has held that it is a "rare case" in which even improper summation comments will be deemed so prejudicial as to support issuance of a writ of *habeas corpus.  See Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990).

   The Supreme Court has considered many factors in evaluating allegedly improper comments made by a prosecutor.  The Court has looked to whether the comments manipulated or misstated evidence, and whether they implicated other specific rights of the accused, such as the right to counsel or the right to remain silent.  *Darden v. Wainwright*, 477 U.S. at 182.  In evaluating the effect of these comments, the Court has looked to whether the objectionable comment was invited by the defense, whether the court issues appropriate instructions to the jury, how heavily the evidence weighed against petitioner, and the opportunity of the defense to address or counter the prosecutor's allegedly improper comments.  *Id*. at 182-183; *see United States v. Young*, 470 U.S. 1, 13 (1985); *Donnelly v. DeChristoforo*, 416 U.S. at 645.

   And the Court has repeatedly affirmed the principle that the People's summation "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error."  *United States v. Young*, 470 U.S. at 12; *see also United States v. Robinson*, 485 U.S. 25, 31-33 (1988).  In this context, "defense counsel's conduct, as well as the nature of the prosecutor's response is relevant."  *United States v. Young*, 470 U.S. at 12.  *See also Lawn v. United States*, 355 U.S. 339 (1958).  Therefore, in order to "make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's [summation] . . . [I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments

would not warrant reversing a conviction." *United States v. Young*, at 12-13.  And in determining "whether the prosecutor's remarks were so prejudicial as to deprive the defendant of a fair trial," "[t]he absence of contemporaneous objections or requests for cautionary instructions are factors to be taken into consideration." *Malley v. Manson*, 547 F.2d 25, 28 (2d Cir. 1976), *cert. denied*, 430 U.S. 918 (1977); *see also United States v. Melendez*, 57 F.3d 238, 243 (2d Cir. 1995) ("The absence of [a mistrial] motion provides some indication that the improper remark was not perceived as rendering the trial unfair . . ."); *Mack v. New York*, 2004 U.S. Dist. LEXIS 3739 *21-22 (E.D.N.Y. March 11, 2004).

In assessing whether a prosecutor's improper comments have substantially prejudiced a petitioner, the court should consider the severity of the prosecutor's alleged misconduct, any curative measures that the trial court may have taken to ameliorate the error and prevent resulting prejudice, and whether the petitioner's conviction was certain absent the prejudicial conduct. *See United States v. Elias*, 285 F.3d 183 (2d Cir. 2002); *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990); *Gonzalez v. Sullivan*, 934 F.2d at 424; *Udzinski v. Kelly*, 734 F.Supp. at 85.  The Court has reiterated that Supreme Court precedent that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding," *United States v. Young*, 470 U.S. at 11, and held that "[r]eversal is an ill suited remedy for prosecutorial misconduct . . ." *United States v. Modica*, 663 F.2d 1173, 1184 (2d Cir. 1981); *accord United States v. Elias*, 285 F.3d at 190.  The Second Circuit has also held that "the severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding." *Id*.; *see United States v. Melendez*, 57 F.3d at 241.

36

Here, the challenged conduct did not so infect the trial with unfairness that petitioner was denied due process. In fact, in the context of the entire trial, the prosecutor's comments were not improper or prejudicial. The prosecutor's summation comments did not affect the jury's verdict, especially given the court's instructions to the jury (*see* Respondent's Appellate Division Brief at 60-74; Respondent's Supplemental Appellate Division Brief at 22-42).

Additionally, any claim of prejudice with respect to the prosecutor's summation is belied by the fact that, at trial, defense counsel failed to object to several of the comments, or did not do so on the grounds raised on appeal. In determining whether a *habeas corpus* petitioner was actually prejudiced by comments of a prosecutor during trial, "[t]he absence of contemporaneous objections or requests for cautionary instructions are factors to be taken into consideration." *Malley v. Manson*, 547 F.2d at 28; *see also United States v. Melendez*, 57 F.3d at 243 ("[T]he absence of [a mistrial] motion provides some indication that the improper remark was not perceived as rendering the trial unfair . . ."). Accordingly, it can be presumed that neither petitioner nor trial counsel believed that certain remarks by the prosecutor prejudiced petitioner such that he was denied a fair trial.

