*To be argued by*
YVONNE SHIVERS *(10 minutes)*

# New York Supreme Court

## APPELLATE DIVISION SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against —*

## YNMACULADA GOMEZ,

*Defendant- Appellant.*

**TO BE HEARD ON
THE ORIGINAL
RECORD**

Queens County
Ind. No. 538/09

A.D. No. 2014-07277

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
Attorney for Defendant-
Appellant
111 John Street, 9th Flr
New York, N.Y.10038
(212) 693-0085

YVONNE SHIVERS
*Of Counsel*

June 2016

2016 JUL - 1  A 11: 14

APPEALS BUREAU
QUEENS COUNTY D.A.

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 5531 ................................................................1

PRELIMINARY STATEMENT...............................................................................2

QUESTIONS PRESENTED....................................................................................2

STATEMENT OF FACTS ......................................................................................3

    Introduction.....................................................................................................3

    The Court's Remarks During Jury Selection..............................................5

    The Molineux Ruling.......................................................................................9

    The People's Direct Case.............................................................................11

    The Defense Case........................................................................................24

    The Rebuttal..................................................................................................25

    The Summations...........................................................................................25

    The Court's Charge and Verdict................................................................27

    The Sentencing............................................................................................29

ARGUMENT.........................................................................................................31

    POINT I

    THE COURT'S REMARKS, INCLUDING BERATING ONE
    PROSPECTIVE JUROR WHO SAID HE COULD NOT BE
    FAIR AND FALSELY TELLING OTHERS THAT THEY
    WOULD BE REQUIRED TO TAKE A TEN-WEEK
    ENGLISH COURSE, HAD A CHILLING EFFECT ON JURY
    SELECTION THAT DEPRIVED OF APPELLANT OF HER
    RIGHTS TO A JURY CHOSEN ACCORDING TO THE
    LAW, DUE PROCESS AND A FAIR TRIAL.. ....................................................31

POINT II

APPELLANT WAS DEPRIVED OF A FAIR TRIAL BY THE
ADMISSION OF UNNECESSARY AND UNDULY
PREJUDICIAL TESTIMONY THAT SHE PREVIOUSLY
SOLICITED INDIVIDUALS TO KILL OR FRAME THE
DECEDENT..............................................................................................37

POINT III

APPELLANT WAS DEPRIVED OF A FAIR TRIAL BY THE
PROSECUTOR'S SUMMATION REMARKS ACCUSING
HER OF TAX FRAUD, DENIGRATING THE DEFENSE
AND MISCHARACTERIZING THE EVIDENCE.........................................44

POINT IV

WITH RESPECT TO THE TAMPERING WITH PHYSICAL
EVIDENCE COUNT, THE COURT'S INSTRUCTIONS
WERE INADEQUATE, THE INDICTMENT WAS
CONSTRUCTIVELY AMENDED, AND THE EVIDENCE
WAS LEGALLY INSUFFICIENT, THUS DEPRIVING
APPELLANT OF DUE PROCESS, FAIR NOTICE OF THE
CHARGE, AND THE RIGHT TO HAVE THE CHARGE
PREFERRED BY A GRAND JURY................................................................50

    A. The Court's Charge Was Inadequate Because it Failed
       to Instruct the Jury that the Subject of the Tampering
       Charge was a Gun...........................................................................51

    B. The Court's Instruction and the Prosecution's
       Summation Comment Regarding Tampering
       Constructively Amended the Indictment.......................................52

    C. The Evidence was Legally Insufficient to Support the
       Tampering Charge ..........................................................................55

## POINT V

THE SENTENCE IMPOSED ON FORTY-SIX-YEAR-OLD
APPELLANT, A BUSINESS WOMAN WITH NO PRIOR
CRIMINAL RECORD, WAS EXCESSIVE ......................................................... 58

CONCLUSION ................................................................................................................ 60

CERTIFICATE OF COMPLIANCE

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
--------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

        - against —

YNMACULADA GOMEZ,

                    Defendant-Appellant.
--------------------------------------------------------------------------X

## STATEMENT PURSUANT TO RULE 5531

1.      The indictment number in the court below was 538/09.

2.      The full names of the original parties were People of the State of New York against Ynmaculada Gomez and Luis Rosado.   This appeal is on behalf of Ynmaculada Gomez.

3.      This action was commenced in Supreme Court, Queens County.

4.      This action was commenced by the filing of an indictment on March 20, 2009.

5.      This appeal is from a judgment convicting appellant, after a jury trial, of murder in the second degree, criminal possession of a weapon in the second degree and tampering with physical evidence.

6.      This is an appeal from a judgment of conviction rendered July 14, 2014.

7.      Appellant has been granted permission to appeal as a poor person on the original record. The appendix method is not being used.

1

## PRELIMINARY STATEMENT

Appellant Ynmaculada Gomez, appeals from the July 14, 2014, judgment of the Supreme Court, Queens County, convicting her, after a jury trial, of murder in the second degree [P.L. § 125.25(1)], two counts of criminal possession of a weapon in the second degree [P.L. §§ 265.03(1)(b), (3)], and tampering with physical evidence [P.L. § 215.40(2)], and sentencing her to concurrent prison terms of 25 years to life on the murder count and 15 years on each weapon possession count, and a consecutive prison term of 1 1/3 to 4 years on the tampering count (Holder, J., at trial and sentencing).

Appellant filed a timely notice of appeal. On November 6, 2014 this Court granted her leave to proceed as a poor person and assigned Lynn W. L. Fahey as counsel on appeal.

No stay has been sought and appellant is currently incarcerated pursuant to the judgment. Codefendant Luis Rosado pleaded guilty and was sentenced.

## QUESTIONS PRESENTED

1. Whether the court's remarks, including berating one prospective juror who said he could not be fair and falsely telling others that they would be required to take a ten-week English course, had a chilling effect on jury selection that deprived of appellant of her rights to a jury chosen according to the law, due process and a fair trial.

2

2. Whether appellant was deprived of a fair trial by the admission of unnecessary and unduly prejudicial testimony that she previously solicited individuals to kill or frame the decedent.

3. Whether appellant was deprived of a fair trial by the prosecutor's summation remarks accusing her of tax fraud, denigrating the defense and mischaracterizing the evidence.

4. Whether with respect to the tampering with physical evidence count, the court's instructions were inadequate, the indictment was constructively amended, and the evidence was legally insufficient, thus depriving appellant of due process, fair notice of the charge, and the right to have the charge preferred by a grand jury.

5. Whether the sentence imposed on forty-six-year-old appellant, a business woman with no prior criminal record, was excessive.

## STATEMENT OF FACTS

Introduction

Appellant, a Florida businesswoman, was charged in an indictment with second-degree murder, criminal possession of a weapon and tampering with physical evidence, in the shooting death of her former business partner Mario Rei. Appellant's former employee Luis Rosado testified, pursuant to a cooperation agreement, that he shot Rei at appellant's behest in return for appellant's promise that he could live rent-free in a house she owned in Florida.

During jury selection, the court angrily told one prospective juror who said that, as a police officer he had a professional bias against appellant and could not be

3

fair, that he had "no business" being in a courtroom or being a police officer, and ordered him to "get out" of the courtroom. Additionally, the court falsely told several prospective jurors who said they had difficulty understanding English that they would have to take English classes for ten weeks.    Other remarks the court made in questioning prospective jurors who expressed hardships or who were students, led one prospective juror to say he had been "afraid" to tell the court he was a student and had missed a class. The court denied defense counsel's motions for dismissal of the entire jury panel and, later, the sworn jurors, on the ground that the court had so intimidated the prospective jurors that they were afraid to respond truthfully to questions during voir dire.

Over defense counsel's objection that it was unduly prejudicial, the court allowed the prosecution to elicit, in order to prove intent, testimony that appellant had attempted to solicit two other people to kill Rei, and one to frame him for drug possession.

During summation the prosecutor accused appellant of tax fraud, told the jury that defense counsel was trying to "distract" them and "didn't let the facts get in the way of her arguments," and that evidence defense counsel referred to regarding a silver car being used by Rei and another witness to drive to Rei's workplace and kill him did "not exist."

The court sentenced appellant, a 46-year-old business woman with no prior criminal record to, cumulatively, twenty-six and a half years' to life imprisonment.

4

## The Court's Remarks During Jury Selection

After some preliminary remarks, the court informed prospective jurors how long the trial would last and asked whether anyone, as a result of "pressing business" or "personal reasons," would be unable to serve (V 41, 100-01).[1]  The court individually questioned those who raised their hands.  One of the first of these prospective jurors was a police officer, who stated that his "professional bias" would prevent him from being fair to the defendant, and that he knew "as a police officer if you're going this far with the charge, I would say that the evidence is pretty..." (V 49-50).  Asked by the court whether as a police officer, the presumption of innocence meant anything to him, the officer responded that he understood what it meant, but that "speaking in all honesty" he would be biased against the defendant (V 91).  The prospective juror further stated that while he "would like to say he would give [the defendant] the benefit of the doubt, "at the end of the day I don't want to second guess myself and hurt someone else" (V 52).  Releasing him, the court stated:

> [Y]ou really have no business in this courtroom. I'm not sure you have any business being a police officer. I'm going to tell you that straight up, okay. But you cannot walk into this courtroom and simply just prejudge this case because it's gotten to this level knowing that you know zero about this case, all right. That's pretty shameful as a police officer.

---

[1]     Numbers in parentheses preceded by "V" refer to the voir dire minutes, by "S" to the sentencing minutes and by "PSR" to the Presentence Report.  Unprefixed numbers in parentheses refer to the trial minutes.

> And quite frankly, I'm disheartened to actually hear you say
> that and it makes me wonder about the job you do.
>
> Get out of my courtroom. You, frankly, have no [business]
> coming in a courtroom. (V 52).

The court subsequently explained to the jury:

> This is . . . in my estimation, one of the pitfalls of what you
> can have in a criminal justice system. You cannot have a
> system where without any evidence whatsoever or knowing
> anything about any case simply because someone is
> arrested or ends up in a trial situation, that you can judge
> that they are guilty of whatever it is they are charged with.
> For those words to come out of a police officer is, frankly,
> sickening. That's just my personal opinion, okay (V 53).

The first prospective juror in the group who stated she had trouble understanding English was excused after the court questioned her about the length of time lived in the United States, employment status, whether she had children in school and had to speak to their teachers, and whether she had understood what had thus far been said in the courtroom (V 47-49). Thereafter, the court questioned prospective jurors who said they had trouble understanding English before telling them it did not believe them and excusing them, stating they would be sent to English classes for ten weeks: "Okay, we're going to send you for English lessons today. I'm going to excuse you and send you to English lessons for 10 weeks" (V 73); "Hold on a second. Ten weeks of English classes. Hope you do well" (V 90); "I'll be honest with you. I don't really believe you. ... We are going to help you out. Twenty-four years here. ... Ten weeks of English lessons ... Good luck" (V 106); "English lessons.

6

I'll be honest with you. I don't believe you but I'll send you for English lessons anyway."(111). One prospective juror who said he had difficulty with English was questioned and not excused (V 111-13).

The court asked prospective jurors who asked to be excused for job-related reasons what their employers would do if they were "hit by a bus" (V 60, 122), "a train ran over your legs" (V 62), or "broke both your legs (V 103), and did not excuse them (V 60, 62, 103, 122). The court excused several students (V 43-44, 58-59, 66, 70-71, 78, 119), in some instances asking them why they failed to seek postponements and suggesting they should have read the jury service notification form more carefully (V 44, 59).

On the second day of jury selection, after prospective jurors were placed in the jury box for formal <u>voir dire</u>, one of them revealed that she was a student and had missed class that day (V 183). She stated that she had been "afraid" to come up and tell the court the previous day (V 183). After the court excused her with the consent of both counsel, defense counsel, moved for "dismissal of this panel and mistrial" on the ground that jurors had been "intimidated" by the court, stating:

> I think it's been apparent throughout the picking of this jury, many of the jurors have been intimidated that your Honor has . . . said that he didn't believe what they were saying or the police officer didn't belong in the courtroom when he was just expressing what he said to be the truth.

> I think this young lady demonstrates how scared the members of this jury are to come forward to even say they don't understand the language, especially since I have a client that

7

doesn't speak English. It puts us in a very difficult place (V 184).

Denying the motion, the court stated that it was apparent that the prospective jurors who had said they did not understand English "were faking," that the police officer's statement had been "reprehensible," and that its explanation to the jury that the officer's position was unacceptable was "consistent with supporting your client and her ability to get a fair trial" (V 185-86). The court further stated that the juror who said she had been afraid to come up "was just nervous" and "not affected by anything I said" (V 186). Defense counsel responded that the juror had "actually said she was afraid," and that the objection was to "the comments that you're making to them that [have] intimidated this entire panel," however the court reiterated its denial of the motion (V 186). Later, to "complete the record," the court noted its belief that there was no indication that any of the prospective jurors was afraid to speak since some had been laughing at the court's jokes, volunteering information, and speaking freely "back and forth" with the court (V 211-12). From this the court concluded that there was no indication that anyone was fearful of speaking (Id.).

During her voir dire, defense counsel asked the prospective jurors if they had any reason they felt they could not be fair or could not sit, even if they felt "too intimidated to say so" (V 245-46). No jurors raised their hands (Id.). When counsel asked whether every juror could promise that their attention would be focused on the case, one prospective juror mentioned her child's graduation she wished to attend but

8

stated, "If I got run over by a truck I wouldn't be there, you know" (V257, 260). The court responded that it had not meant that comment to apply to her children, only to jobs (Id.). Another prospective juror then stated, "I know just like you said last time, if I was to get run over by a truck I wouldn't be able to make it, you know," then added, "My English is not that well and I'm scared I misunderstand for the case . . ." (V 261). After questioning her regarding her ability to understand English, the court did not discharge her (V 262).

Later, the court again "complet[ed] the record," asserting that although defense counsel "on her questioning essentially tried to squeeze out of this jury that they're fearful of disclosing things and questioned them whether or not they're reluctant to make such a disclosure because they're intimidated," "not one person raised their hand" (V 271).   Before the selected jury was sworn, defense counsel reiterated her motion, which the court again denied (714-17).

The Molineux Ruling

On the ground that the evidence proved motive, identity and intent, and provided necessary background regarding appellant's acrimonious relationship with Mario Rei and Gioconda Pazmino's fear of appellant, the prosecutor moved for the admission of testimony that appellant:  1) told Pazmino she had to have Rei killed because he had ruined her business and credit and taken her woman (referring to Rei's wife Flor Cepeda); 2) shown her gun to Pazmino and stated that it was for Rei and

9

whoever else stood between her and Flor; 3) on separate occasions in the summer of 2008, solicited her father and a customer to kill Rei; 4) paid someone to plant drugs in Rei's house and then call the police; 5) made what the prosecution contended as a false report that her gun had been stolen and that she suspected, Pazmino, a recent houseguest, of stealing it; and 6) threatened Pazmino during an argument, telling her that she could shoot her and no one would know (V 12-27).

Defense counsel argued, inter alia, that all of the proposed evidence should be excluded because of "sheer prejudice" (706). She had no objection to the admission of appellant's report that her gun was stolen (708).

Noting that it "must make the determination whether the evidence is more prejudicial than probative before allowing it to be admitted," the court granted the application and ruled that appellant's "multiple threats that she had to get rid of [Rei]" because he had ruined her business, her credit and taken her woman, and her statement that the gun was "for Mario ... or anyone else who got between her and Flor" were "admissible as background information concerning the relationship between the defendant and the victim, and to establish [the] motive, intent, identity of the perpetrator" (711-12). It ruled that appellant's solicitations of her father and a customer to kill Rei were "admissible to establish intent" (Id.). Evidence of appellant's attempt to plant evidence "to frame [Rei] for a crime" was, the court ruled, admissible to "show[] the acrimonious relationship between [appellant and Rei]" (712-13). The court also ruled that evidence that appellant threatened that she could shoot

10

Pazmino and no one would know, was "admissible as background information and to explain the nature of the relationship between [appellant] and Pazmino at that time" (713).

The prosecutor had also sought under <u>Sandoval</u> to cross-examine appellant, if she testified, about the threat to shoot Pazmino and a credit card application, found in appellant's home during execution of a search warrant, in which she had named Flor Cepeda as the applicant and allegedly forged her signature (V 28-32). The court granted that application as well, reasoning that the incidents were probative of appellant's credibility and "indicative of her willingness to place her own self-interests" before those of society (713).

<u>The People's Direct Case</u>

On November 12, 2008, at about 5:00 p.m., <u>John Vasilantonakis</u>, the owner of a mechanic shop located at 50-30 98th Street in Queens, heard three gun shots fired shortly after his employee, decedent Mario Rei, had left the shop for the day (994-96). Vasilantonakis looked outside and saw a man in a heavy dark coat and a dark "ski hat" running away (996). The man got into the passenger side of a "silver Dodge Caravan" parked on the corner, which then made a right turn and drove out of sight (996-97). Rei was lying on the street bleeding (<u>Id.</u>). Paramedics arrived and administered CPR at the scene, then transported Rei to the hospital, where he was pronounced dead (EMT <u>John Scott Hayter</u> 753-62). The cause of death was three gunshot wounds to the torso (Dr. <u>Irini Scordi-Bello</u> 1551).

11

Flor Cepeda and Mario Rei came to the United States from Venezuela in 1999, and remained here illegally (865, 869). They married in 2000, had a son in 2002, and lived in Queens (865, 867). Cepeda met appellant in Queens in or about 2001 at a Jehovah's Witness Kingdom Hall that they both attended (866). They became close friends; appellant got Cepeda a job as a salesperson at a company called Northeast where appellant was also a salesperson, and they saw each other almost daily (868, 908-09). Appellant also helped Cepeda and Rei obtain auto insurance, a lease for their apartment, and credit cards for Cepeda (868, 907). Appellant put these things in her name because Cepeda and Rei were in the country illegally. They in turn paid appellant to cover the bills and Rei, a mechanic, would fix appellant's car for free (869, 908). Appellant, Cepeda and Rei also took vacations together to the Poconos and to Tampa, Florida, where appellant owned property (867-68, 877).

The relationship began to deteriorate after Cepeda and Rei learned that their illegal status did not require them to put things in appellant's name (869-70). Appellant and Rei fought and appellant threatened to report them to immigration (Id.). In 2005, Cepeda and Rei moved to Charlotte, North Carolina and, for a time, ceased communicating with appellant (871-72).

After Cepeda and Rei had been in North Carolina for about eight months, Cepeda received an email from appellant saying that her mother had passed away (872). Cepeda called appellant to offer her condolences, they thereafter began regularly communicating again, and Cepeda invited appellant to come to North

Carolina for a visit (871-73). She met appellant in a hotel in North Carolina for about half an hour, but denied, at trial, that she and appellant had a sexual relationship then or at any time (873-74). Cepeda had, several years earlier, questioned appellant about her feelings because appellant had no husband or boyfriend and would hug Cepeda and say "I love you" a lot, but appellant had told her she thought of her as a daughter and that they were "like family" (874-75, 898, 914). Cepeda denied communicating with appellant after the move to North Carolina before appellant's mother died, or meeting her in a hotel in New York on Valentine's Day in 2006 (910-12). Cepeda did borrow between $3,000 and $5,000 from appellant so that she could move back to New York (875-77). Rei did not want to move back to New York so, in late December 2006 or early 2007, Cepeda and Rei moved to Tampa, Florida (877).

When Cepeda and Rei had been in Tampa for about two months, they accepted appellant's dinner invitation to her Tampa home, reconciled, and talked about going into business together (878-82). Appellant also offered Cepeda and Rei, who were then living in an apartment, her second home in Tampa. She stated that she would transfer its title to them, while the mortgage would remain in her name and they would give her the monthly payments (880-83). Three weeks later, Cepeda and Rei moved into the house, located on North Hale Avenue (the "North Hale house"), and in or about September 2007, appellant transferred title to the house to Cepeda (882-83, 921).

13

Appellant, Cepeda and Rei also opened a "tire shop" called Tire Flea Market (885-87). Rei contributed $5,000 to the startup costs (886-87). Appellant, in their presence and the presence of an accountant, incorporated and registered the business in her name because of Cepeda and Rei's illegal immigration status (Id.).

The business made money and everything went well for about a year. At the beginning of 2008, however, appellant accused Rei of stealing money and Rei accused appellant of failing to pay him and Cepeda their agreed percentages of the business earnings (888). Rei decided to terminate the partnership and asked for his $5,000 back. Appellant told him she did not have the money (889). One day in May 2008, Cepeda came to the shop and found the police there telling Rei he had to leave the premises. Since the business was in appellant's name, Rei had to leave and Cepeda had to leave the car she had driven to the shop, which was also in appellant's name (890-91).

Cepeda and Rei continued to live in the North Hale house, but stopped paying the mortgage because appellant would not return the $5,000 (893). Rei opened his own mechanic shop called Los Chomos, after an accountant advised them they could legally own a business despite their immigration status (892). In September 2008, Rei closed the shop because the landlord did not renew his lease. He and Cepeda subsequently returned to New York, where Rei got a job as a mechanic at his former employer's Queens auto shop (897-98). Cepeda never received an email from

14

appellant telling her that their relationship was over; before leaving Florida she had blocked appellant's emails (975).

Cepeda was not aware that in August 2006, appellant had transferred two Florida properties to her (915-18, 922; Defense Exhibit A). While she signed the quit claim deeds in 2007 (Defense Exhibits C, D) transferring the properties back to appellant, she was not aware of what she was signing because she did not read English (940-41, 982-84). Cepeda never read letters addressed to her from the Florida Department of Revenue regarding the quit claim deeds (Defense Exhibits for identification G, H)[2], because she gave any such mail she received to appellant (946, 986-87). Cepeda was not aware that in December 2006, appellant made her the beneficiary of an insurance policy (917-18). She never went into a paper business called IFGO with appellant and did not know what the letters stood for (911-12).

Gioconda Pazmino had known appellant for 17 years. They had initially worked together in New York; they subsequently became a couple and were in that relationship for eight or nine years before breaking up in 2000 or 2001 (1010-12, 1050). They did not talk for several years after that, until in May 2007, appellant called her and they reestablished a friendship (1013). In May 2008, appellant told Pazmino she needed help at her business because she had fired Rei and Cepeda, whom Pazmino knew casually as appellant's friends from the Kingdom Hall (1015-16,

---

[2]    The letters were never admitted into evidence (977, 1651, 1688).

15

1054).  Pazmino moved to Tampa to work at Tire Flea Market (1016-18).  She lived with appellant during her three-month stay, and worked for her seven days a week (1017-18, 1022, 1056).

In July 2008, appellant asked Pazmino to go to Rei's shop with a document she wanted Cepeda to sign transferring ownership of the North Hale house, where Cepeda and Rei had been living, back to her (Cepeda 894-96; Pazmino 1019).  If Cepeda refused, Pazmino was to tell her that appellant would reveal to Rei that Cepeda and appellant had been in a romantic relationship (Pazmino 1019-20).  Pazmino went to Los Chomos and met with Cepeda and Rei (Pazmino 1020; Cepeda 895-96).  Cepeda refused to sign the document.  When Pazmino delivered appellant's message to Cepeda, she "laughed" and told Pazmino to go ahead and tell Rei, because there was no such relationship between her and appellant and she "didn't like women, and much less Ynmaculada" (Pazmino 1021; Cepeda 896).

Pazmino claimed that when she reported what had happened, appellant became "angry" and said she was "going to kill [Rei] ... because he had ruined the business, he had ruined the credit, and besides that, he had stayed with Flor" (1022).  Appellant supposedly repeated this statement "five or six times" during the three months Pazmino was in Florida (Id.).

Pursuant to the Molineux ruling, the prosecutor elicited that when appellant's father, Joel Gomez, visited that summer, Pazmino heard appellant ask him to kill Rei (1022, 1108-09, 1284).  Gomez responded that he would do it, but that he would also

16

have to kill whoever else was home at the time (1022-23, 1109, 1112). Appellant said that she did not want "Flor and the boy" hurt and told her father to forget it (1023). Pazmino also contended that in August 2008, she heard appellant offer a customer at the tire shop, who was a drug dealer, $3,000 to kill Rei. He responded that it would take $10,000 to kill Rei, and that for $3,000 he could only put him in the hospital (1023-24, 1107, 1113, 1115). Pazmino was present at the tire shop another time that summer when appellant gave someone $300, told them to purchase drugs and plant them in Rei's house, and provided the keys (1024). That individual took the money and never came back (1025).

In September 2008, appellant and Pazmino had an argument "about a customer" and appellant told Pazmino to leave (1018, 1025, 1066). When Pazmino, who had not been paid all summer, demanded her pay, appellant said she could shoot Pazmino and no one would ever know (1025-26). Pazmino had seen a gun appellant kept in a dresser and carried to and from work when she was carrying large sums of money, and had heard appellant say she was going to use it "to harm somebody" (1018, 1062-64, 1066). She therefore left and stayed with a friend for a few days (1026). She subsequently went to appellant's house to get her things, and asked for her pay, but appellant said she did not have the money (1067). Pazmino asked for and was given train fare back to New York (Id.).

Luis Rosado testified under a cooperation agreement pursuant to which he pleaded guilty to manslaughter and would be sentenced to a maximum of 24 years'

17

imprisonment (1367-68). In the summer of 2008, Rosado was living in Tampa with his pregnant girlfriend Odette and her three children (1292, 1354). He had first met appellant in March or April 2008, when he bought tires from Tire Flea Market. Rei had put the tires on his car at that time, but apart from that Rosado did not know him (1293-95). In August 2008, appellant hired Rosado as a mechanic, working at the shop six days a week (1293). He worked alongside Pazmino for about three weeks (Pazmino 1124; Rosado 1298-99). When Pazmino "quit," she came to Rosado's house to tell him about the argument (Rosado 1299-1300).

As Rosado's friendship with appellant grew, she told him that her "ex- partner" Rei had stolen money from the business, and that she was losing her home in North Hale, because Rei was not paying the mortgage (1297-98). Supposedly, appellant once said she wanted Rei dead, but Rosado did not take her seriously although he knew she owned a gun (1296-98). In October 2008, appellant asked Rosado to help her drive to New York to see an attorney and to see Rei to "resolve" their problem (1300-01). Rosado agreed to go because when he at first refused, appellant purportedly threatened him, saying she knew where his family lived (1301-02).

On October 26, 2008, Pazmino received a call from appellant, saying she had found out where Cepeda and Rei lived and was coming to New York. She asked Pazmino to purchase her a cell phone (1026). Pazmino bought appellant a cell phone, but put it in her own name (1027-28). She gave appellant the cell phone when she

18

arrived in New York the next day with Rosado (Pazmino 1029-30, 1039; Rosado 1304).

Rosado and appellant stayed with Pazmino for two or three days, during which they drove to several repair shops in Corona, Queens looking for Rei, and located him in one such shop (Rosado 1304-05; Pazmino 1031).   Appellant had brought a gun in a black box which she kept on top of Pazmino's television set in her bedroom (Pazmino1032).  Rosado and appellant discussed killing Rei on Halloween (Pazmino 1031, 1282; Rosado 1306-08). Rosado at first refused, but agreed in order to "get her off [his] back" after she threatened his family by commenting that she had an incarcerated brother with a "bad attitude" (Rosado 1306-08, 1311, 1395; Pazmino 1031).   Although he assented, he claimed that he never intended to follow through (Rosado 1311, 1352).

Appellant returned to Florida, leaving Rosado behind and her gun hidden in a closet in Pazmino's bedroom (Rosado 1308-09).  Rosado testified that he intended to have Pazmino drive him, in her husband's silver car, to where Rei worked, and then use appellant's gun to shoot Rei (1363-64, 1395-96).   On re-direct, Rosado claimed this was appellant's plan and that he never intended to carry it out or spoke to Pazmino about it.  He denied that Pazmino was involved in the planning or execution of Rei's death (1395-96).   Rosado and Pazmino hung out with Pazmino's friends in Yonkers for a few hours, but when they returned to Queens, Pazmino told him that he could not stay in her apartment because her husband did not want him there

19

(Rosado 1310), or because Pazmino "didn't want to get [involved] in" Rosado's plan to kill Rei (Pazmino 1035-36). She then took him to Penn Station and he spent the night in the station before returning to Florida (Pazmino 1036; Rosado 1310, 1396).

When Rosado returned to Florida and told appellant he had not killed Rei, she demanded that he go back and do it, but he refused despite her repeated threats (1312). A few days later, however, appellant proposed that if Rosado would kill Rei, she would allow him to stay in the North Hale house rent free and continue to work for her (1312-14, 1350). Rosado, facing eviction from his apartment, agreed (1312-14). On November 11, 2008, Rosado and appellant left Florida in a gold colored Dodge Caravan that Rosado had borrowed from a friend, and again headed for New York (1314-17; Maribel Ortiz 1456-57). Appellant did not bring her "regular" cell phone from Florida with her to New York (Rosado 1319). Using the cell phone Pazmino had bought for her, appellant called Pazmino and told her she was coming to New York on November 12, 2008, in order to commemorate the anniversary of her mother's death with family (1036). When Pazmino later called appellant to find out when she would be arriving, appellant said she was in New Jersey and that when she arrived in New York she would need to get something she had left at Pazmino's house (1037-38). In New Jersey, appellant and Rosado stayed with Kenia Soto an acquaintance of appellant's through Pazmino, to rest for a few hours before proceeding to New York (Rosado 1317-19; Soto 1466-69). Appellant thereafter called

Pazmino several times to find out when she would be home (Rosado 1319; Pazmino 1038).

Pazmino got home on November 12, 2008, at about 2:00 p.m.; her friend "Belky" and Belky's partner Erica, had driven her from Yonkers to Queens and remained parked outside because Pazmino intended to return with them to Yonkers (Pazmino 1041-42, 1102-04; Belkis Sanchez 1560, 1570-72). When Pazmino called appellant to ask what she needed from her apartment, appellant told her a gun was in a drawer in the bedroom and told her to bring it to the corner of 60th Avenue and Calloway Street, about a block from Pazmino's apartment (1040-41, 1265-66). Pazmino found the gun wrapped in a sealed black bag, which she did not open (1040-41). She had actually known that the gun was in the apartment because appellant had called her a few days after Rosado left in October, asked her why she had "sent Luis back to Florida without doing what he was going to do," and told her she had left the gun (1275-77).

Pazmino went in Belky's car to the location, and when she did not see appellant's car, called to ask where she was (1041-42, 1102-04, 1278-79). Appellant responded, "you didn't come alone," "are you afraid of me?", and told her to come to the corner alone (1041-42, 1278-79). Pazmino walked to the corner, saw Rosado and gave him the gun, then returned to Belky's car and left (Pazmino 1042-43; Rosado 1322; Sanchez 1561).

21

Rosado returned to the Dodge and, he claimed, he and appellant drove to the shop where Rei worked and parked about half a block away (1324-35). At about 5:00 p.m., Rosado got out of the vehicle and hid behind a school bus parked across from the shop. Rei came out of the shop about ten or fifteen minutes later and, as he walked towards his Jeep, Rosado came from behind the bus and shot him three times in the chest (1326-30, 1349, 1373-74). Rosado then ran back to the Dodge, jumped into the rear passenger seat, and appellant drove them away (1331, 1349). They headed to Florida; in Maryland, appellant threw the cell phone she had been using out of the car window (1332).[3]  Once in Florida, Rosado kept the gun for about a week before returning it to appellant (1333-34; 1377-78).

Cepeda was informed of her husband's shooting on the evening of November 12, 2008 (899). Asked by a detective if Rei had any enemies, she gave him appellant's name and said they had been "fighting" (Id.). On the same night while at Sanchez's house in Yonkers, Pazmino heard a news report of Rei's shooting (Pazmino 1046; Sanchez 1562). Sanchez called a friend who was an NYPD detective and the following night, Detectives Rivera and Pavese spoke to Pazmino at Sanchez's house (Pazmino 1073, 1117-18; Sanchez 1563-65). Pazmino told police "what she knew," but did not recall telling them of her role in delivering the gun to Rosado (1046, 1088-

---

[3]      Phone records showed calls to and from the cell phone on November 12, 2008, used cell towers in Queens at 60-15 Calloway Street and 50-54 98th Street and in Passaic New Jersey (Joseph Sierra, 1467, 1487, 1490, 1495-98; People's Exhibits 50, 51). The last call made on the phone was at 9:29 p.m. via a cell tower in Aberdeen, Maryland (1499).

