UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                                :
**YNMACULADA GOMEZ**,                                           :
                                                                :    **MEMORANDUM**
                              Petitioner,                       :    **DECISION AND ORDER**
                                                                :
                                                                :    18-CV-7252 (AMD) (LB)
              – against –                                       :
                                                                :
                                                                :
**AMY LAMANNA,** *Superintendent, Bedford Hills*                :
*Correctional Facility,*                                        :
                                                                :
                              Respondent.                       :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

       The petitioner, currently incarcerated at Bedford Hills Correctional Facility, petitions for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petitioner was charged with murder

and related crimes after she persuaded an employee to murder her former business partner.  On

July 14, 2014, she was convicted after a jury trial of murder in the second degree, two counts of

criminal possession of a weapon, and tampering with physical evidence.  She was sentenced to

concurrent prison terms for the murder and weapons possession convictions: an indeterminate

term of twenty-five years to life for the murder, and a determinate fifteen year term followed by

five years of post-release supervision for each weapons possession count.  In addition, she was

sentenced to a consecutive, indeterminate term of one and a third to four years for tampering

with physical evidence.  The petitioner claims that she was deprived of her right to a fair trial by

an impartial jury because of comments the trial judge made during jury selection.  (ECF No. 13

at 15.)  She also claims that the evidence of her conduct in the months leading up to the murder

was unfairly prejudicial, and that the prosecutor's comments in summation were inflammatory.

(*Id.* at 21.)  Additionally, the petitioner argues that her trial lawyers were ineffective, that the

prosecution failed to turn over exculpatory evidence, and that the evidence against her was insufficient.[1]  (*Id.*)  For the reasons that follow, the petition is denied.

## BACKGROUND

### I.    Overview

In early 2008, the petitioner had a falling out with her former business partner, Mario Rei. She persuaded her employee, Luis Rosado, to murder Rei in exchange for free housing; she also threatened to hurt his family if he refused.  On November 12, 2008, the petitioner and Rosado drove all night from Florida to Queens, New York.  Rosado used the petitioner's gun to shoot and kill Rei, and he and the petitioner returned to Florida.  The petitioner hid her gun in her bedroom closet.  After her arrest, detectives found the gun during a search of the petitioner's home; ballistics tests confirmed that it was the same gun that Rosado used to shoot Rei.

The petitioner was charged with second-degree murder, two counts of criminal possession of a weapon and one count of tampering with physical evidence.  She went to trial before the Honorable Kenneth Holder and a jury on June 3, 2014, and was convicted of all charges.  Judge Holder sentenced the petitioner as described above.

### II.   Pretrial Proceedings

#### a.    Pretrial Motions

Prior to trial, the prosecution moved to introduce testimony from Gioconda Pazmino—the petitioner's "former lover"—that the petitioner said she wanted to have Rei killed because "he had ruined her credit, her life, her business and taken her woman"—Rei's wife, Flor Cepeda. (Tr. 10-12.)  The petitioner showed Pazmino a gun, which she said "was for [Rei] or anyone else who gets between [the petitioner] and [Cepeda]."  (Tr. 12-13.)  The prosecutor argued that the

---

[1] The petitioner filed a *pro se* petition (ECF No. 1), and subsequently retained counsel, who filed an amended petition (ECF No. 13).

evidence demonstrated motive and intent, and provided "necessary background information concerning the relationship between the [petitioner] and the victim, and . . . place[d] the charged conduct in context."  (Tr. 14-15.)

The prosecutor also moved to introduce as evidence of motive and intent that the petitioner solicited her father and one of her customers to kill Rei.  (Tr. 15-17.)  Additionally, the prosecutor sought to introduce evidence that before the murder, the petitioner falsely reported to the police that her gun—the murder weapon—was stolen and that she suspected Pazmino had stolen it.  (Tr. 18-19.)  The prosecutor argued that the evidence was "probative on her possession of the gun, and probative on her premeditation to kill [Rei]."  (Tr. 22.)  Finally, the prosecutor sought to prove that the petitioner admitted to Pazmino that she paid someone $300 to buy narcotics and plant them in Rei's home, and that she intended to call the police and have Rei arrested.  (Tr. 22.)  The prosecutor argued that although the petitioner's plan ultimately failed, it was relevant to show the "acrimonious relationship between the [petitioner] and the victim."  (Tr. 22-23.)

Judge Holder granted all of the prosecution's applications.  He found that testimony regarding the petitioner's threats against Rei was relevant "as background information . . . and to establish motive, intent, [and the] identity of the perpetrator."  (Tr. 712.)  Similarly, he found that the petitioner's solicitations were relevant "to establish intent," and that her effort to frame Rei for drug possession was "probative of [her] state of mind," and demonstrated the "acrimonious relationship" between the petitioner and Rei.  (*Id.*)

The prosecution also sought to introduce evidence—both on its direct case and to cross-examine the petitioner if she testified—that the petitioner threatened Pazmino by taking out her gun and telling Pazmino that "she could shoot her and that no one would find out what she had

done because no one knew that [Pazmino] was down [in Florida] with her." (Tr. 23-24, 31-32.) Additionally, the prosecutor sought to cross-examine the petitioner about her attempt to apply for a credit card in Cepeda's name. (Tr. 30.) Judge Holder granted the additional applications, explaining that the petitioner's threat against Pazmino was relevant as "background information and to explain the nature of the relationship between [them]," and the other evidence was "relevant regarding [the petitioner's] credibility and willingness to place her own self-interests before that of society." (Tr. 713.)