Furthermore, the trial court's instructions served to mitigate any potential prejudice. Courts frequently observe that even otherwise indefensible conduct may be cured by prompt curative instructions. *See*, *e.g.*, *Sedney Delano v. Superintendent Greiner*, 2003 WL 21821432 (E.D.N.Y. July 23, 2003) (JBW). In this case, any potential prejudice was dissipated by the court's strong and thorough instructions throughout.

Here, the trial court properly conveyed to the jury what constituted evidence and the correct law. And this Court must presume the jury followed the trial court's instructions. *See*

37

*Jackson v. Tellado*, 295 F.Supp.3d 164, 184 (E.D.N.Y. 2018); *People v. Baker*, 14 N.Y.3d 266 (2010).

Before opening statements, the Court discussed with the jury an outline of the order of trial. In so doing, the court noted that, like the opening statements, summations did not constitute evidence. Rather, the attorneys would discuss the facts and reasonable inferences to be drawn from the evidence. The Court added that the jurors should disregard any statement made by the attorneys that was not based on the evidence (718-19).

The Court instructed the jurors that they were the sole and exclusive judges of the facts, they determined what testimony to credit and accept, and they alone determined petitioner's guilt or innocence (721-22).

Prior to summations, the Court reminded the jurors that what the attorneys said in summation, like the opening, was not evidence because they were not witnesses. Rather, the Court explained, the summations were arguments and reasonable inferences based on the evidence. The court added that "Any argument that is made to you that is not based on the evidence should be disregarded" (1689).

Throughout the charge the Court reminded the jurors that they were the sole judges of the facts and it was their determination that governed. The Court added that, as the trier of fact, the jurors determined whether or not to believe a witness.

Thus, any possible prejudice was dissipated by the Court's numerous instructions that it was for the jury to determine the facts of the case, that anything the attorneys said did not constitute evidence, and that the State had the burden – a burden which never shifted – to prove petitioner's guilt beyond a reasonable doubt.

Moreover, error, if any, in the prosecutor's conduct was harmless in light of the overwhelming evidence of petitioner's guilt. Thus, even if petitioner could somehow demonstrate to this Court that the Appellate Division's decision was unreasonable, she is nonetheless not entitled to the issuance of the writ because any error was harmless. A constitutional error is harmless unless it had a substantial and injurious effect on the verdict. And here, in light of the overwhelming evidence of petitioner's guilt, any error as to some of the prosecutor's comments did not have any effect on this verdict, much less a substantial and injurious one. *See Brecht v. Abramhamson*, 507 U.S. 619 (1993); *see also Bradley v. Meachum*, 918 F.2d at 343 (*See* Point Two, *supra*). In fact, the evidence of guilt was so overwhelming that petitioner did not even challenge the sufficiency of the evidence of her guilt of the murder on direct appeal. *See People v. Rodriguez*, 103 A.D.2d 121 (1st Dept. 1984).

The overwhelming evidence of petitioner's guilt ensures that there is no reasonable possibility that the prosecutor's comments affected the verdict. It is simply impossible for petitioner to demonstrate that this jury was leaning towards acquitting petitioner until it heard the prosecutor's summation. Accordingly, nothing the prosecutor said influenced the jury to vote blindly to convict petitioner.

In sum, petitioner claim regarding the prosecutor's summation does not present a federal constitutional issue. The prosecutor's summation comments were either a fair response to petitioner's summation comments or were fair comment on the evidence. Additionally, the trial court's instructions to the jury ensured that petitioner received a fair trial. Finally, given the strength of the prosecution's case, petitioner's conviction was certain, even absent the claimed improper comments. Thus, petitioner was not at all prejudiced by the prosecutor's conduct, much less to the

point where she was denied a fair trial.  Accordingly, the Court should deny petitioner's request for

*habeas corpus* relief.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should reject petitioner's application for

a writ of *habeas corpus*.

Respectfully submitted,


MELINDA KATZ
District Attorney
Queens County


JOHNNETTE TRAILL
SHARON Y. BRODT
NANCY FITZPATRICK TALCOTT
Assistant District Attorneys
of Counsel

July 15, 2020

40