89, 1258-60, 1285-86). She subsequently spoke to the police several more times and showed them where she gave Rosado the "package" (Pazmino 1258-60, 1285-86; Det. Ramon Munoz 1590-91, 1595).

On December 2, 2008, Special Agent James Noblitt of the Florida Department of Law Enforcement assisted New York detectives who had come to Florida in the arrests of Rosado and appellant (Noblitt 1148-50; Munoz 1588-89). Noblitt, the detectives and members of the sheriff's department arrested Rosado outside his apartment where he was in the process of moving (Noblitt 1150-53; Rosado 1338-39). Before he was taken away, Rosado told his girlfriend to call appellant (Rosado 1340; Noblitt 1154). Noblitt and others, including Detectives Munoz and Milan, then went to appellant's house (1154-55). When they knocked about 15 to 20 minutes later appellant, wearing pajamas, answered her door, allowed them to come in and, after being told she was under arrest, changed into appropriate attire in the presence of a female officer, before being taken to the precinct (1155-58). Police did a cursory search of the house to make sure no one else was there (1157).

The next day police searched appellant's residence pursuant to a warrant and found, among other things, a Glock, ammunition and magazines in an unconcealed duffel bag in appellant's closet (Noblitt 1165-67; Munoz 1582-84; People's Exhibit 36). Discharged shell casings recovered from the street near Rei's body, a bullet from the floor of the ambulance in which Rei was transported to the hospital, and a bullet recovered from Rei's body, all came from this gun (Hayter 762; Police Officer Brian

Leguernic 787; Det. Robert Saenz 821; Det. Francisco Castillo 1398-1400; Det. Gregory Dicostanzo 1446-48). On November 2, 2008, appellant had reported the gun stolen and stated that she thought Pazmino, who had been visiting that summer, might have taken it when she returned to New York (Deputy Sheriff Thomas Stein 1212-15, 1222). The police also seized various documents from appellant's house, including a credit application, dated December 2, 2008, allegedly forged in the name of Flor Cepeda (Noblitt 1170, 1182-83; Munoz 1594; Cepeda 978).

## The Defense Case

Yoselin Amarante, appellant's former in-law, recalled that appellant visited her home in Tampa sometime around mid-November 2008 (1606-08). She did not know the precise date, but recalled that it was before Thanksgiving, and that appellant was sad because it was the anniversary of her mother's death (1608, 1612, 1617, 1623). Appellant's brother, Yacell Gomez, testified that their mother died on November 12, 2006 (1631-32, 1664). Amarante had informed appellant's attorney about appellant's visit two years earlier, and had informed family members in December 2008 (1614).

Gomez saw appellant, Rosado and Pazmino together in New York on October 29, 2008 (1651-52, 1665). Appellant's and Gomez's father was in Tampa, Florida in the summer of 2008 staying with a cousin, not with appellant (1634, 1665). When Gomez was a child, their father worked in law enforcement in Puerto Rico as a

24

"Special Deputy" who transported inmates (1635). Gomez, one of six siblings, had never been convicted of a crime (1632).

## The Rebuttal

Lieutenant <u>Frank Torres</u> and Detective <u>Richard McCabe</u>, of the Queens District Attorney's Office, interviewed Amarante in a surprise visit to her home on May 27, 2014 (1667-69, 1674). Amarante told them that the day appellant was with her was between mid-November and early December, 2008, and that she remembered this because at the time appellant visited, Amarante was expecting her sister to fly in from Portugal before Thanksgiving, and her brother to arrive on December 3, 2008 (1671-73).

## The Summations

Defense counsel argued, principally, that Vasilantonakis's testimony that the getaway car was silver proved that Rosado and Pazmino, using Pazmino's silver car, were the ones who planned and executed Rei's homicide (1690-93), and that their intention was not only to kill Rei, but to frame appellant (1713). Counsel argued that Rosado admitted on cross-examination that on Halloween, he and Pazmino drove Pazmino's silver car to Rei's shop intending to kill him, and that he changed that testimony on redirect examination because he had a cooperation agreement with the district attorney's office.

The prosecutor argued that defense counsel was "trying to distract the jury from all the evidence that shows her client is guilty" (1717) and that counsel "didn't let the facts get in the way of her arguments" (1718).   He also contended there was no evidence that Pazmino had a silver car (1718), and that the silver car "does not exist" (1747).

The prosecutor also contended that Rosado was not the first person appellant asked to kill Rei; she had asked her father who "would do it but he didn't care if anyone else was present" and a customer who for $3,000 would only put Rei in the hospital and would need $10,000 to kill him (1732-33).

The prosecutor remarked that the properties appellant transferred to and from Cepeda did not prove they were in a relationship, but rather evinced "heavy tax evasion" by appellant (1757).   Defense counsel's objection was overruled (Id.).   The prosecutor then expounded on the argument, referring to an August 2006 transfer of property to Cepeda that the following year Cepeda quit claimed back to appellant (1757-58).   Defense counsel's objection was again overruled (1758).   The prosecutor continued, citing Cepeda's testimony that she gave letters addressed to her from the Department of Revenue to appellant, and stating "The Department of Revenue in Florida was looking for taxes on the property because the defendant transferred them to her for a year from '06 to '07 (1758).   Defense counsel's objection was overruled (Id.). The prosecutor then concluded:

26

> Two properties she never lived in, two properties she never
> got a dime from, but the defendant quit claims them to her
> and then back to her specifically without knowing what's
> on the document. She wants to tell you that's a suggestion
> there's some relationship here. It's her getting out from
> under the dire taxes and putting it in the name of an illegal
> person (1759).

The prosecutor also argued that the tampering with physical evidence charge

referred to "[appellant] secreting the gun in her home so that it wouldn't be found"

(1765) [emphasis added].

At the close of summations defense counsel moved for a mistrial based upon

the prosecutor's "statement that [appellant] had committed tax fraud" (1767). The

court denied the motion on the ground that, "in light of the charge of murder, the

fact of some tax evasion, if that's how you deem it, is quite minimal" and that by

putting "those documents" in evidence, defense counsel had opened the door for the

prosecutor to "form[] an argument that he believes supports the true underlying basis

of that document" (1769). The court stated that if there was any error, it was

harmless and that it might give the jury a curative instruction. Defense counsel asked

the court to give such instruction (1770).

## The Court's Charge and the Verdict

During its final charge the court instructed the jury as follows:

> Evidence concerning an allegation of tax evasion or tax
> fraud regarding the use of documents that contained Flor
> Cepeda's signature and other documents in that same batch
> that contained what is purported to be the signature of Flor

27

> Cepeda, this evidence may be considered by you only as it
> bears on the significance or insignificance of the depth or
> lack of depth of the relationship that existed between the
> defendant and Flor Cepeda. Nothing else. This is not tax
> court and there's no such issues before you to resolve
> (1784).

The charges of murder in the second degree, criminal possession of a weapon in the second degree (two counts), and tampering with physical evidence were submitted to the jury (1791-97).

The court instructed the jury that it must not consider evidence of bad acts or uncharged crimes as proof of propensity to commit the charged crimes (1783).

With respect to the tampering count, the indictment charged the following:

> The defendants, on or about <u>November 12, 2008, in the
> County of Queens</u>, acting in concert with each other, with
> the belief that a <u>pistol</u> was about to be produced or used in
> a prospective official proceeding, and with the intent to
> prevent such production or use, they suppressed <u>said pistol,</u>
> by an act of concealment, alteration or destruction
> [emphasis added] (<u>See</u> Indictment).

The court instructed the jury that it could convict appellant of tampering with physical evidence if it found:

> One. That on or about <u>November 12, 2008, in the County
> of Queens</u>, the defendant, Ms. Gomez, acting in concert
> with another person, suppressed <u>physical evidence</u> by an
> act of concealment, or alterations, or destruction.
>
> Two. That the defendant did so believing that such <u>physical
> evidence</u> was about to be produced or used in a
> prospective official proceeding.

28

Three. Defendant did so intending to prevent such production or use (1797) [emphasis added].

The court repeated this charge when, during deliberations, the jury asked that the court reread all of the elements of all of the crimes (1813, 1820).

The jury convicted appellant of all of the charges (1823-24).

The Sentencing

Appellant came to the United States from the Dominican Republic in 1991, and became a naturalized citizen in 2001; she lived in New York for nearly 16 years before moving to Florida in 2006 (PSR 5, 6). She graduated from law school in the Dominican Republic and was licensed to practice law there (PSR 5).

With both parents deceased and single with no children, appellant was close to her siblings and nieces and nephews (PSR 5). Appellant's sister, Yaraliz Amezquita, a high school teacher in Massachusetts, submitted a letter in support of appellant on behalf of all her siblings.[4] She was at a loss regarding appellant's crime, which contrasted with the "loving and caring person who took care of her siblings all of her life" and was a "role model" for the entire family. Amezquita recalled how appellant helped their mother care for her younger siblings and how she helped support the family when their parents were not working. Jhoeny Gomez, appellant's eldest niece, a former teacher seeking her nursing degree in vascular surgery, described appellant's

---

[4]    The letters were filed with the court on July 8, 2014, however they were not found in the court file. Copies of the letters obtained from trial counsel's file are therefore submitted as Exhibits with this brief. An additional letter, submitted by Reverend Delores Barret, could not be located as of the time this brief was filed, but will be submitted as an additional exhibit for the court's consideration should appellate counsel obtain it.

commission of the crime as "out of character." Appellant had helped raise Jhoeny and took her to Kingdom Hall and "preaching" in the community, and involved her and other cousins in recreational activities in the church. Appellant also took Jhoeny and her cousins on trips to Disney World. Appellant's brother Yacell Gomez, a salesman, told the probation department that appellant was "a great person" who was "religious, hard-working, and had no issues with substance use, or any other areas" (PSR 5).

At sentencing, defense counsel asked the court not to sentence appellant vindictively because she went to trial and to consider that Rosado, who actually killed Rei, would receive only 16 years' imprisonment (S 9). Appellant wrote on her own behalf and addressed the court, maintaining her innocence and asking for lenience (S 10-11). The prosecutor recommended that the court impose the maximum sentences, and that it impose the tampering sentence consecutively (S 8-9).

The court concluded, based on the letters submitted on appellant's behalf, that appellant became a provider and caregiver for illegal immigrants, but in return demanded "unquestioned" loyalty and punished "disloyalty," and that appellant had Rei killed for disloyalty in business and in failing to let appellant have his wife (S 14-15). Calling appellant "conniving, deceitful, deceptive and cunning," the court sentenced her to concurrent prison terms of twenty-five years to life for murder in the second degree and fifteen years for each count of criminal possession of a weapon in the second degree, and a term of five-years' post release supervision (S 16-17). It

sentenced her to a consecutive prison term of one and a third to four years for

tampering with evidence (S 17).

## ARGUMENT

### POINT I

THE COURT'S REMARKS, INCLUDING BERATING
ONE PROSPECTIVE JUROR WHO SAID HE COULD
NOT BE FAIR AND FALSELY TELLING OTHERS
THAT THEY WOULD BE REQUIRED TO TAKE A
TEN-WEEK ENGLISH COURSE, HAD A CHILLING
EFFECT ON JURY SELECTION THAT DEPRIVED
APPELLANT OF HER RIGHTS TO A JURY CHOSEN
ACCORDING TO THE LAW, DUE PROCESS AND A
FAIR TRIAL. U.S. CONST., AMENDS. VI, XIV; N.Y.
CONST., ART. 1 SEC. 2; C.P.L. § 270.15.

The court made blistering comments to one prospective juror, a police officer

who said he could not be fair, telling him he did not belong in a courtroom and

ordering him to get out of the courtroom. It then falsely told several prospective

jurors who said they had language deficiencies that it did not believe them and that

they would have to take a ten-week English course. These and other comments

created a chilling atmosphere that discouraged prospective jurors from being candid

regarding matters affecting their ability and qualifications to serve, as evidenced by

several jurors mid-selection comments, including one juror who had been "afraid" to

bring up a matter previously. Appellant was thus deprived of her rights to a jury chosen in accordance with the law, due process and a fair trial.

A "defendant has a constitutional right to a trial by a particular jury chosen according to law, in which selection the defendant has had a voice." People v. Buford, 69 N.Y.2d 290, 297-98 (1987). "The process by which juries are seated, examined, excused for cause and by peremptory challenge, and sworn as trial jurors is prescribed by CPL 270.15." People v. Alston, 88 N.Y.2d 519, 523-24 (1996). Section 270.15 requires that the court put to prospective jurors "questions affecting their qualifications to serve as jurors in the action" and that counsel for "[e]ach party . . . be afforded a fair opportunity to question the prospective jurors as to any unexplored matter affecting their qualifications." C.P.L. §§ 270.15(1)(b), (c). While a trial court has broad discretionary power to regulate the conduct of jury selection, its "discretion must be exercised consistent with the essential demands of fairness." United States v. Barnes, 604 F.2d 121, 137 (2d Cir. 1979). Its actions must therefore be in accord with "the purpose of the voir dire," which is to "ascertain disqualifications" of potential jurors. Schlinsky v. United States, 379 F.2d 735, 738 (1st Cir. 1967). The way in which a trial court conducts jury selection "should encourage honesty and frankness in a juror's responses without seeming to place a value or reward on a 'correct' or 'appropriate' answer." People v. Harris, 98 N.Y.2d 452, 481 (2002).

Here, the court's immoderate responses to prospective jurors who it perceived as offering distasteful or bogus excuses to avoid jury service, had a chilling effect on

the entire jury selection process, such that the prospective jurors were discouraged from honestly revealing matters affecting their qualifications to serve.   The court first cast a pall over the selection process in the beginning of questioning with its harsh response to a police who said he could not be fair to appellant because of his "professional bias."   After cross-examining the police officer about whether the presumption of innocence meant anything to him, the court excused him with a lecture and reprimand, saying he had "no business in this courtroom" and questioning whether he had "any business being a police officer" (V52).  The court even ordered the officer, "Get out of my courtroom. You, frankly, have no [business] coming in a courtroom" (Id.), and then told the jury that the police officer's statements were "frankly, sickening" (V 53).

The police officer's revelation of his professional bias, while "sickening" to the court, was precisely the kind of disqualifying bias that voir dire was meant to uncover in order to guarantee an unbiased jury and a fair trial. Schlinsky, 379 F.2d at 738. However well-intentioned the court was, and whatever personal opinion it had about the officer's professed bias, its comments were wholly inappropriate because they sent the message to prospective jurors that, if they revealed biases that would prevent them from being fair and impartial jurors, they would face humiliating chastisement in open court.   If it is to work as intended, the jury selection process, during which prospective jurors are probed about difficult subjects in order to uncover such biases,

33

must be a space where honest discussion can take place and not where prospective jurors will incur punishment for their responses.

Compounding the tone it had already set, the court then repeatedly told prospective jurors who stated they had difficulty understanding English that it did not believe them and, falsely, that they would be sent to "English classes for ten weeks" (V 73, 90, 106, 111-13). There is no provision in the Criminal Procedure Law or other relevant rules and statutes that a prospective juror who is excused for lack of English proficiency is, or even may be, required to take a language course. These comments may have discouraged any number of jurors who had language difficulties from revealing them, knowing they would be harshly scrutinized and believing they would be required to take a ten-week English language course if they did so.

A defendant is entitled to a jury comprised of competent individuals who are "able to understand all of the evidence presented, evaluate the evidence in a rational manner, communicate effectively with other jurors during deliberations, and comprehend applicable legal principles, as instructed by the court." People v. Guzman, 76 N.Y.2d 1, 5 (1990); People v. Foster, 64 N.Y.2d 1144, 1146 (1985) (the "ability to read and write English and speak English understandably go[es] to the substance of a juror's function to listen, understand, and deliberate"); see generally People v. Antommarchi, 80 N.Y.2d 247, 251-252 (1992). Prospective jurors who are unable to engage in this process because of difficulty understanding or communicating in English are, quite obviously, not qualified to perform the duties of

34

a juror. This Court has, accordingly, found it "improper" for the court to tell such prospective jurors they would be required take a nonexistent language course because it could deter some jurors from revealing their language their language difficulties. See People v. Mason, 132 A.D.3d 777, 779 (2nd Dept. 2015), lv. granted, 26 N.Y.3d 1147 (2016).[5]

Compounding the foregoing improper remarks, prospective jurors who stated that serving on the jury would present job-related hardships, were asked what would happen if you were "hit by a bus" (V 60, 122), "a train ran over your legs" (V 62), or you "broke both your legs (V 103). That these gruesome scenarios discouraged full disclosure by prospective jurors regarding matters affecting their ability to serve became evident later, when a number of prospective jurors finally revealed, during the defense voir dire, that there were certain dates they wished to attend graduations, and that they had been reluctant to mention them earlier because, as they put it, "If I was hit by a truck I wouldn't be there" (V 260-61). One of those jurors also, for the first time, revealed that her English was "not that well" and she feared "misunderstand[ing] for the case" (V 262).

Additionally, unnecessary comments made by the court when it excused several students from the jury, asking why they had failed to seek postponements and, in some cases, suggesting they should have read the juror notification forms more

---

[5]     Although this Court did not set forth the nature of the improper comments in its decision, appellate counsel has examined the briefs, and would be pleased to provide them upon request.

carefully, added to the general impression that openness would be met by embarrassing questions or worse. Indeed, one prospective juror, who had waited until the second day of deliberations to mention that she was a student and had missed a day of classes, stated frankly that she had been "afraid" to bring it up before (V 183).

While, standing alone, the court's remarks regarding job-related excuses and its comments to students were not necessarily improper, cumulatively, and added to the improper berating of the police officer and treatment of jurors who said they had trouble with English, the court created a chilling atmosphere in which prospective jurors hesitated to come forward, and some may never have come forward, with information relevant to their ability and qualifications to serve. Defense counsel attempted during her <u>voir dire</u> to ferret out any prospective jurors who may have felt too "intimidated" to inform the court of any reason they could not be fair. This Court should not assume, as the trial court did, that because none raised their hands in response to defense counsel's inquiry, the court had not intimidated anyone. On the contrary, by this point in jury selection there was already record proof that some jurors had taken the court's remarks to heart, including the fearful student and jurors with graduation scheduling issues. Thus, given the demonstrated chilling effect of the court's remarks taken as a whole, there may well have been additional jurors who, even under defense counsel's questioning, did not feel comfortable enough to respond honestly.

36

The court's remarks deprived appellant of her right to trial by jury chosen in accordance with the law, due process, and a fair trial, and is not subject to harmless error analysis. People v. Anderson, 70 N.Y.2d 729, 730-31 (1987); Buford, 69 N.Y.2d at 297-98. The issue was preserved both by defense counsel's motions to strike the jury and for a mistrial, and by the court's rulings denying counsel's motions. See People v. Edwards 95 N.Y.2d 486, 491 n.2 (2000) (argument preserved by court decision deciding issue); C.P.L. § 470.05. This Court should, accordingly, reverse appellant's conviction and grant her a new trial.

## POINT II

APPELLANT WAS DEPRIVED OF A FAIR TRIAL BY THE ADMISSION OF UNNECESSARY AND UNDULY PREJUDICIAL TESTIMONY THAT SHE PREVIOUSLY SOLICITED INDIVIDUALS TO KILL OR FRAME THE DECEDENT. U.S. CONST. AMEND XIV; N.Y. CONST., ART. 1, SEC. 6.

There was extensive testimony regarding appellant's acrimonious business relationship with, and threats aimed at, Mario Rei, as well as her romantic interest in his wife Flor Cepeda, that provided ample background, motive and intent evidence. In allowing the additional sensational testimony that appellant tried unsuccessfully to recruit her father and, later, a drug-dealing customer, to kill Rei, and another individual to purchase and plant drugs in Rei's house, the court failed to properly balance the extraordinarily prejudicial effect of this evidence against its limited

37

additional probative value. This unnecessary evidence was the height of propensity evidence, made worse by the admission of the unnecessary chilling responses of the potential hitmen, and cast such a long shadow on the trial as to deprive appellant of a fair trial.

Evidence of uncharged misconduct that has no other function than to show "defendant is of a criminal bent or character and thus likely to have committed the crime charged," is highly prejudicial and is inadmissible unless it is relevant to a non-propensity purpose such as intent, motive, knowledge, common scheme or plan, defendant's identity, or some other material issue. People v Hudy, 73 N.Y.2d 40, 55 (1988); People v. Alvino, 71 N.Y.2d 233, 241-42 (1987); People v. Ventimiglia, 52 N.Y.2d 350, 359 (1981); People v. Molineux, 168 N.Y. 264 (1901). Uncharged crime evidence may also be admitted to provide background information, without which the testimony concerning the charged crime would be incredible or incomprehensible. See People v. Montanez, 41 N.Y.2d 53, 58 (1976); People v. Steinberg, 170 A.D.2d 50, 73 (1st Dept. 1991).

Even when the evidence fits within one of the exceptions, however, it is still inadmissible unless its probative value exceeds the prejudice resulting from its admission. People v. Gillyard, 13 N.Y.3d 351, 356 (2009); People v. Lewis, 69 N.Y.2d 321 (1987); People v. Ely, 68 N.Y.2d 520, 529 (1986); Ventimiglia, supra, 52 N.Y.2d at 359-360; People v. Agina, 103 A.D.3d 739, 743 (2d Dept. 2013); People v. Ricchiuti, 93 A.D.2d 842, 845 (2d Dept. 1983); People v. Reilly, 19 A.D.3d 736 (3d Dept. 2005).

While the People are not "bound to stop after presenting minimum evidence," Alvino, 71 N.Y.2d at 245, whether the court should admit the evidence "turns on the discretionary balancing of the probative value and the need for the evidence against the potential for . . . prejudice." Ventimiglia, 52 N.Y.2d at 359; Alvino, 71 N.Y.2d at 242; People v. Allweiss, 48 N.Y.2d 40, 47 (1979). Thus, evidence of slight value, but with highly prejudicial effect, should be excluded if it is "unnecessary to the People's case." ); Ely, 68 N.Y.2d at 532 (statements which were "marginally probative" but so unduly prejudicial it was "questionable that even a limiting instruction would have overcome the prejudice," should have been redacted); See Gillyard, 13 N.Y.3d at 356 (evidence of limited probative value compared to its potential for prejudice and "unacceptable danger that the jury might condemn defendant for his past criminal behavior" deemed inadmissible); People v. Resek, 3 N.Y.3d 385, 389-90 (2004) (same, particularly when any ambiguity in the evidence "could have been easily dealt with by far less prejudicial means); Agina, 103 A.D.3d at 743 (evidence of defendant's prior assault on complainant improperly admitted where, although minimally probative of identify, prejudice far outweighed probative value); Reilly, 19 A.D.3d 737 (evidence of prior "peeping Tom" incident was "not highly probative of intent and was extremely prejudicial" and therefore inadmissible). "Prejudice involves both the nature of the crime, for the more heinous the uncharged crime, the more likely that jurors will be swayed by it, and the difficulty faced by the defendant in seeking to rebut the

39

inference which the uncharged crime evidence brings into play." People v. Correal, 160 A.D.2d 85, 93-94 (1st Dept. 1990).

The core of the prosecution's case was appellant's soured relationship with Rei over business and her romantic interest in his wife Cepeda. There was ample evidence of these purported motives: all three of its key witnesses testified about it, and much of their testimony was deemed admissible to provide background and to establish motive and intent. Cepeda described in detail the arc of her and Rei's friendship with appellant from their first encounter in New York through the breakup of the business partnership and friendship in Tampa. Pazmino and Rosado testified that appellant told them about the breakup of the partnership, and that appellant angrily and repeatedly said Rei would have to be killed because he stole money from their partnership and ruined her credit, even displaying her gun and stating it was for Rei and whoever else stood between her and Cepeda. There was additional testimony that appellant reported her gun stolen and suggested that Pazmino might have taken it with her back to New York, and that appellant threatened both Pazmino and Rosado.

In view of this already extensive background, motive and intent evidence, the salacious details of appellant's two purported prior attempts to hire people to kill Rei, and, when neither attempt panned out, to have someone plant drugs in his home, was entirely gratuitous. It was extraordinarily prejudicial while having little additional probative value and thus, on balance, should have been precluded. See Allweiss, 48 N.Y.2d at 47 (if the evidence is of slight value when compared to the possible

40

prejudice to the accused, it should not be admitted, even though it relates to some fact to be proven); see also Gillyard, 13 N.Y.3d at 356; Resek, 3 N.Y.3d at 389-90; Agina, 103 A.D.3d at 743; Reilly, 19 A.D.3d 737.

The admission of this evidence was made all the more devastating by the court's failure to limit its substantial prejudice. Not only did the court allow the evidence that appellant asked her father to kill Rei, it allowed her father's chilling response that he would do it, but would have to eliminate Cepeda and her child as well. Likewise, it allowed the testimony that appellant tried to recruit a customer-drug dealer to kill Rei, along with his cold, calculating response that for $3,000 he could only put Rei in the hospital; he would need $10,000 to kill him. In fact, when the prosecutor referred to these solicitations during summation, he explicitly referenced the responses of appellant's father and the drug-dealer.

Neither one of these prior uncharged crimes was necessary, certainly admitting both of them was overkill, and the details of the responses to appellant's solicitation were completely irrelevant and could easily have been omitted. See Correal, 160 A.D.2d at 93-94 (witness' "dramatic rendition" of the uncharged crime, describing the coldness of the gun and the sound of the hammer clicking, was "strictly collateral" to the issue being decided). The additional testimony that appellant recruited yet another person to try to frame Rei for drug possession was almost anticlimactic and, as with the murder solicitations, added little additional probative value as background and evidence of intent, while adding to an insurmountable amount of prejudice.

41

As the Court of Appeals explained over eighty years ago: "The natural and inevitable tendency of the tribunal – whether judge or jury – is to give excessive weight to the vicious record of [a prior] crime . . . and either allow it to bear too strongly on the present charge, or to take the proof of it justifying a condemnation irrespective of guilt of the present charge." People v. Zackowitz, 254 N.Y. 192, 198 (1930)(quoting 1 Wigmore, Evidence, § 194). "The more heinous the uncharged crime, the more likely the jurors will be swayed by it." People v. Robinson, 68 N.Y.2d 541, 549 (1986). These uncharged crimes were heinous – most particularly, repeat attempted murder-for-hire – and their prejudice was all but impossible to rebut or even lessen by a limiting instruction. See Ely, 68 N.Y.2d at 532.    Moreover, the prosecutor could and did present substantial, far-less prejudicial evidence to provide background and intent. See Resek, 3 N.Y.3d at 389-90. This additional evidence was therefore minimally probative, and given its highly prejudicial nature all but guaranteed appellant's conviction and deprived her of a fair trial.

The evidence in this case was not so overwhelming that the admission of this unduly prejudicial evidence can be deemed harmless. It was Rosado and Pazmino's testimony that connected appellant to Rei's shooting, and the jury had only Rosado's word that appellant, and not Pazmino, was his partner in the crime. Indeed, it was Pazmino who had the gun in her New York apartment and delivered it to Rei and her claim that appellant had left the gun at her home and directed her to deliver it to Rosado conveniently shifted attention from Pazmino as a likely suspect. Thus, that

42

the gun was ultimately found in appellant's house was not conclusive evidence of guilt if the two were colluding to frame appellant. Likewise, it was the cell phone in Pazmino's name that cell tower records placed near the scene of the crime; there was only her word that the phone, although it was in her name, belonged to appellant. Further, if in fact Pazmino gave the phone to anyone, it was just as likely she gave it to Rosado. In any event, the only cell phone actually in appellant's name was indisputably in Tampa, Florida on the date of the shooting; but for Rosado's and Pazmino's claims to the contrary, the obvious inference was that appellant was also in Florida on the day of the shooting.

Additionally, Rosado's explanation of why he would agree to kill someone he barely knew for appellant, a woman for whom he had worked for only a few short months, defied belief. Rosado originally claimed that he agreed to kill Rei because appellant threatened his family. Yet, when he returned to Florida after the first visit to New York without killing Rei he was evidently no longer in fear, as he repeatedly refused appellant's demand that he go back to New York to do the job. Equally unpersuasive was his claim that he finally agreed to kill Rei so that he could live in appellant's North Hale house rent free, since appellant had told Rosado that Cepeda had the deed to the house and that Rei had refused to pay the mortgage, therefore it no longer belonged to appellant and was on the verge of foreclosure.

The evidence was, thus, not unassailable. Any doubts the jury may have had about the credibility of Rosado's and Pazmino's claims, however, were undoubtedly

43

overwhelmed by the sheer force of appellant's purported earlier attempts to hire someone to kill or set up Rei. Defense counsel objected to the admission of the evidence on the ground of "sheer prejudice" (706), and in its decision the court noted that it had to weigh the prejudice against the probative value before admitting uncharged crime evidence (711). See People v. Prado, 4 N.Y.3d 725, 726 (2004). Accordingly, this Court should reverse appellant's conviction as a matter of law and grant her a new trial.


## POINT III

APPELLANT WAS DEPRIVED OF A FAIR TRIAL BY
THE PROSECUTOR'S SUMMATION REMARKS
ACCUSING HER OF TAX FRAUD, DENIGRATING
THE DEFENSE AND MISCHARACTERIZING THE
EVIDENCE.

As if not enough uncharged crimes evidence had been admitted into evidence, the prosecutor in his summation improperly accused appellant of tax fraud, yet another uncharged crime. Contrary to the court's finding that this was a fair comment on the evidence, no evidence of any tax fraud had been admitted during the trial, and the court's supposedly "curative" instruction was buried in its final charge and insufficient to alleviate the harm caused by the prosecutor's remarks. Combined, further, with the prosecutor's denigration of the defense and mischaracterization of the evidence, the prosecutor's summation remarks cumulatively deprived appellant of a fair trial.

44

The prosecutor in summation "may not ... try to convey to the jury, by insinuation, suggestion or speculation, the impression that the defendant is guilty of other crimes not in issue at the trial." People v. Ashwal, 39 N.Y.2d 105, 110 (1976); see People v. Odle, 187 A.D.2d 536 (2d Dept. 1992) (prosecutor's implication in summation that defendant had several drug dealers working for him was error); People v. Solomon, 70 A.D.2d 516, 517 (1st Dept. 1979) (prosecutor's reference during summation to uncharged drug sale "inexcusable"). Relatedly, "[i]t is fundamental that the jury must decide the issues on the evidence, and therefore fundamental that counsel, in summing up, must stay within the four corners of the evidence." Ashwal, 39 N.Y.2d at 109 (internal quotation marks omitted).

Here, the quit claim deeds admitted into evidence reflected no more than the transfer of two Florida properties from appellant to Cepeda in 2006 (Defense Exhibits A and S), and the transfer of the properties back to appellant in 2007 (Defense Exhibits C and D). These, the defense suggested, were evidence of a stronger relationship between appellant and Cepeda than Cepeda would admit. The prosecutor's contention during summation that appellant was engaged in "heavy tax evasion" (1757) and trying to escape "dire taxes" (1759) when she effectuated these property transfers was baseless and improper. The property transfers themselves were not facially fraudulent and referenced no tax debt. And there was no admitted

evidence that the Florida Department of Revenue considered the transfers part of a tax evasion scheme.[6]

Thus, the prosecutor's remarks were not, as the court ruled, a fair response to the evidence. Nor did defense counsel open the door to an unsupported accusation of tax fraud by admitting the quit claim deeds in her attempt to impeach Cepeda about her denial of being in a relationship with appellant. The remarks were speculative, well outside the four corners of the evidence, and improperly accused appellant of yet another uncharged crime. Ashwal, 39 N.Y.2d at 109; Odle, 187 A.D.2d 536; Solomon, 70 A.D.2d at 517; see also People v. Paulino, 187 A.D.2d 736 (2d Dept. 1992) (prosecutor's comments not fairly inferable from evidence were improper); People v. Lyking, 147 A.D.2d 504, 504-05 (2d Dept. 1989) (prosecutor's summation deprived defendant of a fair trial because she made comments that were not fairly inferable from the evidence and testimony adduced); People v. McCall, 128 A.D.2d 552, 553 (2d Dept. 1987) (voicing disapproval of prosecutor bolstering his case by, inter alia, calling upon jury to draw conclusions not fairly inferable from the evidence).