      **b.**    **Jury Selection**

      On the first day of jury selection, Judge Holder described the case to prospective jurors and asked whether any of them would be unable to serve because of business or personal reasons. (Tr. 41-43.) One of the first prospective jurors to respond was a police officer, who stated that his "professional bias" would prevent him from being "impartial toward the [petitioner]." (Tr. 49.) The prospective juror clarified that he knew "as a police officer [that] if [the prosecution is] going this far with the charge, . . . the evidence is pretty [strong]." (Tr. 50.) Although he wanted to give the petitioner "the benefit of the doubt," he did not want to "second guess [him]self and hurt someone else." (Tr. 52.) Judge Holder released him from service, but told the prospective juror that he "really [had] no business being in [the] courtroom" and that he was "not sure" whether the prospective juror "[had] any business being a police officer." (*Id.*) Judge Holder also said that it was "pretty shameful" for a police officer to "walk into [the] courtroom and . . . prejudge [a] case" about which he knew nothing; the judge was "disheartened" by the exchange, and "wonder[ed] about the job [the prospective juror did as a police officer]." (*Id.*) He then addressed the panel to explain that the dismissed juror's statements represented "one of the pitfalls of . . . a criminal justice system"—deciding that

someone is guilty "without any evidence whatsoever or knowing anything about [the] case," and that in his "personal opinion" the officer's words were "sickening."  (Tr. 53.)

Judge Holder also dismissed prospective jurors who raised concerns about their ability to understand English.  (Tr. 48-49, 71-73, 89-90, 104-06, 109-11.)  He told one prospective juror that he would send her to "English lessons for [ten] weeks" (Tr. 73), something he also said to other prospective jurors with similar concerns (Tr. 90, 106, 111).  Although Judge Holder commented that he "[did]n't really believe" two of these jurors, he excused them from service. (Tr. 106, 111.)

The next day, a prospective juror told the judge that she was a student, and missed class the day before because she was "afraid to come [forward]."  (Tr. 183.)  She did not explain why she was afraid.[2]  After Judge Holder excused her, the petitioner's counsel moved for a mistrial and dismissal of the panel, arguing that "many of the jurors [had] been intimidated" by Judge Holder's statements that "he didn't believe what they were saying or [that] the police officer didn't belong in the courtroom."  (Tr. 184.)  She cited the student as an example of "how scared the members of [the] jury [were] to come forward to even say they don't understand the language," which put the petitioner "in a very difficult place."  (*Id.*)  Judge Holder denied the motion, explaining that his statements were "consistent with supporting [the petitioner] and her ability to get a fair trial . . . and were not designed to intimidate anyone."  (Tr. 185-86.)  The petitioner's counsel made the same motion just before opening statements, and Judge Holder denied it.  (Tr. 714.)

---

[2] Judge Holder excused all prospective jurors who were students, asking at one point if there was "[a]ny reason why . . . so many students" did not postpone their service.  (Tr. 44, 58-59, 66, 70-71, 75-76, 78-79, 82, 114.)

### c.      Discovery Requests

After jury selection, the petitioner's lawyer asked the prosecutor for the petitioner's and Rosado's cellphone records, including cell site information, and the petitioner's internet account records.  (Tr. 694-95.)  The prosecutor responded that he was "not even sure" if he had the cellphone records but "[did not] plan on using them" if he did.  (Tr. 695.)  He also said that he gave counsel the relevant cell site information, and "even pointed . . . her [to] the numbers and the corresponding addresses;" he did not know "whether [he was] going to use [the information] or not."  (*Id.*)  The prosecutor did not know if he had received any information from the petitioner's internet provider but did not plan on using it.  (Tr. 695-96.)

Judge Holder ordered the prosecution to turn over the information by the next day.[3]  (Tr. 701-02.)  Counsel acknowledged that the prosecution "delivered a box" with cell site information for New York, which did not "resolve the issue;" she stated that she needed information for Florida.  (Tr. 926-27.)  The prosecutor responded that he did not have that information, and that he "[could]n't get any additional records, although [he] was attempting to do so for [the petitioner]."  (Tr. 927.)  Counsel did not raise the issue again.

## III.     Trial and Sentencing

### a.      The Prosecution's Case

The prosecution called seventeen witnesses at trial and established the following facts:

Mario Rei and Flor Cepeda moved from Venezuela to Queens, New York, in 2000.  (Tr. 865.)  The couple met and befriended the petitioner a year later.  (Tr. 865-67.)  Cepeda and the petitioner saw each other "almost every day" between 2001 and 2005.  (Tr. 867-68.)  The

---

[3] The petitioner argued that the cellphone records and cell site information, and any information recovered from her internet provider was *Brady* material.  (Tr. 694, 696-97, 700.)  Judge Holder was not sure if the information constituted *Brady* material but ordered the prosecution to turn over the materials in any event.  (Tr. 701-02.)

friendship ended when Rei and Cepeda felt "uncomfortable" with the petitioner's constant presence, and started to "push[] her away." (Tr. 870.) The petitioner argued with the couple, and threatened to report them for violating immigration laws. (*Id.*) Fearing deportation, the couple moved to North Carolina. (Tr. 871.)