The court's "curative" instruction was too little too late. It was buried well into the court's final charge, and then referred to "evidence concerning an allegation of tax evasion or tax fraud" when there was in fact no such "evidence," only the

---

[6]    The letters addressed to Cepeda from the Florida Department of Revenue (Defense Exhibits G and G for identification), were never admitted into evidence.

prosecutor's improper summation remarks. The court further undermined the effectiveness of its charge by the weak statement that "this is not tax court" and that no tax issues were before the jury to resolve. This was far from an equivocal statement that there was no evidence or allegation that appellant engaged in tax fraud or tax evasion, and that the prosecutor's comments to that effect had no basis in the evidence, were improper, and must be stricken from the jurors' minds.

In addition to accusing her of tax crimes the prosecutor also denigrated the defense, commenting that it was trying to "distract" the jury and that defense counsel did not let facts stand in her way (1717-18). This Court and others have made it clear that a prosecutor's impugning of defense counsel and ridiculing or trivializing of the defense arguments is improper, and such conduct has been repeatedly condemned. See People v. Mehmood, 112 A.D.3d at 853 (defense evidence of motive to fabricate allegations was "an elaborate attempt to distract [the jury] from the real issues in this case"); People v. Spann, 82 A.D.3d 1013, 1015 (2d Dep't 2011) (improper denigration of defense case as a "distraction," a "smokescreen," and "smoke and mirrors"); People v. Pagan, 2 A.D.3d 879, 880 (2d Dep't 2003) (accusing defense counsel of attempting to "mislead" jury "by asking it to focus on irrelevant issues"); People v. Bhupsingh, 297 A.D.2d 386, 388 (2d Dep't 2002) (improper comments that "denigrated both the defense counsel and the defense"); People v. Ni, 293 A.D.2d 552, 552 (2d Dep't 2002) (error for prosecutor to denigrate defense); People v.

47

Jackson, 143 A.D.2d 363, 364 (2d Dep't 1988) (improper to argue that defense counsel was trying to "cloud" issue).

Equally improper, the prosecutor suggested that the main defense argument – that Vasilantonakis saw the shooter flee in a silver car and only Pazmino had a silver car – was pure fantasy. In fact, however, Pazmino did have access to the silver car belonging to her husband and Rosado had testified he planned to use it in carrying out Rei's murder when he was in New York the first time. Rosado backtracked on that testimony on redirect, claiming he never planned to carry the murder out, but the prosecutor's suggestion – that the silver car and Rosado's plan to have Pazmino drive it was fabricated from nonexistent testimony – was untrue. The prosecutor's mischaracterization of the evidence in an attempt to gut the defense was improper. Spann, 82 A.D.3d at 1015 (improper for prosecution to misstate the evidence in summation); People v. Mehmood, 112 A.D.3d 850, 853 (2d Dept. 2013) (in child sex abuse case, summation comments that "inaccurately stated" the defendant's testimony, constituted reversible error); People v. Lantigua, 228 A.D.2d 213, 217-19 (1st Dept. 1996) (reversible error where prosecutor distorted and misrepresented evidence); People v. Tolbert, 198 A.D.2d 132, 133-34 (1st Dept. 1993) (reversal where, inter alia, prosecutor misrepresented evidence during summation).

The prosecutor's summation comments added to the litany of uncharged crime evidence against appellant and attacked the essence of her defense that Rosado acted

48

with Pazmino to kill Rei. Further, for the reasons discussed in Point II, <u>ante</u> at 42, the evidence of appellant's guilt was not overwhelming. Accordingly, the prosecutor's improper remarks cannot be deemed harmless.

Defense counsel objected to the prosecutor's comments regarding tax fraud; to the extent that the remaining errors were unpreserved, this Court should reach the matter in the interest of justice, reverse appellant's conviction and grant her a new trial. <u>See</u> <u>Anderson</u>, 35 A.D.3d at 872 (although unpreserved, egregious nature of prejudicial comments required reversal in the interest of justice); <u>Pagan</u>, 2 A.D.3d at 880 (cumulative effect of prejudicial comments required reversal in the interest of justice); <u>Smith</u>, 288 A.d.2d at 496 (same).

In the alternative, this Court should find defense counsel ineffective for his inexplicable failure to object to all of the prosecutor's improper summation comments. <u>See</u> <u>People v. Fisher</u>, 18 N.Y.3d 864 (2012) ("defense counsel's failure to object to any, let alone all, of the prosecutor's egregiously improper departures during summation deprived defendant of the right to effective assistance of counsel"); <u>Mehmood</u>, 112 A.D.3d at 855 (failure to improper summation remarks contributed to ineffectiveness).

## POINT IV

WITH RESPECT TO THE TAMPERING WITH
PHYSICAL EVIDENCE COUNT, THE COURT'S
INSTRUCTIONS WERE INADEQUATE, THE
INDICTMENT WAS CONSTRUCTIVELY AMENDED,
AND THE EVIDENCE WAS LEGALLY
INSUFFICIENT, THUS DEPRIVING APPELLANT OF
DUE PROCESS, FAIR NOTICE OF THE CHARGE,
AND THE RIGHT TO HAVE THE CHARGE
PREFERRED BY A GRAND JURY. U.S. CONST.
AMENDS. VI, XIV; N.Y. CONST., ART. 1, SEC. 6.

The court's instruction regarding tampering with the evidence was inadequate

because it failed to inform the jury that the subject of the tampering charge was a gun

even though a gun was specified in the indictment.  Moreover, while in summation

the prosecutor told the jury the charge referred to appellant's gun, he also contended

that the alleged tampering occurred in her home in Tampa, Florida, implicitly on

December 2, 2008, which contradicted both the court's charge and the indictment

which stated the tampering occurred on November 12, 2008, in Queens County.

Between the court's failure to specify what physical evidence appellant was supposed

to have tampered with, and the prosecutor's contradictory statement of when and

where the tampering allegedly occurred, the jury effectively received no instructions

on the tampering count, thus depriving appellant of due process and a fair trial on

that count.  Additionally, both the court and the prosecutor constructively amended

the indictment by changing the theory of the charged crime, thereby depriving

appellant of her rights to fair notice of the charge against her and to have the charge

50

preferred by a grand jury rather than the court or prosecutor at trial. Finally, the evidence was, in any event, legally insufficient to prove the tampering charge.

A. The Court's Charge Was Inadequate Because it Failed to Instruct the Jury that the Subject of the Tampering Charge was a Gun

It is fundamental that the court's instructions to the jury "must 'convey[ ] the proper standard of law and . . . not confuse or mislead the jury.'" People v. Sassi, 122 A.D.3d 779, 780 (2d Dept. 2014) (quoting People v. Arriaga, 77 A.D.3d 846, 847 (2nd Dept. 2010), and that when necessary, a court must tailor its charge to reflect the particular facts and circumstances of the case. People v. Baskerville, 60 N.Y.2d 374, 382 (1983). "Reversal is appropriate . . . when the charge, 'read . . . as a whole against the background of the evidence produced at the trial,' likely confused the jury regarding the correct rules to be applied in arriving at a decision." People v. Walker, __ N.Y.3d __, 2015 WL6455383 (October 27, 2015) (citing People v Andujas,79 NY2d 113, 118 (1992))[emphasis added]; People v. Umali, 10 NY3d 417, 427(2008)).

Appellant was charged in the indictment with tampering with physical evidence by "suppress[ing] [a] pistol by an act of concealment, alteration or destruction" in the County of Queens on November 12, 2008 [emphasis added]. However, the court failed to charge the jury about the pistol in its instructions, instead referring only to "physical evidence. This instruction left the jury with no idea what physical evidence appellant was supposed to have tampered with; after all, on the day of the shooting, according to the prosecution's evidence, appellant had not only a gun, but the cell

51

phone Pazmino had provided, which appellant allegedly threw away. Although the prosecutor stated in summation that the tampering with evidence charge referred to appellant "secreting the gun" (1765), this could not substitute for an adequate instruction on the law from the court Taylor v. Kentucky, 436 U.S. 478, 488-89 (1978). Moreover, while supplying the subject gun omitted from the court's charge, the prosecutor substantially contradicted the rest of the factual allegations of the count with respect to the date and location of the crime; the court instructed that it occurred in Queens County on or about November 12, 2008, while the prosecutor said it occurred when appellant secreted the gun "in her house," which could only have occurred in Florida a week or more later.

.The jury was, thus, left to consider appellant's guilt or innocence of this charge with an incomplete, insufficient charge from the court. These confusing and misleading instructions amounted to no guidance at all on the tampering charge and, thus, deprived appellant of due process and a fair trial. Sassi, 122 A.D.3d at 780.

B. The Court's Instruction and the Prosecution's Summation Comment Regarding Tampering Constructively Amended the Indictment

In addition to inadequately instructing the jury, the Court as well as the prosecutor committed error in constructively amending the indictment.

An accused in a criminal case has a constitutional and statutory right to be given fair notice of the substance of the charges against him and to be tried only on an indictment voted by a Grand Jury. U.S. Const., Amends. VI, XIV; N.Y. Const.

52

Art. I, § 6; see also C.P.L. § 201.05; People v. Rivera, 84 N.Y.2d 766, 769 (1955); People v. Spann, 56 N.Y.2d. 469, 472 (1982). An indictment serves the important purposes of "providing the defendant with fair notice of the accusations against him, so that he will be able to prepare a defense," "prevent[ing] the prosecutor from usurping the powers of the Grand Jury by ensuring the crime for which a defendant is tried is the same one for which he was indicted," and "prevent[ing] subsequent retrials for the same crime in violation of double jeopardy." People v. Grega, 72 N.Y.2d 489 (1988) (quoting People v. Iannone, 45 N.Y.2d 589, 594 (1978)). Accordingly, "after an indictment has been returned, its charges may not be broadened through amendment except by the grand jury." People v. Colletti, 73 A.D.3d 1203 (2d Dept. 2010) (quoting Stirone v. United States, 361 U.S. 212, 215-16 (1960)). "A constructive amendment . . . happens when the government, through its presentation of evidence or its argument . . . broadens the bases for conviction beyond those charged in the indictment." Am. Jur. 2d Ed. § 247 [internal quotation marks omitted]; see People v. Roberts, 135 A.D.2d 1026 (3d Dept. 1987), affirmed sub nom People v. Grega, 72 N.Y.2d 489 (1988).

Here, the court not only gave inadequate instructions, it constructively amended the indictment by charging the jury that it would have to find appellant tampered with "physical evidence" rather than, as the indictment specified, a "pistol." See Colletti, 73 A.D.3d 1203; People v. Gachelin, 237 A.D.2d 300 (2d Dept. 1997).

53

The prosecutor, likewise, not only contradicted the court's charge, leaving the jury with hopelessly conflicting explanations of what appellant was charged with, but in so doing also constructively amended the indictment.   During summation he contended that appellant "secreted the gun in her home," i.e., concealed the gun in Florida at the time of her arrest on December 2, 2008.   The indictment, however, charged appellant with concealing a gun in Queens on November 12, 2008.   The prosecutor's contention was, thus, an uncharged theory at entirely odds with the indictment.

Separately and cumulatively, the constructive amendment afforded appellant no notice of the accusation against her and deprived her of her right to have the charge preferred by the grand jury rather than by the court or prosecutor at trial. U.S. Const., Amend. VI, XIV; N.Y. Const. Art. I, § 6; see C.P.L. § 201.05; Rivera, 84 N.Y.2d at 769; Grega, 72 N.Y.2d 489; Colletti, 73 A.D.3d 1203.

## C. The Evidence was Legally Insufficient to Support the Tampering Charge

Regardless of the theory, the evidence supporting this count was, in any event, legally insufficient. Jackson v. Virginia, 443 U.S. 301 (1979); In Re Winship, 397 U.S. 358 (1970).  A person is guilty of tampering with physical evidence when, "[b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he suppresses it by any act of concealment . . ." C.P.L. § 260.55;

54

People v. Hafeez, 100 N.Y. 2d 253, 259-60 (2003).  Intent to prevent production of physical evidence in an official proceeding "may be inferred from a finding that the defendant contemplated a prospective official proceeding, and from a review of the factual circumstances and defendant's alleged conduct." People v. Lewis, 25 Misc.3d 1209(A), *4 (Crim. Ct. N.Y. Co. 2009).

An official proceeding is defined as "any action or proceeding conducted by or before a legally instituted judicial, legislative, administrative or other governmental agency or official, in which evidence may properly be received." C.P.L. § 215.35(2). An investigation or arrest is not an "official proceeding," see Traynham, 95 Misc.2d 145, 147 (N.Y. City Crim. Ct. 1978), however, if a defendant is aware she is about to be arrested, she may be deemed to have contemplated a prospective official proceeding in which the subject evidence would be used.  See People v. Atkins, 95 A.D.3d 731 (1st Dept. 2012) (evidence was sufficient to support conclusion defendant suppressed bags of heroin by an act of concealment because he believed they would be used in a prospective official proceeding, where he placed them into his mouth while he fled from police); People v. Bass, 15 A.D.3d 287 (1st Dept. 2005)(evidence sufficient to support tampering conviction where during strip search, defendant removed bag containing cocaine from his sock and swallowed it); People v. Higgins, 299 A.D.2d 841 (4th Dept. 2002) (same where defendant threw gun in the river); People v. Mercedes, 194 Misc.2d 731, 735 (Crim. Ct. N.Y. Co. 2003) (same, defendant broke marijuana cigar into pieces and obscuring it in mulch as officer approached);

People v. Palmer, 176 Misc.2d 813 (Crim. Ct. N.Y. Co. 1998) (same, defendant swallowed bag of marijuana while fleeing from police).

Whether on November 12, 2008, in Queens as the indictment charged, or December 2, 2008, in Tampa, as the prosecutor accused, the evidence was legally insufficient to prove that appellant tampered with physical evidence. Clearly appellant did not "suppress" the gun in Queens on November 12, 2008, the day of the shooting. On that day, the prosecution's evidence showed that after Rosado shot Rei, appellant and Rosado headed straight back home to Florida with the gun. The only thing they discarded was a cell phone, and that was in Maryland, not Queens. In the absence of any evidence whatsoever of suppression of the gun used in the shooting in Queens on that date, the evidence was plainly insufficient to support appellant's conviction of tampering on the theory charged in the indictment and by the court in its instructions.

Nor was there sufficient evidence to support the prosecution's unindicted and improper summation theory that appellant concealed the gun in her Florida home before her impending arrest on December 2, 2008. First, there was no evidence that appellant became aware of her imminent arrest on that date. While Rosado testified that he told his girlfriend to call appellant as he was being arrested, there was no evidence that she ever made the call. And when the police arrived at appellant's home she was still in her pajamas, which suggests she did not know the police were on their way. Indeed in summation, the prosecutor himself conceded that appellant had no

"communication" that the police were coming on December 2, 2008, and therefore no time to "get rid of the gun" (1763). Since there was no evidence that appellant believed she was about to be arrested, she could not have anticipated a "prospective official proceeding." See People v. Estrada, 24 Misc.3d 1217(A), *1 (Sup. Ct. N.Y. Co. 2009)(dismissing indictment for tampering with evidence where "allegations d[id] not show that the defendant knew he was being placed under arrest or had been advised of such to establish his knowledge of a prospective official proceeding").

Even assuming, arguendo, that appellant knew that the police were about to arrest her, there still was no evidence she tried to hide the gun. Had appellant intended to conceal the gun, even on short notice, she logically would have placed it someplace the police would *not* be likely to look for it. Obviously they would look for a gun inside an unconcealed duffel bag sitting on a shelf in appellant's closet. Cf. People v. Barreiro, 149 A.D.2d 600 (2d Dept. 1989) (defendant's actions in hiding gun used in shooting in sister's house established tampering with evidence). Furthermore, by all accounts, appellant regularly carried her gun to and from her home and business. "Conduct constituting a common use or action with the item at issue does not favor an inference of intent to prevent [its] production." Lewis, 25 Misc.3d at *4 (dismissing the tampering charge, finding that the "reasonable inference" was that defendant merely threw a cigar to the ground to abandon it or because he finished smoking it rather than to prevent its production in connection with an "official proceeding"). It was, therefore, no more than a "common use or action" for

appellant to keep the gun in a duffel bag, which is easily transportable, in a safe but readily accessible location in her home. Lewis, 25 Misc.3d at *4. Accordingly, her conduct did not "favor an inference" that she was concealing the gun there to prevent the police from finding it. Id.; cf. Atkins, 95 A.D.3d 731; Bass, 15 A.D.3d 287; Mercedes, 194 Misc.2d 731; Palmer, 176 Misc.2d 813. The evidence was thus legally insufficient to support the tampering charge, even on the prosecution's improper theory that appellant concealed it on December 2, 2008, in her Florida home.

* * *

Appellant was deprived of adequate jury instructions, proper notice of the charge and her right to have the charge against her preferred by a grand jury and not the court or prosecutor at trial, and the evidence against her was legally insufficient. Under these circumstances, despite defense counsel's failure to object or move to dismiss on these grounds, this Court should reverse appellant's conviction of tampering with physical evidence and dismiss the indictment or, at a minimum, grant a new trial.

## POINT V

### THE SENTENCE IMPOSED ON FORTY-SIX-YEAR-OLD APPELLANT, A BUSINESS WOMAN WITH NO PRIOR CRIMINAL RECORD, WAS EXCESSIVE.

Undoubtedly, this crime was extremely serious. Without minimizing it or its tragic effects in any way, it is beyond dispute that it was an aberration in the life of an

otherwise family-oriented, well-educated, businesswoman who, at 46 years of age, had no prior brushes with the law. Since her arrival in the United States, appellant had been a hard-working, supportive and caring role-model for her family. As set forth in the sentencing letters submitted on her behalf, it was clear that appellant's sister Yaraliz, who became a highschool teacher, brother Yacell, a salesman, and niece Jhoeny, who had been a teacher and planned to become a vascular surgery nurse, as well as other family members on whose behalf they wrote, all benefitted greatly from appellant's positive influence. Further, given her work ethic, lack of previous convictions or even arrests, and success as an immigrant to this country who later became a naturalized citizen, appellant was, until this complete deviation from her past behavior, a role-model citizen and an asset to society. Accordingly, the court was incorrect to conclude that appellant she was a tyrant who demanded complete loyalty in exchange for her love and support.

"Generally, four principles have been accepted as objectives of criminal punishment: deterrence; rehabilitation; retribution; and isolation." People v. Notey, 72 A.D.2d 279, 282 (1980) (citing Pugsley, Retributivism: A Just Basis for Criminal Sentences, 7 Hofstra L Rev 379, 381.). The present crime stands in sharp contrast to appellant's otherwise unblemished history and appears to have been, at its root, a crime of passion. Something less than the twenty-six and a third to life sentence imposed on the nearly fifty year- old appellant, under which she will not be even parole-eligible until she is seventy-three years old, would serve the objectives of

sentencing, without being unduly harsh and excessive. This Court should therefore

exercise its discretion to reduce appellant's sentence in the interest of justice.

## CONCLUSION

> FOR THE REASONS SET FORTH ABOVE, APPELLANT'S CONVICTION SHOULD BE REVERSED, THE TAMPERING WITH THE PHYSICAL EVIDENCE COUNT DISMISSED, AND A NEW TRIAL GRANTED AS TO ALL OTHER COUNTS, OR, ALTERNATIVELY, A NEW TRIAL SHOULD BE GRANTED AS TO ALL COUNTS (POINTS I, II, III and IV). AT A MINIMUM, FOR THE REASONS SET FORTH IN POINT V, APPELLANT'S SENTENCE SHOULD BE MODIFIED.

Dated: June 2016

Respectfully submitted,

Lynn W.L. Fahey
Appellate Advocates
111 John Street, 9th floor
New York, New York 10038
(212) 693-0085

Yvonne Shivers
Of Counsel

60

## CERTIFICATE OF COMPLIANCE

The foregoing brief was prepared on a computer.    A proportionally spaced typeface was used as follows:

> Name of Typeface: Garamond
> Point Size:          14
> Line Spacing:      Double

The total number of words in the brief, inclusive of point headings and footnotes, and exclusive of pages containing the table of contents, proof of service, certificate of compliance or any authorized addendum containing statutes, rules, regulations, etc., is 15,191.

To be argued by
NANCY FITZPATRICK TALCOTT
(TIME REQUESTED: 10 MINUTES)

# New York Supreme Court

## Appellate Division--Second Department

### AD No. 14-07277

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

against

YNMACULADA GOMEZ,

Defendant-Appellant.

## BRIEF FOR RESPONDENT

RICHARD A. BROWN
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York 11415
(718) 286-6696

JOHN M. CASTELLANO
JOHNNETTE TRAILL
JOSEPH N. FERDENZI
NANCY FITZPATRICK TALCOTT
  Assistant District Attorneys
    *Of Counsel*

OCTOBER 3, 2016

Queens County
Indictment Number 538/09

# TABLE OF CONTENTS

**Page No.**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
The Relationship Between Defendant and the Victim . . . . . . . 7
Defendant's Plans to Kill Mario Rei . . . . . . . . . . . . . . . . . . . 12
The Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Defendant's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
People's Rebuttal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

POINT ONE

    THE COURT'S COMMENTS DURING JURY
    SELECTION WERE PROPER . . . . . . . . . . . . . . . . . . . . . . . 37

POINT TWO

    THE TRIAL COURT PROPERLY ADMITTED
    EVIDENCE THAT DEFENDANT HAD
    SOLICITED OTHER INDIVIDUALS TO
    MURDER THE VICTIM OR FRAME HIM FOR
    OTHER CRIMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

POINT THREE

> THE PROSECUTOR'S SUMMATION DID NOT
> DENY DEFENDANT A FAIR TRIAL.
> DEFENDANT'S CLAIM TO THE CONTRARY IS
> LARGELY UNPRESERVED AND COMPLETELY
> WITHOUT MERIT. IN ANY EVENT, ERROR, IF
> ANY WAS HARMLESS ............................ 60

POINT FOUR

> DEFENDANT'S CLAIMS REGARDING THE
> TAMPERING COUNT ARE UNPRESERVED
> AND WITHOUT MERIT. DEFENDANT WAS
> FULLY AWARE OF THE FACTS UNDERLYING
> THE CHARGE AND NEITHER THE
> PROSECUTOR'S SUMMATION NOR THE
> COURT'S CHARGE ALTERED THAT
> THEORY ........................................ 74

POINT FIVE

> DEFENDANT'S SENTENCE WAS PROPER ........... 84

CONCLUSION ............................................... 87

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,                    :

                      Respondent,                    :

                  -against-                    :

YNMACULADA GOMEZ,                    :

             Defendant-Appellant.                    :

                                :
----------------------------------------------------------------------- x

## BRIEF FOR RESPONDENT

## PRELIMINARY STATEMENT

Defendant Ynmaculada Gomez appeals from a July 14, 2014, judgment of the Supreme Court, Queens County (Holder, J.). By that judgment, defendant was convicted, after a jury trial, of Murder in the Second Degree (Penal Law § 125.25[1]), two counts of Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[1][b], [3]), and Tampering with Physical Evidence (Penal Law § 215.40[2]). The court sentenced defendant to an indeterminate term of imprisonment of from twenty-five years to life for the murder, to run concurrently with concurrent determinate terms of imprisonment of fifteen years, to be followed by five years of post-release

supervision for each weapon possession count. The court also sentenced defendant to an indeterminate term of imprisonment of from one and one-third to four years for the tampering with evidence count, to run consecutive to the concurrent sentences.

## INTRODUCTION

In the summer of 2008, defendant was angry at her former business partner Mario Rei because she believed Rei ruined her credit and her business, and alienated defendant from his wife, for whom defendant harbored romantic fantasies. As a result, defendant solicited her father to kill Rei, and, thereafter, another individual. Unable to come to an agreement with either of them, defendant tried to convince a third person to buy and plant drugs in Rei's home. Unsuccessful in her attempts, in the fall of 2008, defendant promised her employee Luis Rosado free housing for him and his family and job security if Rosado murdered Rei. After defendant threatened his family, Rosado agreed.

On November 12, 2008, defendant and Rosado arrived in New York from Florida. Rosado used defendant's gun to kill Rei. The two returned to Florida and Rosado returned the weapon to defendant, who hid it in a bag in her closet. After arresting defendant, the police executed a search warrant

2

and recovered the weapon. Ballistics tests confirmed it was the murder weapon.

For these crimes, defendant and Rosado were charged, by Queens County Indictment Number 538/2009, with Murder in the Second Degree (Penal Law § 125.25[1]), two counts of Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[1][b], [3]), and Tampering with Physical Evidence (Penal Law § 215.40[2]).[1]

Defendant proceeded to trial before the Honorable Kenneth Holder, Queens County, and a jury. During jury selection, the court chastised a prospective juror who stated that, as a police officer, he was biased against defendant. After dismissing the juror, the court impressed upon the prospective jurors the importance of the presumption of innocence in our system. Additionally, the court asked some students who asked to be excused why they did not seek to defer serving, but excused all, stressing the importance of not missing class. The court also ensured that no prospective

---

[1]Pursuant to a plea agreement, Rosado pleaded guilty to Manslaughter in the First Degree and Criminal Possession of a Weapon in the Second Degree. The court sentenced Rosado to an aggregate term of imprisonment of twenty-four years. According to the records and files of the Appeals Bureau of the Queens County District Attorney's Office, Rosado did not file a notice of appeal.

3

jurors tried to shirk the important civic duty of jury duty by assessing the veracity of some claims of language or work–related issues.

The jury convicted defendant of Murder in the Second Degree, two counts of Criminal Possession of a Weapon in the Second Degree, and Tampering with Physical Evidence. On July 14, 2014, the court sentenced defendant as noted above.

Defendant raises five claims on appeal. First, defendant claims that the court's remarks during *voir dire* had a "chilling effect" on jury selection, thereby depriving her of her right to choose a jury according to the law. This claim must fail. The court's comments ensured that the prospective jurors would follow the law as given. The freedom with which the jurors spoke establishes that there was no chilling effect, but rather, an open dialog between the court and venirepersons. The lone juror who expressed some trepidation about coming forward gave no indication that her hesitancy was the result of anything the court had said and not merely the common anxiety associated with the process of jury selection.

Second, defendant asserts that the court improperly admitted evidence that she had previously solicited individuals to kill or frame the victim. Contrary to defendant's claim, the court properly exercised its

4

discretion in ruling that the prosecutor could elicit such testimony, as it was relevant to establish motive and intent, as well as to refute the defense that others had conspired to kill the victim without defendant's knowledge. Additionally, the court alleviated any potential prejudice with its limiting instruction regarding the evidence. And, error, if any, was harmless in light of the overwhelming evidence of defendant's guilt.

Third, defendant asserts that she was deprived of a fair trial because during summation the prosecutor improperly accused her of tax fraud, denigrated the defense, and mischaracterized the evidence. This claim is largely unpreserved for appellate review and completely without merit. The prosecutor's comments represented fair comments on the evidence and reasonable inferences to be drawn therefrom, or invited response to defendant's summation. Moreover, the court instructed the jurors that the comments of counsel did not constitute evidence. Furthermore, error, if any, in the prosecutor's comments was harmless in light of the overwhelming evidence of defendant's guilt and did not deny defendant a fair trial.

Fourth, defendant raises several claims regarding the tampering with physical evidence count. Defendant asserts that the court's charge on this count was insufficient because it failed to state that the subject of the charge

5

was the gun. Moreover, defendant claims that the charge, as well as the prosecutor's summation comment regarding this count constructively amended the indictment. Defendant also asserts that the evidence was legally insufficient to support the tampering charge. All of defendant's claims are unpreserved for appellate review and without merit. Given the time frame alleged in the indictment, the prosecutor's comment that the tampering occurred in Florida when defendant secreted the weapon in her closet was accurate. Moreover, the court's tracking of the statutory language was proper and did not deny defendant a fair trial. Additionally, the evidence that defendant demanded the gun back from her Rosado, which she then secreted in her home was sufficient to establish the elements of the crime charged.

Finally, defendant claims that her sentence was excessive. Given the manipulative nature with which defendant carried out this heinous crime, the sentence imposed was entirely proper.

6

## THE TRIAL

## The People's Case

### The Relationship Between Defendant and the Victim

Venezuelan natives *Flor Cepeda* and Mario Rei settled in Queens and married in a Jehovah's Witness ceremony in 2000. They moved to a small apartment and had a son in 2002 (Cepeda: 865-67, 904-06).

Cepeda and Rei met and befriended defendant around 2001, at the Jehovah's Witness Kingdom Hall. Cepeda and defendant worked together in 2001, and the couple and defendant saw each other almost daily between 2001 and 2005. They socialized and traveled together (Cepeda: 866-68, 905-07, 970). Sometimes Rei did not go on the trips, but Cepeda's son always accompanied her (Cepeda: 970).

Defendant helped the couple with legal matters, telling them to put the car registration and insurance in her name because she was a citizen. Defendant got Cepeda credit cards, which defendant also used. Cepeda and Rei paid defendant cash for everything and Rei fixed defendant's car for free (Cepeda: 868-69, 907-10, 947-48, 950, 985). Money was borrowed between the three "[a]ll the time" "back and forth" (Cepeda: 870-71).

7

In 2002 or 2003, Cepeda asked defendant if she had any "kind of" "weird" feelings toward her. Defendant said no, claiming Cepeda was like a daughter. Cepeda told defendant that she was married and did not "like" women (Cepeda: 874-75, 914).[2]  Cepeda never had any type of sexual relationship with defendant (Cepeda: 874, 898).

Because defendant was always in their home, Cepeda and Rei felt "uncomfortable" and started "like pushing her away" (Cepeda: 870). Defendant fought with Rei, and told the couple that they should be thankful because she could call the authorities. Fearful of being deported, Rei insisted that they move. In 2005, the couple moved to North Carolina (Cepeda: 870-72, 910).

When they first moved to North Carolina, they did not communicate with defendant. After defendant sent Cepeda an e-mail when her mother passed away, they resumed communicating (Cepeda: 872-73, 911, 935).

When defendant visited, Rei did not want to see defendant, and Cepeda met her at a hotel in Charlotte (Cepeda: 873, 912-13, 915, 935). The

---

[2]Cepeda had asked because defendant was not in a relationship and often hugged her and said she loved her (Cepeda: 875).

8

"friendly" visit lasted about forty-five minutes (Cepeda: 874, 913, 935-36).[3] Sometime after the visit, Cepeda needed money because she wanted to move to New York. Defendant sent her between $3,000 and $5,000 (Cepeda: 875-76). Cepeda and Rei argued because Rei wanted to live in a warm climate. In December 2006, they moved to Tampa, Florida (Cepeda: 876-77, 920, 943).

About two months later, Cepeda re-established communication with defendant, who had also moved to Tampa. Cepeda, Rei, and their son went to dinner at defendant's house on Calgary Circle (Cepeda: 878-79). They spoke about "everything" and defendant and Rei planned to start a business. Rei would oversee the labor and defendant would control the accounting (Cepeda: 880-82, 885).

Defendant offered to transfer title to one of her homes because the couple could not own a home without "paper[s]." About three weeks later, Cepeda and Rei moved into defendant's home at 7011 North Hale Avenue in Tampa. They paid the mortgage and taxes, and gave defendant $1,000 to transfer title. Defendant transferred title to Cepeda's name on September 7, 2007, about six months after Cepeda and Rei moved in (Cepeda: 881-86, 921, 944-45, 988).