In 2007, the couple moved to Tampa, Florida, where they rekindled their friendship with the petitioner, who had family and owned property in the area. (Tr. 877.) The petitioner and Rei decided to start a business together, with Rei overseeing the labor and the petitioner managing the financial aspects of the enterprise. (Tr. 881-82.) The petitioner also offered the couple one of her homes if they agreed to pay the mortgage and taxes and give her $1,000 to transfer the title. (Tr. 881-85.) The couple accepted, and moved in three weeks later. (*Id.*)

A month later, Rei and the petitioner opened the Tire Flea Market. (Tr. 885.) Although Rei contributed $5,000 to the partnership, the business was incorporated under the petitioner's name only; she told Rei and Cepeda that "[they] couldn't be part of the corporation because [they] [did]n't have paper[s]." (Tr. 886-87.) The business was initially profitable, but Rei and the petitioner started arguing in early 2008. (Tr. 887-88.) Rei tried to leave the partnership and asked the petitioner to return his $5,000 investment. (Tr. 889.) The petitioner refused, claiming that she did not have the money. (*Id.*) The petitioner forced Rei out of the business in May of 2008; she told the police that Rei was her employee and had stolen money from her. (Tr. 889-90.) Rei and Cepeda stopped talking to the petitioner, and returned to Queens a few months later. (Tr. 897, 971-72.)

In July of 2008, the petitioner told Gioconda Pazmino, her former lover, that Rei and

Cepeda had stopped making mortgage payments on the Tampa house.[4]  (Tr. 893, 971, 1020.)

The petitioner instructed Pazmino to convince Rei and Cepeda to transfer the title back to the

petitioner, and to threaten Cepeda that the petitioner would tell Rei about "the relationship that

they had" if she did not agree.  (Tr. 896, 1015, 1019-21.)  When Pazmino spoke to Rei, he said

that he would not transfer the title until the petitioner returned the $5,000 that she owed him.

(Tr. 894-96, 1020-21.)  Pazmino spoke to Cepeda separately, telling her, as the petitioner

instructed, that the petitioner would tell Rei about their "relationship" if she did not cooperate;

Cepeda refused.  (Tr. 896, 1021.)  When Pazmino told the petitioner what happened, the

petitioner got angry and said that she would kill Rei "because he had ruined the

business, . . . ruined the credit, and . . . had stayed with [Cepeda]."  (Tr. 1021-22.)

The petitioner repeated her threat to kill Rei "five or six times" over the next two

months.[5]  (Tr. 1022, 1065.)  During this time, the petitioner asked her father to kill Rei, telling

him that Rei had "stolen from her" and that "she needed to get rid of him."  (Tr. 1022-23, 1069,

1108-09, 1283-84.)  The petitioner's father agreed, and said that he would also kill anyone with

Rei; the petitioner told him to "forget it."  (*Id.*)  In August of 2008, the petitioner offered a

customer $3,000 to kill Rei; the customer replied that for $3,000, he could only beat him up.  (Tr.

1023-24, 1107, 1113-15, 1284-1285.)  That same month, the petitioner gave an employee $300

---

[4] Cepeda confirmed that she and Rei stopped paying the mortgage after the petitioner made the false
report to the police.  (Tr. 893, 971, 1020.)

[5] Pazmino lived with the petitioner in the petitioner's Tampa home for about three months in 2008, from
June to early September, and worked for the petitioner at the Tire Flea Market.  (Tr. 1017-18, 1025-26,
1062.)  The petitioner asked Pazmino to leave after an argument about one of the petitioner's
employees; Pazmino returned to Queens a few days later.  (Tr. 1025-26, 1066-67, 1280.)

to buy drugs and plant them in Rei and Cepeda's house; the petitioner planned to call the police and report Rei.  (Tr. 1024-25.)  The employee disappeared with the petitioner's money.  (*Id.*)

On October 26, 2008, the petitioner traveled from Tampa to New York with Luis Rosado, an employee at the Tire Flea Market.  (Tr. 1030, 1292-93, 1300.)[6]  They stayed at Pazmino's home in Queens.  (Tr. 1029-30, 1257-58, 1303.)  On their first night there, the petitioner asked Rosado to kill Rei.  (Tr. 1306.)  When Rosado refused, the petitioner threatened his family.  (Tr. 1306-07.)  Rosado did not plan to kill Rei, but said that he would do it to "get her off [his] back." (Tr. 1307-08, 1311, 1395.)  The petitioner returned to Tampa so that she would not be in New York when Rosado killed Rei, but left her gun in Pazmino's closet.  (Tr. 1308-09, 1394-95.) When Rosado told Pazmino why he was still in New York, she asked him to leave.  (Tr. 1035-36, 1282, 1310, 1396.)  Rosado took a train back to Tampa the next day.[7]  (Tr. 1036, 1310-11, 1395.)

The petitioner told Rosado that he had to go back to New York and kill Rei.  (Tr. 1311-12.)  She threatened his family again, and reminded him that he worked for her; she also promised that he could live in her second house—the one that Rei and Cepeda owned—for free.[8] (Tr. 1312-14, 1341, 1350, 1353, 1390-91.)  Rosado was having "financial problems;" he was behind on his rent and facing eviction, and his girlfriend was pregnant and caring for three children.  (Tr. 1313-14, 1353-54.)  Rosado agreed to kill Rei, and on November 11, 2008, he and

---

[6] Rosado subsequently pled guilty to manslaughter and criminal possession of a weapon.  He testified at the petitioner's trial pursuant to a cooperation agreement, and was promised a reduced sentence for truthful testimony.  (Tr. 1343, 1369-70.)