---

[3] They did not discuss the transfer of any property (Cepeda: 915).

9

Meanwhile, about a month after the dinner, defendant, Cepeda, and Rei opened Tire Flea Market. Although they were partners, and Rei gave her a $5,000 cash contribution, defendant told them they could not be part of the incorporation because they were illegal and did not have papers (Cepeda: 885-87, 951-52).

Everything was under defendant's name. Defendant signed the shop lease, paid the insurance, opened up bank accounts, and paid Rei and Cepeda (Cepeda: 952-53, 955). Defendant gave Cepeda an American Express in Cepeda's name, which defendant also used. Cepeda and Rei paid defendant cash for their purchases, supplies, electricity, and the lease (Cepeda: 949-50, 955).

At the beginning of 2008, defendant and Rei fought, as each accused the other of stealing. When Rei said he wanted to leave the business and asked for the return of his $5,000, defendant claimed she did not have it (Cepeda: 888-89).

In May 2008, the police went to Tire Flea Market. Because the papers for the new 2008 Jeep Cepeda drove were in defendant's name, the

10

police took the keys (Cepeda: 889-90, 957-59, 987).[4] Rei told the police that he was a partner in the business. Defendant arrived, claimed Rei was an employee who was stealing, and demanded they leave. The items Rei had bought for the business, including a pickup truck, were all in defendant's name, and he left with only a tool box (Cepeda: 890-91, 957).[5]

Thereafter, the couple did not speak with defendant (Cepeda: 971, 975). Rei and Cepeda stayed in the house for two or three more months, during which time Rei did not pay the mortgage because defendant would not return his money (Cepeda: 893, 971).

In July 2008, after an accountant advised them they could start a corporation despite their status, Rei and Cepeda opened a mechanic shop called Los Chomos (Cepeda: 869-70, 892-93, 921, 970-71, 973-74, 988, 990-91). The accountant reviewed and explained documents to Cepeda (Cepeda: 992). They closed the business in September 2008, after an issue with the lease (Cepeda: 897, 974).

---

[4]Defendant paid the loan on the car, which they all drove. Cepeda and Rei gave her money for it each month (Cepeda: 958, 965, 987, 989-90).

[5]Rei filed a complaint to recoup his money, but defendant did not appear in court (Cepeda: 893-94).

11

Rei and Cepeda returned to Queens, New York, where Rei worked as a mechanic for *John Vasilantonakis*, at 50-30 98th Street (Cepeda: 897-98, 974; Vasilantonakis: 994-95).

Cepeda was not aware that defendant had transferred Florida properties to her name and made her the beneficiary of a life insurance policy (Cepeda: 915-18, 921-22, 936, 941-42, 980-83, 922; Defense Exhibits A, B). Cepeda signed quit claims deeds in 2007, at defendant's direction. She did not know what she was signing because she did not read English, but trusted defendant (Cepeda: 938-41, 981-84; Defense Exhibits C, D). Cepeda did not read a statement from the Department of Revenue regarding the North Hale property, as they gave defendant any legal mail or paperwork relating to the property (Cepeda: 945-46, 986-87).

### Defendant's Plans to Kill Mario Rei

At the end of May 2008, defendant told her long-time friend and former lover *Gioconda Pazmino* that she had problems with Rei and Cepeda and fired them (Pazmino: 1015, 1055).[6] On June 8, 2008, at defendant's

---

[6]Pazmino and defendant met at work in 1991 and became members of the Jehovah's Witness Church in 1992 (Pazmino: 1048, 1050). They had a romantic relationship for around nine years. That ended around 2001, after which they did not speak for about six years. In May 2007, another friend told Pazmino that defendant had asked for Pazmino's number and was looking for her. Defendant and Pazmino spoke and re-established a friendship (Pazmino: 1012-13, 1053-54). Pazmino met Rei and Cepeda through the church

12

request and expense, Pazmino moved to Tampa to help with the business. Defendant was supposed to help Pazmino with her expenses (Pazmino: 1010-12, 1015-16, 1055-56, 1065-66).

Pazmino lived platonically with defendant for three months. Pazmino worked for defendant at Tire Flea Market, seven days a week, nine to twelve hours a day. Defendant never paid Pazmino (Pazmino: 1016-18, 1056, 1065-66).[7]

Defendant had a black pistol, which she kept in a dresser drawer in her room (Pazmino: 1017-19, 1062, 1064). Defendant sometimes carried the gun when she transported a large amount of cash (Pazmino: 1019, 1063).

In July 2008, defendant asked Pazmino to get Rei and Cepeda to sign papers to transfer the house back to defendant's name so she could negotiate with the bank.[8] Pazmino visited the couple at work and relayed defendant's request. Rei said they would not sign the papers until defendant

---

and saw them at a church volleyball function. Pazmino was not friends with them and did not see them outside of church (Cepeda: 894, 896, 973; Pazmino: 1015-16, 1055).

[7]Although Pazmino knew defendant had broken off her friendship with Cepeda, Pazmino had not gone to Florida hoping to rekindle their romance (Pazmino: 1072-73).

[8]Defendant had told Pazmino that she had transferred one of her homes to Cepeda's name so Cepeda and her family could live there (Pazmino: 1068-69).

13

returned his $5,000 business contribution (Cepeda: 894-96; Pazmino: 1019-21).

Pursuant to defendant's instructions, Pazmino told Cepeda separately that if she did not sign, defendant would show Rei an email confirming Cepeda and defendant's relationship. Cepeda laughed, denied having any relationship with defendant, and refused to sign the papers (Cepeda: 896; Pazmino: 1020-21, 1125-26).

When Pazmino relayed what had occurred to defendant, defendant got angry and said she was going to kill Rei because he had ruined the business, her credit, and had stayed with Cepeda. Defendant repeated that threat five or six times while Pazmino lived with her (Pazmino: 1021-22, 1065).

When defendant's father, Joel Gomez, visited, defendant told him that she had fired Rei because he stole from her and that she needed "to get rid of him" (Pazmino: 1022-23, 1025, 1069, 1108-09). When defendant asked, Mr. Gomez agreed to kill Rei, but said he would also kill anyone else in the

14

house. Not wanting anything to happen to Cepeda or her son, defendant told

her father to "forget it" (Pazmino: 1023, 1109).[9]

In August 2008, defendant solicited a customer who was a drug

dealer to murder Rei. Pazmino left the office during the conversation, and

defendant subsequently told her that the person had said the murder would cost

$10,000, and that he would only send Rei to the hospital for the $3,000

defendant offered (Pazmino: 1107, 1113, 1023-25, 1115, 1284-85).[10]

During that same month, defendant spoke with a colleague and

gave him $300 to buy drugs and plant them in Rei and Cepeda's house, for

which defendant gave him the key. Defendant planned to call the police after,

but the man fled with the money (Pazmino: 1024-25).

In August, *Luis Rosado*, a former customer, began working for

defendant off-the-books as a mechanic (Pazmino: 1030; Rosado: 1292-93,

---

[9]In the grand jury Pazmino testified that defendant told her about the conversation
with her father (Pazmino: 1109-10, 1282-83). Pazmino explained at trial that this referenced
a conversation between defendant and her father before his arrival. While he was in Tampa,
Pazmino was present when they had the same conversation (Pazmino: 1283-84).

[10]Pazmino testified in the grand jury that defendant told her about the conversation
with the customer, but clarified that she was there for the beginning of the conversation
(Pazmino: 1113-15).

15

1293-95, 1352-53).[11] Defendant always carried a black pistol in a briefcase or in her bag, and had the weapon at the shop (Rosado: 1296-97, 1353).

Rosado met Pazmino through work (Pazmino: 1057, 1062, 1123, 1280; Rosado: 1298-99). Their friendly relationship was "work related." They exchanged cell phone numbers, but did not socialize (Pazmino: 1030, 1057, 1061, 1123-24, 1261-62, 1281; Rosado: 1299, 1355).

As Rosado worked for defendant, "a friendship grew" and she told Rosado about her problems with Rei (Rosado: 1295-97). Defendant was losing her second Tampa home because Rei did not pay the mortgage, and she was losing the business because Rei stole from her. One time defendant was "very angry" with Rei and said she wanted him dead. Rosado did not think defendant was serious (Rosado: 1297-98).

In early September 2008, Pazmino and defendant argued and defendant asked her to leave (Pazmino: 1025, 1066; Rosado: 1299). Pazmino agreed but demanded defendant pay her for the three months she had worked.

---

[11]Rosado, a Puerto Rican native, came to the United States in 2004, and lived in Tampa until 2008. In the summer of 2008, he lived at 6619 Cavacade Drive in Tampa with his pregnant girlfriend and her three children (Rosado: 1290-92, 1393-94). He subsequently learned that the child was not his (Rosado: 1354, 1393).

16

Defendant replied that she could shoot Pazmino and no one would know (Pazmino: 1025-26, 1067).

After the fight, Pazmino visited Rosado for about ninety minutes, and then stayed with a friend for a few days (Pazmino: 1026, 1067, 1261-62, 2180; Rosado: 1299-1300, 1355-56). Defendant never paid Pazmino, but sent her a train ticket. Pazmino was angry that defendant threw her out, and returned to her old Queens apartment at 98-15 Horace Harding Expressway (Pazmino: 1026, 1067, 1280).

On October 26, 2008, defendant called Pazmino and said she was coming to New York the next day or two because she knew Rei and Cepeda were in Queens. Defendant asked Pazmino to get her a phone because hers was not working (Pazmino: 1027).

Defendant insisted that Rosado accompany her to New York, and said she was going to see an attorney and Rei.[12] He and defendant drove defendant's gold Jeep Grand Cherokee to New York (Rosado: 1300-03). Defendant and Rosado stayed at Pazmino's home for two or three days (Pazmino: 1027-30, 1032, 1257-58; Rosado: 1303-04, 1364). Pazmino gave defendant the phone she had asked her to buy (Pazmino: 1039; Rosado: 1304).

---

[12] When Rosado initially declined, defendant threatened his family (Rosado: 1301-02).

17

The first night in Corona, defendant told Rosado that she wanted him to shoot Rei. When Rosado declined, defendant threatened his family again (Rosado: 1306-08). Rosado did not intend to kill Rei, but told defendant he would commit the murder "to get [defendant] off [his] back" (Rosado: 1307-08, 1311, 1395). Pazmino was not present for the conversation, but defendant told him that Pazmino would help him (Rosado: 1395). It was defendant's idea to have Rosado murder Rei on Halloween, after defendant had left New York (Pazmino: 1031-32, 1253, 1258, 1281-82). Defendant did not want to be in New York when Rosado killed Rei (Rosado: 1308, 1394-95).

Defendant brought a gun in a plastic black box with her in October 2008 (Pazmino: 1032; Rosado: 1038). Defendant put the box on top of the television in Pazmino's room (Pazmino: 1032). When defendant left New York, she wrapped her gun in plastic bags and left it in the closet in Pazmino's room (Rosado: 1309).[13]

After defendant left, Rosado stayed in Pazmino's apartment another day (Rosado: 1309). They visited one of Pazmino's female friends in Yonkers for a couple of hours, and then returned to Corona. Rosado said he

---

[13]Pazmino thought defendant took the gun with her because she took the box (Pazmino: 1032, 1036). Rosado did not think Pazmino knew defendant left the gun there (Rosado: 1309).

18

stayed to kill Rei on Halloween pursuant to defendant's orders (Pazmino: 1035, 1087; Rosado: 1310, 1395-96). Pazmino did not want to get involved and asked him to leave (Pazmino: 1035-36, 1282; Rosado: 1310, 1396).[14] Pazmino drove Rosado to the train station, where he took the train to Tampa (Rosado: 1036, 1310-11, 1365, 1396).

A few days after Rosado left, defendant called Pazmino and said she had left the gun in her home. Defendant asked why she sent Rosado back to Florida without doing what he was supposed to do (Pazmino: 1275-77, 1287-88). Defendant also told Pazmino that she had reported the gun lost to the police and gave them Pazmino's name (Pazmino: 1276).

Meanwhile, defendant told Rosado that he had to go back to New York to kill Rei. She threatened Rosado's family, and said she could use her family, including her incarcerated brother, against them. She also reminded Rosado him that he worked for her (Rosado: 1307, 1311-13, 1390-91). Defendant told Rosado that if he killed Rei he could stay at her second house rent-free for as long as he needed (Rosado: 1313-14, 1341, 1350, 1353).[15]

_____

[14]Rosado said Pazmino told him that her husband did not want him in the apartment (Rosado: 1310).

[15]Rosado did not know that Cepeda owned the property at the time (Rosado: 1353).

19

Fearing for his family's safety, and facing financial hardship and eviction, Rosado felt "forced" to agree (Rosado: 1313-14, 1340, 1390).

At around 4:40 p.m. on November 2, 2008, Deputy Sheriff *Thomas Stein* went to defendant's home in response to a call of a theft. Defendant told Deputy Stein that she was missing a Glock 40 caliber gun and ammunition, which she had kept in the upper left-hand corner of a dresser drawer in her bedroom. Defendant last saw the weapon on September 6, 2008, and noticed it missing on October 31, 2008 (Stein: 1212-15, 1217, 1219-20, 1222). Defendant had a receipt for the gun and ammunition, which she bought on August 22, 2007 (Stein: 1217, 1224-25).

Defendant said that Pazmino had been a houseguest from June 8 until September 10, during which time she had friends over. Defendant did not have Pazmino's New York address but gave the cell phone number 917-288-6646 (Stein: 1216-17, 1222-23, 1225-26, 1228, 1230). Defendant was "very vague" and did not give the impression that Pazmino actually stole the weapon (Stein: 1222, 1227-28).

## The Murder

On November 10, pursuant to defendant's suggestion, Rosado asked *Maribel Ortiz*, his long-time friend and godson's mother, to lend him her

20

2003 gold Dodge Caravan because he had to go to North Carolina for work (Rosado: 1314-15, 1317, 1378; Ortiz: 1454-56, 1460-61). Ortiz agreed to do so, if Rosado left her another car to use (Rosado: 1315; Ortiz: 1456-57, 1460). That night, Rosado brought Ortiz defendant's four-door gold Grand Cherokee in exchange for the Caravan (Rosado: 1316; Ortiz: 1457).

On November 11, Rosado and defendant left for New York (Rosado: 1314, 1317). Defendant called Pazmino and told her that she was coming to New York the next day to see her siblings for the anniversary of their mother's passing (Pazmino: 1036-37).

Defendant also called her friend *Kenia Soto* and said she was coming into town for business. Soto said they could stop at her place to rest (Soto: 1466, 1475-76).[16] Defendant and Rosado arrived at Soto's Passaic, New Jersey apartment at around 5:00 a.m. on November 12 (Rosado: 1317-18; Soto: 1463-67, 1478). They left for New York at about 8:00 a.m. (Rosado: 1318; Soto: 1468-69, 1472, 1478). Defendant drove a gold or tan minivan SUV (Soto: 1467).

---

[16]Defendant called Soto on her cell phone. Soto's number was 551-655-4099 (Soto: 1467). Soto, who lived with her son, met defendant when she stayed at defendant's house while visiting Pazmino for a weekend in Florida in July 2008 (Soto: 1464-65, 1474). Soto had met Pazmino through some other friends (Soto: 1470-71, 1473).

21

Meanwhile, defendant had spoken with Pazmino at around 4:30 a.m. and said she needed something from Pazmino's home (Pazmino: 1037, 1274-75). Pazmino was at her friend *Belkis Sanchez's* home in Yonkers, where she had spent the night (Pazmino: 1037; Sanchez: 1557-60, 1569, 1575).[17] Defendant called Pazmino numerous times that morning to confirm when she would be home (Pazmino: 1037-38; Rosado: 1319).[18]

The three women drove Erica's blue Chevy Impala to Pazmino's apartment in Queens, where they arrived at about 2:00 p.m. (Pazmino: 1040, 1103-04, 1120, 1275; Sanchez: 1560-61, 1569). Defendant and Rosado arrived in the area in the Dodge Caravan (Rosado: 1319).

Pazmino called defendant when she got home and defendant told her that she needed the gun, which was in a drawer in Pazmino's room (Pazmino: 1040, 1275). While her friends waited in the car, Pazmino went to her apartment and retrieved the closed knotted black bag, which she put in

---

[17]Sanchez lived with her two children and her partner, Erica. Sanchez had known Pazmino, her best friend, for four years. Sanchez knew Pazmino's friend Kenia Soto (Sanchez: 1557-59, 1567). At trial, Sanchez had not spoken to Pazmino for several years (Sanchez: 1568).

[18]Rosado did not think defendant brought her regular phone from Florida (Rosado: 1319).

another bag (Pazmino: 1040-42, 1104-06, 1122, 1265-67, 1276-78; Sanchez: 1570).

Defendant told Pazmino to meet her a block away, at 60th Avenue and Calloway Street (Pazmino: 1041, 1277-78; Rosado: 1320-21). Pazmino, accompanied by her two female friends, turned the corner while speaking with defendant on the phone (Pazmino: 1041; Sanchez: 1561, 1572). Noting she was not alone, defendant asked Pazmino whether she was afraid of her (Pazmino: 1041-42, 1278). Pursuant to defendant's instructions, Pazmino separated from her friends and walked to the corner, where she asked defendant her location (Pazmino: 1041-42, 1278; Rosado: 1320-22). Defendant said that Rosado was behind her and to give him the package (Pazmino: 1042, 1278).[19]

Pazmino turned and saw Rosado approaching her from the other corner (Pazmino: 1042, 1102, 1266; Rosado: 1322). After Pazmino handed him the heavy bag, Rosado went back towards Calloway, to the Dodge Caravan. Pazmino got in the car with her friends, and went back to Yonkers

---

[19]Pazmino did not see defendant or her car that day (Pazmino: 1042, 1119, 1278-79). Pazmino had not spoken to Rosado that day and did not know he was there until defendant said he was behind her (Pazmino: 1278-79). Pazmino did not answer defendant's subsequent calls (Pazmino: 1097-98).

23

(Pazmino: 1042, 1045, 1086, 1125; Rosado: 1322-23; Sanchez: 1561-62, 1572).[20] It was about 3:15 p.m. (Pazmino: 1043; Sanchez: 1572).

Rosado returned to the Dodge Caravan and gave defendant the package (Rosado: 1323-24). The pistol was wrapped in black plastic bags, which was how defendant had wrapped it when she put it on a shelf in Pazmino's room (Rosado: 1324).

Defendant parked about three or four feet from the corner and fifty feet past Rei's workplace. Defendant waited in the car, as Rosado got out and waited on the sidewalk, behind a multi-colored former schoolbus across the street. Rei's black Jeep Cherokee – which defendant had shown Rosado in October – was two cars behind the bus (Rosado: 1324-27, 1327, 1371-72).

Around 5:15 p.m., Rei emerged from the shop. Rosado was behind the bus, armed with a loaded weapon (Rosado: 1327-28, 1370-71). As Rei walked to his car, Rosado approached him. Rei went to the back door on the left hand side of his car. Rosado went in the road, walked from behind Rei's car and, from three or four feet away, asked Rei if he could ask him a question. Rei turned to Rosado, who took defendant's pistol from his front

---

[20]Sanchez did not know Rosado but saw Pazmino hand a "tall" man the bag (Sanchez: 1573). Sanchez and Erica were in the car (Sanchez: 1572).

24

jacket pocket, pointed the gun at Rei's chest, and shot him three times (Rosado: 1328-30, 1373-74).

Rosado then ran on the right side of the sidewalk and got in the rear passenger seat of the waiting Dodge Caravan. As she drove off, defendant asked Rosado whether he had killed Rei. Rosado said he did not know because he was "very nervous." Defendant turned right and drove to the highway to return to Tampa (Rosado: 1330-32). As they drove through Maryland, defendant threw the cell phone out the window (Rosado: 1332, 1374-75).[21]

Meanwhile, as Rei went across the street to his car, Vasilantonakis went to close the gates at the lot down the block, about twenty-five feet away. As he was by the garage door, Vasilantonakis heard three shots. It was daylight and there was "[p]lenty of lighting" (Vasilantonakis: 995-96, 1000, 1006). Vasilantonakis came out and saw a male with a heavy dark coat/ski jacket and dark/black ski hat running away from where Rei's Jeep was parked (Vasilantonakis: 996, 1001-02). The male ran north on 98th Street, and got in the passenger side of a "silver" Dodge Caravan minivan parked on the corner

---

[21]In Tampa, Rosado dropped defendant off at her house and exchanged cars with Ortiz. Rosado returned defendant's car to her the following day, but kept the pistol in his house (Rosado: 1332-33, 1376; Ortiz: 1458). Around a week later, defendant and Rosado argued and defendant told him to bring her the pistol. Rosado went to the shop and gave defendant the gun (Rosado: 1333-34, 1337).

on 98th Street at the intersection of 5th Avenue (Vasilantonakis: 996, 1003, 1008). The car "took off," turned right, and disappeared (Vasilantonakis: 997, 1004).[22]

A UPS driver ran out and went towards Rei, who was laying in the middle of the street, bleeding from the mouth, about five or six feet from his truck. The driver called for help (Vasilantonakis: 997-98, 1005).

New York City Fire Department EMT *John Scott Hayter* and his partner arrived at about 5:24 p.m. (Hayter: 753-57, 770-71, 781-82). It was "early dusk," as Rei lay in the middle of the street "pretty close" to the yellow line. Rei had sustained gunshot wounds and there was "a lot" of blood (Hayter: 757-58, 770-71, 777, 782). There were a couple of hollow bullet casings on the ground near his body (Hayter: 758, 772-73; Vasilantonakis: 1005-06).

Rei was unresponsive and had a "very weak" corotid pulse. The gunshot wounds were "bubbling" and "there w[ere] bodily fluids coming out of his mouth and the gunshot wounds" (Hayter: 758-59, 775-78). Rei's heart stopped beating and Hayter began CPR. Paramedics continued treatment en

---

[22]Vasilantonakis did not see it, but thought that the man fleeing had been the shooter (Vasilantonakis: 1002).

26

route to the hospital. Rei remained in cardiac arrest and was pronounced dead (Hayter: 759-62, 779-80).

Hayter gave the police a bullet that he found on the floor of the ambulance that had fallen out of Rei's clothing (Hayter: 762, 780).

On November 13, 2008, Doctor *Scordi Bello*, an expert in the field of forensic pathology, performed an autopsy on the body of Mario Rei. Rei had been shot three times – two bullets entered and left the body, while the third entered the body but did not exit. Rei died of gunshot wounds to the torso (Bello: 1529, 1531, 1534, 1551-52).

It was defendant's idea to kill Rei and she was the mastermind of the plan (Rosado: 1350, 1374). Pazmino was not involved in the planning of or execution of Rei's murder of Rei. Rosado planned and executed it with defendant (Rosado: 1396).

## The Investigation

Police Officer *Brian LeGuernic* and other officers, including Detective *Ramon Munoz*, arrived at the scene (LeGuernic: 784-86, 801-02, 806; Munoz: 1579-80, 1591). It was "normal visibility for daytime conditions," and Officer LeGuernic could see without a flashlight or any lighting (LeGuernic: 788, 807). There was a converted multi-colored school

27

bus about three or four car lengths from the Jeep (Munoz: 1581). Vasilantonakis told the police he saw the gunman get into a silver minivan, possibly a Dodge Caravan (Vasilantonakis: 998, 1004-05, 1007).

Crime Scene Unit Detective *Robert Saenz* and his partner arrived at approximately 7:30 p.m. (LeGuernic: 789-91, 808, 811-12; Saenz: 814, 816-17, 819, 825, 850). Detective Saenz recovered two spent shell casings, each on either side of the blood spot. The casings were about twenty-one feet apart, directly across from 50-30 98th Street and close to the center line of the road (LeGuernic: 787; Saenz: 820-21, 844-45, 851-55; Munoz: 1580). Detective Saenz collected clothing and blood from the street (Saenz: 820-21, 823, 853).

Detective Saenz photographed the victim and his clothing – a blue collared shirt, blue t-shirt, and blue pants. The clothing was forwarded to the lab for hair and fiber analysis and for DNA analysis (Saenz: 832-33, 858).

At the hospital, Cepeda told the police that defendant was the only enemy she could think of (Cepeda: 899-900, 976).

Meanwhile, Pazmino saw on the news that Rei had been murdered (Pazmino: 1046, 1117, 1253-54, 1285; Sanchez: 1562). "Crying and frightened," Pazmino told Sanchez. Sanchez called a detective friend, who

28

called Detective Rivera (Pazmino: 1046, 1118, 1254, 1285; Sanchez: 1563, 1565).

On November 13, the police went to Sanchez's home and interviewed Pazmino, who wrote and signed a statement (Pazmino: 1046, 1073-74, 1088-90, 1253-54, 1256, 1285, 1287; Sanchez: 1565). She told the police that she thought it was defendant and Rosado, whom she identified in photos. Pazmino told them defendant had made threats against Rei, and that Rosado said he was going to kill him (Pazmino: 1258, 1286-87). Pazmino told Detective Rivera about the gun she gave to Rosado – that she had seen the gun in defendant's house, that defendant came to Pazmino's house with the gun in October, and that Pazmino thought defendant had taken the gun with her when she left (Pazmino: 1094-95). She told the police that she knew the object in her house was a gun (Pazmino: 1258).

Pazmino also told the police that she had another cell phone in her name that she had given to defendant which defendant had asked her to get (Pazmino: 1099, 1263).

Pazmino spoke with Detective Rivera at the precinct on November 16 (Pazmino: 1097, 1100). At that time she told Detective Rivera that she had given Rosado the package, which she believed contained a gun (Pazmino:

29

1076, 1101, 1106, 1259-60). She told the police that Rosado and defendant had been at her home in October, and that Rosado had said he was going to kill Rei (Pazmino: 1116-17, 1259-60).

Pazmino called defendant and Rosado at the behest of police (Pazmino: 1126-28, 1263-64). Defendant said she did not want to speak because she was busy (Pazmino: 1264-65, 1279).

On December 2, 2008, at about 6:00 p.m., Florida Department of Law Enforcement (FDLE) Special Agent *James Noblitt* and his superior met with Queens Homicide Detectives Billy Milan, Ray Munoz, Hector Rivera, and Joe DeFrancis to formulate a plan to locate and arrest Rosado and defendant (Noblitt: 1148-49).

At about 7:30 p.m., Agent Noblitt, other members of the FDLE, and Detectives Milan, Munoz and Rivera, drove to the back of Rosado's residence at 6619 Cavacade Drive, where a couple of men were moving items from the home to the truck (Noblitt: 1150-52, 1154, 1193; Rosado: 1338-39). Noblitt confirmed Rosado's identity and Rosado told a woman there to call defendant (Noblitt: 1152, 1154-55; Rosado: 1339-41). The police recovered five cell phones from Rosado, and drove him to the precinct (Noblitt: 1155;

30

Rosado: 1340-41, 1376).  Rosado gave written and video statements (Rosado: 1341-43, 1360).

Meanwhile, Agent Noblitt, members of the FDLE, and Detectives Munoz and Milan, went to defendant's home at 11349 Calgary Circle (Noblitt: 1154-55, 1193; Munoz: 1588).  Defendant answered, and, after introductions, invited the officers into her well-kept home (Noblitt: 1155-56, 1194; Munoz: 1588-89).    Thereafter, Agent Noblitt locked and secured the home, took custody of the keys, and the police brought defendant to the station (Noblitt: 1159).

On December 3, 2008, after Agent Noblitt obtained a search warrant, which authorized a search of defendant's home for a black automatic firearm, business receipts, and items relating to a communication device, he met several other agents and New York detectives at defendant's home to execute the warrant (Noblitt: 1159-60, 1162, 1583, 1592; Munoz: 1582-83, 1588).[23]  A gym bag on the first shelf in the master bathroom linen closet contained a Glock Model 27 .40 caliber automatic handgun, an empty magazine, and an EasyLoader (Noblitt: 1165-66, 1195; Munoz: 1583-84).  The

---

[23]The police watched the home throughout the night until Agent Noblitt returned (Noblitt: 1162-63).

31

magazine in the gun contained eight rounds, with another round in the chamber (Noblitt: 1167).

Agent Noblitt recovered the weapon, ammunition, magazines, Easyloader, and several documents, including a credit card application in Cepeda's name (Noblitt:1168-71, 1182-83; People's Exhibits 22-23, 38-40).[24]

In December 2008, Ortiz told the police that Rosado had borrowed the car from November 10 through November 13. With Ortiz's permission, New York officers searched her car (Ortiz: 1459-62).

On December 8, 2008, Detective *Francisco Castillo*, an expert in the field of firearms operability and identification, received the firearm, two magazines, and nine cartridges recovered in this case (Castillo: 1400, 1406-07, 1417-18). The weapon, which had evidence of discharge, and ammunition were operable (Castillo: 1408, 1411).

On December 19, 2008, Detective *Gregory DiCostanza*, an expert in the fields of firearms and ammunition operability and microscopy, examined the two cartridge casings, two bullets and test fires, and the bullet received from the medical examiner (DiCostanza: 1434, 1438, 1440-41). The two shell

---

[24]The gun was admitted as People's Exhibit 36. The magazines and speed loader were admitted as People's Exhibit 37 (Noblitt: 1178-80; Munoz: 1586-87; 1179, 1181-82).

casings from the scene and the bullet recovered by the OCME were all fired from the 40 caliber Glock Model 47 recovered from defendant's home (DiCostanza: 1446-49).

*Joseph Sierra*, custodian of records for T-mobile, testified that Gioconda Pazmino opened an account for the prepaid cell phone number 347-981-7336 on October 26, 2008. The phone was last used on November 12, 2008 (Sierra: 1481-82, 1487, 1489-90).[25]

The phone records and cell tower records established that two calls were made from the phone on the evening of November 11, 2008, from North Carolina (Sierra: 1500-01). The phone was used as follows on the next day, November 12: in Passaic, New Jersey at 5:28 a.m. (Sierra: 1498)[26]; in the vicinity of 60-15 Calloway Street in Queens on November 12, 2008, at 12:22 p.m. (Sierra: 1495); in the vicinity of 50-54 98th Street in Queens between 4:00 and 4:45 p.m. (Sierra: 1496-97); in Aberdeen, Maryland at 9:27 p.m. (Sierra: 1499, 1502).

---

[25]This was the phone number of the phone Pazmino got for defendant and gave her in October (Pazmino: 1029).

[26]The North Carolina calls, which were at 8:01 p.m. and 9:27 p.m., as well as the call in Passaic, New Jersey, were to number 551-655-4099 (Sierra: 1498, 1500-01), which was Soto's cell number (Soto: 1467).

33

Rosado, represented by counsel, entered an agreement with the Queens County District Attorney's Office (QCDA). Rosado pleaded guilty to manslaughter and criminal possession of a weapon. If he testified truthfully in this case, the court would sentence him to an aggregate term of imprisonment of twenty-four years. If convicted after trial, he faced a maximum of twenty-five years to life, and an additional ten years for the weapon possession (Rosado: 1343, 1367-70, 1391). Prior to entering the agreement, Rosado had been offered a plea deal of thirty-four years (Rosado: 1344).

## Defendant's Case

On November 13, 2008, Detectives *Hector Rivera* and *Joseph DeFrancis* met with Pazmino at the Yonkers home of Belkis Sanchez (Rivera: 1606, 1608-09). Pazmino, who was "nervous and scared," did not tell Detective Rivera that she had handed a package to Rosado or that Rosado had told her he was going to kill Rei (Rivera: 1606-07, 1609, 1611).

Detective Rivera had a more detailed interview with Pazmino at the precinct on November 16, when she was "more at ease, more calm, was less nervous" (Rivera: 1607, 1611). Pazmino told Detective Rivera that she had

34

handed a package to Rosado. She did not know what was in it because it was wrapped in plastic, but claimed it could have been a gun (Rivera: 1611-12).