[7] A few days after Rosado left, the petitioner called Pazmino and asked her why she "sent [Rosado] back to Florida without doing what he was going to do."  (Tr. 1275.)  The petitioner told Pazmino that she had left her gun in Pazmino's house, and that she had reported the weapon as lost and told the police that Pazmino had taken it.  (Tr. 1275-76, 1287-88.)

[8] Rosado did not know that Rei and Cepeda owned the petitioner's second home.  (Tr. 1353.)

the petitioner left for New York.  (Tr. 1314, 1317.)  The petitioner called Pazmino the next day, and told her that she needed her gun back; she told Pazmino to give it to Rosado.  (Tr. 1040, 1275.)  Pazmino met Rosado near her apartment, and gave him the gun.  (Tr. 1042, 1102-04, 1266-67, 1322.)

The petitioner and Rosado then drove to the shop where Rei worked.  (Tr. 1324-25.)  Rosado hid behind a bus across the street and waited for Rei.  (Tr. 1325-26, 1370, 1372-73.)  As Rei left the shop, Rosado approached him from behind, and said he wanted to ask him a question.  (Tr. 1327-29, 1372-73.)  When Rei turned, Rosado shot him three times in the chest.  (Tr. 1329-30, 1373.)  Rosado ran back to the car, and he and the petitioner drove back to Florida.  (Tr. 1330-32, 1374.)  Rei died at the hospital.  (Tr. 762.)

When Pazmino saw the news of the shooting, she called the police and reported the petitioner's threats to kill Rei, and that she had given Rosado the murder weapon.  (Tr. 1046, 1073-76, 1088, 1106, 1116-18, 1253-54, 1258-60, 1562-65.)  The police arrested the petitioner and Rosado in Tampa on December 2, 2008.  (Tr. 1149-52, 1154-56, 1193, 1338.)  The next day, the police searched the petitioner's home, and found the gun.[9]  (Tr. 1162, 1165, 1582-84.)

### b.    The Defense's Case

The petitioner called four witnesses, including Yoselin Amarante, the ex-wife of the petitioner's cousin.  (Tr. 1606.)  Amarante testified that the petitioner visited her in Tampa sometime before Thanksgiving in November of 2008, but could not recall whether the petitioner was with her on November 12th, the day that Rei was shot and killed.  (Tr. 1607-08, 1612, 1615-18, 1623.)

---

[9] Ballistics tests later confirmed that the gun found in the petitioner's home was the same one used to shoot and kill Rei.  (Tr. 1446-49.)

### c.      Summation

During his summation, the prosecutor remarked that the petitioner's transfer of properties to and from Cepeda were indicative of "heavy tax evasion." (Tr. 1757.)  The petitioner moved for a mistrial after the summation, arguing that the prosecutor's "statement that [the petitioner] had committed tax fraud" was evidence of an uncharged crime. (Tr. 1767-68.)  Judge Holder denied the motion, explaining that "in light of the charge of murder, the fact of some tax evasion . . . is quite minimal." (Tr. 1769-70.)  The judge also pointed out that the petitioner introduced the records the prosecutor cited in making the argument. (*Id*.)  Judge Holder held that any error was "harmless" and "no basis for a mistrial." (Tr. 1770.)

### d.      Jury Instructions and Verdict

Judge Holder charged the jury on the elements of second-degree murder, criminal possession of a weapon and tampering with physical evidence. (Tr. 1790-98.)  He gave a limiting instruction on the evidence of the petitioner's uncharged criminal conduct, telling the jury that "evidence of [the petitioner's] bad acts and crimes were not offered and must not be considered for the purpose of proving that [she] had a propensity or predisposition to commit the crimes charged." (Tr. 1783.)  He instructed the jury to consider the the prosecutor's summation "allegation of tax evasion or tax fraud" only "as it bears on the significance or insignificance of the depth or lack of depth of the relationship" between the petitioner and Cepeda, and "[n]othing else." (Tr. 1784.)

On June 24, 2014, the jury convicted the petitioner of murder in the second degree (N.Y. Penal Law § 125.25(1)), two counts of criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03(1)(b), (3)) and tampering with physical evidence (N.Y. Penal Law § 215.40(2)). (Tr. 1809, 1822-24.)

### e.   Sentencing

On July 14, 2014, Judge Holder sentenced the petitioner to concurrent terms of twenty-five years to life for the murder, and fifteen years followed by five years of post-release supervision for each of the two weapons possession counts.  (ECF No. 15-14 at 91-92.)  He sentenced the petitioner to an additional, consecutive term of one and a third to four years for tampering with physical evidence.  (*Id.* at 92.)

## PROCEDURAL HISTORY

The petitioner, represented by counsel, appealed her conviction to the Appellate Division, Second Department, in June of 2016.  (ECF No. 15 at 1.)  She claimed that Judge Holder's comments to prospective jurors during *voir dire* deprived her of her right to a fair trial by an impartial jury.  (*Id.* at 35-41.)  She also argued that the judge should not have admitted the evidence of her actions leading up to the murder, including her efforts to recruit someone to murder Rei and her attempt to frame him.  (*Id.* at 41-48.)  She challenged the sufficiency of the evidence (*id.* at 54-62), and maintained that the prosecutor's remarks during summation were unfair, and that her trial lawyer was ineffective for failing to object to those remarks (*id.* at 48-53).  Finally, she claimed that her sentence was excessive.  (*Id.* at 62-64.)

In December of 2016, the petitioner filed a supplemental *pro se* brief in which she made additional complaints about her trial lawyer and about the prosecutor's summation.  (*Id.* at 157, 162-190.)  She also claimed that the prosecutor withheld cellphone and cell site records in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  (ECF No. 15 at 190-96.)