In 2008, *Yoselin Amarante*, the ex-wife of defendant's cousin, lived in Tampa and saw defendant weekly (Amarante: 1605-07, 1610). Sometime before Thanksgiving in November 2008, defendant came to her house. Defendant was ill from her period and she was sad because it was the anniversary of her mother's death (Amarante: 1607-08, 1612, 1615-17). Amarante did not recall whether defendant was with her on November 12, 2008 (Amarante: 1623).

Defendant called Amarante from jail. Pursuant to defendant's request, Amarante called defendant's brother, *Yacell Gomez*, and told him what had happened (Amarante: 1611, 1613). Gomez went to defendant's home on Calgary Circle and recovered documents (Gomez: 1635-40, 1655, 1664; Defendant's Exhibits A-H, O-R, X, Y).

Weeks before trial, Amarante did not tell New York detectives that when defendant came to see her in November 2008, she was upset because of her mother's passing (Amarante: 1608, 1621, 1624-25). She never told the police that defendant came in between the arrival of her sister and brother-in-law (Amarante: 1622).

35

Gomez and their father, a deputy who transported prisoners in Puerto Rico, visited Tampa in summer 2008 (Gomez: 1631, 1633-35, 1665).

On October 29, 2008, Gomez saw defendant, Pazmino and Rosado in Queens (Gomez: 1651-52, 1665).[27]  His mother passed on November 12, 2006 (Gomez: 1664).

## People's Rebuttal

In May 2014, QCDA Lieutenant *Frank Torres* and Detective *Richard Mecabe* went to Amarante's New Jersey home (Torres: 1667-69, 1674).  Amarante said that defendant had visited her between Thanksgiving and the first week in December, but she could not say whether defendant was with her on November 12.  Amarante said defendant had complained of menstrual problems, but did not tell the police that defendant was sad because it was the anniversary of her mother's death (Torres: 1670-73).

Detective Mecabe found no record of Rei entering the country legally (Mecabe: 1678-80).

---

[27]Gomez knew Pazmino and Cepeda, but had never met Rosado (Gomez:1653-54, 1656).

36

## POINT ONE

## THE COURT'S COMMENTS DURING JURY SELECTION WERE PROPER.

The court's comments during jury selection were designed to examine jurors regarding their qualifications and certainly did not deny defendant a fair trial. In fact, by its comments, the court ensured that all prospective jurors were qualified to sit and would follow the law as given. Nevertheless, defendant asserts that the court's comments had a "chilling effect" that denied her right to a fair trial (Defendant's Brief at 31). This claim must fail.

Section 270.15 of the Criminal Procedure Law prescribes the manner in which a court must conduct jury selection, including the manner in which jurors should be seated for *voir dire*, the order in which the parties question the jurors and exercise challenges, and the fact that each party must have a full and fair opportunity to examine the potential jurors. The statute also explicitly gives a court discretion to ask the prospective jurors "questions as it deems proper regarding the qualifications of such prospective jurors." C.P.L. § 270.15(1)(c). *See generally People v. Ahmed*, 66 N.Y.2d 307, 310 (1985) ("integral component" of right to jury trial is the supervision of judge);

37

*People v. Pinkney*, 272 A.D.2d 52, 53 (1st Dept. 2000) (Judge has responsibility

to rule on challenges raised by counsel, and to "independently determine that

every chosen juror is fit to serve [CPL 270.15, 270.20, 270.25]").

The court acted well within its discretion during jury selection.

After discussing some preliminary matters, the court noted the importance of

the civic obligation of jury duty. Obviously recognizing that people may want

to shirk that duty, the court also noted that merely because an individual might

be excused from this particular case did not mean he or she was free from the

obligation of jury duty (39-43, 101).

Prospective juror Athanasios Ternas informed the court that he

was a police officer and felt that his "professional bias" would cause him to be

"impartial" (49-50). The court confirmed that other than what it had said, Mr.

Ternas did not know anything about the case. Mr. Ternas acknowledged that

merely because the case was on trial he was biased. After Mr. Ternas admitted

that he understood the presumption of innocence, the court asked whether that

should not be afforded to defendant, reminding Ternas that he knew nothing

about the case. Mr. Ternas replied, "That goes to show you how deep that bias

is" (50-52). Mr. Ternas noted that while he would like to give defendant the

38

benefit of the doubt, "at the end of the day" he did not want to "second guess"

himself and "hurt someone else" (52).

The court admonished the officer:

Just so I'm clear, because I'm going to release you, you really have no business being in this courtroom. I'm not sure you have any business being a police officer. I'm going to tell you that straight up, okay. But you cannot walk into this courtroom and simply just prejudge this case because it's gotten to this level, knowing that you know zero about this case, all right. That's pretty shameful as a police officer.

And, quite frankly, I'm disheartened to actually hear you say that and it makes me wonder about the job you do.

Get out of my courtroom. You, frankly, have no [business] coming in a courtroom.

(52).

After dismissing Mr. Ternas, the court addressed the panel, stating

that there could not be a system "where without any evidence whatsoever or

knowing anything about any case simply because someone is arrested or ends

up in a trial situation, that you can judge that they are guilty of whatever it is

they are charged with." The judge added that in his "personal opinion," for a

police officer to have indicated he would so judge someone was "sickening"

(53).

39

Contrary to defendant's suggestion (Defendant's Brief at 33-34),

it is difficult to see how the court conveying such a strong belief in the

presumption of innocence and impressing upon the panel of prospective jurors

the importance of that principle would prejudice defendant in any way.

Furthermore, given that police officers are charged with upholding the law –

inside and outside of a courtroom – the officer's statements, made in the

presence of other jurors, were inappropriate. As such, the court's comments

were understandable and designed to impress the other panelists with the

importance of the presumption of innocence. And, there is absolutely no

indication that the court's comments to and about this panelist had a

detrimental effect on any other jurors.

The court also acted well within its discretion in offering help by

way of English classes to those who sought to be excused because of a

language barrier. Section 510 of the Judiciary Law requires a person must be

able to "understand and communicate in the English language" in order to

qualify as a juror. Therefore, questions and comments regarding a prospective

juror's ability to speak English necessarily fall within a court's discretion. In

this regard, the court recognized that many prospective jurors do not want to

serve on jury duty, and, to that end, will often exaggerate, or even fabricate,

viable excuses to be relieved from service – one such excuse being that they did not speak English well enough.[28]

The court asked the first juror who raised concerns about her ability to understand some background questions and confirmed with the parties the juror should be excused (47-49). After posing similar questions to the next juror who did not understand the proceedings, the court stated "we're going to send you for English lessons, okay. I'm going to excuse you and send you for English lessons for ten weeks. . . . You're excused, but we'll try to assist you. . . ." (71-73).

The purpose behind the court's statement about helping the jurors who were hindered from service because of language issues was twofold. First, the statement was clearly designed to fend off any sort of exaggerated or fabricated excuse regarding the ability to comprehend the proceedings. Second, the statement was designed to actually help those immigrants who did not speak the language well so that they could someday fulfill their civic

---

[28]The court suggesting that an English course might be appropriate for a citizen called for jury service is in keeping with the report by the Chief Administrator of the Courts in 2011 expressing the concern that "the racial and ethnic makeup of the eligible juror pool in Bronx, Kings and Queens Counties is certainly affected by the fact that, according to the 2010 Census, in 17 to 18 percent of households in these counties, no one over the age of 14 speaks only English or speaks English very well." A. Pfau, *First Annual Report Pursuant to Section 528 of the Judiciary Law* at 11.
http://courts.state.ny.us/publications/pdfs/528_ReportNov2011.pdf (accessed 9/28/16)

obligation. This had no affect on other panelists, as evidenced by the others who came forward raising possible language issues.

The court asked some background questions of the next juror who had a language issue. Again, after excusing the juror, the court noted that they would send her for ten weeks of English lessons. The court added, "Hope you do well. Thank you very much" (89-90).

After questioning another juror regarding a potential language issue, the court questioned the sincerity of her claim, but politely noted that it would "help her out" and send her for English lessons. The court wished the juror "good luck" (104-06). Although the court also questioned the veracity of the next juror's language issue, it also excused the juror and provided for him to go to English lessons (110-11).

Thus, the court did not question the sincerity of all jurors who claimed that they could not serve because of an inability to understand English enough. Rather, it did so only after questioning the juror and determining whether it thought there was truly a language barrier warranting their dismissal. Moreover, even when the court was hesitant to believe there was a true issue with language, it excused those jurors. Again, that could only have enured to defendant's benefit. Furthermore, given the number of jurors who

42

asked to be excused because of a language barrier after the court initially

offered English classes to the first such venireperson, defendant's speculative

claim that the court's comments may have discouraged others from coming

forward (Defendant's Brief at 34) is belied by the record.[29]

There were also a number of students who asked to be relieved

from service. The first informed the court that he was a full-time student and

had finals the following week. The court asked why he had not postponed jury

service. Although the student replied that he did not know he could postpone

it, he also stated that he was a student all year round, indicating that postponing

it at this point in his life may have had no practical effect. After the court

advised him to "always look at the form," as jury service can be postponed, the

court wished the student "[g]ood luck" (44).

Obviously not discouraging anyone from positing potential issues

with school, others raised similar issues. When a doctoral student explained

that serving could affect her graduation, the court simply asked why she had

---

[29]Defendant's reliance on *People v. Mason*, 132 A.D.3d 777, *lv. granted*, 26 N.Y.3d 1147 (2016) (Defendant's Brief at 35) is misplaced. In *Mason*, the court made a blanket statement to the jury pool that if they raised a language issue, the court might require them to take English classes. In this case, by contrast, the court did not make such a statement *before* speaking with any jurors, and addressed each individual juror separately. And, although this Court found the court's comments inappropriate in *Mason*, it also held that they did not deny defendant a fair trial.

not postponed her service. Noting that she would be a student for another year, the juror replied that "any time would be bad." The court politely asked what school she attended and then excused her (58-59).

When the next two students sought to be excused, the court asked where they went and when their tests/classes were. The court then excused them (66, 70-71).

The next student informed the court that he had just begun summer classes and had missed one class. The court wondered aloud about the number of students and asked the student why he did not postpone service. The student explained that he only recently learned he had to take summer classes in order to graduate. The court excused the juror without further comment (75-76).

The next two students explained that they were in summer school. After determining when their classes began, the court excused them without comment (78, 82).

Given the number of students who approached the court with scheduling issues, it is clear that nothing the court said affected their willingness to come forward and express their concerns about their ability to serve. There is no support in the record for defendant's speculation that the

44

court's discussions with the jurors gave any "impression that openness would be met by embarrassing questions or worse" (Defendant's Brief at 35-36). To be sure, asking someone whether they read a form, where they went to school, and about class schedule are hardly embarrassing questions.

The following day the court asked another full-time student whether he did not see on the form that he could postpone service. Obviously concerned about students missing school, the court questioned why he would be there when he had school. The court then tried to help the student by asking him whether anyone in central jury had discussed excusing him because he was a full-time student (107-09).

When another prospective juror noted that she was a full-time student, the court confirmed that she was in school at the time and had missed class. Concerned, the court replied "we can't have that." The juror stated she was afraid to "come here yesterday." The court assured her that when there was problem she had to "step up." Recognizing the importance of her education, the court then excused the juror on consent (183).

At this point, defendant moved for a mistrial, arguing that many of the jurors were intimidated, and that the court had indicated it did not believe some, and highlighting the court's comment that the police officer did

45

not belong in the courtroom. Defendant argued that the juror demonstrated how scared jurors were to come forward even if there was a language barrier (184).

The court replied that some of the jurors had jobs requiring they speak English, and that "through their physical actions, their facial expressions and their actual answers acted as though they didn't even understand one wor[]d of English. It became quite apparent that they were faking." The court added that it still dismissed those jurors (185).

The court stated that for a police officer to convey that anyone who reached that point in a case must be guilty was a "reprehensible statement for a law enforcement officer to make in a courtroom." The court noted that it made it clear to the venirepersons that such a belief could not be tolerated because a fundamental tenet in this country was that people are innocent until proven guilty. The court added that such statements supported defendant and her ability to get a fair trial and were not designed to intimidate anyone. On the other hand, the court could not have a courtroom that was "going to be run over by individuals who are just feigning and faking" (185-86).

The court finished by stating that there was "one lady" who said she was "just nervous about coming up and saying anything," indicting she

46

would not have come up even before the court had said anything (186). Indeed, given the number of students who came forward, the court asking a small number why they had not postponed service obviously had no chilling effect. And, the court asked in a polite and informative manner. To be sure, the court posed the same question for people with various work-related issues (63, 77).

Defendant also takes issue with questions the court posed with some potential work-related issues (Defendant's Brief at 36). The court's questions to such jurors were entirely proper. For example, when a juror raised a potential issue because she was the only provider of a certain service at her job, the court posited, out of curiosity – and stating its hope that it never occur – what would happen to the clients if she got hit by a bus and could not work for a month. The juror replied that she believed the company would look for someone new, as she might be able to switch appointments for a few days, but to do so for weeks would be "very hard" (59-60).

The court's hypothetical – which, by its extreme nature was obviously illustrative – was merely posited to assess how truly burdensome the potential work-related issues were. Indeed, the court questioned the juror further and actually clarified that her issue with missing work would really

47

result in a financial hardship (60-61). As a result, the court excused her (66),

as it did whenever the court's questions revealed that service created a

financial hardship (47, 54, 82-83, 84-85, 118, 123, 125, 126).[30]

Given that most, if not all, employed people could seek to avoid

jury duty with some work-related excuse, the court reasonably exercised its

discretion in probing these potential conflicts. Such questions were not

improper and did not prevent the venirepersons from being forthright with the

court. Indeed, after the above exchange, others raised work-related concerns

(62-63, 102-03, 122, 123-24). The court explained that while all work is

important, the fact is "the train keeps on rolling" if something prevents a

person from working (122).

And the court later clarified the nature of its work-related

hypothetical when a juror raised a potential conflict with the graduation of her

children. Using the court's example, the juror observed that if she got hit by

a bus she would not be able to attend. The court assured her the example did

not apply with respect to her children, and there was a reason it said it with

---

[30]The court also excused a prospective juror whose ability to apply for a promotion would possibly affected by serving (64), as well as two others who had training for new jobs (74, 78-79).

48

respect to a job (260). When the juror was chosen, the court assured her that she would be able to attend the graduation (270).

After the court asked preliminary questions of seated venirepersons, outside the presence of the prospective jurors, the court made a further record in response to defendant's motion for a mistrial. The court noted that the panel was "jovial" and laughed at jokes the court made. It added that the prospective jurors were "quite open," "candid," and "volunteer[ed] information." The court found that there was "no indication" that its comments to two or three people had any effect on the panel "such to make them fearful of speaking" (211). The court also noted that it had explained to the jurors that it thought it was reprehensible that an officer of the law took the position the officer had taken and would make such statements in a public courtroom (212).

Thus, the court ensured that the prospective jurors were available for service for the duration of the trial, while positing questions to enable them to be able to be available to fulfill their civic duty at a future time if they could not do so for defendant's trial. This only ensured that the prospective jurors were the best candidates from whom defendant would choose.

Defendant's reliance on the one juror who expressed some hesitance in coming forward is misplaced (Defendant's Brief at 35-36), as there

49

is absolutely no indication that her trepidation was the result of anything the court had said and not merely the normal nervousness associated with coming forward in such a situation. Notably, this general anxiety was referenced several times during jury selection, including by the defense.

A prospective juror who had recently had tests for an irregular heartbeat for "stress-related issues," informed the court that once it mentioned the charge in the case, his "heart feels like it's ready to jump out of [his] chest" (46). Another juror noted that he felt "anxiety" and his "heart [was] pounding out of [his] chest" (128).

During defendant's questioning of the panel, one of the jurors noted that they got nervous "easily," and was the type of person who "doesn't like the unknown," which jury duty was (245). Counsel even posited that just sitting in the chair can be "a little nerve wracking" (248).

Significantly, when the prosecutor sought to challenge a juror for cause, defendant noted that she thought the juror was "just nervous about being on jury service," but that she did not think he really had a problem. Defendant added that the juror was "just worried about making promises that he did not understand what they were about," and she thought he was capable of serving (267).

50

Another prospective juror conveyed a similar sentiment when they said they were not good "under pressure," as it made them stutter a lot. The juror did not like to "pick and choose" (467). Defense counsel replied that "everybody sitting in that chair is not exactly happy. Everybody has a little bit of nervousness here." Counsel added that the juror was not "expressing anything unusual" (468).

Defendant also recognized that another juror seemed nervous when he said that he did not know how the issue of an affair might affect his ability to judge credibility (475). Yet another juror expressed concern about whether they were "emotionally strong enough," as they were "not a crime drama person at all" (529). After another juror expressed concern that if the trial were too graphic they might be uncomfortable, defense counsel noted that she did not think it was "a comfortable situation for anyone" and that "it's difficult" (530).

The record establishes that defendant's constitutional right to a jury was in no way impaired by the court's comments. *See People v. Casanova*, 62 A.D.3d 88, 92 (1st Dept. 2009). The court's comments did not prevent jurors from raising various issues regarding potential problems with their ability to serve. The court offered help and advice to jurors.

51

Additionally, even when it questioned the veracity of some issues raised, the court ensured that defendant received a fair trial by dismissing those jurors.

The record, therefore, does not support any contention that the jury selected did not represent a fair cross-section of the community or that defendant was not tried by a fair and impartial jury. Moreover, the jurors who ultimately served were selected with full input from defendant.

In sum, the court conducted *voir dire* in a fair and impartial manner. Its comments had no chilling effect on the panel. There is absolutely no indication that the sole juror who expressed some nervousness about coming forward did so because of the court's comments, and not merely because of the general apprehension many feel under the circumstances. As such, defendant's claim is devoid of merit.

## POINT TWO

## THE TRIAL COURT PROPERLY ADMITTED EVIDENCE THAT DEFENDANT HAD SOLICITED OTHER INDIVIDUALS TO MURDER THE VICTIM OR FRAME HIM FOR OTHER CRIMES.

The trial court properly exercised its discretion in allowing the People to introduce evidence that, prior to the commission of the actual murder, defendant had solicited two other individuals to commit the crime, and a third individual to frame the victim for drug possession. Such evidence was relevant to establish defendant's motive and intent, as well as negate her claim that others committed the crime and framed her. Nevertheless, defendant argues that the admission of such evidence deprived her of a fair trial. This claim must fail.

It is a fundamental rule that all evidence that is relevant to and probative of some issue at trial is admissible unless it is subject to some exclusionary rule. Evidence is relevant if it "has any tendency in reason to prove any material fact." *People v. Lewis*, 69 N.Y.2d 321, 325 (1987) (quoting Prince, *Richardson on Evidence*, § 4, at p.2 [10th ed. 1973]). Evidence of prior uncharged crimes will always have some probative value as to the likelihood that the defendant has committed the crime charged. "[O]ne who has a record

53

of bad acts is, according to human experience, more likely to commit another than is a person who has led a blameless life." *People v. Hudy*, 73 N.Y.2d 40, 68 (1988) (Wachtler, C.J., dissenting) (citing 1A Wigmore, *Evidence* 58.1, at 1211 n.2 [Tillers rev. ed. 1983]).

As a matter of policy, however, such evidence is excluded if it is offered solely to show the defendant's criminal propensity. *People v. Alvino*, 71 N.Y.2d 233, 241 (1987); *People v. Allweiss*, 48 N.Y.2d 40, 46 (1979). If, on the other hand, "evidence of prior, uncharged criminal conduct has a bearing upon a material aspect of the People's case other than the accused's general propensity toward criminality, our cases have recognized that the probative value of the evidence justifies its admission, notwithstanding the potential for incidental prejudice." *People v. Santarelli*, 49 N.Y.2d 241, 247 (1980). If evidence of prior criminal activity is relevant to prove some fact in the case, it is not rendered inadmissible "simply because it may also reveal that the defendant has committed other crimes." *Allweiss*, 48 N.Y.2d at 47.

It is well established that evidence of uncharged criminal conduct may be admissible to prove the defendant's motive, intent, identity, lack of accident or mistake, or common scheme or plan, as long as the probative value of the uncharged crime evidence outweighs the potential for unfair prejudice.

54

*Alvino*, 71 N.Y.2d at 241-42; *Allweiss*, 48 N.Y.2d at 46-47; *People v. Molineux*, 168 N.Y. 264, 297 (1901). Such evidence may also be received when it completes the narrative of events surrounding the crime charged or is inextricably intertwined with the crime charged (*see People v. Vails*, 43 N.Y.2d 364, 368-69 [1977]; *People v. Gines*, 36 N.Y.2d 932 [1975]; *People v. Hardwick*, 140 A.D.2d 624, 625 [1ˢᵗ Dept. 1988]), or when it tends to refute a proffered defense (*see People v. Satiro*, 72 N.Y.2d 821, 822 [1988]; *People v. Wirth*, 224 A.D.2d 1002 [4ᵗʰ Dept. 1996]; *People v. Carpenter*, 187 A.D.2d 519 [2d Dept. 1992]).

In this case, evidence that defendant had solicited other people to commit the murder, as well as evidence that she attempted to frame the victim for drug possession, was relevant to establish her motive and intent. *Wirth*, 224 A.D.2d at 1003. The evidence was also relevant to establish the background and nature of the relationships between the parties. This set forth the increasingly acrimonious feelings of defendant toward Rei. *People v. O'Gara*, 239 A.D.2d 215 (1ˢᵗ Dept. 1997). Finally, the evidence was also relevant to establish defendant's identity as the mastermind behind the plan to murder Rei, and refute defendant's claim that Rosado and Pazmino conspired together to commit the murder and sought to frame her for the crime.

Thus, the court properly exercised its discretion in weighing the probative value of the evidence against the potential prejudice. Applying the appropriate standard, the court correctly determined that the evidence provided relevant background information regarding the relationship of the parties, and was also relevant to establish motive, intent, and identity (712). *See People v. Dorm*, 12 N.Y.3d 16 (2009) (evidence of prior and subsequent conduct toward victim was probative of motive and intent to assault victim; provided necessary background on nature of relationship and placed charged conduct in context); *People v. Johnson*, 137 A.D.3d 811 (2d Dept. 2016) (evidence of uncharged crimes properly admitted as relevant to and probative of defendant's motive, gave jury appropriate context in which to evaluate case, necessary background evidence and completed narrative); *People v. Wisdom*, 120 A.D.3d 724 (2d Dept. 2014) (evidence of uncharged crimes against complainant's daughter made clear defendant's rage began against daughter and arose from relationship with her, rather than anything complainant said to defendant).

Defendant claims that there was ample evidence of defendant's motive (Defendant's Brief at 40). While there was evidence regarding the deterioration of the relationship between Rei and defendant, the evidence of the uncharged crimes established defendant's intent to murder Rei.

Additionally, such evidence provided the background of the state of the relationship. Having a business dispute or unrequited love may arguably be common ends to relationships; actively seeking to murder or frame someone for a crime provides a different backdrop entirely. Finally, this evidence also provided evidence of defendant's identity as the mastermind of the plot to murder Rei, thereby negating defendant's claim that Pazmino and Rosado had concocted the plan and framed her.

Moreover, the court minimized any potential prejudice by giving a lengthy limiting instruction regarding the admission of evidence of uncharged crimes. The court first noted that the evidence of the uncharged bad acts and crimes "w[as] not offered and must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit the crimes charged in this case" (1783).

Addressing the evidence that defendant solicited others to commit the murder, the court instructed the jurors that the evidence was offered "for your consideration on the question of intent" (1783). The court later cautioned the jurors that evidence of defendant's attempt to frame Rei for a crime was offered for "your consideration on the question of defendant's state of mind and the relationship between the defendant and Mario Rei" (1783-84).

57

After discussing the evidence of prior bad acts and uncharged crimes, the court instructed the jurors that *if* they found the evidence of prior bad acts and crimes believable, they could "consider it for the limited purpose, those limited purposes I just told you and nothing else" (1784). Not only did the court limit the purpose of the evidence, it made clear to the jurors that they did not even have to credit the evidence.

And, error, if any, in the admission of the evidence was harmless in light of the overwhelming evidence of defendant's guilt. *See People v. Chapman*, 101 A.D.3d 406 (1st Dept. 2012) (admission of uncharged crime evidence was harmless in face of overwhelming evidence of defendant's guilt). Although not necessary to establish defendant's guilt, the victim's wife, Flor Cepeda, Rosado, and Pazmino provided evidence of the motive for the crime – namely, to avenge what defendant perceived as a business deal gone bad, the loss of her home, and unrequited love. Rosado, who carried out defendant's plan in the hopes of getting free housing and a secure job, testified in detail as to defendant's plan to have him murder Rei. Pazmino corroborated large portions of his testimony, particularly regarding the events leading up to and surrounding the shooting. Soto also corroborated his testimony regarding stopping in New Jersey en route to New York.

58

Cell phone records provided further corroboration regarding defendant's location and activities before the morning of the shooting. Ballistics evidence established that the shots were fired from defendant's gun, which Rosado confirmed defendant had provided. The police recovered this gun from defendant's home. Finally, defendant's flight was also indicative of her guilt.

In sum, the trial court properly exercised its discretion in admitting evidence of defendant's attempts to solicit others to commit the murder and evidence of defendant's attempt to frame the victim. Such evidence was highly probative of defendant's motive and intent, provided relevant background evidence regarding the relationship of the parties, and refuted her defense that others committed the crime without her knowledge. The court alleviated any potential prejudice with its limiting instruction. Finally, error, if any, was harmless in light of the overwhelming evidence of defendant's guilt.

## POINT THREE

## THE PROSECUTOR'S SUMMATION DID NOT DENY DEFENDANT A FAIR TRIAL. DEFENDANT'S CLAIM TO THE CONTRARY IS LARGELY UNPRESERVED AND COMPLETELY WITHOUT MERIT. IN ANY EVENT, ERROR, IF ANY WAS HARMLESS .

The prosecutor's summation remarks constituted fair comment on the evidence adduced at trial and constituted fair response to the arguments of defense counsel. Defendant nevertheless claims that the prosecutor improperly accused her of tax fraud, denigrated the defense, and mischaracterized the evidence. As defendant concedes, this claim is largely unpreserved for appellate review. And, all of defendant's claims are without merit because the prosecutor relied on the evidence adduced at trial and reasonable inferences that could be drawn therefrom in making his arguments. Moreover, the prosecutor's comments were appropriate in light of the unrelenting attack on the credibility of the People's witnesses proffered by defendant. Finally, any error was harmless in light of the court's instructions to the jury and the overwhelming evidence of defendant's guilt, which included the credible testimony of defendant's accomplice, which was largely corroborated by defendant's long-time friend and former lover.

60

Initially, as defendant concedes, her claim regarding the prosecutor's summation is largely unpreserved for appellate review (Defendant's Brief at 49). In order to preserve a claim that the prosecutor erred in summation, a defendant must raise it below by making a timely, specific objection, requesting a curative instruction, or timely moving for a mistrial thereby allowing the trial court the opportunity to cure any purported error. *People v. Romero*, 7 N.Y.3d 911 (2006); *People v. Medina*, 53 N.Y.2d 951, 953 (1981); *People v. White*, 5 A.D.3d 511 (2d Dept. 2004); *People v. Davis*, 272 A.D.2d 408 (2d Dept. 2000). Therefore, if a defendant does not specifically alert the trial court to the basis for any objections to the prosecutor's summation comments, the alleged errors are not preserved for appellate review. *Romero*, 7 N.Y.3d at 912; *People v. Williams*, 46 N.Y.2d 1070, 1071 (1979); *People v. Brown*, 285 A.D.2d 472 (2d Dept. 2001); *People v. Gonzalez*, 202 A.D.2d 606 (2d Dept. 1994). As detailed below, although defendant objected to some of the comments with which she takes issue, she lodged only a general objection.

And, as discussed more fully below, defendant's claims regarding the prosecutor's summation are meritless. Attorneys are given great latitude in their summation remarks, and a prosecutor's comments are proper if they are

61

based upon the evidence adduced at trial. Indeed, a prosecutor has the right "'to comment upon every pertinent matter of fact bearing upon the questions the jury [has] to decide,'" and is to be afforded "'the widest latitude by way of comment, denunciation or appeal in advocating his cause,'" so long as counsel stays "within 'the four corners of the evidence.'" *People v. Ashwal*, 39 N.Y.2d 105, 109 (1976) (quoting *Williams v. Brooklyn El. R.R. Co.*, 126 N.Y. 96, 102 [1891]); *see People v. Halm*, 81 N.Y.2d 819 (1993); *People v. Valdes*, 291 A.D.2d 513 (2d Dept. 2002); *People v. Daise*, 220 A.D.2d 524 (2d Dept. 1995). Moreover, remarks made during summation must be considered in light of the entire trial. *See People v. Galloway*, 54 N.Y.2d 396 (1981).

In addition , a prosecutor is entitled to respond to points raised in the defense summation. *People v. Marks*, 6 N.Y.2d 67, 77-78 (1959); *People v. Estrella*, 156 A.D.2d 710 (2d Dept. 1989). Certainly, any fair analysis of a prosecutor's summation must view the prosecutor's comments in comparison to the defendant's summation. *See People v. Anthony*, 24 N.Y.2d 696, 703 (1969); *People v. Draksin*, 145 A.D.2d 500 (2d Dept. 1988). Accordingly, a prosecutor has broad latitude to respond when the defendant has attacked the credibility of the People's witnesses or has posited speculative arguments that are unsupported by the evidence. *See People v. Baker*, 251 A.D.2d 592 (2d

62

Dept. 1998); *People v. Sykes*, 151 A.D.2d 523, 524 (2d Dept. 1989). A prosecutor's summation must thus be examined in the context of the summation delivered by opposing counsel and should be deemed proper if it is responsive to arguments and issues raised by the defense. *People v. Thomas*, 51 N.Y.2d 466 (1980); *Marks*, 6 N.Y.2d at 77; *People v. Rosario*, 195 A.D.2d 577 (2d Dept. 1993).

As a corollary to this rule, when a defendant attacks the credibility of the prosecution's witnesses, the prosecution has considerable latitude in responding. *People v. Scoggins*, 227 A.D.2d 204, 205 (1st Dept. 1996) (prosecutor's characterization of defense testimony as "nonsense" was permissible in light of defendant's attack on the credibility of police officer's testimony); *People v. Blackstock*, 184 A.D.2d 775, 776 (1992) (prosecutor's remarks regarding credibility of police officers was fair response to defense counsel's claim of police cover-up); *People v. Guthrie*, 157 A.D.2d 668 (2d Dept. 1990) (prosecutor did not "denigrate" the defense in referring to defense as "desperate" after defense counsel had remarked in summation that the police had coached the witness and falsified evidence); *People v. Moran*, 154 A.D.2d 322 (1989) (proper response to state that complainants had "no motive to lie" and had testified to "exactly what had happened out there").

63

Here, the prosecutor properly commented on the evidence or fairly responded to the attack on the People's witnesses and investigating officers in the defense summation. Thus, none of defendant's unpreserved claims have merit.

Defendant first claims that the prosecutor improperly accused defendant of tax fraud (Defendant's Brief at 44-45). The prosecutor's comments were a fair comment on the evidence and fair response to the defense summation. In response to the defense argument that all the mortgage and property transfers to Cepeda's name were a result of the relationship between defendant and Cepeda, the prosecutor posited that the evidence did not suggest a relationship between the two – a relationship which Cepeda had denied – but that defendant was engaged in tax evasion (1757). After the court sustained defendant's general objection, the prosecutor noted that the evidence showed that Cepeda had not even signed some of the documents, and did not understand the ones she signed transferring the titles back to defendant, but did so at defendant's request (1757-58).

The prosecutor then argued that when the defense had asked Cepeda about letters from the Department of Revenue for money owed on the properties, Cepeda said she gave the letters to defendant (1758). The

64

prosecutor concluded that the Department of Revenue was "looking for taxes on the property" defendant had transferred to Cepeda for a year (1758-59). Relying on the evidence presented, the prosecutor stated that Cepeda had never lived in the properties and received no income from them. Tying up the threads of this argument, the prosecutor again noted that the transfers were not indicative of a relationship, but rather defendant's attempt to "get[] out from under dire taxes and put[] it in the name of an illegal person" (1759).[31]

When defendant moved for a mistrial based on the prosecutor's statement that defendant had committed tax fraud, the prosecutor replied that the comments were based on the evidence, highlighting that the defense had put in the evidence and questioned the witness on whether she owed taxes on the property (1767-68). The prosecutor stated that he was "merely suggesting" what the evidence showed (1768).