The Appellate Division unanimously affirmed the petitioner's conviction on August 17, 2017.  *People v. Gomez*, 153 A.D.3d 724 (2d Dep't 2017).  The court rejected the petitioner's claim about Judge Holder's remarks during *voir dire*, holding that "[w]hile some of the court's remarks were inappropriate, those remarks [did] not warrant reversal."  *Id.* at 725.  The Appellate

Division also rejected the petitioner's challenge to the sufficiency of the evidence that she

tampered with physical evidence as unpreserved for appellate review, noting that in any event

the evidence "was legally sufficient to establish the [petitioner]'s guilt of that crime beyond a

reasonable doubt." *Id.*

The Appellate Division concluded that the evidence of the petitioner's actions before the

murder was "relevant to establish [her] motive and intent to murder [Rei], and provided

necessary background information on the nature of the relationship between [them]," and that the

trial court "providently exercised its discretion in determining that the probative value of the

evidence outweighed any potential prejudice to the [petitioner]" and "gave a sufficient limiting

instruction regarding the use the jury could make of the evidence." *Id.* The Appellate Division

also rejected the petitioner's claims about the prosecutor's summation, finding that the

challenged remarks were fair comments on the evidence and responsive to defense counsel's

arguments; the court held that "[t]o the extent that some of the . . . other comments were

improper, any error was not so egregious as to have deprived the [petitioner] of a fair trial." *Id.*

at 725-26.

The Appellate Division determined that because the petitioner's ineffective assistance

claim was based in part on matters outside the record, a § 440.10 proceeding was "the

appropriate forum for reviewing the claim in its entirety." *Id.* at 726. Finally, the Appellate

Division found that the remaining claims were without merit. *Id.* The New York Court of

Appeals denied the petitioner's application for leave to appeal on December 28, 2017. *People v.*

*Gomez*, 30 N.Y.3d 1060 (2017).

In her habeas petition, the petitioner renews the arguments she made on direct appeal.[10] (ECF No. 1; ECF No. 13.)

## LEGAL STANDARD

A federal court reviewing a habeas petition cannot "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of [a] federal question and adequate to support the judgment." *Coleman v. Thompso*n, 501 U.S. 722, 729 (1991). This is true whether the state court's decision is based on substantive or procedural state law grounds. *Id.* at 729-30. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits.[11] 28 U.S.C. § 2254(a). A state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *accord Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015). For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme]

---

[10] On January 30, 2020, I granted the petitioner's request for a "stay and abeyance" pending the exhaustion of her state court claims. (ECF No. 8.) On March 20, 2020, the petitioner's counsel represented that there was "no further need for [the petitioner] to exhaust her state court remedies." (ECF No. 10 at 1.)

[11] If the state court does not explain the reasoning for its decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] . . . presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court's decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case.  *Id.* at 412-13.

Further, a petitioner must exhaust her remedies in state court before seeking federal habeas relief by "giv[ing] the state courts an opportunity to act on [her] claims before [s]he presents those claims to a federal court in a habeas petition."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *accord* 28 U.S.C. § 2254(b)(1).  In other words, a petitioner must present "the essential factual and legal premises of [her] federal constitutional claim to the highest state court capable of reviewing it."  *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

### I.     Trial Court's Comments During *Voir Dire*

The petitioner claims that Judge Holder's comments during *voir dire* deprived her of a fair trial by an impartial jury.  (ECF No. 13 at 15.)  According to the petitioner, the court "intimidate[d] jurors from revealing any potential biases they had that would [prevent] them [from] judg[ing] the case impartially."  (*Id.*)  The Appellate Division rejected the petitioner's claim, acknowledging that "[w]hile some of the court's remarks were inappropriate, those remarks do not warrant reversal."  *Gomez*, 153 A.D.3d at 725.

To obtain federal habeas relief based on comments made by a trial court during *voir dire*, "a petitioner must show that the comments not only misstated the law, but also deprived [her] of a fair trial."  *Gomez-Kadawid v. Kirkpatrick*, No. 08-CV-5819, 2011 WL 2581838, at *7

(S.D.N.Y. May 5, 2011) (citing *Sams v. Walker*, 18 F.3d 167, 171 (2d Cir. 1994)); *see also Brown v. Superintendent*, No. 02-CV-4810, 2003 WL 1948803, at *5 (S.D.N.Y. Apr. 23, 2003) (applying standard for determining error in trial court's jury instructions to statements made by the court during *voir dire*).   The trial court's comments must have "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).   Put another way, "[o]nly judicial misconduct that renders the trial so fundamentally unfair as to violate federal due process under the Constitution requires habeas relief." *Salahuddin v. Strack*, No. 97-CV-5789, 1998 WL 812648, at *8 (E.D.N.Y. Aug. 12, 1998) (citing *United States v. Robinson*, 635 F.2d 981, 984 (2d Cir. 1980)).   "[S]pecifically, habeas relief . . . is warranted only if the federal court determines that the alleged improprieties, taken in the context of the total trial, undermined fundamental fairness to the defendant." *Salahuddin*, 1998 WL 812648, at *8 (citing *Daye v. Att'y Gen. of N.Y.*, 712 F.2d 1566, 1572 (2d Cir. 1983)).