The court noted that in light of the murder charge, any claimed prejudice from the mention of tax evasion was "quite minimal" (1769). The court also concluded that the prosecutor could not have and would not have made the arguments had the defense not admitted the evidence, as that was not

---

[31] The court overruled defendant's objection and instructed the jurors that it was argument, which they were free to disregard or accept (1759).

65

the thrust of his case. Rather, the defense admission of the documents opened

the door to the prosecutor suggesting an alternative basis for the documents

(1769). The court did not deem it "necessarily a bad act," concluded that any

error was harmless, and agreed to instruct the jury accordingly (1770).

Thus, as the court below properly held, the comments were indeed

based on the evidence – again, evidence the defense admitted – and were fair

response to the defense claim that the evidence supported the claim of a

relationship between Cepeda and defendant.

In any event, the court alleviated any potential prejudice that

might have resulted from the argument when, in its charge, it instructed the

jurors that:

> Evidence concerning an allegation of tax evasion or tax fraud
> regarding the use of documents that contained Flor Cepeda's
> signature and other documents in that same batch that contained
> what is purported to be the signature of Flor Cepeda, this
> evidence may be considered by you only as it bears on the
> significance or insignificance of the depth or lack of depth of the
> relationship that existed between defendant and Flor Cepeda.
> Nothing else. This is not tax court and there's no such issues
> before you to resolve (1784).[32]

_____

[32]Defendant's claim that the court's charge was "too little too late" (Defendant's Brief
at 46-47) is unpreserved for appellate review. Defendant did not object to the court's charge
or ask for further instruction. Moreover, any attack on the charge is somewhat puzzling as
the charge invited the jury to consider the evidence only as it related to the purpose defendant
posited – namely, the nature of the relationship between defendant and Cepeda.

Additionally, as discussed below, error, if any, in the prosecutor's comments was harmless in light of the overwhelming evidence of defendant's guilt.

Defendant claims the prosecutor denigrated the defense when he said that defense counsel in summation tried to "distract" the jury from evidence that showed defendant was guilty (Defendant's Brief at 47). Initially, defendant's claim is unpreserved for appellate review. Defendant never objected to the comment with which she now takes issue, let alone on the grounds raised on appeal. As such, her present claim is unpreserved for appellate review. C.P.L. § 470.05(2).

In any event, defendant's claim is without merit. After commenting that the experienced defense attorney gave a "very good" summation, the prosecutor commented that the summation tried to "distract" the jury from the evidence that established defendant's guilt. The prosecutor never suggested that the defense counsel tried to mislead the jury in any way. Rather, the comment merely urged the jurors to keep their focus on the evidence and facts presented. It was certainly not a comment intended to convey that the entire defense was such nonsense as to be worthy of derision by the jury. *Cf. People v. Morgan*, 111 A.D.3d 1254 (4th Dept 2013) (reversal warranted where prosecutor improperly denigrated defense and defense

67

counsel by characterizing defense as "noise," "nonsense," and a "distraction[]," and arguing counsel fabricated facts and tried to mislead jury); *People v. Lopez*, 96 A.D.3d 1621 (4th Dept. 2012) (prosecutor's reference to defense theory as "distraction" and "nonsense" was improper but did not deny defendant a fair trial).

Defendant next claims the prosecutor mischaracterized the evidence in an attempt to "gut the defense" by asserting that the defense argument that only Pazmino had a silver car was "fantasy" (Defendant's Brief at 48). This claim too is unpreserved for appellate review.

When the prosecutor offered a suggestion as to why Vasilantonakis might have said the car he saw flee the scene was silver, and not gold – namely, because depending on the angle of the sun, it may have in fact appeared silver to him, he was arguing inferences that could reasonably be drawn from the evidence. Although defendant lodged a general objection to the prosecutor's comment, she did not do so on the ground that the comment mischaracterized the evidence. The claim, therefore, is unpreserved. And, counsel likely did not object on that ground because the comment was in fact based on the evidence.

68

As the prosecutor thereafter noted, there was no evidence that any car other than a Caravan was involved in the crime (1746). The prosecutor continued that while defendant wanted them to believe Pazmino had a gray or silver car which she drove to the scene, there was "no testimony of such a thing happening" (1747). This claim was a fair comment on the evidence because there was in fact no evidence that Pazmino had a silver car which they took to the scene. Rather, on cross-examination, Rosado testified that it was his intention on Halloween to have Pazmino drive him from her home to where Rei lived, while armed with the gun (Rosado: 1364). When counsel asked whether Pazmino had a silver car, Rosado claimed that it belonged to her husband (Rosado: 1364). There was no evidence that Pazmino had or drove a silver car at the time of the crime. In fact, the evidence established that Pazmino went to the scene in the blue Chevrolet Impala owned by Sanchez's girlfriend, Erica (Sanchez: 1560).[33]

Additionally, the comment was a fair response to defendant's summation. Defendant argued that Vasilantonakis testified that the car he saw leave the scene was silver (1690, 1692-93). Defendant also argued that Rosado

---

[33]Pazmino thought they took Sanchez's four-door car to the scene, the color of which she did not recall (Pazmino: 1102).

69

and Pazmino were "working together and driving a silver car" while going to kill Rei on Halloween (1691). Defendant stated that "we know" Pazmino – "even though she never told you guys" – drives a silver car (1693). In discussing the phone calls on November 12, defendant again highlighted that Pazmino was in a silver car at the scene (1702-03).

To be sure, defendant commented on the silver car randomly in her effort to emphasize it. For example, after discussing Rosado's plea deal and defendant's failure to discard the gun, defendant stated, "Again, thank you, it was a silver car" (1704). After making further arguments in support of her claim that defendant and Pazmino masterminded and executed the plan to kill Rei, defendant argued that "we're back to that silver car, because I'm sticking with that silver car, the one witness who said it's a silver car" (1711). Defendant ended his summation by again urging the jury not to disregard Pazmino, because the silver get-away car was hers (1716).

Notably, defendant acknowledged that Pazmino never stated that she had a silver car and that she was relying on one witness – Vasilantonakis – who said the car was silver (1693). What defendant did *not* note, however, was that Vasilantonakis never connected the car he saw to Pazmino.

70

Accordingly, defendant's claim that the prosecutor's summation deprived him of a fair trial is largely unpreserved for appellate review. *See People v. Houston*, 82 A.D.3d 1122 (2d Dept. 2011); *People v. Damon*, 78 A.D.3d 860 (2d Dept. 2010); *People v. Philbert*, 60 A.D.3d 698 (2d Dept. 2009); *People v. Almonte*, 23 A.D.3d 392 (2d Dept. 2005).

The litany of cases upon which defendant relies are inapposite. This summation must be viewed in light of the evidence presented at this trial, and the summation of this defense counsel. When viewed in this context, it is clear the prosecutor's comments were fair comments on the evidence and fair response to the defense summation.

And defendant could not have been prejudiced by these comments, as any potential prejudice was dissipated by the court's instructions. Even when a prosecutor has made improper comments, strong and thorough instructions can cure the error. *People v. Valerio*, 167 A.D.2d 439 (2d Dept. 1990) (court's instructions during preliminary and final charge vitiated prejudicial effect of prosecutor's comments); *People v. Melendez*, 211 A.D.2d 488 (1st Dept. 1995). Here, the trial court properly conveyed to the jury what constituted evidence and the correct law. And this Court must presume the

71

jury followed the trial court's instructions. *People v. Berg*, 59 N.Y.2d 294 (1983).

Before opening statements, the court discussed with the jury an outline of the order of trial. In so doing, the court noted that, like the opening statements, summations did not constitute evidence. Rather, the attorneys would discuss the facts and reasonable inferences to be drawn from the evidence. The court added that the jurors should disregard any statement made by the attorneys that was not based on the evidence (718-19).

The court instructed the jurors that they were the sole and exclusive judges of the facts, they determined what testimony to credit and accept, and they alone determined defendant's guilt or innocence (721-22).

Prior to summations, the court reminded the jurors that what the attorneys said in summation, like the opening, was not evidence because they are not witnesses. Rather, the court explained that the summations were arguments and reasonable inferences based on the evidence. The court added that "Any argument that is made to you that is not based on the evidence should be disregarded" (1689).

Throughout the charge the court reminded the jurors that they were the sole judges of the facts and it was their determination that governed.

The court added that as the trier of fact, the jurors determined whether or not to believe a witness.

Thus, any possible prejudice was dissipated by the court's numerous instructions that it was for the jury to determine the facts of the case, that anything the attorneys said did not constitute evidence, and that the People had the burden – a burden which never shifted – to prove defendant's guilt beyond a reasonable doubt.

Furthermore, error, if any, was harmless in light of the overwhelming evidence of defendant's guilt. As established in Point Two, *supra*, the evidence overwhelmingly established defendant's guilt of the crimes of which she was convicted.

In fact, the evidence of guilt was so overwhelming that defendant does not even challenge the sufficiency of the evidence of her guilt of the murder. *See People v. Rodriguez*, 103 A.D.2d 121 (1st Dept. 1984). "Reversal is an ill-suited remedy for prosecutorial misconduct; it does not affect the prosecutor directly, but rather imposes upon society the cost of retrying an individual who was fairly convicted." *Galloway*, 54 N.Y.2d at 401. "[I]t's invocation is properly shunned when the misconduct has not substantially prejudiced a defendant's trial." *People v. Saks*, 256 A.D.2d 479, 480 (2d Dept.

1984) (quoting *Galloway*, 54 N.Y.2d at 401). An examination of the entire trial record establishes that defendant did indeed receive a fair trial. *See People v. Paul*, 78 A.D.3d 1684, 1685 (4th Dept. 2010) (prosecutor did not engage in such a "pattern of egregious or frequent misconduct to warrant the 'ill-suited remedy' of reversal") (citations omitted).

In sum, defendant was not deprived of a fair trial by the prosecutor's summation. The record establishes that the prosecutor's summation comments were either fair comments on the evidence or invited response to the defense summation. In any event, any error was harmless in light of the court's instructions and the overwhelming evidence of defendant's guilt. Therefore, defendant's judgment of conviction should be affirmed.

## POINT FOUR

**DEFENDANT'S CLAIMS REGARDING THE TAMPERING COUNT ARE UNPRESERVED AND WITHOUT MERIT. DEFENDANT WAS FULLY AWARE OF THE FACTS UNDERLYING THE CHARGE AND NEITHER THE PROSECUTOR'S SUMMATION NOR THE COURT'S CHARGE ALTERED THAT THEORY.**

The evidence established beyond a reasonable doubt that defendant was guilty of the crime of tampering. After the murder, defendant

74

and Rosado kept the weapon. In Florida, Rosado returned the weapon to defendant, who ultimately hid it in her closet as the police closed in on her. Defendant claims that the People's summation comments and the court's charge regarding the tampering count improperly amended the indictment. Additionally, defendant claims that the evidence was insufficient to establish her guilt of that crime. All of defendant's claims are unpreserved for appellate review and devoid of merit.

Defendant first claims that the court's charge was inadequate because it failed to specify that the subject of the tampering charge was the gun (Defendant's Brief at 51). This claim is unpreserved for appellate review. After the court's charge, the court asked whether there were any objections to the charge. Both parties stated they had no objections (1801). Having failed to alert the court to any claim, let alone the one raised on appeal, defendant's claim is unpreserved for this Court's review. C.P.L. § 470.05(2).

In any event, the court's charge was entirely proper. In addressing the count of tampering with physical evidence, the court instructed the jury that a person was guilty of tampering with physical evidence "when believing that certain physical evidence is about to be produced or used in a prospective official proceedings and intending to prevent such production or use, he or she

75

suppresses it by an act, by any act of concealment, alterations, or destruction" (1796). After defining "official proceedings," the court defined "physical evidence" as "any article, object, document, record or thing or physical substance which is or is about to be produced or used as evidence in an official proceeding" (1796).

The court then delineated the three elements of the crime which the People had to prove beyond a reasonable doubt: 1) that on or about November 12, 2008, defendant, acting in concert with another, suppressed physical evidence by an act of concealment, or alterations, or destruction; 2) that defendant did so believing that such physical evidence was about to be produced or used in a prospective official proceeding; and 3) that defendant did so intending to prevent such production or use (1797).

Thus, the court's charge, which tracked the language of the statute, was proper. Defendant claims that the charge left the jury with "no idea" what the evidence was, and speculates they may have believed it was the phone defendant discarded in Maryland (Defendant's Brief at 51-52). This claim is unpersuasive.

The indictment charged defendant and Rosado with acting in concert in committing the tampering. There was absolutely no evidence

76

connecting Rosado to the pre-paid phone defendant used. They were, however, both connected to the weapon and concealment thereof. In fact, the only reference or evidence of the tampering charge related to the gun. Thus, the court's charge did not alter the theory of the prosecution. *People v. Caldarola*, 45 A.D.3d 600 (2d Dept. 2007) (court's charge, which followed statute rather than indictment, did not change theory of prosecution). That the defense understood this to be the case is strongly evidenced by counsel's failure to object to the instruction.

Additionally, neither the court's charge nor the prosecutor's comment in summation constructively amended the indictment (Defendant's Brief at 52). Again, this claim is unpreserved for appellate review. Defendant never objected to the prosecutor's comment on summation, let alone on the ground that the comment constructively amended the indictment. As such, this portion of defendant's claim is also unpreserved for this Court's review. C.P.L. § 470.05(2).

In any event, the claim is devoid of merit. In summation, the prosecutor stated that the final count of tampering with evidence "merely goes to [defendant] secreting the gun in her house so that it wouldn't be found. That makes her guilty of tampering . . ." (1765). This comment did not

77

constructively amend the indictment. Indeed, the fourth count of the

indictment charged defendant and Rosado as follows:

> ON OR ABOUT NOVEMBER 12, 2008, IN THE COUNTY OF
> QUEENS, ACTING IN CONCERT WITH EACH OTHER,
> WITH THE BELIEF THAT A PISTOL WAS ABOUT TO BE
> PRODUCED OR USED IN A PROSPECTIVE OFFICIAL
> PROCEEDING, AND WITH THE INTENT TO PREVENT
> SUCH PRODUCTION OR USE, THEY SUPPRESSED SAID
> PISTOL, BY AN ACT OF CONCEALMENT, ALTERATION
> OR DESTRUCTION.

As relevant here, the Bill of Particulars also informed defendant that the People

intended to prove that, after shooting the victim, "defendant, acting in concert

with another, did flee the scene taking and concealing the firearm used to kill

[the victim]" (Bill of Particulars at 2, ¶ 2).

Thus, defendant was fully aware that the People's theory of

tampering related to the gun. That the prosecutor highlighted the time of the

tampering as occurring in Florida did not alter this theory. As noted, the

indictment stated that the crime occurred "on or about November 12," and the

Bill of Particulars posited that the crime occurred after the shooting. The

prosecutor's reference to defendant hiding the weapon in her home fully

comported with the notice given. Defendant was provided with sufficient

78

information as to the date, time, and place to permit her to prepare a meaningful defense. *See People v. Luscomb*, 68 A.D.3d 1548 (3d Dept. 2009).

Finally, defendant's claim that the evidence was insufficient to establish her guilt of tampering is also unpreserved for this Court's review. After the People's case, defendant moved to dismiss all counts on the ground that "the People have failed to meet their burden (1598). After the defense rested, defendant moved for "dismissal of the entire indictment" (1685). These general motions were insufficient to preserve her present claim for appellate review. C.P.L. § 470.05; *People v. Green*, 54 A.D.3d 603 (1ˢᵗ Dept. 2008) (legal sufficiency argument concerning tampering conviction unpreserved); *People v. Henderson*, 265 A.D.2d 573 (2d Dept. 1999) (motion to dismiss failed to preserve specific claim that prosecutor did not prove tampering with witness).

In any event, defendant's claim is without merit. The appellate standard for reviewing defendant's legal sufficiency claim is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Contes*, 60 N.Y.2d 620, 621 (1983); *People v. Andersen*, 118 A.D.2d

716, 717 (2d Dept. 1986). Under this analysis, the People are entitled to every reasonable inference that can be drawn from the evidence. *People v. Ford*, 66 N.Y.2d 428, 437 (1985). When determining the sufficiency of the evidence, a reviewing court must "indulge all reasonable inferences in the People's favor, mindful that a 'jury faced with conflicting evidence may accept some and reject other items of evidence.'" *People v. Carr-El*, 99 N.Y.2d 546, 547 (2002) (citing *Ford*, 66 N.Y.2d at 437). As long as the evidence established a "valid line of reasoning and permissible inferences" that could lead a rational person to the conclusion reached by the jury, the conviction must be upheld against a sufficiency challenge. *People v. Williams*, 84 N.Y.2d 925, 926 (1994); *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987).

As noted, the People had to establish, beyond a reasonable doubt, that on or about November 12, 2008, defendant, acting in concert with Rosado: 1) suppressed the gun by an act of concealment, or alterations, or destruction; 2) that defendant did so believing that such physical evidence was about to be produced or used in a prospective official proceeding; and 3) that defendant did so intending to prevent such production or use. Penal Law § 215.40(2). Tampering does not require the actual suppression of evidence, but only that

80

defendant "perform an act of concealment while intending to suppress the evidence." *People v. Eaglesgrave*, 108 A.D.3d 434, 434 (1st Dept. 2013).

The evidence established that defendant and Rosado left New York after the murder. Rosado held onto the weapon for about a week, after which defendant demanded he return it to her. The evidence also established that when the police came to arrest Rosado, he told a woman there to call defendant. When the police subsequently recovered the gun from defendant's home, it was secreted in a bag in a closet. Given that defendant had previously stated that she kept the weapon in a dresser drawer in her room – a fact which she had told the police upon reporting it stolen, as well as Pazmino – that it was hidden in a different location indicates that she sought to prevent the police from finding it.

Additionally, this inference in strengthened by the fact that, after reporting the gun stolen, defendant never notified the police that she was in possession of the weapon again. Under the circumstances, it is reasonable, if not expected, for the jury to concluded that defendant sought to keep the police from finding the weapon, which undoubtedly connected her to the crime and so would be used in a criminal proceeding. *See People v. Lucas*, 25 A.D.3d

822 (3d Dept. 2006) (defendant's admission of hiding clothes sufficient to support tampering conviction).

Defendant claims that there was no evidence she "suppressed" the gun in Queens on November 12, 2008 (Defendant's Brief at 56). However, as noted, the indictment charged that the crime occurred on or about November 12. Additionally, defendant asserts that there was no evidence that she was aware of her impending arrest on December 2 and, therefore, had no reason to conceal the gun (Defendant's Brief at 56). Defendant also attempts to draw support for her claim that she had no intent to conceal the gun from her claim that the gun was in a place where the police would likely look (Defendant's Brief at 57). All these assertions, however, do not undermine the actual evidence.

To begin, there is no force to any argument that defendant would only have been motivated to hide the gun if she knew her arrest was about to take place momentarily. Given all her connections to the crime, she obviously had every motive to hide her gun from the moment the crime occurred. Taking the gun to Florida was certainly a key piece of evidence establishing her desire to conceal the weapon. As to the actual spot where she hid the weapon, it is unsupportive of the idea that this shows defendant's state of mind because it

82

was an obvious place for the police to search (Defendant's Brief at 57). First of all, as the prosecutor noted, after getting the gun back from Rosado, "[s]he didn't have time to get rid of it because when they arrested Rosado, within 20 minutes they were at her house to arrest her. They didn't have any communication so she wasn't able to get rid of the gun before the police arrested her. That's why the gun is in the house" (1762-63). Second, defendant hid the gun in a bag in a closet. Perhaps thinking that the police would never connect her to the crime or be able to get a search warrant, defendant may well have believed that her concealment was sufficient to prevent its discovery.

In sum, defendant's claims regarding the tampering with evidence count are entirely unpreserved for appellate review. Moreover, the court's charge and People's summation did not improperly amend the indictment or alter the theory of the People's case. Finally, the evidence was legally sufficient to establish defendant's guilt of tampering with evidence. Accordingly, the Court should affirm the judgment of conviction.

83

## **POINT FIVE**

## **DEFENDANT'S SENTENCE WAS PROPER.**

In a premeditated and calculated series of events over the course of months, defendant planned and oversaw the murder of Mario Rei, her former business partner. In seeking to coverup her own complicity in the crime, defendant attempted to set up others. Her efforts were unsuccessful, however, as those she tried to manipulate and use as scapegoats established that she was the mastermind behind the murder of Mario Rei, and provided her main puppet, Luis Rosado, with the gun which she exhorted Rosado to use in killing Rei. Given the cold-blooded and heinous nature of the premeditated murder, the sentencing court properly exercised its discretion in sentencing defendant to an aggregate term of imprisonment of from twenty-six and one-third years to life.

Although sentencing is primarily a function of the trial court (*People v. Felix*, 58 N.Y.2d 156, 161 [1983]), this Court may modify the sentence "as a matter of discretion in the interest of justice." C.P.L. § 470.15(3). In order to exercise this power, however, the Court must determine not only that the sentence imposed was harsh and excessive, but also that there is some demonstrated "need to impose a different view of discretion than that

84

of the sentencing Judge." *People v. Suitte*, 90 A.D.2d 80, 86 (2d Dept. 1982). Such a need will generally only arise if, pursuant to the statutory mandate that governs invocation of this Court's interest of justice jurisdiction, the sentence imposed was "unduly" harsh and excessive. C.P.L. § 470.15(6)(b); *People v. Thompson*, 60 N.Y.2d 513, 519 (1983). Here, defendant's sentence was not harsh or excessive – and certainly was not "unduly" so – and there is no need for this Court to substitute its discretion for that of the court below.

In relying on the appropriate factors – and defendant does not contend otherwise – the court highlighted how defendant assumed the role of "ultimate provider" for new immigrants and people in the country illegally, but that they then had to be "beholden" to her. Indeed, the court noted that unbeknownst to her purported benefactors, defendant "dole[d] out" out her kindness at the price of "unquestioned loyalty" (Sentencing: 13).

The court stated that as part of her plan to get back at the one who was most disloyal – Mario Rei – defendant attempted to frame Gioconda Pazmino, another "defector." The court added that the worst thing Rei did was keep his wife from defendant, and for that defendant sentenced him to death. In formulating her plan, defendant used the "pathetic" illegal alien Luis Rosado, knowing his self-esteem was so low he could be convinced to kill in

85

exchange for housing his family (Sentencing: 14-15). The court concluded not one other person had the "slightest" motive to kill Rei, finding that defendant was responsible and was the principal behind the murder (Sentencing: 16).

In support of her claim that her sentence should be reduced in the interest of justice, defendant cites to her history as a hard-working, supportive, and caring role-model for her family, as well as letters from her family (Defendant's Brief at 59). The court was aware of defendant's history and stated that it had read all of the letters submitted. Indeed, as noted, in relying on these letters, the court believed that defendant's helpfulness came at a steep price.

Although this was defendant's first criminal conviction, it clearly represented a most calculated and heinous crime, and one for which she was the mastermind. And, the court was fully aware of her age when it imposed sentence. Merely because an individual commits a crime when arguably older than the usual first-time felon does not warrant a reduction of sentence. Simply because she will be even older when her sentence is completed offers no reason to reduce it. This is especially true given the serious nature of the crimes of which defendant was convicted. *See People v. Marshall*, 106 A.D.3d 1, 11 (1st Dept. 2013) (aged felon should not be "categorically immune from

86

incarceration"); *Cf. People v. Walsh*, 101 A.D.3d 614 (1st Dept. 2012) (considering non-violent nature of crime, defendant's age and poor health, expressions of remorse, sentence reduced in interest of justice).

In sum, the court relied on the appropriate factors in imposing the statutorily proper sentence. As such, the Court should not disturb the sentence.

## CONCLUSION

For the reasons set forth above, defendant's judgment of conviction should be affirmed.

Respectfully submitted,

RICHARD A. BROWN
District Attorney
Queens County

JOHN M. CASTELLANO
JOHNNETTE TRAILL
JOSEPH N. FERDENZI
NANCY FITZPATRICK TALCOTT
Assistant District Attorneys
of Counsel

October 3, 2016

87

## CERTIFICATE OF COMPLIANCE

I certify the following in compliance with section 670.10.3 of the Rules of this Court:

1. The foregoing brief was prepared on a computer.

2. The typeface used is Times New Roman.

3. The point size of the text is 14 point, except for footnotes, which are 12 point.

4. The brief is double spaced, except for the Table of Contents, point headings, footnotes, and block quotes.

5. The brief contains 17,978 words, exclusive of the Table of Contents, proof of service, and the certificate of compliance, based on the word count of the word-processing system used to prepare this brief.

Dated:     Kew Gardens, New York
           October 3, 2016

                                   _____
                                   Assistant District Attorney

*Talcott/Ferdenzi*
(F) 2/26/17

# New York Supreme Court

## APPELLATE DIVISION SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

Queens County
Ind. No. 538/09

*-against-*

A.D. No. 2014-07277

YNMACULADA GOMEZ,

*Appellant.*

## SUPPLEMENTAL BRIEF FOR APPELLANT, PRO SE

October 2016

2016 NOV 30 P 3:23
QUEENS COUNTY D.A.
APPEALS BUREAU

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.............................................................................1

QUESTIONS PRESENTED................................................................................1

STATEMENT OF FACTS.................................................................................2

ARGUMENT.................................................................................................4

POINT I

APPELLANT WAS DENIED A FAIR TRIAL BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE (NY CONST. ART. 1, 6), THAT DEPRIVED APPELLANT HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, THEREBY DENYING HER, HER RIGHT TO A FAIR TRIAL.............................4

A) Presentation of a Flawed Alibi.............................................................5

B) Trial Counsel failed to conduct proper investigation procedure by failing to contact three witnesses whose testimony could have been exculpatory in nature..............11

C) Prejudice....................................................................................14

POINT II

APPELLANT WAS DEPRIVED OF A FAIR TRIAL BY PROSECUTOR MISCONDUCT DURING SUMMATION SHIFTING THE BURDEN, CALLING FOR SPECULATION BY THE JURY, TRYING TO INFLAME THE JURY, VOUCHING FOR THE CREDIBILITY OF HIS WITNESSES, EXPRESSING HIS PERSONAL OPINIONS, BECOMING AN UNSWORN WITNESS AND ACCUSING APPELLANT OF UNCHARGED CRIMES..................................................................17

POINT III
APPELLANT WAS DEPRIVED OF A FAIR TRIAL BY STATE'S FAILURE TO DISCLOSE BRADY MATERIALS..................................................................32

CONCLUSION...............................................................................................38

## PRELIMINARY STATEMENT

On June 24, 2014, Appellant Ynmaculada Gomez was convicted in a trial by jury in Queens

County before The Honorable Kenneth Holder for the crimes of Murder in the Second Degree

(PL 125.25), two counts of Criminal Possession of a Weapon in the Second Degree (PL 265.03

(1)(b)(3)), and Tampering with Physical Evidence (PL 215.40 (2)), and is currently serving a

sentence of 25 years to life on the murder count and on each weapon possession count, while

also serving a consecutive prison term of 1 1/3 to 4 years for the crime of Tampering with

physical evidence.

No stay has been sought and Appellant is currently incarcerated pursuant to the judgment.

Co-defendant Luis Rosado pleaded guilty and was sentenced.

## QUESTIONS PRESENTED

1.     Whether Appellant was denied a fair trial by defense counsel's deficient performance

(NY Const. Art. 1, 6), that deprived Appellant her right to effective assistance of counsel,

thereby denying her, her right to a fair trial. Appellant asserts two grounds:

A) Trial counsel presented a flawed alibi defense.

B) Trial counsel failed to conduct proper investigation procedure by failing to contact

three witnesses whose testimony could have been exculpatory in nature.

C) Prejudice

2.     Whether Appellant was deprived of a fair trial by prosecutor misconduct during

summation shifting the burden, calling for speculation by the jury, trying to inflame the

jury, vouching for the credibility of his witnesses, expressing his personal opinions,

becoming an unsworn witness and accusing Appellant of uncharged crime.S

1

3.  Whether Appellant was deprived of a fair trial by state's failure to disclose Brady
materials.

## STATEMENT OF FACTS

Appellant Ynmaculada Gomez, a Florida businesswoman was charged with Second-
Degree Murder, Criminal Possession of a Weapon, and Tampering with Physical Evidence in the
accusatory instrument filed in connection with the death of Mario Rei. Appellant's former
employee, Luis Rosado, testified pursuant to a cooperation agreement, that he shot Mr. Rei on
Appellant's behalf in return for Appellant's promise that he could live rent free in a house that
she owned in Florida.

Appellant presented an alibi defense dependent on the testimony of Yoselin Amarante,
who at the time of the crime lived in Tampa, Florida. She testified that Appellant was at Ms.
Amarante's house on the day of the crime, further stating that Appellant was there on the day of
the anniversary of her Mother's death, a date that was stated in the entire trial, as November 12.
Witness was incapable of recalling the exact day, although the date being November 12, 2008,
was the same day of the crime. Defense Counsel did not clarify the discrepancy in redirect
examination, presented a flawed alibi defense which deprived Appellant her right to a fair trial,
because the heart of the accusation was that Appellant was the mastermind of the crime, the one
who planned it, gave Luis Rosado (co-defendant) the murder weapon, loaded the gun, and drove
him to the scene followed by driving him from the scene of the crime.

Trial Counsel's failure to call or contact three witnesses that she knew, since the
beginning of the case, deprived Appellant her right to a fair trial. The Appellant has the
constitutional right of presenting a defense, which includes testimony of witnesses, more
importantly if these witnesses are material to the trial. One of these witnesses was Appellant's

2

former attorney, Victoria Alvarez, who prepared documents that were mentioned, permitted as exhibits but not admitted into evidence at the trial. Another witness includes Ramon Diaz, who was not only an imperative character witness for the Appellant, indeed, a person who was the employer of two of The People's key witnesses: Flor Cepeda and Gioconda Pazmino, including the victim, Mario Rei. Diaz is a witness who has valuable information concerning the real relationship and character of the majority of the parties involved in this case.

Another witness includes Donna Garcia who knew Appellant, Gioconda Pazmino and Flor Cepeda for years. She was a co-worker of theirs and later became the boss of Flor Cepeda when Ms. Cepeda was living in Charlotte, North Carolina. Ms. Garcia was fully aware of the relationship between Appellant, Pazmino, and Cepeda and also knew about their character. For these reasons Appellant was deprived of effective assistance of counsel by counsel failing to seek locations of critical witnesses where Appellant has provided Trial Counsel with witnesses' names, addresses, and phone numbers prior to trial. Counsel failed to adequately investigate the facts of the case. Although this claim was not preserved, Appellant requests this Court to exercise its inherent discretion by reviewing claim in the interest of justice.

During summation the prosecutor engaged in improper conduct, including shifting the burden, vouching for the credibility witnesses with regard to significant aspects of the People's case, calling for speculation by the jury, becoming an unsworn witness and accusing Appellant of uncharged crimes. During summation, the prosecution improperly stated, "She's the one Luis Rosado got on the stand and told you…and nothing he said was refuted…she's the one who asked me to do it. I did it for her," (T. 1766) which clearly shifted the burden to the defense and attacking defendant's decision to exercise her 5th Amendment right to remain silent.

3

State's failure to disclose Brady materials, where defense counsel has made a specific request for such materials, is reversible error. In this case, defense counsel had requested that the prosecution turn over to her the documents they received for the subpoena of Mr. Rosado's telephone records, for Appellant's phone records. (T. 693), documents recovered in a search warrant executed on Appellant's AOL account (T. 694) and the T-Mobile 2008 cell sites (T. 698).

For any further questions, Appellant requests that the Second Department please refer to Appellant's Counsels brief for the entirety of statement of facts.