During *voir dire*, Judge Holder dismissed a prospective juror who admitted that his "professional bias" as a police officer would prevent him from being "impartial toward the [petitioner]."  (Tr. 49-52.)  Addressing the panel, the judge explained that assuming a person is guilty "without any evidence whatsoever or knowing anything about [the] case" represented "one of the pitfalls of . . . a criminal justice system," and that in his "personal opinion" the dismissed police officer's words were "sickening."  (Tr. 53.)  Judge Holder was, of course, correct that a juror could not simply assume that the petitioner was guilty without any evidence.  To the extent that the judge's statements of his personal opinion were somewhat intemperate, they were "insufficient to establish a constitutional violation." *Gumbs v. Brown*, No. 05-CV-5667, 2010 WL 92775, at *8 (E.D.N.Y. Jan. 4, 2010) (citing *Daye*, 712 F.2d at 1572).

The petitioner argues that Judge Holder "punish[ed]" the juror for his "honest response to questions regarding potential bias," and made it impossible for counsel to get necessary information from other potential jurors. (ECF No. 17 at 3.)  But nothing in the record suggests that other prospective jurors were reluctant to give honest answers.  The petitioner's counsel appealed to the prospective jurors to be candid about whether they could give the petitioner a fair and impartial trial, "even if [they were] afraid to;" counsel encouraged them to share "any feelings that they might have . . . to think [there was] some bias that hadn't come out" that they had "been somewhat intimidated to talk about."  (Tr. 245-46, 248, 253-54, 371.)  None of the prospective jurors raised their hands immediately, and after subsequent questioning, some disclosed lingering scheduling conflicts and language issues.  (Tr. 257-263.)

The petitioner's second challenge is to Judge Holder's comments that "prospective jurors who had limited English proficiency" should attend "mandatory English classes."  (ECF No. 13 at 20.)  These remarks do not appear to have deterred jurors from telling the court about their difficulty with English; after the judge told a prospective juror to attend English classes, three more jurors said that they also had difficulty understanding English.  (Tr. 71-73, 89-90, 104-06, 109-11.)

One juror, a student, said that she was "afraid to come [forward]," although she did not say why.  (Tr. 183.)  The petitioner claims that the juror "made it clear that she was intimidated into not saying that she was a student . . . for fear of repercussion" from the court.  (ECF No. 13 at 20.)  But Judge Holder had previously excused other prospective jurors who were students, and excused this juror as well.  (Tr. 44, 58-59, 66, 70-71, 75-76, 78-79, 82, 114, 183-84.)  Under these circumstances, the Appellate Division's decision that the court's comments during *voir*

*dire* did not warrant reversal was neither contrary to nor an unreasonable application of clearly established law.

## II.     Evidentiary Rulings

The petitioner claims that she was denied a fair trial by "unnecessary and unduly prejudicial testimony that she previously solicited individuals to kill or frame [Rei]."  (ECF No. 1 at 6, 54.)  According to the petitioner, there was already "an extensive amount of testimony regarding [her] business relationship with, and threats aimed at, [Rei], as well as her romantic interest in his wife . . . that provided ample background, motive and intent evidence."  (*Id.* at 54.) The petitioner also contends that Judge Holder "failed to properly balance the extraordinary prejudicial effect of this evidence against its limited additional probative value."  (*Id.*)  The Appellate Division rejected that claim, finding that the challenged evidence was properly admitted because it "was relevant to establish the defendant's motive and intent to murder the victim, and provided necessary background information on the nature of the relationship between [them]."  *Gomez*, 153 A.D.3d at 725.  In addition, the Appellate Division found that the trial court appropriately determined that the probative value of the evidence outweighed any potential prejudice to the petitioner, and then "gave a sufficient limiting instruction regarding the use the jury could make of the evidence."  *Id.*

"[S]tate trial court evidentiary rulings generally are not a basis for habeas relief."  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012); *see also Estelle*, 502 U.S. at 67 (holding that state court evidentiary rulings were "no part of a federal court's review of a state conviction").  That is because a federal habeas court does not "reexamine state-court determinations on state-law questions."  *Estelle*, 502 U.S. at 68; *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law . . . .").  Accordingly, a habeas petitioner must demonstrate that the challenged evidentiary ruling violated her right to due

process under the Fourteenth Amendment.  *Estelle*, 502 U.S. at 67-68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." (citations omitted)).  The Due Process Clause "guarantees the fundamental elements of fairness in a criminal trial."  *Spencer v. State of Tex.*, 385 U.S. 554, 563-64 (1967) (citations omitted).  Therefore, the introduction of evidence, even if it is unfairly prejudicial, "does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."  *Vega v. Portuondo*, 120 F. App'x 380, 382 (2d Cir. 2005) (citing *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998)).

The trial court's evidentiary rulings did not violate the petitioner's due process rights. "[T]o establish that an erroneous application of state rules of evidence violates the federal guarantee of due process," a petitioner must "demonstrate that the state court's erroneous conclusions about New York evidence law were so egregious as to implicate the Fourteenth Amendment's guarantee of due process," as established by Supreme Court precedent.  *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013).  Under New York law, "[e]vidence of a defendant's prior bad acts may be admissible when it is relevant to a material issue in the case other than [the] defendant's criminal propensity."  *People v. Dorm*, 12 N.Y.3d 16, 19 (2009).  Judge Holder determined that the petitioner's threats to Rei were relevant "as background information . . . and to establish motive, intent, [and the] identity of the perpetrator."  (Tr. 712.)  He determined that the petitioner's attempts to convince her father and a customer to kill Rei were relevant "to establish intent," that evidence about her attempt to frame Rei for drug possession was "probative of [her] state of mind" and "show[ed] the acrimonious relationship between [her] and the victim," and that the petitioner's threat to shoot Pazmino was relevant as "background information to explain the nature of the relationship between [them]."  (Tr. 712-13.)