## ARGUMENT

### POINT I

APPELLANT WAS DENIED A FAIR TRIAL BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE (NY CONST. ART. 1, 6), THAT DEPRIVED APPELLANT HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, THEREBY DENYING HER, HER RIGHT TO A FAIR TRIAL.

Defense Counsel's performance was so deficient as to call into question the fairness of the trial (NY Const. Art. 1 & 6) and the reliability of the verdict (US Cons. 6th Amendment). Two aspects of the performance of Defense Counsel adversely affected the trial's fairness and the verdict's reliability. The first concerns to her presentation of the alibi defense. The second relates to her failure to call or contact witnesses that she knew since the beginning of the case. Because of those deficiencies, Appellant was deprived of her constitutional right to effective assistance of counsel. (US Const. 6th Amendment; NY Constitutional Art. 1 & 6).

The right to Counsel is an "essential ingredient in our system of criminal justice, rooted deeply in our concept of a fair trial within an adversarial context" (People v. Felder, 47 N.Y.2d 287, 295-297 (1979). As such, the right to counsel is the right to effective assistance of counsel

4

(Strickland v. Washington, 466 U.S. 668, 686 (1984); People v. Benevento, 91 N.Y.2d 708, 711 (1998).

To prove ineffectiveness under either the Federal or the State's standard, defendants must show that their attorney's performance fell "below an objective standard of reasonableness" and that they were thereby prejudiced. (See Strickland (supra) at 687-688, 695-696. Hurrell-Harring v. State, 15 N.Y.3d 8, 16-17 (2010); People v. Turner, 5 N.Y.3d 476, 480 (2005). The standards differ only in their measurement of prejudice, with the state "meaningful representation" standard purportedly "somewhat more favorable to defendants" (See Turner (supra); People v. Ozuna, 7 N.Y.3d 913, 915 (2006); People v. Caban, 5 N.Y.3d 143, 156 (2005).

A) Presentation of a Flawed Alibi

"A defendant's right to effective assistance of counsel includes defense counsel reasonable investigation and preparation of defense witnesses" People v. Jenkins, 84 A.D.3d 1403, 1408 (2nd Dept. 2011). "An attorney must interview and prepare witnesses before they testify" United States v. Rhymes, 218 F.3d 310, 319 (4th Cir. 2000). See People v. Droz, 39 N.Y.2d 457, 462 (1976). "Defense Counsel must review and prepare both the law and the facts relevant to the defense." Defense Counsel breached that duty here and thus her representation was deficient in that respect as well. People v. Jarvis, 25 N.Y.3d 968 (2015).

Since the beginning of the investigation, eyewitnesses including John Vasilantonakis, indicated the day of the crime, he saw a man running away from the scene, he testified that "The man ran north toward 50th Ave. on 98th Street, it appeared that it was a car waiting that he hop in and he took off" (T. 996). But he did not see who was driving the car (see T. 997). During cross-examination Mr. Vasilantonakis stated that

5

he only saw the person went inside the car, and "they took off" but he never saw a driver waiting in the car (T. 1004). Nobody saw the Appellant Ms. Gomez at the scene of the crime, only the testimony of the co-defendant placed her at the scene the day of the crime. Not even Gioconda Pazmino who claimed to have spoken with Ms. Gomez over the phone the day of the crime could state that she saw the Appellant in Queens, NY the day of the crime. (T. 1278).

At the heart of the problem is that the crime occurred on Appellant's Mother's death anniversary, on November 12, although properly stated for "the day of defendant's mother's anniversary," Ms. Amarante the defense alibi, could not state for November 12, 2008 (T. 1607-1608). Defense counsel directed Yoselyn Amarante to the period of November, but without reference to the day of the month. Once that flaw was exposed by the prosecutor (T. 1615-1616, 1619-1620, 1623). Defense Counsel could only listen as the prosecutor argued during his summation that "nothing was refuted" (T. 1766). Defense Counsel in her re-direct of Amarante never mentioned the correct day of the crime.

Either Defense Counsel was unaware of the applicable day of the month or she failed to prepare her witness properly. Either way, Defense Counsel's presentation of the alibi defense "Plainly fell below any acceptable level of professional competence" Henry v. Poole, 409 F.3d 48, 64-65 (2nd Cir. 2005). The paramount responsibility of a Defense Counsel is "to protect the interests of his client" People v. DeJesus, 42 N.Y.2d 579, 526 (1977). Defense Counsel failed to accomplish this responsibility.

The discrepancy surfaced during Amarante's direct examination (T. 1607-1608) was repeated on cross-examination (T. 1615, 1619, 1623) and then fully exploited by the

6

prosecutor in his rebuttal (T. 1671-1673). As stated above, Defense Counsel did not

conduct a redirect-examination on that matter. Defense Counsel failed to object when the

prosecutor was impeaching Ms. Amarante by the alleged omission of the fact that

Appellant "was sad about her mother's death anniversary," being that impeachment was

improper because "A witness cannot ordinarily be impeached by the alleged omission of

a fact in a prior statement unless the witness was specifically asked about that fact"

People v. Bornholdt, 33 N.Y.2d 75, 88 (1973). The People attempted to impeach Ms.

Amarante due to Lt. Torres' testimony during rebuttal stating that the anniversary of

Appellant's mother's death was never mentioned by Ms. Amarante, a notion in which

Respondent failed to ask during the interview conducted by Lieutenant Torres at

Amarante's house by The People merely violated Appellant's right to a fair trial, thereby

precluding her from proffering a credible alibi witness, one in which would not be

improperly impeached.

Yoselin Amarante, Direct-Examination (T. 1607-1608)

Q – Now, I'm going to ask you about a specific time in November 2008. In November of

2008, do you remember Ynma Gomez coming to your house?

A – Yes.

Q – Describe what you remember about that particular day?

A – I had made her some – because she was not feeling well from her period, and it was

the Anniversary of her Mother's death.

Q – And on that day, the Anniversary of her Mother's death, did she come to your house

or – did she come to your house, if you remember, or did you go to her house?

A – She came to my house.

7

Q – Was there anyone else at your house at the time?

A – Yes, my sister was in my house.

Q – Do you recall --- if you recall, at around the time Ms. Gomez arrived at your house on that date, the Anniversary of her Mother's death, do you recall, if you recall, at approximately what time Ms. Gomez arrived on that date, on the Anniversary of her Mother's death?

A – No, I really don't remember.

Q – Do you remember if it was daylight or it was evening?

A – It was in the afternoon. I think it was in the afternoon.

Yoselin Amarante, Cross-Examination (T. 1615)

Q – Do you, as you sit here now, know what day in November 2008 she was with you?

A – Not exactly, I don't remember exactly.

Q – Now, Ms. Amarante, isn't it a fact that you were told that the day you were with her was the Anniversary of her Mother's death?

A – No, because back then when she came to my house she was very sad. It was because it was the Anniversary, her Mother's Anniversary.

Q – Now, and you know as you sit here now that it was the exact day of her Mother's Anniversary?

A – No.

(T. 1619)

Q – Now, Ms. Amarante, were you told that the date of her mother's passing was the day that she was accused of killing someone?

A – No.

8

Q – Nobody ever told you that to you?

A – No.

(T. 1623)

Q – Well, do you know whether she was with you on November 12, 2008?

A – Exactly that day or that day in particular, no I don't remember.

On cross-examination as on rebuttal (Lieutenant Torres testimony, T. 1670-1673), the prosecutor established that the alibi defense (Yoselin Amarante) didn't know the exact day of the Defendant's Mother's death anniversary, which it was the same day of the crime.

"An alibi defense is fraught with danger, for an attempt to create a false alibi is generally accepted as evidence of consciousness of guilt." Henry, 409 F.3d at 65, 72; O'Donnell v. State, 26 A.D.3d, 59, 64 (2nd Dept. 2005), "Where, however, the prosecution offers evidence affirmatively disproving the alibi, the jury may properly draw an inference that the presentation of a fabricated alibi evinces a consciousness of guilt and such inference may certainly contribute to the jury's decision to convict. Indeed, according to one source cited by the second circuit in Henry (at 65): "Maintaining false alibis to meet a false charge is the way many defendants end up in prison. If the prosecution can establish the falsity of an alibi...your case is as good as lost. Many jurors regard a false alibi as an admission of guilt." (2F. Bailey & K, Fishman Criminal Trial Techniques § 32:21, 2002). According to another source cited by the Court (at 65): "There is nothing as dangerous as a poorly investigated alibi. An Attorney who is not thoroughly prepared does a disservice to his client and runs the risk of having his client convicted even where the prosecution's case is weak. A poorly prepared alibi is worse than no alibi at all" (2 G. Schultz, proving Criminal defenses 16.08, 1991).

9

The Defense Counsel elicited an alibi for the wrong date, for the month of the crime, "November," but without knowledge of the day of the crime the "12th." It could not have been a tactic, since an attempt to create a false alibi is evidence of a consciousness of guilt. It could not have been a mistake, since the Defense Counsel undoubtedly knew when the crime occurred. Therefore, her representation failed below an acceptable level of professional competence.

Other cases in New York are similar on their facts and were resolved on direct appeal in favor of the Defendant as a matter of State law. See People v. Cabrera, 234 A.D.2d 557-558 (2nd Dept. 1996); People v. Long, 81 A.D.2d 521-522 (1st Dept. 1981). In Cabrera, the Defense Counsel focused his questions on a Friday night, "Which resulted in the alibi witness testifying as to Defendant's whereabouts approximately 18 hours after the crime occurred." In Long, the attorney presented an alibi for 12 hours or so after the crime occurred.

Defense Counsel's performance in this case was no less deficient. In each of those cases, the defense attorney presented an alibi that was not an alibi at all. Here, Defense Counsel knew, or should have known that she was presenting the same type of evidence. Furthermore, assisting a client in presenting false evidence is unethical (N.Y. Rules of Professional Conduct as Amended July 1, 2012, Rule 3.3 (a)(3) as well as unlawful. See Nix v. Whiteside, 475 U.S. 157, 166 (1986); See also People v. Townsley, 20 N.Y.3d 294, 300-301 (2012).

Other aspects of Defense Counsel's presentation of the alibi bolster the conclusion that Defense Counsel was not up to the job. For example by not conducting a redirect-examination on the matter, see People v. Blair, 148 A.D.2d 767, 769 (1989); People v. LaRosa, 112 A.D.2d 954-955 (1985); People v. Torres, 111 A.D.2d 885 (1985). Defense Counsel essentially conceded that the alibi that she presented was an admission of guilt (see Criminal Trial Techniques, supra).

Appellant was deprived of her Constitutional right to have an effective assistance of

Counsel. This Court should accordingly reverse Appellant's conviction and grant her a new trial.

    B) <u>Trial counsel failed to conduct proper investigation procedure by failing to contact</u>

       <u>three witnesses whose testimony could have been exculpatory in nature.</u>

As stated before, "A Defendant's right to effective assistance of counsel includes Defense

Counsel reasonable investigation and preparation of defense witnesses." <u>People v.</u>

<u>Jenkins</u>, 84 A.D.3d 1403, 1408 (2nd Dept. 2011), leave denied, 19 N.Y.3d 1026 (2012).

The interest of justice demands a full trial before a jury which can hear all the witnesses.

Defense Counsel's failure to produce evidence to corroborate the Defendant's version of

events deprived Appellant of her right to a fair trial. A Defendant in a murder prosecution

is denied effective assistance of counsel where the Defendant's claim that he or she has

given Defense Counsel the name and address of a crucial witness, who counsel fails to

contact, is supported by the corroborating affidavit of the witness in question. <u>People v.</u>

<u>Castaneda</u>, 189 A.D. 2d 890 (2nd Dept. 1993). Likewise in here, the Appellant provided

the Defense Counsel with the names, addresses and phone numbers of the witnesses since

the beginning of the case. Appellant also asked her defense lawyer about theses witnesses

days before the trial, without any assurance of the presentation of these witnesses from

her Defense Counsel. Every time Appellant asked about these witnesses she had an

evasive response. Ineffective assistance of counsel was found where Defense Counsel

failed to interview witnesses prior to the trial. "Defense Counsel did not attempt to locate

medical staff including a nurse at the time of the trial. Failure to produce their testimony

since it was not then the theory of the defense that the deceased could talk." <u>People v.</u>

<u>Salemi</u>, 309 N.Y. 208 (1955). See <u>People v. Wheeler-Whichard</u>, 884 N.Y.S.2d 304

(2009), where the Court reversed the decision, holding ineffective assistance of trial counsel where "defense counsel failed to present testimony of alibi witness at trial."

The Court can compel the appearance of the witnesses, subpoena of witnesses, it is a common practice in our N.Y. Court system. (Code Crim. Pro. §465). The Defense Counsel failed to use this right to present a good defense, counsel failed to adequately investigate the facts of the case. "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. The right to present the Defendant's version of the facts as well as the prosecution's to the trier of facts so it may decide where the truth lies." People v. Gibian, 76 A.D.3d 583, 585 (2010). "An attorney must interview and prepare witnesses before they testified." People v. Droz, 39 N.Y.2d 457 (1976). In this case Defense Counsel's deficient to call or contact these witnesses, it was not harmless error, since the evidence against Defendant was not overwhelming and a major part of that evidence came from witnesses testimony. Luis Rosado (Co-defendant), Gioconda Pazmino and Flor Cepeda.

Defense Counsel's failure to call or contact the three witnesses that Appellant provided her with their information since the beginning of the trial, deprived Appellant of a fair trial. Those three witnesses were important to establish the truth, and their testimony was material at the trial. The first witness, Ramon Diaz, mentioned in the trial record (T. 1051), would have testified about Appellant's character. The good character or reputation of the accused is not a defense as a matter of law, but is a fact for the jury's consideration in connection with other facts. Hallengren v. State, 14 Md.App. 43, 286 A.2d 213 (1972); People v. Miller 35 N.Y.2d 65 (1974). A defendant is allowed to introduce evidence of his or her good character and reputation, where such evidence has

12

reference to a trait involved in the offense with which he or she is charge. Hoffman v.

State, 95 So.2d 643 (Fla.3d DCA 2007). Diaz also would have testified concerning

Gioconda Pamino's, Flor Cepeda's and Mario Rei's character and relationship with the

Appellant. Diaz was the owner of North East Packaging, the employer of Appellant,

Pazmino, Cepeda and Rei. He knew them and their circumstances on a personal level.

Another witness, Victoria Alvarez, Appellant's and Cepeda's attorney during the period

they lived in Tampa, FL, her name was mentioned during Flor Cepeda's cross-

examination (T. 941-942). Cepeda first said she didn't speak with any lawyer, then she

admitted to know her, but denied to having signed any document to her. Victoria Alvarez

is the attorney who prepared all the legal documents (Last Will, Power of Attorney,

Health Care Proxy, etc.) for the Appellant and Cepeda. This attorney would have testified

concerning the veracity/authenticity of those documents that couldn't be admitted into

evidence and the ruling of the court did not even permit them as exhibits.

The final witness would have been Donna Garcia, who knew Appellant, Pazmino

and Cepeda for years. She also knew about the real relationship between Appellant and

them. She was the owner of a paper company, in Charlotte, NC. She would have testified

about Appellant's several trips to Charlotte, NC during the period July-October 2006.

During that period, Appellant helped Flor Cepeda to get a job as a salesperson in Garcia's

company. But Cepeda denied through all her trial testimony, that she saw or contacted

Appellant, Ms. Gomez, before the passing of her mother, November 12, 2006.

Garcia would have testified about Pazmino and Appellant's real relationship

concerning Pazmino's constant harassment and obsession with the Appellant. She knew

about Pazmino getting fired for stealing from North East Packaging. Defense Counsel's

13

failure to produce evidence to corroborate the Defendant's version of the events could not

be a tactic or trial strategy because their testimony was crucial due to the fact Appellant

didn't testify following her trial lawyer's advice because of the unfair ruling of Sandoval.

Their testimony was non-cumulative. The failure of Defense Counsel to call or

contact these witnesses, denied Appellant's right to have a fair trial, "the right to present

a defense, the right to present the Defendant's version of the facts as well as the

Prosecution's to the trier of facts so it may decide where the truth lies." People v. Gibian,

76 A.D.3d 583, 585 (2010).

Therefore, this Court should exercise its discretion to review this claim in the

interest of justice. This Court should find Defense Counsel ineffective for her

inexplicable failure to call or contact three witnesses that she knew since the beginning of

the case. Her failure deprived Appellant of her Constitutional right to have effective

assistance of counsel. This Court should, accordingly, reverse Appellant's conviction and

grant her a new trial.

C) Prejudice

New York Constitution

Under the State Constitution. The focus of the prejudice prong is on the "fairness of

the process as a whole rather than its particular impact on the outcome of the case."

Benevento, 91 N.Y.2d at 714; See People v. Caban, 5 N.Y.3d at 156; See also Rosario v.

Ergole, 601 F.3d 118, 124 (2 Cir. 2009).

Thus, whether Defendant would have been acquitted of the charges but for

Counsel's errors is relevant, but not dispositive under the State Constitutional guarantee

of effective assistance of counsel. The safeguards provided under the Constitution must

14

be applied in all cases to be effective, and for that reason, "Our legal system is concerned

as much with the integrity of the judicial process as with the issue of guilt or innocence."

Benevento, 91 N.Y.2d at 714. If in any instance, an Appellate court concludes that there

has been "such inadequacy of defense counsel" as to have operated to deny any

individual defendant his fundamental right to a fair trial, the reviewing Court must

reverse the conviction and grant a new trial, quite without regard to any evaluation as to

whether the errors contributed to the Defendant's conviction. The right to a fair trial is

self standing and proof of guilt, however overwhelming, can never be permitted to negate

this right. People v. Crimmins, 36 N.Y.2d 230, 238 (1975). See Benevento, 91 N.Y.2d at

714 (harmless error doctrine not applicable to substantiated claims of ineffective

assistance). People v. Miller, 63 A.D.3d 1186, 1188 (3rd Dept. 2009). "While we

recognize that defendant's admissions and the accomplices testimony are strong evidence

of his guilt, his counsel's deficiencies cannot be overlooked because the harmless error

doctrine is inapplicable" in cases involving substantiated claims of ineffective assistance;

see also Rosario, 601 F.3d at 125. "Even if the errors are harmless in the sense that the

outcome would remain the same, a defendant may still meet the New York prejudice

standard by demonstrating that the proceedings were fundamentally unfair."

The phony alibi also "diminished the effectiveness" of the reasonable doubt

defense since it too was "likely to be viewed by the jury as evincing consciousness of

guilt." Henry, 409 F.3d at 72. The prosecutor focused on the discrepancy during his

cross-examination of Amarante and independently proved the alibi's falsity during his

rebuttal case. He also stressed the failure of the defense witness to come forward with her

information. The false alibi opened the door to the jury's consideration of the alibi as

evidence of guilt. "The court's finding the witnesses were credible is not a factor in this case. The appropriate analysis is whether there is a reasonable probability that a jury could or would believe witnesses," such reasonable probability clearly exists, thus establishing the "prejudice" element of the Federal Constitutional standard and the "unfairness"element under the State Constitutional test. People v. Bornholdt, 33 N.Y.2d 75, 88 (1973).

These errors, (presentation of flawed alibi and the failure to call or contact witnesses) singly or together resulted in a fundamentally unfair trial. In a case where the prosecutor presented the Appellant as the mastermind of the crime, who drove the shooter to the scene and drove him away from the scene, and the only person who had the motive to kill the victim.

This Court should reverse Appellant's conviction as a matter of State Constitutional law because of the inadequacy of Defendant's representation Counsel.

Federal Constitution

Likewise, Appellant's conviction should be reversed as a matter of Federal Constitutional law. In contrast to New York's single minded quest for fairness, the focus under Strickland is on the reliability of the verdict. The Federal test requires a showing that "there is a reasonable probability that, but for Counsel's unprofessional errors, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" 466 U.S. at 694. The Defendant must show more than that the unprofessional performance merely had some conceivable effect. To satisfy the "reasonable probability" test, however, a Defendant need not show that counsel's

16

deficient conduct more likely than not altered the outcome of the case." Henry, 409 F.3d

at 63.

Defense Counsel's deficient presentation of the alibi undermined confidence in

the verdict. Additionally, it had resulted in the presentation of a seemingly false alibi that

suggested guilt. Also, Defense Counsel's failure to call witnesses and present a defense

which supported Defendant's version of the events undermined confidence in the verdict.

Appellant's conviction should be reversed as a matter of Federal Constitutional

law because there is "a reasonable probability that the outcome of the proceeding would

have been different but for Counsel's professional unreasonable performance."

Strickland, 466 U.S. at 694.

Justice delayed is justice denied. That applies to not just the victims of crime, but

also to those accused of them. Because Appellant did not receive representation meeting

Federal and State standards, which resulted in an unfair trial, this Court should order the

new trial Defendant is entitled. This is not just a question of law, but simply a matter of

what is right.

## POINT II

APPELLANT WAS DEPRIVED OF A FAIR TRIAL BY PROSECUTOR
MISCONDUCT DURING SUMMATION SHIFTING THE BURDEN, CALLING FOR
SPECULATION BY THE JURY, TRYING TO INFLAME THE JURY, VOUCHING
FOR THE CREDIBILITY OF HIS WITNESSES, EXPRESSING HIS PERSONAL
OPINIONS, BECOMING AN UNSWORN WITNESS AND ACCUSING APPELLANT
OF UNCHARGED CRIMES.

A defendant is entitled to "a fair trial, a trial neither colored nor influenced by

irrelevant matters likely to mislead or confuse the jury." People v. Carborano, 301 N.Y.

39, 42 (1950). (Citing People v. Tassiello, 300 N.Y. 425 (1950). After all a prosecutor "is

charged with the duty not only to seek conviction but also to see that justice is done."

People v. Pelchat, 62 N.Y.2d 97, 105 (1984). Failing in his duty to seek justice, the

prosecutor in Appellant's case instead resorted to blatant misconduct during summation

by shifting the burden, vouching for the credibility of his witnesses, expressing his

personal opinions, becoming an unsworn witness, calling for speculation by the jury and

accusing Appellant of uncharged crimes, insinuating that Appellant had a propensity to

place her interests above society. That was improper, where Appellant never had had a

brush with the law. As a result of this pervasive misconduct, Appellant was deprived of a

fair trial. U.S. Const. Amends V, XIV; N.Y. Const. Art. 1 and 6; Darden v. Wainwright,

477, U.S. 168, 181 (1986). Prosecutorial misconduct is reversible error when comments

"so infected the trial with unfairness as to make the resulting conviction a denial of due

process."

During summation, prosecutor attempted to shift the burden of proof to the

Defendant, when he improperly stated, "She's the one Luis Rosado got on the stand and

told you -- and nothing he said was refuted --- she's the one who asked me to do it. I did

it for her." (T. 1766). While Defense Counsel objected to the prosecutor's statement, the

trial Court overruled and said "The D.A., at all times, bears the burden in the case. It does

not shift to the defense even if they put on evidence, ladies and gentlemen. I will charge

you to that." And the Court's "curative" instruction in its final charge was "remember

that even though the defendant may have introduced evidence, the burden of proof

always remains with the District Attorney, with the People. The defendant is not required

to prove that she is not guilty. In fact, the defendant is not required to prove or disprove

anything." (T. 1775). The charge was insufficient to alleviate the harm caused by the

18

prosecutor's improper comment upon the Defendant's failure to testify. Prosecutor's improper comment attacked Appellant's decision not to testify. "A comment on the defendant's decision not to testify is reversible error if it cannot be said that there is no reasonable possibility that comment might have contributed to the conviction." People v. Carvalho, 256 A.D.2d 1223 (4th Dept. 1998). Moreover, where Defendant's decision whether to testify or not was an issue during the selection of the jury. One prospective juror expressed his opinion as follows: "If I was in that position, I'd want to say something, though, in my defense." "I feel my own case, I'm trying to defend myself here, why can't I be the one who speaks, you know." (T. 247). After defense counsel had explained to the prospective juror the fifth amendment right, she asked, "If you're sitting as a juror and the person chooses not to speak, will you hold that against them?" The prospective juror answered, "I wouldn't hold it against them, but I would wonder why they wouldn't want to say anything." (T. 248). Another prospective juror was confused about whether the defense would have to present a case to the jury. She said, "I have to listen to both cases and then listen to the police officer…" Defense Counsel responded, "Funny. If I heard correctly, you said you have to listen to both cases." Then she tried to clarify the issue saying, "Guess what, we don't have a burden, there is no such thing as both cases. You have to listen to their case. We don't have to do anything and you still have to figure out, did they prove it to me beyond a reasonable doubt. So forget that both cases stuff, okay." (T. 628).

After all the explanation concerning the defendant's right to not testify, a third prospective juror still had doubts. He stated, "The only things I might have issue with, if I felt like I was not guilty, I would want to profess that and take the stand and plead my

19

case." Now, the Court had to explain the law to the prospective jurors, all over again, but still, this third prospective juror kept saying, "Yeah, I understand the law. I just put myself in that situation. If a case were held against me, I knew I wasn't guilty, what I would do in that…" The Court and defense counsel continued to explain the issue to the prospective juror, but at the end, he concluded saying that he was not 100 percent sure to be impartial if Ms. Gomez decided not to testify. (T. 629-632). Therefore, Prosecutor's comment shifting the burden of proof deprived Appellant of a fair trial; People v. Levandowski, 8 A.D.3d 898 (3rd Dept. 2004).

In a recent case, People v. Rupnarine, 140 A.D.3d 1204 (3rd Dept. 2016), the judgment of conviction was reversed because Defendant was prejudiced by prosecutor's comments in summation. "during summation, prosecutor improperly shifted burden of proof from the people to defendant by remarking that defendant failed to provide an innocent explanation for his actions or that it was necessary for him to do so…or for the presence of incriminating evidence at the crime scene." In People v. Ortiz, 116 A.D.2d 531 (1st Dept. 1986), "Prosecutor attempted to shift burden of proof from people to defendant by referring to defendant's failure to introduce evidence, suggesting that defendant has obligation to call witnesses on his own behalf." Prosecutor's impermissible comment concerning defendant's failure to testify required reversal.

In here, the prosecutor shifted the burden to the Appellant when he stated, "Nothing he said was refuted – " (T. 1766). He also said in the beginning of his summation, referring to the defense, "She didn't let the facts get in the way of her arguments…And here's what they can't get around. Nobody other than Ynmaculada Gomez had any motive to kill Mario Rei," (T. 1718) suggesting that Appellant could not

20

explain something, as if she had any obligation or burden to come up with an explanation. Counsel is afforded wide latitude during summations, but when a prosecution's remarks are so egregious such that they deprive a defendant of a fair trial, reversal is warranted. See People v. Forbes, 111 A.D.3d 1154 (2013).

The prosecutor also tried to denigrate the defense when he said, "What she tried to do in her summation was to distract you from all the evidence that shows her client is guilty." (T. 1717). He also improperly expressed his own opinion of the guilt of the accused. He continued expressing his personal opinions in this matter during his summation, "Nobody other than Ynmaculada Gomez had any motive to kill Mario Rei." "Because the link, the key, the reason he's dead is sitting in the chair over there." (T. 1718). "The only person with a motive to kill Mario Rei is the defendant." (T. 1748). The prosecutor repeatedly stated unqualified pronouncements of the defendant's guilt during summation deprived Appellant of a fair trial." People v. Smith, 288 A.D.2d 496 (2nd Dept. 2001).

He also gave his personal opinion on the evidence, calling for speculation by the jury when he stated, "The reason why the defendant didn't need her gold Jeep ladies and gentlemen, is because she was traveling to New York with Luis Rosado to perform this murder." (T. 1738). This failed in the range of speculation, because Appellant had another car, "Jeep Wrangler" that was mentioned on Flor Cepeda's cross-examination (T. 958-960, Defense Exhibit I) and it was also beside the gold Jeep in the pictures received into evidence, People #42 and #43. (T. 1202-1206). "Prosecutor personal opinions of the guilt of the defendant was improper since such determination ultimately rests with the jury." People v. Jones, 47 A.D.2d 761 (2nd Dept. 1975). Prosecutor continued expressing

21

his personal opinion on the evidence, this time, concerning the color of the runaway's

car, "Now, counsel made a big deal out of the fact he said it was a silver car. But, ladies

and gentlemen, I ask you, a metallic-colored car, 5 o'clock in the afternoon, depending on

how the light hits this car, it can look silver, it can look gold," (T. 1746). Defense

Counsel objected to the comment but the court overruled.

Echoing the earlier remark about the car's color, the prosecutor again sought to

explain why the people's witness, Mr. Vasilantonakis "may not have the color exactly

right." (T. 1746). He was improperly impeaching his own witness. He used pictures

(People's #42, #43) that were taken in Tampa, Florida, during the execution of a search

warrant at the Appellant's house during day light (Agent Noblit testimony, T. 1162,

1201-1203), trying to prove that the color of the car can change depending on the way the

light is hitting. That was improper and speculative. Moreover, where the crime occurred

past 5 p.m. on November 12, in New York, where it was not sunlight, it was starting to

get dark. "It is thus improper for a prosecutor, during summation to characterize some of

the evidence and to express his or her personal opinion on the evidence." People v. Knox,

71 A.D.2d 41 (1979). It was clear that prosecutor was trying to fix the testimony of the

only eyewitness at the crime scene, Mr. Vasilantonakis, who testified that the color of the

runaway car was silver. Prosecutor Clark attempted to mislead the jury, supporting the

People's theory, that the color of the runaway car was gold. That was the reason why

defense counsel argued and objected to the admission in evidence the pictures of

Appellant's car (People #42, #43). Defense Counsel stated, "Well, there really is no

relevance for these photographs to come in, and there is really no reason that they both

have to come in. It's obvious what counsel is trying to do is show that the silver car can

22

sometimes look gold and the gold car can sometimes look silver, which there is a suggestion here that it's not a fair and accurate representation of how these cars looked on this particular day." (T. 1204). "There is nothing that said that she has driven this car – no one said she has driven this car up to commit this homicide. There is no reason that both of these photographs have to go in. I'm going to object to 42 because it doesn't fairly and accurately represent this vehicle." (T. 1205). But one more time the Court ignored the defense argument and overruled (T. 1206-1207). Sadly, the defense was right. The prosecutor used these pictures (People #42, #43) during his summation to improperly mislead the jury about the color of the runaway car (T. 1746).

Further, in commenting on the testimony of the silver car, the prosecutor improperly suggested that the main defense argument (that Vasilantonakis saw the shooter flee in a silver car and only Pazmino had a silver car) was pure fantasy. In fact, Pazmino did have access to a silver car belonging to her husband and Rosado had testified he planned to use it in carrying out Rei's murder when he was in New York the first time. (T. 1364). Prosecutor's suggestion that the silver car and Rosado's plan to have Pazmino drive it was fabricated from non-existent testimony, was untrue. The prosecutor's distortion and misrepresentation of the evidence in an attempt to denigrate the defense was improper. People v. Mehmood, 112 A.D.3d 850, 853 (2nd Dept. 2013). "Summation comments that 'inaccurately stated' the defendant's testimony, constituted reversible error." People v. Lantigua, 228 A.D.2d 213, 217-219 (1st Dept. 1996), "reversible error where prosecutor distorted and misrepresented evidence."

Prosecutor also improperly estimated how much money Luis Rosado would get for living in a house rent free. He stated, "Think about how much it is. Let's say, ladies

23

and gentlemen, rent was $1000.00 a month, lives there rent free for a year, that's 12 grand. She tells him he can live there as long as he wants, so it's potentially more than that." (T. 1750). Not only was the remark needless, it was speculative, there was not testimony about how much Rosado's rent was. In fact, the record shows, by testimony of Cepeda, Pazmino and Rosado, that the house Rosado was supposed to live rent free it was in foreclosure, no payment had been made to the mortgage, and that property belonged to Flor Cepeda, not the Appellant, Ms. Gomez. That property was transferred to Flor Cepeda in September 2007 and she lived there until September 2008. The quit claim deed for this property was admitted into evidence (Defense Exhibit W).