In his final instructions, Judge Holder explained that "evidence of [the petitioner's] bad acts and crimes were not offered and must not be considered for the purpose of proving that [she] had a propensity or predisposition to commit the crimes charged." (Tr. 1783.)  He instructed the jury to consider the petitioner's threats to kill Rei only as evidence of the "motive, intent and identity of the perpetrator," and that evidence that she tried to get others to murder Rei was "offered for . . . the question of intent." (*Id.*)  Judge Holder also explained that evidence of the petitioner's attempt to frame Rei was "offered for . . . the question of [her] state of mind and the relationship between [the petitioner and Rei]." (*Id.*)  Similarly, evidence of the petitioner's threat to Pazmino was "offered as background information and to explain the nature of the relationship between [them]." (Tr. 1783-84.)  The jury is presumed to have followed these instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

The trial court's evidentiary rulings, affirmed on appeal, were reasonable, and did not deprive the petitioner of a fundamentally fair trial.  The evidence was relevant to issues at trial, and the trial court took steps to ameliorate the risk of unfair prejudice.

## III.  Prosecutorial Misconduct

The petitioner claims that the prosecutor made "inflammatory remarks" during summation. (ECF No. 13 at 21.)  The Appellate Division rejected this argument, concluding that "most of the challenged remarks constituted a fair response to arguments made by defense counsel during summation, or constituted fair comment on the evidence, and did not denigrate the defense." *Gomez*, 153 A.D.3d at 725.

Like claims of judicial misconduct, a prosecutor's comments in summation warrant habeas relief only if the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Smith v. Greiner*, 117 F. App'x

779, 781 (2d Cir. 2004) ("[T]he standard for evaluating whether prosecutorial misconduct constitutes constitutional error is whether the 'remarks were so prejudicial that they rendered the trial in question fundamentally unfair.'" (quoting *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990))).  "A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)); *accord Festus v. Noeth*, No. 17-CV-3941, 2020 WL 7042666, at *18 (E.D.N.Y. Nov. 30, 2020).  A federal court must consider "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *United States v. Elias*, 285 F.3d 183, 190-92 (2d Cir. 2002) (citing *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999)); *accord Joseph v. Superintendent*, No. 18-CV-1877, 2020 WL 5645196, at *7 (E.D.N.Y. Sept. 22, 2020).

In her brief to the Appellate Division, the petitioner argued that the prosecutor "improperly accused [her] of tax fraud," and that the trial court's curative instruction was "buried in its final charge and insufficient to alleviate the harm caused by the prosecutor's remarks." (ECF No. 15 at 48.)  The Appellate Division found that the state trial court "properly sustained the [petitioner]'s objections to certain improper comments and corrected any possible prejudice by issuing curative instructions;" to the extent that the prosecutor's comments were improper, "any error was not so egregious as to have deprived [her] of a fair trial." *Gomez*, 153 A.D.3d at 725-26.  Although the petitioner argues that the Appellate Division's conclusion was "not supported by the record" (ECF No. 1 at 51), the trial transcript shows that Judge Holder clearly instructed the jury to consider the "allegation of tax evasion or tax fraud" only "as it bears on the significance or insignificance or lack of depth of the relationship" between the petitioner and Cepeda, and "[n]othing else" (Tr. 1784).  This was sufficient.

21

The petitioner also contends that the prosecutor "mischaracteriz[ed]" the evidence about the kind of car the perpetrator drove.[12]  (ECF No. 1 at 46-47.)  The petitioner's lawyer did not object to the challenged comments.  A federal court should consider the "absence of contemporaneous objections or requests for cautionary instructions" in response to the challenged remarks.  *Rao v. Artuz*, No. 97-2703, 1999 WL 980947, at *3 (2d Cir. Oct. 22, 1999) (quoting *Malley v. Manson*, 547 F.2d 25, 28 (2d Cir. 1976)).  Because counsel registered no objection, Judge Holder cannot be faulted for failing to give a curative instruction.  Finally, none of the challenged remarks materially affected the outcome of the case.  The evidence against the petitioner—including her motive, preparation and execution of the murder—was strong.  Accordingly, the Appellate Division's decision to reject the petitioner's claim of prosecutorial misconduct was neither contrary to nor an unreasonable application of clearly established law.

## IV.    Ineffective Assistance of Counsel

The petitioner claims that her trial lawyers were ineffective because of their presentation of a flawed alibi defense.  (ECF No. 1 at 52-53.)  The Appellate Division determined that a § 440.10 proceeding was "the appropriate forum for reviewing the claim in its entirety," as the claim could not be resolved without reference to matters outside the record.  *Gomez*, 153 A.D.3d at 725.  In January of 2020, I granted the petitioner's request for a "stay and abeyance" of her petition, pending the exhaustion of her state court claims in a § 440.10 proceeding.  (ECF No. 8.)  However, no such proceeding has commenced.  (ECF No. 10 at 1.)

---

[12] The petitioner's trial lawyer argued in summation that Pazmino and Rosado killed Rei, and that they drove a silver car.  (Tr. 1690-91.)  The prosecutor responded that counsel "want[ed] [the jury] to believe that Gioconda Pazmino said she had a gray car or silver car which she drove to the scene [of the shooting]" but that it was "absolutely not in the record and does not exist" and that "there's no such testimony of such a thing happening."  (Tr. 1747.)