The prosecutor was also allowed during summation in commenting on the Appellant's relationship with Flor Cepeda, the following: "Defense Counsel asked a lot of questions of Flor Cepeda. What did she establish? She established defendant clearly had an obsession with her. She suggests there's more of a relationship there than that, which she denies and she tells you nothing more than obsessions." (T. 1756). That was improper, the prosecutor tried to inflame the jury by characterizing the Appellant as an "obsessed woman." There was not testimony to support that comment. When a prosecutor expresses personal beliefs, that action is considered "a subtle form of testimony against the defendant" which may be accorded undue weight because "of the prestige of the office of the District Attorney." People v. Palermo 54 N.Y.2d 294 (1981).

Prosecutor also said that the fact Appellant called Pazmino to tell her she reported the gun stolen and gave Pazmino's name, "was designed to scare her, to scare her from turning the gun in, to scare her from telling the police what she knew about the defendant." (T. 1752-1753). These negative descriptions of Appellant by prosecutor

24

during summation, presenting her as an "obsessed woman," and someone "who scared Pazmino," invited the jury to stray outside of the four corners of the evidence and had the effect of aligning the jurors against Appellant. Prosecutor's "words and actions carry greater force and hold greater sway with a jury than those of a private attorney." <u>People v. Mott</u>, 94 A.D.2d 415, 418 (4th Dept. 1983).

Having denigrated Appellant's character, the prosecutor then impermissibly vouched for the witnesses with the most favorable testimony for the prosecution's case. He said, "When you take the testimony of Luis Rosado and compare it to the testimony of Gioconda Pazmino and the other witnesses and evidence in this case, you will find that it both consistent and accurate. It shows that it's truthful and it shows that defendant is guilty." (T. 1721).

In reference to Luis Rosado's testimony, prosecutor stated, "I'm not asking you to like him. <u>What I'm suggesting here</u>, what I'm arguing, what I'm telling you is that when you take what he says and back it up against the other evidence and the other testimony in this case, <u>he's telling the truth</u>." (T. 1750). Commenting about Luis Rosado's agreement with the District Attorney's office, prosecutor stated, "that's a reason for him to get involved, that's a reason for him to get on the stand and testify, <u>not a reason for him to get on the stand and lie</u>. And what he's telling you is what he already told the police. <u>There's no reason to doubt what he's saying</u>, especially, when everything he's saying is corroborated by other witnesses and other evidence in this case." (T. 1752).

He continued vouching for his witnesses, "Gioconda Pazmino in this case, ladies and gentlemen. She knew they were talking about it in October...She didn't think they would actually go through with it....Now, should she have called the police, absolutely.

25

Should she have let a gun stay in her house, absolutely not. Should she have handed it

back to the defendant, absolutely not... That doesn't make her a murderer." (T. 1752). "If

she's involved in this murder, if she was in it, why is she calling the police five hours or

four hours afterwards to report the crime, to give them, to tell them, to give them the

names of Luis Rosado and Ynmaculada Gomez. That makes no sense. That's how they

found Luis Rosado and Ynmaculada Gomez." (T. 1753). Defense Counsel objected, but

the Court overruled.

Prosecutor trying to gain the jury's sympathies, described the killer, Luis Rosado

as "The guy that's getting kicked out of his house." (T. 1720). He also said, concerning

Rosado's motive to kill Mario Rei, "He sees that as money, sees that as a way to get out

from under and decides he's going to, he will kill for his boys, for his friend, for the

person he works for." (T. 1750). Prosecutor improperly vouches for the credibility of his

witnesses bolstering their testimony and appeals to the jury's sympathies. People v.

Bosset, 45 A.D.3d 693 (2nd Dept. 2007), People v. Ortiz, 33 A.D.3d 432 (1st Dept. 2006),

see also People v. Brown 26 A.D.3d 392 (2nd Dept. 2006); People v. Robinson 260

A.D.2d 508 (2nd Dept. 1999).

The prosecutor misconduct during summation served to deprive Ms. Gomez of

both a fair trial and due process of law. Assistant District Attorney, Shawn Clark,

presented a classic example of a prosecutorial misconduct, a prosecutor so desperate to

win that he violated established Constitutional protections. Assistant District Attorney

Clark, realized that the absence of an explanation for the participation of Pazmino in the

crime, provided an obstacle for his case. His remedy, provide the missing testimony by

injecting himself in the case and providing an explanation based upon his own opinion of

26

the events in this case. In the face of this clear dilemma, the prosecutor resorted to arguing before the jury his unsworn version of the events.

The prosecutor's comments were not made in response to any improper remarks by defense counsel or because the defense "opened the door." Instead, it is absolutely clear that, in this case, the prosecutor was clearly responding to defense counsel's remarks challenging the veracity of the prosecutor witnesses, G. Pazmino, L. Rosado and F. Cepeda.

Both the Federal and State Courts, along with the American Bar Associations standards for criminal justice, have declared that it is unprofessional and improper conduct for a prosecutor to express his personal belief as to the truth or falsity of any testimony or evidence or guilt of the defendant. People v. Jaime, 84 A.D.2d 696 (1st Dept. 1981), United States v. Modico, 663 F.2d 1173 (2 Cir. 1981); ABA Standards for Criminal Justice, standard 3-5.8 (b) 1980.

When a prosecutor's comments clearly exceed the bounds of legitimate advocacy, as was done in this case, the prosecutor makes himself an unsworn witness, supporting his case by his own veracity and official position. This type of improper advocacy has been condemned in the strongest terms by both the Federal and State Courts, Berger v. United States, 295 U.S. 78 (1935); People v. Mariable, 58 A.D.2d 877 (2nd Dept. 1977); People v. Rivera, 75 A.D.2d 544 (1st Dept. 1980); People v. Santiago, 78 A.D.2d 666 (2nd Dept. 1980).

As if not enough all the improper remarks the prosecutor had already done, in his summation, he accused Appellant of tax fraud, and of forging Flor Cepeda's signature in a credit card application (T. 1757-1760). Prosecutor's improper comment about the quit

27

claim deeds admitted in evidence for the defense was, "Ladies and gentlemen, that is not

what these things suggest. What these documents suggest, ladies and gentlemen, is the

defendant was engaged in heavy tax evasion." (T. 1757). Defense Counsel objected, but

the Court overruled, allowing prosecutor to continue accusing defendant of an uncharged

crime. He said, "She wants to tell you that's a suggestion there's some relationship here.

It's her getting out from under dire taxes and putting it in the name of an illegal person."

(T. 1759). Defense Counsel objected once again, but the Court overruled and commented,

"this is argument, ladies and gentlemen. You're free to disregard it if you choose, or

accept it."

Here, the quit claim deeds admitted into evidence reflected no more than the

transfer of two Florida properties from Appellant to Cepeda in 2006 (Defense Exhibits A

and S), and the transfer of the properties back to Appellant in 2007 (Defense Exhibits C

and D). The property transfers themselves were not facially fraudulent and referenced no

tax debt. The prosecutor's accusation during summation that Appellant was involved in

tax fraud was baseless and improper.

The prosecutor in summation "may not...try to convey to the jury, by insinuation,

suggestion or speculation, the impression that the defendant is guilty of other crimes not

in issue at the trial." People v. Ashwal, 39 N.Y.2d 105, 110 (1976). "It is fundamental

that the jury must decide the issues on the evidence, and therefore fundamental that

counsel, in summing up, must stay within the four corners of the evidence." Ashwal, 39

N.Y.2d at 109.

The Court's "curative" instruction was too little. It was buried into the Court's

final charge, and then referred to "evidence concerning an allegation of tax evasion or tax

28

fraud." (T. 1784). When there was in fact no such "evidence," only the prosecutor's improper summation remark. The Court also undermined the effectiveness of its charge by the statement that "this is not tax court and there's no such issues before you to resolve." The Court failed to cure the prejudicial remarks or admonish the prosecutor to refrain from such further improper remarks.

The defense made timely objections which were overruled by the trial court. The Court failed to sustain any defense objections to the prosecutor's improper and prejudicial comments, thus giving the imprimatur of propriety to the prosecutor's comments. See Ashwal, 39 N.Y.2d at 111, "possibility of prejudice is greatly enhanced" when court overrules defense objections, thus giving "standing" to prosecutor's improper comments. People v. Walters 251 A.D.2d 433, 435 (2nd Dept. 1998). Prejudice compounded when misconduct was "not only condoned in the eyes of the jury, but perhaps also encouraged" by Court's overruling of objections to "blatantly improper remarks." See also People v. Lippolis, 246 A.D.2d 557-558 (2nd Dept. 1998).

In addition to accusing her of tax crimes the prosecution accused the Appellant of forging Flor Cepeda's signature in a credit card application. He based this accusation on a credit card application recovered from Appellant's house during execution of a search warrant, in which she had named Flor Cepeda as the applicant and allegedly forged her signature. (T. 1759-1760). He continued accusing the Appellant of a crime that she never was charged, without any evidence to prove it. He stated, "Look at these signatures. She tried to get her signature right." "She tried to make it like her signature. She may have practiced her signature." (T. 1760). The only thing he had, it was a credit card application

29

found in Appellant's house. Nothing else. He gave his own explanation of the events and became once again an unsworn witness.

The rules governing a prosecutor's summation comments are unmistakably clear. "Evenhanded justice and respect for the fundamentals of a fair trial mandate the presentation of legal evidence unimpaired by intemperate conduct aimed at sidetracking the jury from its ultimate responsibility – determining facts relevant to guilt or innocence." People v. Calabria, 94 N.Y.2d 519, 523 (2000). A prosecutor's improper assertions "are apt to carry weight when they should properly carry none," precisely because juries have confidence that it is a prosecutor's obligation not to use improper methods to obtain conviction. Berger v. United States, 295 U.S. 78, 88 (1935). Using a variety of improper tactics, the prosecutor in this case went well beyond the defined boundaries of proper conduct in his summation and thus, impermissibly "sidetracked the jury from its ultimate responsibility." Calabria 94 N.Y.2d at 523.

Here the prosecutor violated his duty of fairness by exceeding the bounds of the Sandoval ruling by improperly accusing Appellant of forging Cepeda's signature. All of Appellant's prior bad acts, the Court limited the use of this, only for impeaching the Appellant, if she testified, but the prosecutor went far beyond this bound.

The United States Supreme Court has disapproved such tactic, because it poses the danger of "conveying the impression that evidence not presented to the jury, but known to the prosecutor supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of

the evidence." United States v. Young, 470 U.S. 1, 18-19 (1985). Proof of the commission of a crime or of prior bad acts is admissible "for the purpose of impeaching a defendant's credibility." People v. Sandoval 34 N.Y.2d 371, 374 (1974). Propensity evidence, however, is not solely inadmissible, but highly prejudicial as it is "inevitable." That evidence of prior criminal, vicious or immoral conduct will always be detrimental the defendant." Id. at 376-378. In fact, for more than a century, this state has considered propensity evidence to "invite a jury to misfocus, if not base its verdict, on a defendant's prior crimes rather than on the evidence – or lack of evidence – relating to the case before it." People v. Rojas, 97 N.Y.2d 32, 36-37 (2001). Despite the clarity of this longstanding rule, the prosecutor in the instant case engaged in precisely this tactic.

However, Defense Counsel didn't object when the prosecutor was violating the bounds of the Sandoval ruling, misconduct that was not objected to, it should be addressed in the interest of justice, given its excessiveness and prejudicial impact. See Anderson, 35 A.D.3d at 872; People v. Pagan 2 A.D.3d, 879, 880 (2nd Dept. 2003); People v. Smith, 288 A.D.2d 496 (2nd Dept. 2001) (although no objections were made to some improper prosecutorial comments during summation, reversal granted in the interest of justice); People v. Facciolo, 288 A.D.2d 392, 394 (2nd Dept. 2001) (New trial required, in the interest of justice, based upon improper remarks by the people during closing argument.)

A defendant has the right to have a fair trial, in this case, the prosecutor's pervasive misconduct during summation destroyed any chance of that. Here, the prosecutor attempted to shift the burden, expressed his personal opinion of the guilt of Appellant, he also gave his personal opinion on the evidence, calling for speculation by

31

the jury, denigrated the defense and the character of Appellant presenting her as a liar,

obsessed woman, who could scare Pazmino, with criminal propensity. He also vouched

for the credibility of his witnesses, tried to arouse the jury's sympathy and accused

Appellant of uncharged crimes.

The prosecutor in the instant case was persistent in his misconduct in summation.

But a criminal defendant is entitled to have his case "heard by a jury that finds the facts

solely on the evidence, ideally via cool and detached deliberations." People v. Nevedo,

202 A.D.2d 183, 185 (1ˢᵗ Dept. 1994). It cannot be said that there is no significant

probability that the verdict in this circumstantial case would have been different absent

the cumulative, prejudicial effect of prosecutor's improper remarks.

For all of the reasons stated above, Appellant's conviction should be reversed and

new trial ordered.

## POINT III

APPELLANT WAS DEPRIVED OF A FAIR TRIAL BY STATE'S FAILURE TO
DISCLOSE BRADY MATERIALS.

The fifth, sixth, and fourteenth Amendments to the United States Constitution

impose an absolute obligation on a prosecutor to disclose to the defense favorable

evidence "material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87

(1963). Failure to do so violates due process. Id. Brady material can be favorable "either

because it is exculpatory, or because it is impeaching." Strickler v. Greene, 527 U.S. 263,

282 (1999). A Constitutional violation is established when such evidence is withheld and

it is "material" to the outcome of the case. Id. at 281-282.

Under the Federal standard, evidence is material if there is a "reasonable

probability" that, had the prosecution timely disclose the evidence," the result of the

32

proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682

(1984). A reasonable probability means "that the likelihood of a different result is great

enough to undermine confidence in the outcome of the trial." Smith v. Cain, 132 S.Ct.

627, 630 (2012).

Of course, in New York, when the people have failed to disclose favorable

evidence that the defense has specifically requested, Courts measure materiality by

whether there is any "reasonable possibility" that the failure to disclose the evidence

"contributed to the verdict." People v. Vilardi, 76 N.Y.2d 67, 77 (1990). This is because a

specific "request puts the prosecutor on notice that there is particular evidence the

defense does not have and believes to be important." Id. at 73, 74. By nature the Vilardi

test is strict and thus the People's failure to disclose specifically requested evidence is

"seldom, if ever, excusable." Id. at 74 (quoting United States v. Argurs, 427 U.S. 97, 106

(1976).

The prosecutor's failure to disclose Brady materials, that defense counsel has

made a specific request for such materials, deprived Appellant of her right of a fair trial.

In here, defense counsel, Ms. Butler, requested to the prosecutor to turn over to her the

documents they received for the subpoena of co-defendant Luis Rosado's telephone

records, for Appellant's telephone records (T. 693), the T-mobile 2008 cell sites (T. 698),

and the information recovered in a search warrant executed on Appellant's AOL account

(T. 694).

Prosecutor's response to defense counsel's request was, "Judge, with respect to

Mr. Rosado's telephone records I subpoenaed, defendant's telephone records I

subpoenaed. I'm not introducing either one of those records. I'm not even sure I have

33

them. I know they were subpoenaed. I don't believe we have them. We may have them, I don't plan on using them (T. 695)." Prosecutor Clark responded with the excuse that he was not using the records in his case, he even tried to convince the defense that he didn't even know if he had the phone records.

The State should have had those phone records in his possession and turned them over to the defense. Luis Rosado's phone records would have established a close relationship between Rosado and Gioconda Pazmino, a relationship they denied during their trial testimony. Rosado's phone records would have shown that he had continued in communication with Pazmino, after Pazmino left Tampa, Florida in September 2008. This was a fact prosecutor denied, trying to establish that Rosado and Pazmino just had "a work relationship" that lasted only three weeks, as he argued in his closing arguments, attacking the defense theory that Appellant was framed by Rosado and Pazmino. These phone records could have an impeachment value to the defense. Rosado's phone records could have shown his activities the days before the date of the crime. "Prosecution failure to disclose Brady material which affected credibility of key prosecution witness was reversible error, in prosecution for second-degree attempted murder and first degree robbery where defendant made specific request for such material and there was reasonable possibility that, had such material been disclosed, result would have been different." People v. Harris, 35 A.D.3d at 1197 (4th Dept. 2006).

Likewise, appellant's phone records would have revealed information favorable for her that could impeach Cepeda's and Pazmino's testimony. Concerning Appellant's phone records, defense counsel argued, "So if he has the records and they are arguable Brady material, he can say she didn't bring her phone. But if he has the records, I demand

34

they be turned over. If there's cellular records that shows my client's phone was answering in Florida, it's Brady material (T. 697).

"A Brady violation occurs when the prosecution fails to timely disclose all exculpatory and material evidence, including evidence that could be used to challenge credibility of a crucial prosecution witness." See People v. Madison, 116 A.D.3d 1074 (2014); People v. Williams, 50 A.D.3d 1177 (2008). Nondisclosure of Rosado's and Appellant's phone records prevented the defense from conducting a proper cross-examination of Rosado and Pazmino.

Prosecutor's response to defense counsel concerning that T-Mobile cell sites, as follows, "I gave her the key for the cell sites that I believe are relevant and I even pointed to her the numbers and the corresponding address – I don't know whether I'm going to use those keys or not. What she's looking for may or may not be in there. But I called Verizon or T-Mobile, rather to try to get all the ones on that sheet, but they don't go back to 2008. So, I'm not going to get any more than that." (T. 695). The Prosecutor's excuse for not being able to turn over the T-Mobile cell sites to the defense, was unacceptable. Because trial testimony has shown that he had been in possession of those records since 2008. (Joseph Sierra – T-Mobile Custodian of Record, T. 1504). He had been in possession of the complete T-Mobile phone record, but he decided to use a redacted version of the record, only a piece of the entire record, the piece that was convenient to support his case (Joseph Sierra, T. 1491, 1503), forcing the defense to be limited to a part of the record, an issue that was argued by defense counsel through the entire trial, including her closing argument (T. 1696-1700, 1715).

Prosecution's failure to disclose those records deprived Appellant of both the ability to investigate additional avenues of exculpatory or impeaching evidence and a meaningful opportunity to employ that evidence during her cross-examination of the prosecution's witnesses. People v. Negron 26 N.Y.3d 262. A trial is supposed to be a search for the truth, with the accused permitted to defend himself against the awesome power of the state. But not in this case, the prosecutor successfully held back evidence that would have supported the defense, preventing that evidence to go to the jury.

The Government had the complete T-Mobile records back in 2008, but at the time of the Appellant's trial (June 2014), they claimed they didn't have them. That is unacceptable.

In a similar vein to the Brady rule is the due process requirement that a prosecutor refrain from relying on false or misleading evidence or argument to achieve a conviction. See People v. Colon, 13 N.Y.3d at 349-350; People v. Steadman, 82 N.Y.2d 1, 7 (1993). A prosecutor is an officer of the court, whose obligation is to achieve justice, not just a conviction. Steadman, 82 N.Y.2d at 7.

To have a Brady violation, the accused would have to establish that the information that is known by the prosecution was material, meaning, there was a reasonable possibility that had they been turned over to the defense, it would have changed the outcome of the proceedings. People v. Fuentes, 12 N.Y.3d 259, 263 (2009); People v. Vilardi, 76 N.Y.2d 67, 77 (1990).

In this case Rosado's phone records, Appellant's phone records, and the complete T-Mobile record, including all the cell sites from 2008, would have presented to the jury a solid defense, it would have helped to prove the defense theory and it would have put

more than a reasonable doubt in the mind of the jury. This could have contributed to a more favorable verdict. See People v. Williams, 50 A.D.3d 1177 (2008).

In reference to the documents recovered from Appellant's AOL account, the prosecutor stated the same excuse, "I'm not introducing any of the defendant's AOL records." (T. 695). "There is a DD-5 in there that says there was a search warrant for her AOL records. I don't know if we received them. I'm not using them, so I don't know why she thinks she's entitled to those." (T. 696).

Likewise, the phone records, the AOL documents could be exculpatory, could have established Appellant's constant communication with Flor Cepeda prior to the passing of Appellant's mother. This information could have been of strong impeachment value since Cepeda denied being in a relationship with Appellant and had testified, she had not communication with Appellant before Appellant's mother passed on November 12, 2006 (T. 910-911).

The absence of the state to turn this material over to the defense was of such prejudicial nature that it violated the due process rights under Brady as well as Appellant's right to a fair trial. "To establish a Brady violation, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching. That evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued because the evidence was material." See People v. Smith, 138 A.D.3d 1418 (4th Dept. 2016); People v. Garret, 106 A.D.3d 929 (2nd Dept. 2013).

In this case, the Brady material requested by Defense Counsel was material, the phone records, the cell sites and the AOL records were evidence favorable to Appellant

"either because it is exculpatory, or because it is impeaching." Therefore State's failure to disclose Brady materials to the defense substantially prejudiced Appellant and contributed to the verdict against her.

The Brady issue was preserved by Defense Counsel's argument and objections. This Court should, accordingly reverse Appellant's conviction and grant her a new trial.

## CONCLUSION

FOR THE REASONS SET FORTH ABOVE, APPELLANT'S CONVICTION SHOULD BE REVERSE, AND A NEW TRIAL SHOULD BE GRANTED.

Date:  October 2016

Respectfully Submitted,

Ynmaculada Gomez 14G0730
Appellant pro se
Bedford Hills Correctional Facility
247 Harris Road
Bedford Hills, NY 10507

To be argued by
NANCY FITZPATRICK TALCOTT
(TIME REQUESTED: 10 MINUTES)

# New York Supreme Court

**Appellate Division--Second Department**

### AD No. 14-07277

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

against

YNMACULADA GOMEZ,

Defendant-Appellant.

## SUPPLEMENTAL BRIEF FOR RESPONDENT

RICHARD A. BROWN
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York 11415
(718) 286-6696

JOHN M. CASTELLANO
JOHNNETTE TRAILL
JOSEPH N. FERDENZI
NANCY FITZPATRICK TALCOTT
  Assistant District Attorneys
    *Of Counsel*

FEBRUARY 23, 2017

Queens County
Indictment Number 538/09

# **TABLE OF CONTENTS**

**Page No.**

PRELIMINARY STATEMENT ................................. 1

INTRODUCTION ............................................ 1

POINT ONE

        DEFENDANT RECEIVED THE EFFECTIVE
        ASSISTANCE OF COUNSEL ......................... 4

POINT TWO

        THE PROSECUTOR'S SUMMATION WAS
        PROPER. DEFENDANT'S LARGELY
        UNPRESERVED CLAIM TO THE CONTRARY IS
        WITHOUT MERIT. IN ANY EVENT, THE
        COURT ALLEVIATED ANY POTENTIAL
        PREJUDICE WITH ITS INSTRUCTIONS.
        FINALLY, ERROR, IF ANY, WAS HARMLESS
        IN LIGHT OF THE OVERWHELMING
        EVIDENCE OF DEFENDANT'S GUILT .............. 22

POINT THREE

        THE TELEPHONE RECORDS WERE NOT
        *BRADY* MATERIAL. DEFENDANT'S CLAIM
        THAT THE PROSECUTOR IMPROPERLY
        WITHHELD THESE DOCUMENTS IS
        ABANDONED AND WITHOUT MERIT .............. 42

CONCLUSION ............................................ 51

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

---------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,                    :

                    Respondent,                    :

                    -against-                    :

YNMACULADA GOMEZ,                    :

                  Defendant-Appellant.                    :

                                  :

--------------------------------------------------------------------- x

## **SUPPLEMENTAL BRIEF FOR RESPONDENT**

## **PRELIMINARY STATEMENT**

In a decision and order dated September 23, 2016, this Court

granted defendant permission to file a *pro se* supplemental brief. Respondent

submits this brief in response to defendant's *pro se* brief, which was accepted

for filing on or about December 28, 2016.

## **INTRODUCTION**[1]

Defendant raises three claims in her *pro se* supplemental brief.

First, defendant claims she was denied the effective assistance of counsel.

Specifically, defendant asserts that counsel was ineffective for failing to clarify

---

[1]A summary of the trial evidence appears in Respondent's main brief, dated October
3, 2016.

a discrepancy in the testimony of the alibi witness, Yoselin Amarante, regarding the exact date she saw defendant, resulting in a flawed alibi defense. Amarante did not negate defendant's alibi defense, however. Counsel's strategic decision to call Amarante to suggest defendant may have been with her on the date of the murder did not fall below a standard of reasonableness. Insofar as defendant criticizes counsel's preparation of this witness, it depends on matters not in the record, and, therefore, not justiciable on direct appeal. Moreover, this single error was not so clear and dispositive as to render counsel's representation ineffective.

Defendant also claims that counsel was ineffective for failing to call three other witnesses. This claim is also *dehors* the record and is not properly raised on direct appeal. Although defendant now claims that counsel knew of these witnesses, there is no indication of that alleged knowledge on the record. Moreover, there is nothing on the record regarding any conversations between defendant and counsel regarding these witnesses or any decision whether to call them, or even whether counsel interviewed the witnesses and elected not to call them. As such, the claims are not properly raised on direct appeal.

2

Second, defendant claims that the prosecutor's summation comments shifted the burden, called for speculation, tried to inflame the jury, and vouched for the credibility of the People's witnesses. Defendant also claims that in his summation, the prosecutor became an unsworn witness and accused defendant of uncharged crimes. This claim is largely unpreserved for appellate review and completely without merit. The prosecutor's comments were fair comments on the evidence or invited response to defendant's summation. In any event, the court alleviated any potential prejudice with its instructions. Finally, error, if any, was harmless in light of the overwhelming evidence of defendant's guilt.

Third, defendant claims that the People failed to disclose *Brady* materials, thereby denying her a fair trial. Specifically, defendant claims that the prosecutor improperly withheld her phone records, Luis Rosado's phone records, and the T-mobile 2008 cell sites. Initially, the claim is abandoned. When defendant raised whether the records existed and argued they constituted *Brady* material, the prosecutor made clear he had turned over all discoverable material and did not have the documents defendant sought, although he would check again. The prosecutor also made clear that he did not intend to introduce any such records into evidence. By not raising the issue again, defendant

3

abandoned the claim. In any event, defendant's claim is devoid of merit, as the records did not constitute *Brady* material. And, error, if any, was harmless in light of the overwhelming evidence of defendant's guilt.

## **POINT ONE**

### **DEFENDANT RECEIVED THE EFFECTIVE ASSISTANCE OF COUNSEL (Responding to** *Pro Se* **Brief, Point I).**

Defense counsel provided defendant with meaningful representation throughout the proceedings. Counsel pursued a cogent and consistent strategy throughout the trial. Nevertheless, defendant claims that counsel was ineffective for failing to call three witnesses. Defendant also asserts that counsel was ineffective for presenting a flawed alibi defense. Because most of defendant's claims involve matters *dehors* the record, they are not properly raised on direct appeal. In any event, to the extent the claim is reviewable, they are devoid of merit.

Defendant asserts that counsel was ineffective for failing to conduct a proper investigation, which resulted in her failure to call three witnesses whose testimony could have been exculpatory. Defendant claims that she provided counsel with the contact information for the witnesses, and, when she asked counsel about the witnesses, she received "an evasive

4

response" (Defendant's Brief at 11).   Initially, to the extent that defendant's allegations involve matters *dehors* the record, the claim cannot be raised on direct appeal. Defendant's claim regarding counsel's failure to investigate and call three witnesses, as well as conversations related thereto, relates to matters that do not appear on the record.   As such, the claim cannot be raised on direct appeal.   *People v. Fisher*, 121 A.D.3d 1013 (2d Dept. 2014) (insofar as defendant's contentions regarding counsel's conduct were based on matters *dehors* the record, they could not be reviewed on direct appeal); *People v. Wornell*, 112 A.D.3d 656 (2d Dept. 2013) (defendant's claim of ineffective assistance of counsel was based on matters *dehors* the record and could not be reviewed on direct appeal).

Defendant also asserts that counsel was ineffective for presenting a flawed alibi defense.   To the extent defendant's claim can be gleaned from the record, it is not properly before this Court.   Where a "mixed claim" of ineffective assistance of counsel cannot be resolved without reference to matters outside the record, the appropriate forum for reviewing the claim in its entirety is a motion to vacate the judgment, pursuant to section 440.10 of the Criminal Procedure Law. *People v. Barber*, 133 A.D.3d 868, 872 (2d Dept. 2015); *People v. Adamson*, 131 A.D.3d 701 (2d Dept. 2015).   Because

5

defendant's claim that she was denied the effective assistance of counsel involves matters outside the record, the claim is not properly raised on direct appeal.

In any event, to the extent defendant's claim involves matters on the record, it is devoid of merit. The record establishes that defendant received the effective assistance of counsel.

The right to effective assistance of counsel is guaranteed under both the Federal and State Constitutions. *See* U.S. Const., 6th Amend.; N.Y. Const., art. I, § 6. In order to establish a claim of ineffectiveness under the Sixth Amendment to the United States Constitution, a defendant must demonstrate, first, that counsel's performance fell below an objective standard of reasonableness and second, that the deficient performance deprived the defendant of a fair result. *Strickland v. Washington*, 466 U.S. 668 (1984). In this vein, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689; *People v. Cuesta*, 177 A.D.2d 639, 641 (2d Dept. 1991). And it is the defendant's burden not only to overcome the strong presumption of reasonable professional assistance, but also to demonstrate a reasonable probability that,

6

but for this substandard performance, the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 689, 694.

Under the New York rule, what qualifies as effective assistance varies with the unique circumstances of each representation. *People v. Benevento*, 91 N.Y.2d 708, 712 (1998); *People v. Baldi*, 54 N.Y.2d 137 (1981). In order to succeed on a claim that trial counsel was ineffective under the state constitution, a defendant must demonstrate, viewing the totality of the evidence, the law, and the circumstances of that particular case, that counsel failed to provide "meaningful representation." *People v. Baker*, 14 N.Y.3d 266, 270 (2010); *Benevento*, 91 N.Y.2d at 713 ; *People v. Jackson*, 70 N.Y.2d 768 (1987); *People v. Satterfield*, 66 N.Y.2d 796, 798-99 (1985); *Baldi*, 54 N.Y.2d at 147.

The meaningful representation standard is not a stringent one; it is, in fact, "undemanding." *People v. Borrell*, 12 N.Y.3d 365, 368 (2009) (quoting *People v. Turner*, 5 N.Y.3d 476, 482 [2005]). The essential inquiry in assessing whether counsel's representation was meaningful is not whether counsel could have achieved a better result, rather, it is whether, when viewed objectively, counsel's actions are consistent with those of a reasonably competent attorney. *Borrell*, 12 N.Y.3d at 368. In addition, the meaningful

7

representation standard "include[s] a prejudice component which focuses on the 'fairness of the process as a whole rather than [any] particular impact on the outcome of the case.'" *People v. Henry*, 95 N.Y.2d 563, 566 (2000) (citing *Benevento*, 91 N.Y.2d at 714).

Courts should apply a "flexible approach" when evaluating ineffective assistance of counsel claims. *Henry*, 95 N.Y.2d at 565 (citing *Benevento*, 91 N.Y.2d at 712). The question is whether the attorney committed "egregious and prejudicial" error such that the defendant did not receive a fair trial. *See Benevento*, 91 N.Y.2d at 713 (quoting *People v. Flores*, 84 N.Y.2d 184, 188-89 [1994]). What is guaranteed is a fair trial, "not necessarily a perfect one." *Benevento*, 91 N.Y.2d at 712; *see also Flores*, 84 N.Y.2d at 187. Moreover, when applying this standard, courts must take care not to accord "undue significance" to retrospective analysis. *Benevento*, 91 N.Y.2d at 712; *Baldi*, 54 N.Y.2d at 145. So long as the defendant was afforded "meaningful representation," it is irrelevant whether a course chosen by defendant's counsel was the best course to pursue, or even a good one. *Satterfield*, 66 N.Y.2d at 799.

Indeed, even if there are some unexplained or unjustified failures in counsel's representation, if they are "insufficient to overshadow" her overall

8