A district court "would abuse its discretion" if it were to grant a stay for unexhausted claims that are "plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 278 (2005). However, even if a "stay and abeyance is inappropriate," a district court reviewing a habeas petition that includes both exhausted and unexhausted claims "should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." *Id.* Here, if the petitioner did not delete her unexhausted claim and have the Court review the balance of her petition, the petition would have to be dismissed. *See Johnson v. Kirkpatrick*, No. 11-CV-1089, 2011 WL 3328643, at *14 (S.D.N.Y. Aug. 3, 2011) (assuming the petitioner would "prefer his unexhausted claims deleted and other claims reviewed" and proceeding accordingly, and collecting cases). The petitioner's counsel believes that "there is no further need for [the petitioner] to exhaust her state court remedies," and that her unexhausted claims "should not preclude" consideration of her current habeas petition. (ECF No. 10 at 1-2.) Accordingly, I assume that the petitioner would prefer I delete her unexhausted ineffective assistance of counsel claim, and review her other claims.

## V.   *Brady* Violations

The petitioner claims that the prosecutor's failure to turn over cellphone records, including cell site information, and material from the petitioner's internet provider constituted a violation of *Brady v. Maryland*. (ECF No. 1 at 52-53.) The petitioner first raised this claim in a supplemental *pro se* brief to the Appellate Division. (ECF No. 15 at 190.) The State responded that "once it was clear that the prosecutor had turned over all *Brady* material, and that the documents at issue did not constitute *Brady* material, [the petitioner] abandoned the claim." (ECF No. 15-1 at 38.) The State also argued that the petitioner "offer[ed] no factual support for her claim that the records would have been exculpatory," and "could have subpoenaed the

23

records herself." (*Id.* at 41.)  The Appellate Division agreed, rejecting the petitioner's claim as "without merit."  *Gomez*, 153 A.D.3d at 726.

Under *Brady*, the prosecution must disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'"  *United States v. Bagley*, 473 U.S. 667, 667 (1985) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  To establish a *Brady* violation, a petitioner "must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice."  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)) (internal quotation marks omitted).  Reversal is required "if there is a 'reasonable probability' that disclosure would have changed the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  *Kirk Tang Yuk*, 885 F.3d at 86 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)).

There is no merit to the petitioner's claim.  During the trial, counsel requested certain cellphone records.  The prosecutor responded that he was "not even sure" if he had them but "[did not] plan on using them" if he did.  (Tr. 695.)  The prosecutor also said that he gave the petitioner the relevant cell site information and "even pointed . . . her [to] the numbers and corresponding addresses;" he did not know "whether [he was] going to use [the information] or not."  (*Id.*)  Similarly, the prosecutor did not know if he had received any information from the petitioner's internet provider, but did not plan on using it.  (Tr. 695-96.)  Judge Holder directed the prosecution to provide the information by the next day.  (Tr. 701-02.)  Nothing in the record suggests that the prosecutor did not comply with the judge's order, let alone that the records

contained exculpatory information.[13]  "[T]he mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief."  *Mallet v. Miller*, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006); *accord Scott v. Griffin*, No. 10-CV-5989, 2018 WL 4298342, at *12 (E.D.N.Y. Apr. 2, 2018); *see also United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (holding that "undisclosed impeachment evidence is not material in the *Brady* sense when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972))).  Significantly, counsel never raised the issue again, nor sought the court's assistance in obtaining the records.

## VI.   Sufficiency of the Evidence

Finally, the petitioner challenges the sufficiency of the evidence that she tampered with physical evidence.  (ECF No. 13 at 21.)  The Appellate Division rejected the claim because it was unpreserved for review; even if it were preserved, "viewing the evidence in the light most favorable to the prosecution," the evidence was sufficient.  *Gomez*, 153 A.D.3d at 725.

A sufficiency of the evidence claim faces a "high bar" in federal habeas proceedings because it is subject to "two layers of judicial deference;" not only does the state fact finder have broad discretion to decide the case, but a state court's decision on a sufficiency of the evidence challenge should not be overturned unless it is "objectively unreasonable."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).  Evidence is legally sufficient if "after viewing the evidence in the light most favorable to the prosecution, *any*

---

[13] The petitioner acknowledged that the prosecutor "delivered a box" that contained cell site information for New York, and argued that she needed information for Florida.  (Tr. 926-27.)  The prosecutor stated that he did not have that information, and that he "[could]n't get any additional records, although [he] was attempting to do so for [the petitioner]."  (Tr. 927.)

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citations omitted).

Under New York law, a person is guilty of tampering with physical evidence when, "[b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, [s]he suppresses it by any act of concealment, alteration or destruction, or by employing force, intimidation or deception against any person." N.Y. Penal Law § 215.40(2). The evidence at trial established that before the murder, the petitioner falsely reported that her gun—which was the murder weapon—was stolen; the police found the gun hidden in her closet. (Tr. 1287-88, 1446-49.) The jury was entitled to conclude from this evidence that the petitioner tampered with physical evidence. Accordingly, the petitioner has not demonstrated that the Appellate Division's decision to uphold her conviction was objectively unreasonable.

**CONCLUSION**

Accordingly, the petition for a writ of habeas corpus is denied in its entirety.  The claim

for ineffective assistance of counsel is deleted from the petition.  The case is dismissed.  A

certificate of appealability will not be issued.  *See* 28 U.S.C. § 2253(c).

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, NY
         October 25, 2021

27